MAYER, BROWN, ROWE & MAW LLP
LEE H. RUBIN (SBN 141331)
SHIRISH GUPTA (SBN 205584)
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
lrubin@mayerbrownrowe.com
sgupta@mayerbrownrowe.com

Attorneys for Defendant TD Ameritrade, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA—SAN FRANCISCO DIVISION

| | |
|---|---|
| MATTHEW ELVEY, an individual, and GADGETWIZ, INC., an Arizona corporation, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>TD AMERITRADE, INC., a New York corporation, and DOES 1 to 100,<br><br>Defendants. | Case No. C 07 2852 MJJ<br><br>MOTION TO DISMISS FIRST AMENDED COMPLAINT<br><br>Judge: Martin J. Jenkins<br><br>Date: Tuesday, August 28, 2007<br>Time: 9:30 a.m.<br>Loc: Courtroom 11, 19th Floor |

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I.      STANDARD FOR A MOTION TO DISMISS ................................................... 4

II.     APPLICATION OF NEBRASKA LAW FORECLOSES CALIFORNIA STATE LAW CLAIMS ..................................................................................................... 4

III.    FEDERAL LAW PREEMPTS PLAINTIFFS' STATE LAW CLAIMS ......................... 6

IV.     FAILURE TO STATE A CLAIM UNDER THE CLRA, CAL. CIV. CODE § 1770............................................................................................................................ 8

        A.      Plaintiffs lack standing under Cal. Civ. Code § 1770............................................ 9

        B.      Plaintiffs have not alleged conduct that constitutes a violation of the CLRA ........................................................................................................ 11

V.      FAILURE TO STATE A CLAIM UNDER THE UCL, CAL. BUS. & PROF. CODE § 17200............................................................................................................. 13

        A.      Plaintiffs lack standing under Cal. Bus. & Prof. Code § 17200 ......................... 13

        B.      Plaintiffs have not alleged conduct that constitutes a violation of the UCL........ 15

        C.      Because Plaintiffs' claims are based in part on securities transactions, the UCL does not apply ................................................................................. 15

VI.     FAILURE TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY ................ 16

VII.    FAILURE TO STATE A CLAIM FOR VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 ............................................................ 18

VIII.   FAILURE TO STATE A CLAIM FOR VIOLATION OF THE CAN SPAM ACT, 15 U.S.C. § 7704(A)(1)........................................................................................... 20

        A.      Plaintiffs lack standing under 15 U.S.C. § 7704(a)(1)............................................ 20

        B.      TD AMERITRADE's alleged conduct does not fall within the meaning of 15 U.S.C. § 7704(a)(1)........................................................................................ 23

CONCLUSION.............................................................................................................................. 24

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. C:06-CV-03468 SI

TABLE OF AUTHORITIES

Page

**CASES**

*America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1 (2001)............................................. 6

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1988) ................................................ 4

*Bardin v. Diamlerchrysler Corp.*, 136 Cal. App. 4th 1255 (2006)............................................ 12

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (May 21, 2007)................................................. 4

*Bowen v. Ziasun Tech., Inc.*, 116 Cal. App. 4th 777 (2004) ...................................................... 15

*Butera & Andrews v. IBM*, 456 F.Supp. 2d 104 (D.D.C. 2006) ........................................... 19, 20

*Chavez v. Blue Sky Natural Beverage Co.*, No. C-06-6609, 2007 WL 1691249
(N.D. Cal. June 11, 2007) .................................................................................................. 10

*Continental Airlines, Inc. v. Mundo Travel Corp.*, 412 F.Supp. 2d 1059 (E.D. Cal.
2006) ................................................................................................................................... 5

*Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005) ........................... 8

*Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824 (2006) ........................ 12

*DeSciose v. Chiles, Heider & Co.*, 239 Neb. 195 (1991) ..................................................... 16, 17

*Dietrich v. Bouer*, 76 F. Supp. 2d 312 (S.D.N.Y. 1999)........................................................... 15

*Epstein v. Wash. Energy Co.*, 83 F.3d 1136 (9th Cir.1996)......................................................... 4

*Fate v. Covenant Care*, No. RG03-087211, 2005 WL 4932974 (Cal. Super. Ct.
Sept. 27, 2005) ................................................................................................................... 14

*Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th  997 (2006)............................ 8

*Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043 (N.D. Cal. 2002
(same), *aff'd*, 353 F.3d 765 (9th Cir. 2003) ......................................................................... 7

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ................................................................ 8

*Gordon v. Virtumondo, Inc.*, No. 06-0204, 2007 WL 1495395 (W.D. Wash. May
15, 2007) ....................................................................................................................... 21, 22

*Hypertouch, Inc. v. Kennedy-Western University*, No. C 04-05203, 2006 WL
648688 (N.D. Cal. 2006)............................................................................................... 22, 23

*Kagan v. Gibraltar Savings and Loan Assoc.*, 35 Cal. 3d 582 (1984) ...................................... 10

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006)......................................................................... 1

*Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F. Supp. 2d 842 (N.D. Cal.
2000) ............................................................................................................................... 5, 6

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503 (2006) .......................... 7

*Meyer v. Sprint Spectrum L.P.*, 59 Cal. Rptr. 3d 309 (2007).................................... 10, 11, 14

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ...................................................................... 4

*Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992) .......................................... 5, 16

*Perera v. Chiron Corp.*, No. C-95-20725 SW, 1996 WL 251936 (N.D. Cal. May
8, 1996) ............................................................................................................................. 15

*Petersen v. Securities Settlement Corp.*, 226 Cal. App. 3d 1445 (1991) ................................... 18

-ii-

TABLE OF AUTHORITIES
(continued)

Page

*Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530 (9th Cir. 1984)....................................... 4

*Rowinski v. Solomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005) ...................................... 7

*SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780 (9th Cir. 1996)............................................................................................................................................ 4

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F.Supp2d 526 (M.D. Pa. 2006) .................. 16

*Twomey v. Mitchum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690 (1968)........................... 17

*U.S. v. Impulse Media*, No. CV05-1285RSL, 2007 WL 1725560 (W.D. Wash. June 8, 2007)...................................................................................................................................... 24

*U.S. v. Phillips*, 477 F.3d 215 (5th Cir. 2007) ............................................................................ 19

*Williams v. Gerber Products Co.*, 439 F.Supp. 2d 1112 (S.D. Cal. 2006) ..................... 11, 12, 15

**STATUTES**

15 U.S.C. §§ 77p(b) ............................................................................................................ 6, 7, 8

15 U.S.C. §§ 77r(b) ...................................................................................................................... 8

15 U.S.C. §§ 78bb ............................................................................................................... 6, 7, 8

15 U.S.C. § 7702 ......................................................................................................................... 23

15 U.S.C. § 7704(a)(1) .......................................................................................................... 20, 23

15 U.S.C. § 7706(g) ............................................................................................................... 20, 24

18 U.S.C. § 1030 .................................................................................................................... 18, 19

47 U.S.C. § 231(e)(4) .................................................................................................................. 20

Cal. Bus. & Prof. Code § 17200 ......................................................................................... 11, 13, 15

Cal. Bus. & Prof. Code § 17204 ................................................................................................. 14

Cal. Civ. Code § 1750 ............................................................................................................. 11, 12

Cal. Civ. Code § 1751 ................................................................................................................... 6

Cal. Civ. Code § 1770 ......................................................................................................... 8, 9, 11

Cal. Civ. Code § 1780(a) .............................................................................................................. 9

Cal. Civ. Code § 1798.82(e) ............................................................................................. 3, 12, 13

Fed. R. Civ. P. 12(b) ..................................................................................................................... 4

Nebraska Rev. St. § 59-1602 ........................................................................................................ 5

**OTHER AUTHORITIES**

American Heritage Dictionary (4th ed. 2004) ........................................................................... 23

Black's Law Dictionary 62 (6th ed. 1990)................................................................................. 17

Petition for Commission Action to Protect the Investing Public from Unlawful and Deceptive Securities Promotions (Apr. 24, 2006), http://sec.gov/rules/petitions/petn4-519.pdf .......................................................................... 8

SEC Suspends Trading Of 35 Companies Touted In Spam Email Campaign (Mar. 8, 2007), http://sec.gov/news/press/2007/2007-34.htm .......................................................... 8

iii

1    TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

2    PLEASE TAKE NOTICE that on Tuesday, August 28, 2007 at 9:30 a.m., or as soon

3    thereafter as the matter may be heard, Defendant TD Ameritrade, Inc. ("TD AMERITRADE")

4    shall move this Court pursuant to Fed. R. Civ. P. 12(b) to dismiss Plaintiffs' First Amended

5    Complaint filed on June 28, 2007 on the ground that all counts fail to state a claim upon which

6    relief can be granted.

7    TD AMERITRADE's motion to dismiss is supported by the following Memorandum of

8    Points and Authorities, the Request for Judicial Notice, the [Proposed] Order, and any argument

9    that may be heard by the Court.

10    <u>ISSUES TO BE DECIDED (Civil L.R. 7-4(a)(3))</u>

11    1.    Whether Plaintiffs have adequately pled a claim for violation of the California

12    Consumer Legal Remedies Act ("CLRA") (Count I).

13    2.    Whether Plaintiffs have adequately pled a claim for violation of the California

14    Unfair Competition Law ("UCL") (Count II).

15    3.    Whether the federal securities law and the choice-of-law provision in Plaintiffs'

16    Client Agreement with TD AMERITRADE foreclose Plaintiffs' CLRA and UCL claims.

17    4.    Whether Plaintiffs have adequately pled a claim for breach of fiduciary duty

18    (Count III).

19    5.    Whether Plaintiffs have adequately pled a claim for violation of the Computer

20    Fraud and Abuse Act ("CFAA") (Count IV).

21    6.    Whether Plaintiffs have adequately pled a claim for violation of the CAN SPAM

22    Act (Count V).

23

24

25

26

27

28

-1-

# INTRODUCTION

In their First Amended Complaint ("FAC"), Plaintiffs allege that they supplied TD AMERITRADE, Inc. ("TD AMERITRADE") with unique e-mail addresses that were never disclosed to any other person, and that they received spam at those e-mail addresses.[1]  It is on this basis that Plaintiffs claim that TD AMERITRADE has violated state and federal law by disclosing Plaintiffs' and other TD AMERITRADE customers' e-mail addresses, which ended up in the hands of spammers.  Although Plaintiffs alternatively allege that this disclosure was inadvertent or intentional, the crux of their claim is that TD AMERITRADE made false representations to Plaintiffs (largely through TD AMERITRADE's Privacy Statement[2]) and breached a claimed fiduciary duty to Plaintiffs by not informing them of the suspected misappropriation by a third party of their e-mail addresses and by not warning them of the dangers of purchasing the stock being touted in the spam.

The FAC reveals that this is not a case that arose as a result of a harm, but rather a case where plaintiffs manufactured a "harm" for the sole purpose of bringing suit.  Indeed, the FAC makes clear that Elvey waited more than seven months after he began receiving spam to file this action and during that time he continued to have an account at TD AMERITRADE and collected spam e-mail with which to pursue this litigation.  Although Plaintiffs have had ample time to plan this lawsuit, they have nevertheless failed to state a cognizable claim.  Accordingly, their case should be dismissed.

---

[1] To be specific, Plaintiff Gadgetwiz.com, Inc. (Gadgetwiz) alleges that one of its users supplied TD AMERITRADE with unique email addresses.  FAC ¶ 27.  Though this Motion to Dismiss refers throughout to "Plaintiffs," Gadgetwiz does not actually bring any counts.  Each count specifies that it is brought by "Elvey, on his own behalf and on behalf of other California Resident Class members."  FAC ¶¶ 63, 68, 76, 89, 95.  Furthermore, Gadgetwiz has no basis to bring any claim under California law because it has not alleged that it has any connection with California and is not a California resident.  FAC ¶ 6.  In any event, Gadgetwiz *could not* bring any of the five counts in the FAC for reasons discussed herein.

[2] The Privacy Statement is incorporated by reference into recent versions of the TD AMERITRADE Client Agreement, including those versions at all times relevant to the allegations in the FAC.   The Client Agreement and incorporated Privacy Statement (attached to this motion as Attachment A) may properly be considered by this Court in deciding this motion.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (holding that documents cited in but not attached to a complaint may be considered on a motion to dismiss).

Plaintiffs allegations fall into three categories.  First, as described above, they allege that the unauthorized use of e-mail addresses by spammers causes TD AMERITRADE's Privacy Statement to be false and triggers a duty to make remedial disclosures.  Plaintiffs base these claims on the California Consumer Legal Remedies Act ("CLRA") (Count I), the California Unfair Competition Law ("UCL") (Count II) and common law governing fiduciary duty (Count III).  Second, Plaintiffs allege that unauthorized intrusions into TD AMERITRADE's computers somehow constitute violations of the Computer Fraud and Abuse Act ("CFAA") by TD AMERITRADE (Count IV).  Finally, Plaintiffs allege that TD AMERITRADE should be held liable under the CAN SPAM Act for spam e-mail sent by unknown spammers without authorization (Count V).

Plaintiffs' CLRA and UCL claims are foreclosed by federal securities law and by the choice-of-law provision in Plaintiffs' Client Agreement with TD AMERITRADE—which provides that Nebraska law shall govern any dispute.   California courts have specifically held that the UCL does not apply to securities transactions.  Moreover, Plaintiffs have not alleged— and cannot allege—any damage sufficient to give them standing to bring these state law claims or to recover monetary damages.  Plaintiffs also fail to allege the basis for their claim that the statements in the Privacy Statement are false or misleading.  The Privacy Statement indicates that TD AMERITRADE will not deliberately disclose customer personal information to unauthorized third parties, and has made a "significant investment in leading-edge security software, systems, and procedures to . . . protect your personal, financial and trading information."   But, it does not contain any false or misleading statements as contemplated by the CLRA or UCL.  Most significantly, the Privacy Statement explicitly warns customers that even though TD AMERITRADE has made this investment in security, "no security system is absolutely impenetrable."  The representations in the Privacy Statement are not rendered false or misleading by the FAC's allegation that unauthorized persons obtained customer email addresses from TD AMERITRADE.  Moreover, the mere fact that e-mail addresses ended up in the possession of spammers cannot reasonably support the conclusory allegation that TD AMERITRADE intentionally provided the information to unauthorized persons.

-2-

Furthermore, California law imposes no requirement that a company give notice to customers where there has been an unauthorized acquisition by a third party of customer e-mail addresses. See Cal. Civ. Code § 1798.82(e) (excluding e-mail address from the definition of "personal information" the acquisition of which by security breach requires disclosure). While the known improper acquisition of personal customer information (such as social security numbers) does give rise to a duty to disclose, the FAC only offers unsupported speculation and conjecture—not facts—in claiming that this kind of information may have been acquired as well.

Plaintiffs' efforts to bring suit under a common law claim for breach of fiduciary duty are equally unavailing. Plaintiffs have failed to allege any relationship with TD AMERITRADE that would give rise to a duty to disclose to them the alleged unauthorized acquisition of customer email information (or a duty to warn customers about the risks of stock spam). Here, the FAC wholly fails to allege that TD AMERITRADE exerted controlling influence over Plaintiffs' or any other customer's investment decisions—an essential element to a breach of fiduciary duty claim in the broker/client setting. Furthermore, TD AMERITRADE's Privacy Statement already disclosed the risk that third parties may obtain personal information.

The CFAA claim also must be dismissed because the statute protects the owner of the computer (TD AMERITRADE, in this case) from unauthorized intrusions by third parties. If the access was not authorized, TD AMERITRADE could not be held liable to anyone else for the unauthorized intrusion by third parties (including its own employees) into its computer. And if the access was authorized, there would be no violation of the CFAA.

Finally, the CAN SPAM Act claim must be dismissed because plaintiffs are not the type of Internet service providers who have standing to bring such a claim. Furthermore, they did not suffer the type of adverse effect necessary to support standing (a commercial service being inundated with spam to the point where its servers' performance is affected). Only the spammer who initiates the message or a party who induces the spammer to send a spam e-mail message on its behalf can be liable under the CAN SPAM Act. Plaintiffs have not alleged, and in good faith cannot allege, that TD AMERITRADE sent the spam messages or induced anyone else to do so on its behalf.

If spammers gained access through TD AMERITRADE to e-mail addresses of some customers, TD AMERITRADE is the target of the theft, not the culprit. All of Plaintiffs' claims should be dismissed with prejudice.

<u>**ARGUMENT**</u>

**I.      <u>STANDARD FOR A MOTION TO DISMISS</u>**

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is proper when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. See *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 782 (9th Cir. 1996); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). In order for a complaint to survive a motion to dismiss pursuant to Rule 12(b)(6), "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 125 S.Ct. 1955, 1964-65 (May 21, 2007) (internal citations omitted). Indeed, "[c]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). Here, even accepting all of Plaintiffs' non-conclusory factual allegations as true, they have utterly failed to allege sufficient facts to state a cognizable claim.

**II.     <u>APPLICATION OF NEBRASKA LAW FORECLOSES CALIFORNIA STATE LAW CLAIMS</u>**

Plaintiffs' claims are based on their status as "accountholders" at TD AMERITRADE. Accordingly, their claims are subject to the Client Agreement that TD AMERITRADE enters into with all of its accountholders. That Client Agreement contains a clear and unambiguous provision applying Nebraska law to all claims arising out of the client relationship. According to the choice-of-law provision, the "Agreement will be governed by the laws of the State of Nebraska." Attachment A, Sec. 13(k). The Client Agreement here incorporates the Privacy Statement by reference, so all claims arising from or related to the Privacy Statement must be brought under Nebraska law. Attachment A, Sec. 5(a).

-4-

1   The California Supreme Court has explained that "a valid choice-of-law clause, which

2   provides that a specified body of law 'governs' the 'agreement' between the parties,

3   *encompasses all causes of action arising from or related to that agreement, regardless of how*

4   *they are characterized*, including tortious breaches of duties emanating from the agreement or

5   the legal relationship it creates." *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 470

6   (Cal. 1992) (emphasis added). In *Nedlloyd*, the California Supreme Court found that the

7   "governed by" language foreclosed a breach of fiduciary duty claim even though plaintiffs

8   contended it was independent of the agreement. *Id.* at 469, 471. See also *Continental Airlines,*

9   *Inc. v. Mundo Travel Corp.*, 412 F.Supp. 2d 1059, 1065, 1070 (E.D. Cal. 2006) (finding similar

10  choice-of-law provision broad enough to cover all causes of action, including a UCL claim).

11      To determine whether a choice-of-law provision applies under California law, courts will

12  look to "(1) whether the chosen state has a substantial relationship to the parties or their

13  transaction, or (2) whether there is any other reasonable basis for the parties' choice of law."

14  *Nedlloyd*, 3 Cal. 4th at 466. Only one of these two provisions need be met. *Id.* As Plaintiffs

15  note, TD AMERITRADE "maintains its headquarters" in Omaha, Nebraska (FAC ¶7 ), so the

16  first condition is met. *See* 3 Cal. 4th at 468 ("If one of the parties resides in the chosen state, the

17  parties have a reasonable basis for their choice." (internal quotation marks omitted)).

18      Courts have repeatedly held that a choice-of-law provision applying another state's law

19  will foreclose a claim under the UCL. In *Medimatch, Inc. v. Lucent Technologies, Inc.*, 120 F.

20  Supp. 2d 842 (N.D. Cal. 2000), this court barred a claim under the UCL because the parties had

21  agreed to apply New Jersey law. *See also Continental Airlines*, 412 F.Supp. at 1070 ("A valid

22  choice-of-law provision selecting another state's law is grounds to dismiss a claim under

23  California's UCL.").

24      Once it is established that either test is met, courts will next inquire "whether the chosen

25  state's law is contrary to a fundamental policy of California." *Nedlloyd*, 3 Cal. 4th at 466.

26  Nebraska has a provision in its Consumer Protection Act that is virtually identical to the UCL.

27  *See* Nebraska Rev. St. § 59-1602 ("Unfair methods of competition and unfair or deceptive acts or

28  practices in the conduct of any trade or commerce shall be unlawful."). There is no material

-5-

difference between the two statutory provisions and thus a decision not to apply California law would not in any manner violate the state's public policy. Thus, the UCL claim should be barred by the choice-of-law provision contained in the Client Agreement.

The CLRA claim should also be dismissed on this basis, notwithstanding the fact that Nebraska's consumer protection provisions may not be entirely coextensive with the CLRA. In *Medimatch*, this Court rejected plaintiff's position that the court should apply California law if it finds that the plaintiffs had no remedy under New Jersey law. "Plaintiffs' position is clearly untenable, and defendants correctly label it a 'heads I win, tails you lose' argument." *Medimatch*, 120 F.Supp. 2d at 861. This Court laid out the following standard, "The mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law." *Id.* at 862.

Defendant acknowledges that some courts have taken a narrower view than the *Medimatch* court, and found the CLRA not foreclosed by a choice-of-law clause due to its anti-waiver provision and its significantly broad level of protection. *See America Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 15 (Cal. Ct. App. 1st Dist. 2001) (rejecting the choice of Virginia law due to the anti-waiver provision of Cal. Civ. Code § 1751 and the fact that "Virginia's law provides significantly less consumer protection to its citizens than California law provides for our own, primarily because Virginia does not permit class actions"). But even if this Court were inclined to adopt this stricter view and were to conclude that Plaintiffs' CLRA claim should not be foreclosed by choice of law, it must still find Plaintiffs' UCL claim foreclosed because the UCL does not contain an anti-waiver clause and Nebraska law is not contrary to any public policy of California.

## III.    FEDERAL LAW PREEMPTS PLAINTIFFS' STATE LAW CLAIMS.

To prevent plaintiffs from circumventing the stringent requirements for pleading and proving a federal securities fraud class action, the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") preempts state law class action suits that allege securities fraud. In particular, SLUSA forbids (1) a "covered class action"; (2) based on state law; (3) by a private party; (4)

-6-

1    that alleges the defendant made an untrue statement, misrepresentation, or omission of material

2    fact or used a manipulative or deceptive device or contrivance; (5) "in connection with the

3    purchase or sale"; (6) of a "covered security."  15 U.S.C. §§ 77p(b), 78bb(f)(1).  Plaintiffs' state-

4    law CLRA, UCL, and fiduciary duty claims fall squarely within SLUSA preemptive scope.

5         Since Plaintiffs seek damages on behalf of more than 50 prospective class members and

6    on behalf of themselves and other named parties, they allege a "covered class action."  FAC ¶¶

7    51-54; 15 U.S.C. §§ 77p(f)(2)(A)(i), 78bb(f)(5)(B)(i).  Plaintiffs' CLRA, UCL, and fiduciary

8    duty claims plainly are based on "the statutory or common law of [a] State."  FAC ¶¶ 60-61, 66,

9    73-74; 15 U.S.C. §§ 77p(b), 78bb(f)(1).  And there is no doubt that each Plaintiff is a "private

10   party."  FAC ¶¶ 5-6; 15 U.S.C. §§ 77p(b), 78bb(f)(1).

11        The FAC is based on Plaintiffs' receipt of unsolicited commercial email touting stocks

12   (see, *e.g.*, FAC ¶¶ 1,18-20, 23-24, 27, 31) and is replete with  allegations that  TD

13   AMERITRADE made untrue statements, misrepresentations, and omissions of material facts.

14   FAC ¶¶ 38-40, 60-61, 65, 73-74 (alleging "false," "misleading," and "deceptive" statements and

15   a "failure to disclose" allegedly material facts).  The FAC likewise plainly alleges fraud "in

16   connection with" security purchases or sales, as it alleges in support of each of its state-law

17   claims that TD AMERITRADE "fail[ed] to disclose to California Resident Class members who

18   trade in stock touted in the Traced Spam that the stock is being touted by the Traced Spam and

19   its value is very likely being manipulated."  FAC ¶¶ 61, 65, 74; FAC ¶ 18 (describing "classic

20   pump-and-dump scheme"); FAC ¶ 63, 76 (seeking return of commissions on trades).  Numerous

21   SLUSA precedents—including from this Court and the Supreme Court—conclude that state-law

22   actions based on supposedly manipulative or deceptive efforts to tout stocks constitute

23   allegations of fraud in connection with a purchase or sale of securities.  See *Merrill Lynch,*

24   *Pierce, Fenner & Smith, Inc. v. Dabit*, 126 S. Ct. 1503, 1512-15 (2006) (misleading analyst

25   research reports); *Feitelberg v. Merrill Lynch & Co., Inc.*, 234 F. Supp. 2d 1043, 1051-52 (N.D.

26   Cal. 2002) (same), *aff'd*, 353 F.3d 765 (9th Cir. 2003); *Rowinski v. Solomon Smith Barney Inc.*,

27   398 F.3d 294, 299-304 (3d Cir. 2005) (same).  Those precedents should control here.

28        Plaintiffs' suit also undoubtedly involves a "covered security," a term that includes

-7-

1    securities traded on the New York Stock Exchange, American Stock Exchange, NASDAQ

2    National Market System, or other national exchange with similar standards.  15 U.S.C. §§

3    77p(f)(3), 77r(b), 78bb(f)(5)(e).  Plaintiffs do not allege that the securities touted in the Traced

4    Spam traded exclusively on other markets.  Indeed, given the large number of "covered

5    securities" and the alleged quantity of the Traced Spam, it is fair to infer from the FAC that this

6    suit involves a "covered security."

7         Separate and apart from SLUSA, the federal securities laws impliedly preempt Plaintiffs'

8    state-law claims.  Spam-based pump-and-dump schemes of the sort Plaintiffs allege are a focus

9    of ongoing SEC regulatory and enforcement efforts.  Petition for Commission Action to Protect

10   the Investing Public from Unlawful and Deceptive Securities Promotions (Apr. 24, 2006),

11   http://sec.gov/rules/petitions/petn4-519.pdf; SEC Suspends Trading Of 35 Companies Touted In

12   Spam Email Campaign (Mar. 8, 2007), http://sec.gov/news/press/2007/2007-34.htm.  It would

13   frustrate the objectives of the SEC's still-developing approach in this complicated area to

14   impose, in this litigation, the novel, California-only consumer law disclosure requirements that

15   Plaintiffs seek in contending that TD AMERITRADE should have disclosed that certain stocks

16   were "being touted by Traced Spam" and their values were "very likely being manipulated."

17   FAC ¶¶ 61, 65, 74.  In sum, the existence of a comprehensive federal securities enforcement and

18   regulatory scheme forecloses Plaintiffs' state-law claims.  *Geier v. Am. Honda Motor Co.*, 529

19   U.S. 861, 869-74 (2000) (frustration of federal objective gives rise to implied conflict

20   preemption); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1134-36 (9th Cir.

21   2005) (same, finding preemption by SEC approved NASD rules).  California's abstention

22   doctrine supports the same result.  *See, e.g., Feitelberg v. Credit Suisse First Boston, LLC*, 134

23   Cal. App. 4th 997, 1009 (Cal. Ct. App. 6th Dist. 2006).

24   **IV.    FAILURE TO STATE A CLAIM UNDER THE CLRA, CAL. CIV. CODE § 1770**

25         Additionally, Plaintiffs' claim under Cal. Civ. Code § 1770 (Count I) must be dismissed

26   because Plaintiffs have not alleged the minimum requirements for standing under the statute, and

27   because TD AMERITRADE's alleged conduct does not constitute a violation of the statutory

28   provisions.

-8-

### A.    Plaintiffs lack standing under Cal. Civ. Code § 1770.

California Civil Code § 1770 provides that a claim for relief can be brought by "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770." Cal. Civ. Code § 1780(a). Plaintiffs cannot meet these requirements. They have failed to allege that they suffered "damage" within the meaning of the CLRA, and have failed to allege that any "damage" was "a result of" the challenged representations or omissions.

Plaintiffs lack standing to bring a claim under the CLRA because they have not sufficiently alleged "any damage" within the meaning of the statute. In Count I itself—though not in the Factual Background section—Plaintiffs allege "the loss of the benefit of the bargain on TD AMERITRADE's brokerage fees," FAC ¶ 62, but do not allege that the non-receipt of spam was material to the bargain made with TD AMERITRADE, or that TD AMERITRADE failed to provide any of the brokerage services sought or purchased. Plaintiffs also attempt to characterize as "damage" the receipt of eighty spam messages over seven months to unique e-mail accounts never used for any purpose other than to provide evidence for this litigation:

> The damage from the Traced Spam includes California Class members' lost time required to sort, read, discard and attempt to prevent future Traced Spam, and lost storage space, Internet connectivity, and computing resources on the personal computers on which they received the Traced Spam. Further, California Resident Class members are subject to a identity theft to the extent Ameritrade's security has been breached.

FAC ¶ 62.

There are several reasons why this description fails to assert a claim of cognizable damage. First, this allegation fails to capture any form of compensable pecuniary loss. Second, Plaintiffs do not claim that they suffered any of these harms; instead they speak generally of the damage to "California Resident Class members." This failure is especially glaring in light of the fact that Elvey and the Gadgetwiz user supplied *unique* e-mail addresses to TD AMERITRADE. Unlike a customer who typically provides an email address that is used in the normal course,

1   Plaintiffs could avoid the alleged "damage" here by discontinuing the use of these unique email

2   addresses.  Third, this description, to the extent it describes any harm, describes de minimis

3   harm.  Fourth, Plaintiffs attempt to conjure speculative harms that they do not allege actually

4   occurred, such as the possibility of prospective identity theft.

5          In order to adequately plead "damage" under the CLRA, a complaint must allege a "loss

6   due to injury," that is "injury or harm to person, property, or reputation" or a "[l]oss or injury to

7   person or property."  *Meyer v. Sprint Spectrum L.P.*, 59 Cal. Rptr. 3d 309, 317 (Cal. App. 4th

8   Dist. 2007) (internal quotation marks omitted).  The occasional receipt of spam messages at a

9   unique e-mail address not used for any purpose other than as a source of evidence for this lawsuit

10  cannot constitute "loss due to injury" or "injury or harm to person, property, or reputation" as

11  required by the California courts to sustain a CLRA claim.  Plaintiffs attempt to dress up the

12  "damage" by alleging generally lost time to read and discard spam e-mails and lost storage space

13  and "Internet connectivity," but this is unavailing; Elvey's alleged lost time is de minimis and

14  alleged "80" spam messages could not have any appreciable impact on such systems or

15  functions.  Nor is the alleged speculative damage concerning the theoretical prospects of identity

16  theft sufficient to confer standing.

17         This Court recently rejected a CLRA claim on account of plaintiff's failure to assert any

18  real damage.  In *Chavez v. Blue Sky Natural Beverage Co.*, No. C-06-6609, 2007 WL 1691249,

19  (N.D. Cal. June 11, 2007), Plaintiff alleged that he would not have purchased a beverage had he

20  known the truth about its geographic origin.  This Court rejected the CLRA claim, noting that the

21  plaintiff "did not pay a premium for Defendants' beverages" because he was unaware of the

22  origin of the drink, and therefore had not suffered any cognizable injury.  *Id*. at *4.  Similarly,

23  Plaintiffs have not alleged that they paid any kind of "premium" or suffered any loss as the result

24  of receiving spam messages, even spam messages that touted stock for manipulative purposes.[3]

_____

[3] There is one older California Supreme Court case that suggests a broader definition of "any
damage" under the CLRA.  *See Kagan v. Gibraltar Savings and Loan Assoc.*, 35 Cal. 3d 582,
593 (1984).  The *Meyer* court discussed *Kagan* at great length, explaining why it should be
narrowly interpreted and largely confined to the facts of the case.  *Meyer*, 59 Cal. Rptr. 3d at
319.  Furthermore, the *Meyer* court observed, "In the more than 23 years since *Kagan* was filed,
not a single published decision has cited it for the proposition that an individual representing a
class of plaintiffs need not have suffered any damage to maintain a cause of action under the

(cont'd)

1    Plaintiffs also lack standing because they have failed to sufficiently allege causation—

2    that is that the alleged loss was caused by the alleged misrepresentations and misleading

3    practices.  "[C]ausation of damage is a separate element of a claim under the CLRA."  *Meyer*, 59

4    Cal. Rptr. 3d at 320 (citing cases).  In *Meyer*, the California Court of Appeal affirmed the

5    dismissal of the CLRA claim in part because the plaintiffs did not allege that they suffered any

6    damage "*as a result of* Sprint's inclusion of one or more allegedly illegal and/or unconscionable

7    provisions in the customer service agreement."  *Id.*  Here, Plaintiffs have not alleged that they

8    provided their e-mail addresses to TD AMERITRADE "as a result of" the representations in the

9    Privacy Statement or any other conduct by TD AMERITRADE.  Indeed, the FAC makes clear

10   that Elvey provided "unique email address[es]" to TD AMERITRADE (and received spam at

11   those addresses) not "as a result of" the representations in the Privacy Statement, but rather in

12   order to develop evidence for this case.  See FAC ¶¶ 22-24.   Because the FAC fails to

13   adequately allege the required element of causation under the CLRA, this claim should be

14   dismissed.

15       **B.    Plaintiffs have not alleged conduct that constitutes a violation of the CLRA.**

16       Even if Plaintiffs had standing to pursue their CLRA claims—which they do not—they

17   have not alleged conduct that constitutes a violation of the CLRA.  Plaintiffs claim that TD

18   AMERITRADE's conduct violates two provisions of the CLRA, Cal. Civ. Code § 1770(a)(5)

19   and Cal. Civ. Code § 1770(a)(14).  Cal. Civ. Code § 1770(a)(5) renders unlawful "[r]epresenting

20   that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or

21   quantities which they do not have or that a person has a sponsorship, approval, status, affiliation,

22   or connection which she does not have."  Cal. Civ. Code § 1770(a)(14) prohibits "[r]epresenting

23   that a transaction confers or involves rights, remedies, or obligations which it does not have or

24   involve, or which are prohibited by law."  Neither of these provisions encompass TD

25   AMERITRADE's alleged conduct.

26       As a district court for the Southern District of California has explained, "In order to state

27   a claim under California's Bus. Prof. Code § 17200 *et seq.* or the Consumer Legal Remedies Act,

28   CLRA."  *Id.*

-11-

Civil Code § 1750, *et seq.*, Plaintiffs must allege that Defendants' statements are likely to deceive a reasonable consumer." *Williams v. Gerber Products Co.*, 439 F.Supp. 2d 1112, 1115 (S.D. Cal. 2006). "The term 'likely' means probable, not just possible. If the alleged misrepresentation would not mislead a reasonable consumer, then the allegation may be dismissed on a motion to dismiss." *Id.* (internal citation omitted).

The challenged representations in TD AMERITRADE's Privacy Statement plainly do not constitute representations that goods or services have qualities which they do not have and were certainly not statements that would render it "probable" that a "reasonable consumer" was misled. That a person obtains and uses customer e-mail addresses in an unauthorized manner is in no way inconsistent with the Privacy Statement. Indeed, the possibility that third parties may illicitly obtain e-mail information is expressly acknowledged in the Privacy Statement's assertion that "no security system is absolutely impenetrable."

Similarly, Plaintiffs' assertion that the Privacy Statement is "misleading as it [sic] not disclose any ongoing security breach" is unavailing. California courts have held that if a CLRA claim rests on an omission, as opposed to an affirmative misrepresentation, then the complaint must allege facts showing defendant either had a duty to make a disclosure or made other factual statements that could have had the likely effect of misleading the public for want of communication of the undisclosed fact. *Bardin v. Diamlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1276 (2006); *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835 (2006). As discussed above, the Privacy Statement acknowledges the possibility of security breaches. Accordingly, the Privacy Statement is not misleading and does not require an additional disclosure. Furthermore, the Privacy Statement does not pledge to disclose any occasion in which there is suspected unauthorized conduct involving the potential misuse of customer information. And even if the Privacy Statement could be read to imply any duty to disclose where there is a known security breach—a proposition with which we disagree—that duty would reasonably be confined to circumstances where the information is of a personally identifiable nature that could result in identity theft, not simply the disclosure of e-mail addresses. Notably, as discussed above, the California legislature considered when disclosure of

-12-

a security breach was necessary and concluded that disclosure of e-mail addresses did not require notification of customers. See Cal. Civ. Code § 1798.82(e).

Finally, Plaintiffs' allegations that TD AMERITRADE violated the CLRA due to its "failure to disclose to California Resident Class members who trade in stock touted in the Traced Spam that the stock is being touted by the Traced Spam and its value is very likely manipulated," (FAC ¶ 6) cannot support a claim. First, and most importantly, Plaintiffs do not allege that they themselves traded in any stock touted by the Traced Spam, much less that they relied on the Traced Spam in making investment decisions. As such, they have not alleged that they suffered "any damage" due to such failure to disclose. Second, Plaintiffs do not, and cannot, allege that any of the representations made in the Traced Spam was made by TD AMERITRADE, a fact that would have to be established to prove a violation of the CLRA. And third, Plaintiffs do not allege that the Privacy Statement in any way indicated that persons who supplied personal information to TD AMERITRADE would be warned about third-party attempts to manipulate stock prices.

Ultimately, Plaintiffs' CLRA claims must fail because they have not alleged a single fact that is in any way inconsistent with the representations in the Privacy Statement. The Privacy Statement simply cannot be read to promise or represent that third parties could never illicitly obtain or use e-mail addresses. The CLRA cannot form the basis of a claim based upon such activity unless TD AMERITRADE affirmatively represented that it could not happen. Instead, TD AMERITRADE explicitly gave notice of the possibility. Simply put, Plaintiffs' allegations do not support the conclusion that TD AMERITRADE disclosed the e-mail information contrary to the representations in the Privacy Statement. For all these reasons, the CLRA claim should be dismissed.

## V.    FAILURE TO STATE A CLAIM UNDER THE UCL, CAL. BUS. & PROF. CODE § 17200

Plaintiffs' attempt to invoke Cal. Bus. & Prof. Code § 17200, also fails for much the same reasons as Plaintiffs' attempt to seek relief under the CLRA—the absence of allegations that could support standing and a failure to plead conduct by TD AMERITRADE that could

1    mislead a reasonable person.  Furthermore, to the extent that Plaintiffs' claims are based on

2    securities transactions, the UCL does not apply.

3         **A.**    **Plaintiffs lack standing under Cal. Bus. & Prof. Code § 17200.**

4            Though the UCL does not have the same "consumer" requirement as the CLRA, it has a

5    more stringent standing requirement when it comes to injury.  In order to establish standing

6    under the UCL, a party must allege that it has "suffered injury in fact *and* has lost money or

7    property as a result of such unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis

8    added).  Because Plaintiffs have failed to allege anything that could constitute injury in fact and

9    the loss of money or property, their claim under the UCL must be dismissed for lack of standing.

10            This heightened standing requirement was added to the UCL as a ballot initiative,

11    Proposition 64, in 2004.  As one California court explained after reviewing the ballot materials,

12    the voters intended to eliminate the loophole "that permitted fee seeking trial lawyers to appoint

13    themselves Attorney General . . . filing lawsuits on behalf of the People of the State of

14    California."  *Fate v. Covenant Care*, 2005 WL 4932974, No. RG03-087211 (Cal. Super. Ct.

15    Sept. 27, 2005) (internal quotation marks omitted).  In that same case, the California Superior

16    Court explained that this standing requirement "demand[s] more" than the standing requirements

17    of the United States Constitution.  The court explained, "Now, a plaintiff (1) cannot assert a

18    claim on behalf of the general public, (2) must obtain class certification if he or she wants to

19    represent absent persons, and (3) can assert a claim on his or her own behalf (and on behalf of a

20    class) only if he or she has lost money or property *that can be restored to him or her.*"  *Id.*

21    (emphasis added).

22            As the *Meyer* court recently explained, since the passage of Proposition 64, courts have

23    concluded that the standing requirements are met in three circumstances: where the plaintiff has

24    (1) "expended money due to the defendant's acts of unfair competition"; (2) "lost money or

25    property"; or (3) "been denied money to which he or she has a cognizable claim."  *Meyer*, 59

26    Cal. Rptr. 3d at 314.  For the same reasons discussed above in TD AMERITRADE's discussion

27    of the Plaintiffs' failure to allege damages under the CLRA claim, Plaintiffs have utterly failed to

28    meet any of these requirements and, as a result, have no standing to assert a claim under the

-14-

UCL.

**B.    Plaintiffs have not alleged conduct that constitutes a violation of the UCL.**

Under the UCL, Plaintiffs also must allege conduct that constitutes an "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

Plaintiffs have failed to allege that TD AMERITRADE made any statements that are likely to deceive a reasonable consumer. As explained in the previous section, it is simply not "probable" that a "reasonable consumer" reading the Privacy Statement would have concluded that there was no way a third-party could illicitly obtain an e-mail address. *See Williams*, 439 F.Supp.2d at 1115.

Plaintiffs' allegations that TD AMERITRADE failed to disclose the manipulation of stock touted in the Traced Spam to account holders who received the Traced Spam and traded in the touted stock also does not support a claim under the UCL. As explained above (in describing the defects in Plaintiffs' CLRA claim), the statements allegedly made in the Traced Spam were not made by TD AMERITRADE. Plaintiffs do not allege that they themselves traded in any manipulated stock. Nor do Plaintiffs allege that TD AMERITRADE ever promised that it would warn them of such attempted manipulations.

**C.    Because Plaintiffs' claims are based in part on securities transactions, the UCL does not apply.**

A number of Plaintiffs' allegations on behalf of the California Resident Class are clearly tied to securities transactions. For example, in their UCL claim, Plaintiffs point to "TD AMERITRADE's failure to disclose to California Resident Class members who trade in stock touted in the Traced Spam" that such stock was subject to manipulation. FAC ¶ 65. Because Plaintiffs' UCL claim is based, at least in part, on securities transactions, it is invalid on its face because the UCL does not apply to securities transactions. *See Bowen v. Ziasun Tech., Inc.*, 116 Cal. App. 4th 777, 787-90 (2004); see also *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 351 (S.D.N.Y. 1999); *Perera v. Chiron Corp.*, 1996 WL 251936, * 5 (N.D. Cal. May 8, 1996).[4]

---

[4] Though it does not appear that a court has addressed the issue, the logic foreclosing the application of the UCL to securities transaction should apply to foreclose application of the

(cont'd)

**VI.     FAILURE TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY**

Plaintiffs efforts to state a claim for breach of fiduciary duty utterly fail to describe any cognizable legal theory, or to allege facts that support any actionable claim.  It is a legal claim without precedent, made by Plaintiffs who have not alleged any relationship with TD AMERITRADE that could give rise to *any* fiduciary duty, let alone one that would extend far beyond the scope of a broker's obligations.

Plaintiffs allege that TD AMERITRADE owes them a fiduciary duty "[a]s their stock broker"  (FAC ¶ 70), and that it breached this duty by allegedly "allowing the disclosure of its accountholder's e-mail addresses to spammers," allegedly failing to "disclose the events that led to the disclosure of its accountholders' e-mail addresses to spammers," allegedly telling accountholders to destroy spam, and allegedly failing to disclose to accountholders who trade in stock touted in Traced Spam that such stock is subject to manipulation.  FAC ¶ 71-73.  The FAC, however, is devoid of any factual allegations that Plaintiffs and TD AMERITRADE had the kind of relationship that could give rise to a breach of fiduciary duty claim, much less that it had the specific duties alleged.

At the outset, it is important to note that there is no independent fiduciary duty that arises out of the sharing of personal information as a part of a business transaction.  Courts have held that sharing information in the course of conducting a business transaction imposes a fiduciary duty only when "one party surrenders substantial control over some portion of his affairs to the other."  *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F.Supp2d 526, 534 (M.D. Pa. 2006).  Plaintiffs have not alleged, and cannot allege, this sort of relationship.

As important, it is clear that in Nebraska, as in other jurisdictions, a broker/client relationship does not by itself give rise to a blanket fiduciary duty. [5]  The Nebraska Supreme Court has explained that "[t]he mere existence of a broker/client relationship, without more, does not imply a confidential relationship" giving rise to a breach of fiduciary duty.  *DeSciose v.*

_____

CLRA as well.

[5] For reasons explained above, the choice-of-law provision mandates that Nebraska law applies to Plaintiffs' breach of fiduciary duty claim.  *Nedlloyd*, 3 Cal. 4th at 469, 471.  However, the principles articulated in this section are equally valid under California law.

1  *Chiles, Heider & Co.*, 239 Neb. 195, 206 (1991).

2  In *DeSciose*, the Nebraska Supreme Court laid out the standard for determining that there

3  was a fiduciary duty: "A fiduciary relationship 'arises whenever confidences reposed on one

4  side, and domination and influence result on the other.'" *Id.* (quoting Black's Law Dictionary 62

5  (6th ed. 1990)). In *DeSciose*, the court determined that no such relationship existed, and that the

6  trial court had not erred in refusing a tendered jury instruction on a fiduciary relationship

7  between a broker and a client. *Id.* at 206-07.

8  Plaintiffs have not alleged the existence of a broker/client relationship in which the

9  broker dominates and influences the decisions of the client. On the contrary, as the Client

10  Agreement demonstrates, TD AMERITRADE processes securities orders submitted by its self-

11  directed customers; it does not provide investment advice to those customers and certainly has no

12  trading discretion. Accordingly, under Nebraska law, TD AMERITRADE does not owe a

13  fiduciary duty to Plaintiffs that extends to the matters alleged in the FAC.

14  The California courts take a similar approach by focusing on the nature of the

15  relationship between the broker and the client to determine if disclosure of the alleged omissions

16  is within the scope of the duty. In *Twomey v. Mitchum, Jones & Templeton, Inc.*, 262 Cal. App.

17  2d 690 (Cal. Ct. App. 1st Dist. 1968), a California court distinguished between a broker/client

18  relationship where the broker simply processes unsolicited trade orders (as is the case with TD

19  AMERITRADE), and one where a broker provides advice that is invariably followed:

20
21  It is contended that the sole obligation of the broker-dealer is to
   carry out the stated objectives of the customer. This may well be
   true when the broker is acting merely as agent to carry out
22  purchases or sales selected by the customer, with or without the
   broker's recommendation. Here, however, there is evidence to
23  sustain the finding that [the broker's] recommendations, as
   invariably followed, were for all practical purposes the controlling
24  factor in the transactions. Under these circumstances, there should
   be an obligation to determine the customer's actual financial
25  situation and needs. *Id.* at 719.

26

27  Plaintiffs do not allege, and cannot allege, that TD AMERITRADE was a "controlling

28  factor" in any securities transactions. Indeed, there is no allegation that TD AMERITRADE's

1  relationship with Plaintiffs or its customers extends beyond simply processing trade orders.

2  Where a broker's relationship with its client "is confined to the simple performance of

3  transactions ordered by a customer, the duties described in *Twomey* . . . do not arise." *Petersen*

4  *v. Securities Settlement Corp.*, 226 Cal. App. 3d 1445, 1456 (Cal. App. 4th Dist. 1991).  In

5  *Petersen*, the California Court of Appeal affirmed a grant of summary judgment in favor of a

6  clearing broker because the broker did not have a fiduciary duty to disclose the highly

7  speculative nature of a particular investment.  The court in *Petersen* explained that in *Twomey*

8  and another later decision relying on *Twomey* "the disclosure obligations . . . are predicated

9  expressly on evidence a broker's recommendation was the controlling factor in the customer's

10  stock purchases." *Petersen v. Securities Settlement Corp.*, 226 Cal. App. 3d 1445, 1454 (Cal.

11  App. 4th Dist. 1991).  The court further observed that "[i]n adopting a disclosure standard for

12  stockbrokers, the court in *Twomey* relied in particular on the personal nature of the relationship

13  between the customer and the broker."  *Id.*

14      Because "the scope of a broker's duty to disclose is delimited by the nature of the

15  broker's relationship with the customer" (*id.* at 1456) and the FAC fails to make any allegations

16  that the Plaintiffs' relationship with TD AMERITRADE extended beyond TD AMERITRADE's

17  status as Plaintiffs' "stock broker," the breach of fiduciary duty claim should be dismissed.

18  **VII.    FAILURE TO STATE A CLAIM FOR VIOLATION OF THE COMPUTER**

19  **FRAUD AND ABUSE ACT, 18 U.S.C. § 1030**

20      Plaintiffs allege that "Does"—TD AMERITRADE's "employees," "partners," or

21  "agents"—violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5) ("CFAA"), by

22  accessing TD AMERITRADE computer systems without authorization. FAC ¶ 81.  Section

23  1030(a)(5) of the CFAA creates a cause of action against a party that, *inter alia*, intentionally

24  accesses a "protected computer" and causes injury as a result of the unauthorized access.

25      Plaintiffs' novel attempt to bring a claim under 18 U.S.C. § 1030—a statute designed to

26  protect the owner of a computer system from unauthorized access by third parties—should be

27  rejected.  Under the terms of the CFAA, TD AMERITRADE is the target of the theft and, thus,

28  the victim of any alleged violation of the statute.  Specifically, the "protected computer" as

-18-

1   defined by the CFAA, is TD AMERITRADE's own computer system.  In essence, Plaintiffs are

2   attempting to hold TD AMERITRADE liable for its own employees' or partners' alleged

3   unauthorized access of its own computers or alternatively, to hold TD AMERITRADE liable for

4   authorizing that access.  But neither theory states a claim under the CFAA.  Under Plaintiffs'

5   allegations, either the Does alleged access to the computer system was *with* authorization by TD

6   AMERITRADE, in which case there is no violation of the statute, or it was *without* authorization

7   by TD AMERITRADE, in which case TD AMERITRADE cannot be held vicariously liable.

8       Plaintiffs state their CFAA claim under 18 U.S.C. § 1030(a)(5).  Under this provision of

9   the CFAA, the access must be "without authorization" to be actionable.[6]  Thus, to the extent that

10  Plaintiffs claim that TD AMERITRADE "directed and encouraged" John Does to misappropriate

11  customer information (FAC ¶ 86) there is no violation of the statute.  It is not possible to direct

12  and encourage access without authorizing access within the meaning of the CFAA.

13      Alternatively, to the extent Plaintiffs allege that the access was unauthorized—whether as

14  a result of an alleged violation of the Privacy Agreement or otherwise (see FAC ¶ 81)—Plaintiffs

15  cannot hold the owner of the computer (TD AMERITRADE) liable as there is no respondeat

16  superior liability under the CFAA when the access is without authorization.  *Butera & Andrews

17  v. IBM*, 456 F.Supp. 2d 104 (D.D.C. 2006) is instructive on this point.  In *Butera*, plaintiff law

18  firm discovered that their computer systems had been infiltrated by hackers.  They discovered

19  that the IP address involved in the attack was registered to IBM. *Id.* at 106.  The plaintiff brought

20  suit against IBM and a "John Doe defendant" identified as "a person who is employed by

21  Defendant IBM at its Durham, North Carolina facility."  *Id.* at 107.  The court granted IBM's

22  motion to dismiss.  The district court reasoned that an employer could not be held liable for an

23  employees' intentional conduct based solely on the employer-employee relationship.  "If the

24  attacks were not authorized by IBM, there are no grounds whatsoever for bringing an action

25  against IBM under any of the statutes relied upon by plaintiff, as each requires 'intentional'

---

[6] Contrary to Plaintiffs' suggestion, "in excess of authorization" is not actionable under 18 U.S.C. § 1030(a)(5).  *See U.S. v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (explaining that 1030(a)(5) is a subsection of the CFAA designed to apply "exclusively to users who lack access authorization altogether").  *See also id.* (explaining that Congress intended section 1030(a)(5) to apply to "outside hackers who break into a computer" (quoting Congressional Record)).

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. C:06-CV-03468 SI

conduct on the part of the defendant." *Id.* at 110.  Thus, Plaintiffs simply have no basis to proceed against TD AMERITRADE under the CFAA, and the claim must be dismissed.  Indeed, it is TD AMERITRADE that would have a valid cause of action under the CFAA against those who may have improperly utilized its customer information.

## VIII.    FAILURE TO STATE A CLAIM FOR VIOLATION OF THE CAN SPAM ACT, 15 U.S.C. § 7704(A)(1)

Plaintiffs fail to state a claim for violation of the CAN SPAM Act based on two independent grounds.  First, Plaintiffs lack standing to bring a claim under the Act.  Second, the FAC fails to allege that TD AMERITRADE "initiated" the offending spam to Plaintiffs—an essential element under the Act.

### A.       Plaintiffs lack standing under 15 U.S.C. § 7704(a)(1).

Plaintiffs' allegations fail to meet the standing requirements to bring  a private right of action under 15 U.S.C. § 7704(a)(1) for two reasons: Plaintiffs have failed to allege adequately that they are providers of Internet access service within the meaning of the Act, and have failed to allege that they were "adversely affected" within the meaning of the Act.

The CAN SPAM Act contains only a very limited private right of action.  For a party to state a claim under 15 U.S.C. § 7704(a)(1), that party must be a "provider of Internet access service adversely affected by a violation of section 7704(a)(1)."  15 U.S.C. § 7706(g)(1).  The term "Internet access service" is defined as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers."  47 U.S.C. § 231(e)(4).  The FAC fails to allege facts indicating that Elvey comes within the statute's reach.  Elvey alleges that he "maintains a domain name, and provides that domain name with e-mail and web (http) services.  Elvey also provides users of his domain name with e-mail services."  FAC ¶ 5.  Elvey, however, does not allege that he actually has any users for these "services."  And though Elvey may claim that he "provid[es]" services, Elvey's subsequent allegations make clear that he does no such thing.  "The server which provides e-mail service to Elvey's domain name is maintained, stored, and given Internet

connectivity by a third party with whom Elvey contracts." FAC ¶ 26. Thus, reading the FAC as a whole, all that Elvey means by "provid[ing] services" is that he may configure a service via the Internet that is in fact maintained by a third-party. Elvey's described internet "business" falls far short of a bona fide "service that enables users to access content, information, electronic mail." Indeed, Elvey's alleged Internet service is functionally indistinguishable from letting a friend use a computer with a web browser to check her Yahoo! Mail.[7] Accordingly, Plaintiffs have not adequately alleged that they come within the class of "Internet access service" providers that are protected by the CAN SPAM Act.

Even if Plaintiffs' allegations could be construed to satisfy the "Internet access service" provider requirement, they would still lack standing because they have failed to allege that they were "adversely affected" by the alleged CAN SPAM violation. Since only a "provider of Internet access service" has standing to bring a private right of action under the CAN SPAM Act, the plaintiff must allege the type of harm that would be experienced by a provider of Internet access service (IAS), not just an individual user. Plaintiffs do not allege that the spam messages received resulted in any adverse impact in their capacity as a provider of Internet access service. Elvey does not allege, for example, that he incurred any expense, or was required to take any steps in his capacity as a provider of Internet access service to address this spam. Moreover, the general allegations of adverse impact that Plaintiffs attribute to California Resident Class members are not sufficient to establish being "adverse affected" within the meaning of the Act. FAC ¶ 62. In particular, the "lost time required to sort, read, discard and attempt to prevent future Traced Spam," are the type of activities undertaken by an individual user, not a provider of Internet access service.

In *Gordon v. Virtumondo, Inc.*, No. 06-0204, 2007 WL 1495395, *4 (W.D. Wash. May 15, 2007), plaintiffs claimed that they had been inundated with spam by defendant, costing them "untold hours of manpower, and substantial resources." The court examined the Congressional

---

[7] Furthermore, Plaintiffs provide no indication that members of the California Resident Class are providers of Internet access service. Though only Elvey, and not Gadgetwiz, brings a claim under the CAN SPAM Act, FAC ¶ 95, Gadgetwiz's description of the "service" it provides is functionally identical to Elvey's description, FAC ¶¶ 6, 28. Accordingly, the FAC also fails to qualify Gadgetwiz as a provider of Internet access service within the meaning of the statute.

-21-

record for the CAN SPAM Act, which focused on the "significant economic burdens" of dealing with spam by providers of Internet access service, the "[i]ncreased costs of anti-spam software" being "passed on as increased charges to consumers." *Id.* at *6 (internal quotation marks and citations omitted). Offering a detailed summary of the Congressional record, the *Gordon* court held that, "even if an entity could meet the ill-defined and broad definition of an IAS, the 'adverse effect' to that entity must be both real and of the type uniquely experienced by IASs for standing to exist. Any other reading would expand the private right of action beyond what Congress intended." *Id.* at *7.

Applying this standard, the court in *Gordon* concluded that the plaintiff failed to sufficiently allege that it had been "adversely affected" to confer standing under the statute. The court reasoned:

> [E]ven if there is some negligible burden to be inferred from the mere fact that unwanted e-mails have come to Plaintiffs' domain, it is clear to the Court that whatever harm might exist due to that inconvenience, it is not enough to establish the "adverse effect" intended by Congress. Indeed, the only harm Plaintiffs have alleged is the type of harm typically experienced by most e-mail users. The fact that Congress did not confer a private right of action on consumers at large means that "adverse effect" as a *type* of harm must rise beyond the level typically experienced by consumers—*i.e.*, beyond the annoyance of spam. *Id.* at *8.

So too here. Because the harm that Plaintiffs allege is nothing more than the kind of inconvenience and annoyance "typically experienced by most e-mail users," they have failed to establish the standing required under the Act. Plaintiffs' allegations of "adverse effect" stand in stark contrast to those decisions where a plaintiff has been found to have standing under the Act. *See, e.g., Hypertouch, Inc. v. Kennedy-Western University*, No. C 04-05203, 2006 WL 648688, *4 (N.D. Cal. 2006) (finding adverse effect where plaintiff alleged e-mail users' receipt of "thousands" of messages, and declared "that high spam loads have caused decreased server response and crashes, led to higher bandwidth utilization, and forced expensive hardware and software upgrades"). Plainly, the "adverse effect" Elvey alleges is nothing remotely like the "adverse effect" alleged in *Hypertouch*. Allowing a plaintiff to proceed under the Act based only on the kind of harm typically associated with the average e-mail user's receipt of spam would be

-22-

contrary to the Congressional purpose behind the statute.  Accordingly, Elvey lacks standing to seek relief under the CAN SPAM Act.

### B.    TD AMERITRADE's alleged conduct does not fall within the meaning of 15 U.S.C. § 7704(a)(1).

15 U.S.C. § 7704(a)(1) makes it unlawful for a person to "*initiate the transmission*, to a protected computer, of a commercial electronic message" with certain qualities.  *Id.* (emphasis added).  Plaintiffs do not allege that TD AMERITRADE was the party that created or sent the spam messages.  Rather, Plaintiffs allege that because they would not have received the spam "but for [TD AMERITRADE's] disclosure of the e-mail addresses," TD AMERITRADE "originated" or was "the origin of the [spam]."  FAC ¶ 93.  This sleight of hand allegation clearly fails to establish an essential element of the statute—that the defendants actually "initiated the transmission" of the spam—and consequently, the CAN SPAM ACT must be dismissed for this reason as well.

Section 7702(9) of the Act defines "initiate" as "to originate or transmit such *message* or to procure the origination or transmission of such *message*" (emphasis added).  Plaintiffs allege that TD AMERITRADE disclosed e-mail addresses, not that it initiated the actual e-mails.  Furthermore, though Plaintiffs plead their conclusion that TD AMERITRADE originated the spam, the factual allegations belie such a claim, as they in fact allege that TD AMERITRADE's conduct was only the "but for" cause of their receipt of the spam.  The word "originate" does not mean a "but for" cause.  Indeed, the plain meaning of the word "originate" is "[t]o bring into being; create."  American Heritage Dictionary (4th ed. 2004).  The plain meaning of the phrase "to originate . . . such message" as used in the statute is to create the actual spam message.  Plaintiffs do not allege TD AMERITRADE did this.  Nor do Plaintiffs claim that TD AMERITRADE "transmitted," or sent, the spam to them.

Section 7702(9) does bring within its reach "procuring the origination or transmission" of spam, but Plaintiffs also fail to allege this theory of liability under the Act.  The term "procure" is defined as "*intentionally* to pay or provide other consideration to, or induce, another person to initiate such a message *on one's behalf*."  15 U.S.C. § 7702(12) (emphasis added).  Clearly,

-23-

1  Congress did not intend for the phrase "procure the origination or transmission of such message"

2  to include unintentional disclosure of an e-mail *address*, or even intentional disclosure of an e-

3  mail *address*.  In order for a defendant to "procure the origination or transmission" of an e-mail

4  message, the message itself must be intentionally paid for by or induced *on behalf of the*

5  *defendant*.  Even Plaintiffs have not alleged that TD AMERITRADE intended to pay or induce

6  another to send commercial e-mail, or that the Traced Spam was sent on behalf of TD

7  AMERITRADE.  *See U.S. v. Impulse Media*, 2007 WL 1725560 (W.D. Wash. June 8, 2007)

8  ("However, given the inclusion and context of the word 'intentionally' in the Act's definition of

9  'procure' the Court cannot conclude that CAN-SPAM triggers liability without a threshold

10 showing that the defendant intended to pay or induce another to send commercial email . . . .

11 The Court rejects plaintiff's effort to characterize the CAN-SPAM Act as a strict liability statute

12 . . . .").

13      The statute further requires a private plaintiff to establish that the "procur[ement] was

14 done "with actual knowledge, or by consciously avoiding knowing, whether such person is

15 engaging, or will engage, in a pattern or practice that violates this chapter."  15 U.S.C.

16 § 7706(g)(2).  Plaintiffs do not allege that TD AMERITRADE undertook any role in the

17 transmission of the spam messages themselves.  The absence of such an allegation is dispositive

18 and requires dismissal of Plaintiffs' CAN SPAM Act claim.

19                           **CONCLUSION**

20      For the foregoing reasons, the FAC should be dismissed in its entirety.

21

22 Dated: July 18, 2007                    MAYER, BROWN, ROWE & MAW LLP

23                                        By:  _____*/s/*___Lee H. Rubin_____
                                              Lee H. Rubin
24                                        Counsel for Defendant  TD AMERITRADE,
                                          Inc.

25 Of Counsel
   MAYER, BROWN, ROWE & MAW LLP
26 Robert Kriss
   71 S. Wacker Drive
27 Chicago, IL  60606

28

MOTION TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. C:06-CV-03468 SI