# ATTACHMENT A

# TD AMERITRADE

**Client Agreement**

## 1. Introduction

This Agreement governs all brokerage accounts that I open with you, all transactions in my Account, the use of your Websites, the Brokerage Services, the TD AMERITRADE Content, and the Third Party Content, and is binding on my heirs, executors, administrators, successors and assigns and will inure to the benefit of your successors. By opening an Account with you, I acknowledge that I have received, read and understand this Agreement and agree to be bound by its terms.

"I," "me," "my," or "account owner" means each account owner who signs the Account Application. "You, "Your," or "TD AMERITRADE" means TD AMERITRADE, Inc., a wholly owned subsidiary of TD AMERITRADE Holding Corporation, and when applicable, TD AMERITRADE Clearing, Inc. ("Clearing"), TD AMERITRADE's clearing broker-dealer.

## 2. Definitions

"**Account**" means each brokerage account I open with you.

"**Agreement**" means these terms and conditions as well as any supplemental agreements and disclosures that apply to my Account, as amended from time to time.

"**Applicable Rules**" means all applicable federal and state laws, rules and regulations, rules of any self-regulatory organization, and the constitution and applicable rules, regulations, customs and usages of the exchange or market and its clearinghouse.

"**Brokerage Services**" means your Website and related services that you provide other than TD AMERITRADE Content, which I need to place trades in my Account.

"**Business Day**" means Monday through Friday, excluding market holidays.

"**TD AMERITRADE Content**" means all information, tools and services available on your Website, other than Brokerage Services provided by you, and not by a third party.

"**Services**" means, collectively, the Websites, the Brokerage Services, The TD AMERITRADE Content and the Third-Party Content.

"**Third Party Content**" means all information, tools and services available on your website that are provided by a third party ("Third Party Provider"), including financial and investment tools, market data, reports, alerts, calculators, access to online conferences, telecasts, bulletin boards, tax preparation or account management tools.

"**Websites**" means the internet sites of TD AMERITRADE whose domain name is registered as http://www.tdameritrade.com and others and through which you offer Services.

## 3. My Account and Relationship with You

**a. Self-Directed Account.** My Account with you is self-directed. I am responsible for orders and instructions placed in my Account. Unless you provide advice to me that is clearly identified by you as an individualized recommendation for me, any investment decision that I make or investment strategy that I utilize is based on my own investment decisions or those of my agent and is at my own risk. All investments involve risk and, unless you provide individualized recommendations to me, I or my agent are responsible for determining the suitability of any trade, investment, investment strategy and risk associated with my investments. TD AMERITRADE Content or Third Party Content I access through you do not constitute a recommendation to invest in any security or to utilize any investment strategy.

**b. Fees and Commissions.** I will pay commissions, charges, taxes and other fees applicable to my Account. Current commission pricing and other fees are on the Websites. You may change your fees and commissions at any time by posting changes on the Websites or other means.

You reserve the right to vary commissions among clients in connection with special offers or combinations of services or in other circumstances. You or Clearing may pay a portion of the revenues or fees derived from servicing my Account to third parties that provide services to you or Clearing. If my Account is an IRA or other retirement plan account, my Account may be charged fees that the particular plan has authorized to be paid to service providers other than you or Clearing.

**c. Statements and Confirmations.** It is my obligation to review trade confirmations and Account statements promptly upon receipt. These documents will be considered binding on me unless I notify you of any objections within 5 days from the date confirmations are sent and within 10 days after Account statements are sent.

**d. Instructions.** You may accept and act on instructions from me, my agent or any person authorized on my account. You may refuse any order, or delay placing any order, if you determine that an order requires clarification from me. I will not hold you responsible for any losses caused by the rejection or delay. You will not receive any order or instruction transmitted by my agent or me until you have actual knowledge of the order or instruction. You do not determine the validity of my agent's status or capacity, the appropriateness of or the authority or actions by such person.

**e. No Endorsement of Day Trading Strategy.** You do not recommend, endorse or promote a "day trading" strategy, which may involve significant financial risk to me.

**f. Clearing Agreement.** You and Clearing have entered into a clearing agreement in which Clearing is the clearing agent for securities transactions for your clients. You transmit client instructions to Clearing which causes such instructions to be executed. Clearing carries my Account on a fully disclosed basis.

**g. Account Protection.** You are a member of the Securities Investor Protection Corporation ("SIPC"). My Account is protected up to $150 million per client (as defined by SIPC rules), including up to $1 million for cash. The first $500,000 of coverage is provided by SIPC, of which up to $100,000 covers cash. A SIPC explanatory brochure is available upon request by calling 800-669-3900 or online at www.sipc.org. The remaining $149.5 million coverage (including up to $900,000 cash) is provided through Lloyd's of London, subject to an aggregate limit of $250 million. Losses due to market fluctuation and Accounts of banks and broker-dealers are not covered by SIPC.

*(continued)*
AMTD 182 F 03/07

## 4. About Me

**a. Legal Capacity.** I am of legal age in the jurisdiction in which I reside and have the capacity and authority to enter into this Agreement.

**b. Accuracy of Information.** All the information I provide you is true and correct. I will promptly notify you in writing within ten Business Days after any change in such information. You may rely upon all information I provide you.

**c. Interest in Account.** I represent that no one else except me (us) has an interest in any of my (our) Account(s) (unless I am opening the Account as a fiduciary).

**d. Multiple Owners.** If there is more than one Account owner, then the provisions of the Agreement apply to each owner. Accounts of husbands and wives in community property states will be held in the name of husband and wife as community property unless we instruct you otherwise; any other joint Account will be held jointly with rights of survivorship unless I notify you of a different form of ownership and provide such documentation as you require. You will have no liability for any loss that may arise due to taking instructions from one owner or requiring instructions from all owners.

**e. Rights, Terms and Obligations of Securities in Account.** Except as required by Applicable Rules, you are not obligated to notify me of any events involving my securities positions nor do you have the responsibility to take any actions on my behalf with respect to such events without specific instructions from me. I am responsible for knowing the rights, terms and obligations of securities in my Account and for monitoring the occurrence of any events involving my securities positions or securities for which I intend to place an order.

## 5. Privacy and Confidentiality

**a. Privacy.** You will take reasonable measures to protect the privacy and confidentiality of information in your possession about my Account and me. Your Privacy Statement explains how you collect and protect my information. The Privacy Statement is incorporated into this Agreement by reference.

**b. Account Number, PIN, or Password.** I will receive a password and/or access number (collectively "PINs") that provide electronic access to my Account. Account numbers and PINs are confidential and I am responsible for the confidentiality, protection and use of them. Subject to the TD AMERITRADE Security Guarantee, I agree to be responsible for all activities in my Account. You may rely that I have authorized any orders or instructions that are received under my account number and PIN.

**c. TD AMERITRADE Security Guarantee.** If I lose cash or securities from my Account due to unauthorized activity, you will reimburse me for the cash or securities I lose. You promise me this protection in the event unauthorized activity causes losses and you determine it was through no fault of my own. You guarantee this if I do three things: (1) keep my Account information secure and confidential -- don't share it, because sharing my UserID, password, PIN, or Account number with other people means I authorize them to take action in my Account; (2) frequently check my Account and statements and report any suspicious or unauthorized activity to you immediately; and (3) take the actions you request and cooperate with any investigation.

**d. Phone Conversations and Electronic Communications.** You may record and monitor any telephone or electronic communications with me.

**e. Credit Reports.** I authorize you to request my credit reports to verify my creditworthiness and to provide information to credit agencies. Upon request, you will inform me whether a report was requested and provide me with the name and address of the credit reporting agency that furnished the report. Negative credit information may be submitted to a credit reporting agency if I fail to fulfill the terms of my credit obligations.

**f. Disclosure of Account Information to Third Parties.** Consistent with your Privacy Statement, you and your agents are specifically authorized to disclose information about my Accounts and me to third parties.

## 6. Client Communications

**a. Addresses.** You may send communications to the mailing address, email, telephone number, or facsimile that I provide.

**b. Electronic Signatures.** My use of electronic signatures to sign your documents legally binds me in the same manner as if I had manually signed. The use of an electronic version of these documents fully satisfies any requirement that they be provided to me in writing. If I sign electronically, I represent that I have the ability to access and retain a record of the documents. I am responsible for understanding these documents and agree to conduct business with you by electronic means. I am obliged to review periodically the Websites for changes or modifications.

**c. Consent.** By consenting to the electronic delivery of all information relating to my Account, I authorize you to deliver all communications to me by the following means: (1) by email at the email address specified by me; (2) by posting the communication on the Websites or other sites on the Internet where the communication can be read and printed; (3) by sending me an email that includes a hyperlink to the Websites or an address on the Internet where the information is posted, and can be read and printed; and (4) by sending me a notice that directs me to an address on the Internet or a place within the Websites where the communication is posted and from which it can be read and printed. Such delivery will be effective delivery to me for the purpose of any Applicable Rules whether or not I access or review the communication. Although I consent to electronic delivery, you may elect to deliver communications by other means which shall not affect my consent. I will notify you of any change in my address. I may revoke my consent to electronic delivery of communications and receive documents in paper. You have a reasonable period to effect such a change and may charge a reasonable fee for sending paper copies.

**d. Equipment.** If I agree to electronic delivery, I must have a computer with Internet access, an email address and the ability to download and save or print communications to retain for my records. I am responsible for obtaining and maintaining all equipment and services required for online access of my Account.

## 7. Electronic Services

**a. Availability.** You do not guarantee that any media will be available to me at a particular time. Access to the Websites may be limited or unavailable during periods of peak demand, market volatility, system upgrades or other reasons.

You reserve the right to suspend and deny access to the Services, without prior notice or for any reason. I recognize that Account activity may be conducted through several different media (e.g., IVR and phone); and if a certain medium is not available I will use another medium to conduct Account activity. You will not be liable for the unavailability, delay, or failure of any of the media at any particular time or for the accessibility of, transmission quality, outages to, or malfunction of any telephone circuits, computer system or software.

**b. Use of Services.** I will use the Services for lawful purposes, my personal and noncommercial use and as permitted by this Agreement. I will not transmit through the Websites any material that violates or infringes in any way upon the rights of others or would encourage conduct that may give rise to civil or criminal liability. I will not modify, copy, publish, transmit, license, participate in the transfer or sale of, reproduce, create derivative works from, distribute, redistribute, display or in any way exploit the Services. I will not upload, post, decompile, reverse engineer, disassemble, modify, copy, distribute, transmit, reproduce, republish, license, display, sell, or transfer or create derivative products from the Services. Software accessed on the Website is subject to U.S. export controls and may not be downloaded by any person prohibited from doing so by Applicable Rules.

I may download software on a single computer for personal, noncommercial use, provided I keep intact all copyright and other proprietary notices. You and Third Party Providers reserve the right to revise, modify, change, upgrade, suspend, impose limitations or restrictions on, deny access to, remove or discontinue the Services at any time without prior notice. Third Party Providers may enforce this Agreement against me and take action against me for my breach of this Agreement.

**c. Limitation of Liability.** The Services are provided "as is" and "as available." You, your affiliates, the Third Party Providers and their respective licensors, employees, distributors or agents make no representations with respect to the system and expressly disclaim all warranties. Subject to Applicable Rules, in no event will you, your affiliates, the Third-Party Providers or their respective licensors, employees, distributors or agents be liable to me or any third party for any direct, indirect, incidental, special, punitive or consequential losses or damages of any kind with respect to the Services.

I am solely responsible for my investment research, and neither you nor any Third-Party Provider make any representations, warranties or other guarantees as to the accuracy or timeliness of any market data; nor do you or any Third Party Provider make any representations, warranties or other guarantees as to the present or future value or suitability of any sale, trade or other transaction involving any particular security or any other investment.

**d. Intellectual Property.** My use of the Services will not confer any title, ownership interest, or intellectual property rights to me. The Services are protected under U.S. patent, copyright laws, international treaties or conventions and other laws, and will remain the exclusive property of you or Third Party Providers. Company names, logos, and all related product and service names, design marks and slogans of you or your affiliates, or any Third-Party Provider are the property of the respective company. I am not authorized to use any such name or mark in any advertising, publicity or any other commercial manner.

**e. Cookies.** You use cookies on Websites and my browser will need to accept all cookies for the Websites' to perform fully. Certain features of the Websites also may require the acceptance of cookies.

**f. Hyperlinks.** The Websites may include hyperlinks to websites owned or operated by unaffiliated, third parties. Neither you nor Third Party Providers are responsible for the content or availability of such other websites, and shall not be responsible or liable for any loss in connection with reliance on such sites.

## 8. Brokerage Services

**a. Order Routing and Executions.** Unless I specify the market for execution, you decide where to route my orders for execution. You consider a wide variety of factors in determining where to direct my orders, such as execution price, opportunities for price improvement (which is when an order is executed at a price that is more favorable than the displayed national best bid or offer), market depth, order size and trading characteristics of the security, efficient and reliable order handling systems and market center service levels, speed, efficiency, accuracy of executions, and the cost of executing orders at a market.

**b. Order Refusal.** You may refuse any of my orders. I will not hold you liable for any loss I may incur due to your refusal to permit any transaction.

**c. Trade Execution and Price.** You route orders to markets for prompt execution in view of prevailing market conditions, but there can be delays in the processing of orders. I understand and agree with the following:

- The quoted price may not reflect the trading activity from all markets.
- High volumes of trading at the market open or intra-day may cause delays in executions and result in prices significantly away from the price quoted at the time the order was entered.
- Markets may handle orders manually and may reduce size guarantees during periods of volatility, resulting in possible delays in order execution and losses.
- The execution price I receive may be impacted by numerous factors beyond your control and responsibility, including the type of security, liquidity and the size of my order. For example, large or "block" orders or orders involving illiquid securities may take additional time to execute and may execute at prices significantly different from the quoted price.
- The execution of market and stop-market orders may be at a price significantly different from the quoted price of that security. Limit orders will be executed only at a specified price or better, but there is the possibility that the order will not be executed.
- Securities traded in the over-the-counter bulletin board and pink sheets and other thinly-trade securities present particular trading risks in that they are often more volatile and are generally less liquid than securities traded on exchanges. You reserve the right to place restrictions on the trading of such securities without prior notice.
- I may suffer market losses during periods of volatility in the price and volume of a particular stock when systems issues result in an inability to place buy or sell orders.

**d. Payment for Order Flow.** You may receive remuneration from markets for directing orders to them. The source and amount of these payments is available upon written request. Markets may act as principals to buy, sell or hold securities for their own accounts and they may make money when executing your trade.

**e. Payment for Transactions.** All orders that I authorize will be processed with the understanding that I will pay for any purchase and deliver certificates to cover all sales on or before settlement date. All sell orders that I place will be for securities that I own ("long") and in deliverable form at the time I place the order unless I inform you otherwise.

You reserve the right to require full payment, or an acceptable equity deposit, prior to the acceptance of any order. I will have the required cash, available funds, or equity in my Account prior to the execution and/or settlement of a purchase or short sale transaction, and the required securities in my Account prior to the execution and/or settlement of a long sale. If I do not have sufficient funds or securities in my Account you have the right to liquidate or buy-in securities at my expense and I will be responsible for any cost or loss.

**f. Payment of Indebtedness Upon Demand.** I will be liable for the payment upon your demand of any obligations owing in my Account, including the reasonable costs incurred in collecting such amounts.

**g. Security for Indebtedness.** I consent to you having a continuing security interest in, right of set-off to and lien on all securities, cash and other property in my Account ("Collateral"). Subject to Applicable Rules, and without prior notice to me, you may sell or transfer the Collateral to satisfy my obligations. You also have the discretion to determine which securities and other properties are to be sold and which contracts are to be closed. You have all rights of a secured party under the Uniform Commercial Code.

**h. Loan of Securities.** You are authorized to lend to yourself or others any securities you hold in my Account and to carry all securities lent as general loans. In connection with such loans, you may receive and retain certain benefits to that I will not be entitled, such as interest on Collateral posted for such loans. In certain circumstances, such loans may limit my ability to exercise voting rights with respect to the securities lent.

**i. Short Sales.** I will designate any sell order as a "short" sale if, at the time I place the order I do not own the security I intend to sell or am unable to deliver the security before settlement. All short sales will be executed in a Margin Account.

**j. Mutual Funds.** I authorize you to custody mutual fund holdings that I purchase directly through you. When purchasing a mutual fund, I acknowledge that I have received and read the fund prospectus. Mutual fund purchases may be subject to investment minimums and some mutual funds sold through you impose a charge on the purchase of shares, called a "sales load." I may be able to purchase mutual fund shares through you without paying a front-end sales load, but I may be charged a fee, called a "contingent deferred sales charge," when I sell or redeem my shares. You may receive part or the entire sales load.

Some mutual funds offer reductions in front-end sales loads ("breakpoints"), for purchases over certain amounts or purchased through Letters of Intent or Rights of Accumulation. I am responsible for determining and obtaining any breakpoints, or providing you with sufficient information to assist me in obtaining a breakpoint. Some mutual funds impose a marketing distribution fee known as a "12b-1 fee." You may receive the 12b-1 fees in connection with my investment in such fund's shares. If I invest online in no-transaction fee mutual funds ("NTF funds") directly through you I will not pay a sales load or transaction fee. You receive remuneration from fund companies participating in its NTF fund program. NTF funds have other fees and expenses that apply to continued investment in the fund that are described in the prospectus.

**k. Sweep Program.** My available cash may be swept into a sweep vehicle pending investment of the cash. The alternatives available under the Sweep Program are referred to as "Sweep Choices" and the one I select is referred to as the "Designated Sweep Vehicle." You will notify me of the Sweep Choices and the Designated Sweep Vehicle.

Cash will be automatically invested or deposited in the Designated Sweep Vehicle, according to a sweep schedule determined by you. Proceeds from the sale of securities will be swept into the Designated Sweep Vehicle following settlement if the securities sold have been received in good deliverable form by settlement date. The proceeds of any checks that I deposit to my Account will be swept to the Designated Sweep Vehicle on the Business Day after receipt by you and will begin earning dividends or interest on that day. Access to such funds may be withheld for up to six Business Days to assure that such checks have not been returned unpaid. I may instruct you to change my Designated Sweep Vehicle at any time to another of the Sweep Choices, and acknowledge that such instruction shall constitute my authorization to liquidate balances in my Designated Sweep Vehicle and transfer such balances to the new Designated Sweep Vehicle. I authorize you to automatically withdraw cash or redeem securities maintained in a Designated Sweep Vehicle to satisfy my obligations. I authorize you to act as my agent to purchase and redeem balances in the Designated Sweep Vehicles, and authorize you to select and use agents as you deem appropriate.

The Sweep Choices may include money market funds or a Money Market Deposit Account ("MMDA") for which you or your affiliates receive, to the extent permitted by Applicable Rules, transaction and other fees for providing services. These fees will vary depending on the money market fund (or share class) or MMDA used. No portion of these fees will reduce or offset the fees otherwise due to you unless required by Applicable Rules.

There may be certain minimum requirements for initial and subsequent investments in the Designated Sweep Vehicles. You may change the eligibility criteria or replace the Sweep Choices available to me. You will give me advance notice of any such change in Sweep Choices. Unless I notify you of an objection to such change, I authorize you to withdraw cash or redeem securities held in the prior Designated Sweep Vehicle and to invest or deposit the proceeds in the replacement Designated Sweep Vehicle.

  1. **MMDA.** If the MMDA is my Designated Sweep Vehicle, the available cash in my Account will be automatically deposited in the MMDA at TD Bank, USA, N.A. ("the Bank"), your affiliate. The MMDA will be eligible for insurance by the FDIC of up to $100,000 for non-retirement accounts, $250,000 for IRAs and certain other retirement accounts, for principal and accrued interest per depositor in each recognized legal capacity (e.g., individual, joint, IRA) when aggregated with other deposits held at the Bank in the same capacity. Questions about FDIC insurance coverage may be directed to you. Information also may be obtained by contacting the FDIC, Office of Compliance and Consumer Affairs, by letter (550 17th Street, N.W., Washington, DC 20249), by phone (877-275-3342, 800-925-4618 (TDD) or 202-942-3100), by e-mail (dcainternet@fdic.gov) or by accessing the FDIC Web site at fdic.gov.

  Available cash will be deposited into the MMDA without limit, even if the amount in the MMDA exceeds the FDIC limits of $100,000 or $250,000. I am responsible for monitoring the total amount of deposits that I maintain at the Bank in order to determine the extent of Federal deposit insurance coverage available to me. I acknowledge that the MMDA constitutes an obligation of the Bank and is not an obligation of you. You do not guarantee in any way the financial condition of the Bank or the accuracy of any publicly available financial information concerning the Bank. You will not be responsible for any insured or uninsured portion of the MMDA. Cash in my Account will be automatically swept on a daily basis to the MMDA at the Bank. As required by federal regulations, the Bank reserves the right to require seven days prior notice before permitting a withdrawal out of the MMDA.

Currently, the Bank does not intend to exercise this right. In addition, the MMDA has transfer limits that prevent using it as a transaction account. The following applies to my MMDA:

- When available cash is available for deposit, you will deposit available cash from my Account into a MMDA at the Bank.
- All withdrawals necessary to satisfy debits in my Account will be made by you or Clearing, as my agent. A debit will be created when I purchase securities or request a withdrawal of funds from my Account.
- If my account is flagged as a "Pattern Day Trader," on the next day you will withdraw all MMDA deposits placed them in TD AMERITRADE Cash (described below).
- The Bank will determine interest rates on the MMDA in its discretion based upon a variety of factors including prevailing economic and business conditions, and the nature and scope of the client's relationship with you. For example, rates may vary based on special offers, the particular offering the client uses or the level of assets held by you. The interest rates paid with respect to the MMDA may be higher or lower than the interest rates available to depositors making deposits directly with the Bank or other depository institutions in comparable accounts. The current interest rate will be available on the Website, or I may contact you to obtain the current rate. Interest will accrue on balances from the day they are deposited into the MMDA through the Business Day preceding the date of withdrawal from the MMDA. Interest will be accrued daily and credited on the last Business Day of each month.
- You or Clearing will act as my agent in establishing a MMDA at the Bank, depositing funds into the MMDA and withdrawing funds from the MMDA. No evidence of the MMDA, such as a passbook or certificate, will be issued to me. Ownership of the MMDA at the Bank will be evidenced by a book entry on the records of the Bank, and by records maintained by you or Clearing.

You may terminate my use of the MMDA sweep feature. If you terminate my use of the MMDA sweep feature, or do not wish to continue to act as my agent with respect to the MMDA, I may deal directly with the Bank, subject to its rules, with respect to maintaining deposit accounts. In the event you terminate my use of the MMDA sweep feature, you will inform me of the replacement sweep vehicle.

Similarly, if I decide to terminate my use of the MMDA sweep feature, or that I no longer wish to have you or Clearing act as my agent with respect to the MMDA, I may establish a direct depository relationship with the Bank, subject to the Bank's rules. Establishing a direct depository relationship with the Bank will result in the separation of my MMDA balances from my Account.

You or your affiliates receive, to the extent permitted by applicable law or regulation, transaction and other fees for providing sweep services. The rate of the fee that you receive may exceed the interest rate or effective yield that I receive in the MMDA. No portion of these fees will reduce or offset the fees otherwise due to you in connection with my Account unless required by law or regulation.

You may add banks to the MMDA sweep feature. I will receive notification in advance of any such change. If a depository institution ceases to make its MMDA available through the MMDA sweep feature, I will be given an opportunity to establish a direct depository relationship with that institution outside of the MMDA sweep feature, or to transfer funds to another depository institution participating in the MMDA sweep feature, if available.

2. **TD AMERITRADE Cash.** If I selected TD AMERITRADE Cash as my Designated Sweep Vehicle, you will pay interest on available cash in my Account, which may be changed without prior notice. Interest will be accrued daily, and credited on the last Business Day of each month. You may vary interest rates among clients in connection with special offers or combinations of services or in other circumstances. TD AMERITRADE Cash represents balances pending investment and is not maintained solely for receiving credit interest. TD AMERITRADE Cash is not segregated and you may use the balances, but only to the extent permitted by Applicable Rules. You may segregate TD AMERITRADE Cash held in IRA and other designated accounts from other cash.

3. **Money Market Funds.** Investments in money market funds are subject to restrictions, charges and expenses described in the prospectus. Money market funds are securities that may increase or decrease in value. They are not insured or guaranteed by the FDIC, any other government agency, or you, and there can be no assurance that such funds will be able to maintain a stable net asset value of $1 per share.

# 9. Margin Trading

a. **Margin Account.** When I purchase securities on margin, I am borrowing money from you and pledging all securities and other property in my Account as collateral for these loans. I agree to evaluate my own financial situation, resources, investment objectives and other relevant circumstances to determine whether margin transactions are appropriate for me. You will not make this determination. Even if I determine that margin is appropriate for me, you determine whether to make such loans to me. I also understand that trading securities on margin involve a variety of risks, including the following:

1. **I can lose more funds than I deposit in the Margin Account.** A decline in the value of securities that I purchase on margin may require me to provide additional funds to you to avoid the forced sale of those securities or other securities or assets in my Account. I could lose more than the amount I deposit in my Account.

2. **You can force the sale of securities or other assets in my Account.** If the equity in my Account falls below the maintenance margin requirement, or any higher "house" requirements, you can sell the securities or other assets in any of my Account to cover the margin deficiency. I also will be responsible for any shortfall in the Account after such a sale.

3. **You can sell my securities or other assets without contacting me.** Some investors mistakenly believe that a firm must contact them for a margin call to be valid, and that the firm cannot liquidate securities or other assets in their accounts to meet the call unless the firm has contacted them first. This is not the case. Although you will attempt to notify me of margin calls, it is not required to do so, and even if you have contacted me and provided a specific date by which I can meet a margin call, it can still take necessary steps to protect its financial interests, including immediately selling securities without notice to me.

4. **I am not entitled to choose which securities or other assets in my Account are liquidated or sold to meet a margin call.** Because the securities are collateral for my margin loan, you have the right to decide which securities to sell in order to protect its interests.

5. **You can increase your "house" maintenance margin requirements at any time and you are not required to provide me advance written notice** of the change. These changes to your policy often take effect immediately and may result in the issuance of a maintenance margin call. My failure to satisfy the call may cause you to liquidate or sell securities in my Account.

6. **I am not entitled to an extension of time on a margin call.** While an extension of time to meet margin requirements may be available to clients under certain conditions, I do not have a right to any extension. You will determine whether to provide an extension.

(continued)

**b. Initial Margin and Margin Maintenance Requirements.** There are rules and regulations covering margin loans including the initial and margin maintenance requirements for Margin Accounts. You may impose more stringent margin requirements, which may change without notice to me.

To trade on margin my Account must maintain at least $2,000 minimum equity. I will meet the margin requirement in my Margin Account before entering any order and will satisfy any additional requirements you may require. You may apply all premiums received from option writing against my margin requirements. I have the obligation to monitor the balances in my Margin Account to ensure that I maintain sufficient amounts to meet margin requirements at all times. I agree to read carefully the TD AMERITRADE Margin Handbook before purchasing securities on margin.

You may decline to extend credit to me for any reason, subject to Applicable Rules. There may be times when you have extended credit on certain securities, but due to market or other conditions may require additional cash or securities.

**c. Margin Interest.** I will pay interest on any credit provided to me for the purpose of purchasing, carrying, or trading in any security.

**d. Margin Interest Rates You utilize a base rate ("Base Rate") to set margin interest rates.** My margin interest rate will vary based on the Base Rate and the margin balance ("Balance") in my Margin Account during the interest period. The Base Rate may be changed without prior notice to me. You will post on the Websites any changes to the Base Rate.

**e. Interest Calculation.** For each day there is a debit balance in my Account, the interest charged for that day is calculated by multiplying the applicable interest rate by my debit balance, with the result divided by 360. The sum of the daily interest charges is totaled at the end of each Account statement period and is posted to my Account on the first Business Day of the following Account statement period. I will not earn interest on credit balances in my short Account.

**f. Short Sales.** Sales designated as "short" are done in my Margin Account, and are subject to different margin maintenance requirements than securities purchased on margin. Short sales are subject to certain regulatory rules and cannot be executed under certain market conditions. You may not always have the securities available to facilitate my short sale. You may, without notice, "buy-in" securities to cover any short security position in my Account. I will reimburse you for any losses that you may incur. You may require me to deposit Collateral if the collateral in my Account becomes insufficient. Short sale proceeds are part of the collateral that secures your loan to me. I am also liable for all dividends paid on securities that I have sold short.

**g. Pledge of Securities and Other Property.** You may pledge, repledge, hypothecate or re-hypothecate, without notice to me, all securities and other property that you hold, carry, or maintain in or for any of my Margin or Short Accounts. You may do so without retaining in your possession or under your control for delivery the same amount of similar securities or other property. The value of the securities and other property that you may pledge, repledge, hypothecate or re-hypothecate may be greater than the amount I owe you and any losses, gains or compensation that result from these activities will not accrue to my Account.

## 10. Options Trading

If I elect to engage in options transactions, I will be bound by following additional terms:

**a. Suitability.** Options are not suitable for all investors. Options trading has inherent risks and I am prepared financially to undertake such risks and to withstand the losses that may be incurred. I acknowledge I have received or have been given access to the "Characteristics and Risks of Standardized Options" by the Options Clearing Corporation ("OCC").

**b. General Terms.**

- I am responsible for knowing the rights and terms of all options in my account.
- If my options trading occurs in a margin account, it is subject to the terms and conditions applicable to Margin Trading.
- Settlement on options cleared through the OCC is the business day after trade date. I shall not exceed the position and exercise limits imposed by the rules of the OCC.
- I am responsible for instructing you as to my intention to exercise options contracts before expiration date.
- You and Clearing are authorized to take steps to protect their position and any obligation they have assumed at my request without notifying me.
- If I write (short) a call options contract that requires the delivery of securities to be sold, I may be required to keep the securities in my account until the expiration of the options period and may not be allowed to sell or withdraw the securities.
- If a write (short) a put options contract that requires payment for securities to be purchased, I may be required to keep sufficient funds in my account to make the payment until the expiration of the options period, and may not be allowed to withdraw the funds or use them for any other purpose. If I am assigned on the options, Clearing may use the funds for the purchase of the securities without prior notice to me.
- All short equity and some index options positions are available for assignment. Exercise assignment notices for equity or index options are randomly allocated among all clients' short positions by an automated procedure.

## 11. Initial Public and Follow-On Offerings

You may participate as underwriter or a member of the selling group of, and provide access to Initial Public Offerings ("IPOs") and follow-on offerings. If I participate in such I will be bound by additional terms.

*(continued)*
AMTD 182 F 03/07

## 12. Arbitration

This Agreement contains a pre-arbitration clause. By signing an arbitration clause, the parties agree as follows:

- All parties to this Agreement give up their right to sue each other in court, including the right to jury trial, except as provided by the rules of the arbitration forum in which a claim is filed.
- Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
- The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.
- The arbitrators do not have to explain the reason(s) for their award.
- The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
- The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.
- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement.
- No person will bring a class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a class action; or who is a member of a class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the client is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate will not constitute a waiver of any rights under this Agreement except to the extent stated herein.

I agree that any controversy between you and your affiliates, any of their respective officers, directors employees or agents and me (including any of my officers, directors, employees or agents) arising out of or relating to this Agreement, our relationship, any services provided by you, or the use of the Services, and whether arising before or after the date of this Agreement shall be arbitrated and conducted under the provisions of the Code of Arbitration of the NASD. If any party unsuccessfully resists confirmation or enforcement of an arbitration award rendered under this Agreement, then that party shall pay all costs, attorneys' fees, and expenses incurred by the other party or parties in confirming or enforcing the award. Arbitration must be initiated by service upon the other party of a written demand for arbitration or notice of intention to arbitrate. Judgment, upon any award rendered by the arbitrator, may be entered in any court having jurisdiction.

## 13. Miscellaneous

**a. Severability.** If any provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws, such provisions shall be fully severable. In such event: (i) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision has never comprised a part of this Agreement or was modified to be legal, valid and enforceable; and (ii) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provisions or by its severance from this Agreement, to the extent permitted by Applicable Rules.

**b. Account Handbook.** The Account Handbook provided to me upon account opening and available on your Websites contains important information about my Account. I will refer to the Account Handbook to learn additional information about the handling of trade orders, the receipt and delivery of funds, account policies and other general account information.

**c. Entirety of Agreement.** This Agreement, any attachments hereto, the addenda and other agreements referred to in this Agreement and the terms and conditions contained in the Account statements and confirmations contain the entire agreement between you and me; and it supersedes all prior or contemporaneous communications and proposals, whether electronic, oral or written, between me and you, provided, however, any and all other agreements if any, between me and you and your affiliates, not inconsistent with this Agreement will remain in full force and effect.

**d. Assignment.** I may not assign this Agreement or any rights or obligations under this Agreement without first obtaining your prior written consent. You may assign, sell or transfer my Account and this Agreement, or any portion thereof, at any time, without my prior consent.

**e. Amendment.** You reserve the right to amend this Agreement without prior notice to me or as required by Applicable Rules. The current version of the Agreement will be posted on the Websites and my continued Account activity after such amendment constitutes my agreement to be bound by all amendments to the Agreement, regardless of whether I have actually reviewed them. You are not bound by any verbal statements that seek to amend the Agreement.

**f. Termination.** You may terminate this Agreement, or close, deactivate, or block access to my Account. I will remain responsible for the payment of all obligations incurred in my Account or otherwise. I may terminate this Agreement after paying any obligations owed upon written notice. The Agreement survives termination of the Account.

**g. Force Majeure.** You will not be liable for loss caused directly or indirectly by conditions beyond your reasonable control, including but not limited to Force Majeure events. "Force majeure" means events that are beyond the reasonable control of a party, including but not limited to the following: disasters, extraordinary weather conditions, earthquake or other acts of God, war, insurrection, riot, labor strikes, terrorist acts, government restrictions, exchange or market rulings, suspension of trading, computer or communication line failure, failure of market centers or transmission facilities.

**h. Indemnification.** I agree to indemnify and hold harmless you, your affiliates, and Third Party Providers and their respective officers, directors, employees, agents and representatives from any and all liabilities, losses, costs, judgments, penalties, claims, actions, damages, expenses or attorney's fees (collectively "Losses") resulting or arising directly or indirectly from the use of the Services.

**i. Waiver.** Your failure to insist on compliance with this Agreement will not constitute a waiver of any of its rights.

**j. Admissibility of Documents in Proceedings.** All documents in any format are considered to be true, complete, valid, authentic and enforceable record of the applicable document, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated

*(continued)*
AMTD 182 F 03/07

and maintained in printed form. I will not contest the admissibility or enforceability of your copy of the documents in any proceeding arising out of this Agreement.

**k. Governing Law, Jurisdiction, and Venue.** This Agreement will be governed by the laws of the State of Nebraska but not its conflicts of law provisions. I hereby consent to the jurisdiction of and venue within the State of Nebraska for all disputes arising out of or relating to this Agreement.

# Amerivest Addendum (only for TD AMERITRADE Investing Accounts using the online Self-Directed Amerivest Service or the Amerivest Target Date Portfolio Service)

**Note: Clients with TD AMERITRADE Investing Accounts using the Guided Amerivest Service are subject to the Guided Amerivest Client Agreement.**

Amerivest® is an investment advisory service (the "Advisory Service") of Amerivest Investment Management, LLC, an SEC-registered investment advisor ("Amerivest"), your affiliate.

TD AMERITRADE Investing Accounts are designed for use in conjunction with the Amerivest Advisory Service. They facilitate the execution of ETF transactions relating to the Advisory Service as well as other activities, including performance tracking.

Amerivest provides no advice on securities other than selected ETFs. While TD AMERITRADE Investing Accounts can receive cash as well as securities, any ETF purchases associated with the Advisory Service must be paid for with cash. Accordingly, I should only deposit securities into my TD AMERITRADE Investing Account that I wish to transfer out or sell promptly after the deposit. As to any securities deposited into my TD AMERITRADE Investing Account, I agree that (i) any actions taken by me will be subject to all of the provisions of this Agreement, (ii) neither TD AMERITRADE nor Amerivest has provided or will provide any advice or recommendation to me as to the sale of such deposited securities and that any sale will be on an unsolicited basis, and (iii) I take full responsibility for the consequences for each such sale. If I decide not to sell any securities I deposit into my TD AMERITRADE Investing Account, I will transfer them out of that account promptly.

I agree to the following terms and conditions, which supplement those in the TD AMERITRADE Client Agreement:

1. The forecasts or other information generated by the Advisory Service regarding the probabilities that various investment outcomes might occur are hypothetical in nature, do not reflect actual investment results and are not guarantees of future results. The Advisory Service only presents a range of possible outcomes. The results that I achieve for my portfolio may vary significantly from the historical performance shown due to a variety of reasons, such as whether or not I decide to implement any recommendations provided by the Advisory Service. Historically, the return associated with individual types of investments is positively related to the risk associated with that type of investment. Investment decisions should be based upon a variety of sources and opinions. I should consult a qualified financial and tax professional before trading in any financial instrument. Amerivest and any of its affiliated companies, or any third party, shall have no liability, contingent or otherwise, for any decision made or action I take in reliance upon the Advisory Service.

2. I will pay Amerivest a quarterly fee based on the assets on which Amerivest provides advice:

| Amount Being Advised | Annual Fee* |
|---|---|
| Up to $99,999.99 | .50 of one percent (50 basis points), subject to a minimum fee of the lesser of $100 or 2.95% of the advised amount. |
| $100,000 and over | .35 of one percent (35 basis points) |

*In connection with this fee, TD AMERITRADE will waive commission charges for all associated ETF transactions.

For amounts up to $99,999.99, the fee will be at the annual rate of one-half of one percent (50 basis points), subject to a minimum fee of the lesser of $100 annually or 2.95 percent (295 basis points). This effectively means that advised assets of $20,000 or more will be charged at the 50 basis point rate, that advised assets of between $3,375 and $20,000 will be charged at the $100 annual rate and that only advised assets of up to $3,375 will be charged at the 295 basis point rate. The fee will be assessed by Amerivest quarterly at a rate of one-eighth of one percent (12.5 basis points), subject to a quarterly minimum of the lesser of $25 or .7375 of one percent (73.75 basis points). For amounts of $100,000 or more, the fee will be at the annual rate of .35 of one percent (35 basis points), which will be assessed quarterly at a rate of 8.75 basis points.

If I am an Amerivest client in connection with its Target Date Portfolio service I understand the minimum investment amount is $25,000.

3. The fee will be assessed in my TD AMERITRADE Investing Account on the first trading day of each quarter. If I open my related TD AMERITRADE Investing Account in the middle of a quarter, Amerivest will collect a pro-rated fee for the balance of the quarter upon the account funding. If I close my related TD AMERITRADE Investing Account in the middle of a quarter, Amerivest will refund to me the unearned portion of the previously collected fee. If I close my related TD AMERITRADE Investing Account within five (5) days of opening it, Amerivest will refund to me the fee paid in full promptly.

4. All pricing is subject to change on reasonable notice. Amerivest reserves the right to vary pricing in connection with promotional discounts, including discounts and/or fee waivers for employees of any affiliated company of Amerivest. Amerivest also reserves the right to negotiate fees in individual circumstances.

5. Amerivest's fee does not include commissions or any other charges that may be charged by TD AMERITRADE or any other broker-dealer to execute transactions I may choose to make because of use of the Advisory Service. However TD AMERITRADE will waive all commission charges on associated ETF transactions. In addition, assets held in any exchange-traded fund, money market fund, or any other mutual fund are subject to various fees and expenses, described in the fund's prospectus.

6. In using the Advisory Service, I have provided the following information, directly or indirectly, to Amerivest: (a) my financial goal for an account invested in accordance with an asset allocation model involving index services "(Index Model Account"); (b) my time horizon to attain such goal; (c) my risk tolerance. Any information provided by me to TD AMERITRADE or its affiliates will not be considered in the Index Model Account recommendations. Recommendations provided by the Advisory Service constitute impersonal advice only and are not based on my individual financial circumstances that might impact any decisions I may make. I am responsible for evaluating the recommendations provided by the Advisory Service in light of my own personal financial situation and overall financial goals. It is my responsibility to determine if the recommendations made by the Advisory Service are suitable for my personal circumstances and whether I should implement them.

*(continued)*
AMTD 182 F 03/07

7. The Advisory Service contains model asset allocation recommendations involving index services. If I decide to follow any of the model recommendations I may implement such recommendations through TD AMERITRADE Investing Account on an unsolicited basis. If I implement the recommendations in my separate Account I may be charged applicable commissions and fees, and TD AMERITRADE will act solely as broker. Because Amerivest is not exercising any discretion with regarding to my Account, I am responsible for re-balancing and re-allocating any Index Model Account I may maintain.

8. Amerivest reserves the right to modify or change this Addendum and terminate my access to the Advisory Service without notice, for any reason. Fees, if any, are not refundable for termination under this section. In the event Amerivest terminates this Agreement, Amerivest may refund the pro rata portion of any fee that may have been paid by me in advance as of the date of termination.

9. Subject to Applicable Rules, the liability of Amerivest, or any Third Party Providers arising out of any kind of any claim connected with the Advisory Service will not exceed the amount I have paid for the Advisory Service.

10. I indemnify and hold Amerivest and any of its affiliated companies, Third Party Providers, their respective officers, directors, employees and representatives, harmless from and against any and all claims, losses, liability, costs and/or expenses arising from my violation of this Addendum or any third party's rights. This indemnification and hold harmless obligation will survive the termination of this Addendum. Nothing in these indemnification provisions is intended to limit any rights I may have.

11. Amerivest will not assign this Agreement (as the term "assignment" is defined in the Investment Advisers Act of 1940) without my consent.

12. This Addendum as it relates to the Advisory Services offered by Amerivest will be governed by and construed in accordance with the laws of the United States of America and the State of Nebraska without giving effect to principles of conflict of law.

All controversies concerning this Addendum will be determined by arbitration. Such arbitration will be conducted by the American Arbitration Association in accordance with its Commercial Arbitration Rules, in the State of Nebraska; provided, however, that if such controversy between the parties relates to a controversy to which TD AMERITRADE, Inc. is a party and that is or becomes the subject of an arbitration before a national securities exchange or self-regulatory organization of which TD AMERITRADE, Inc. is a member ("SRO Arbitration"), then the arbitration relating to the controversy between the parties shall be conducted by the same organization and according to the same rules and regulations as the SRO Arbitration. The decision or award of the arbitrator or a majority of them shall be final, and judgment on the award may be entered or enforced in any state or federal court having jurisdiction thereof.

This agreement to arbitrate does not constitute a waiver of any right provided to me by the Advisers Act, including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes.

Any cause of action must be brought by me within one (1) year of when the alleged breach occurred. Any consent, waiver or approval by either party of any act or matter must be in writing and shall apply only to the particular act or matter to which such consent, waiver or approval is given. I acknowledge that, in providing me with the Advisory Service, Amerivest has relied upon me to be bound by the terms of this Addendum and the Agreement. I further acknowledge that I have read, understood and agreed to be bound by the terms of this Addendum, and hereby reaffirm my acceptance of these terms by the use of the Advisory Service.

TD AMERITRADE, Inc., & TD AMERITRADE Clearing, Inc. members NASD/SIPC. TD AMERITRADE is a trademark jointly owned by TD AMERITRADE IP Company, Inc. and The Toronto-Dominion Bank. © 2007 TD AMERITRADE IP Company, Inc. All rights reserved. Used with permission

AMTD 182 F 03/07

**TD AMERITRADE**

Contact Us | Client Log On

Quotes Find Symbol

ex. MSFT    Go

Home | Portfolio & Accounts | Trade | Research & Ideas | Trading Tools | Planning & Retirement | Client Services

TD AMERITRADE Privacy Statement
# A Guide to How We Use and Protect Client Information

**Our Pledge To You**

The trust of our clients is our most precious asset. Protecting your privacy and safeguarding your personal and financial information is one of our highest priorities. The following Privacy Statement explains how TD AMERITRADE, Inc. collects and protects your information. References to "TD AMERITRADE" in this Privacy Statement include all TD AMERITRADE, Inc. companies and divisions.

If you have any questions that this statement does not address, please contact a Client Services representative. By opening a TD AMERITRADE account or by using TD AMERITRADE Web sites, you give your consent to the collection and use of personal information by TD AMERITRADE as explained in this statement. Any dispute over our Privacy Statement is subject to this notice and the TD AMERITRADE, Inc. Terms and Conditions, including arbitration of disputes and limitation of damages.

Please review the following topics to learn more.

Why do we gather information?

What information do we collect?

When do we obtain information?

How do we use your personal information?

What information does TD AMERITRADE share with affiliates, alliances and partners?

Do we share the information collected with any other third parties?

Does our Privacy Statement apply to the sites to which we link?

What steps do we take to protect our clients' personal information?

What about "cookies" and other tracking devices?

Can I opt out of sharing my personal information with non-affiliated third parties?

Can I opt out of receiving certain information?

Will I be able to review, change or correct my information?

How will I know if there are any changes to this Privacy Statement?

**Why do we gather information?**
There are several very important purposes. They all relate to providing you the optimum Internet trading experience.

We collect information required to open an account, to transact business effectively and to safeguard your assets or your privacy. But we also continually strive to improve our services and provide you opportunities to use additional products and services you may find of interest. To do this, we gather information to help us assess your needs and preferences. This includes conducting surveys that ask you to provide demographic information and other means to aid us in anticipating your needs and satisfying your requests.

**What information do we collect?**
The information we collect directly from you includes information required to communicate with you, including your name, mailing address, telephone number, e-mail address and fax number; and to identify who you are, including Social Security number; employer name and address.

As required by law, to assess your experience in margin use and trading, we may also collect your approximate annual income, approximate net worth, approximate worth, and credit reports to assess your financial position.

We also collect demographic information when you register through the site or request information on our products, including gender, birth date, education, occupation, etc.

The information we collect indirectly from you includes your Internet Protocol (IP) address, browser type, operating system, Internet Service Provider (ISP), time stamps, transactions placed, products or services used, prior and following Web site you view, and banner ads you click. We do this through the use of cookies, which are small text files sent from the Web server to your computer. Cookies help us to know you better by providing operational data we can use to aid your interaction with our Web site and improve its navigation and usability.

**When do we obtain information?**
You directly provide to us the majority of information we collect. You do this by completing the account application and related documentation, placing a trade, sending us an e-mail for questions or comment, or submitting information in response to a promotion or special offer. Other ways we obtain information are by (1) observing your usage of the Web site, (2) providing products and services to you, and (3) through other sources such as credit agencies, affiliates and business partners. This information enables us to offer you products and services that should be of interest to you.

**How do we use your personal information?**
Again, the trust of our clients is our most valued asset. Therefore, we use personal information only as appropriate to provide you quality service and security.

For example, TD AMERITRADE may use the information collected from you to verify your identity and contact information. We may also use this information to establish and set up your trading account, issue an account number and a secure password, maintain your portfolio and trading activity, and contact you with account information. This information helps us improve our services to you, customize your browsing experience and inform you about additional products, services or promotions that may be of interest to you.

TD AMERITRADE may also use demographic information provided by others on our clients so that we can develop products and services for our clients.

Should you close your account with us, TD AMERITRADE will retain your information as needed to comply with regulatory requirements.

**What information does TD AMERITRADE share with affiliates, alliances and partners?**
TD AMERITRADE may share information with affiliates if the information is required to provide the product or service you have requested or to provide you the opportunity to participate in the products or services our affiliates offer. TD AMERITRADE also forges partnerships and alliances, which may include joint marketing agreements, with other companies who offer high-quality products and services that might be of value to our clients. In order to ensure that these products and services meet your needs and are delivered in a manner that is useful and relevant, TD AMERITRADE may share some information with partners, affiliates and alliances. This allows them to better

understand the offers that are most relevant and useful. We may also compare our client lists with those of our partners and affiliates to ensure that they are not sending messages to you if you've elected not to be so notified. In our strategic relationships, we will require that it be identified that an offer is being extended because of the relationship with us. The use of your personal information is limited to the purposes identified in our relationship with the partner or affiliate.

Examples of partners and alliances may be financial or non-financial companies, such as airlines, credit card companies, telecommunications companies, and other services providers. Types of information shared are name, e-mail address, mailing address, date of birth, employment status, and general account and demographic information.

An affiliate is a company that we own or control or with which there is common ownership with us and our parent company. An example of an affiliate is our sister company Amerivest Investment Management, LLC, a subsidiary of TD AMERITRADE Holding Corporation. We may share with our affiliates information about our transactions and experiences with you such as name, e-mail address, mailing address, date of birth, employment status, and general account and demographic information. This information may be used for internal reporting, anticipating margin calls, and development strategies. We do not share information other than the types of transaction and experience information described above with our affiliates.

**Do we share the information collected with any other third parties?**
The cornerstone of our Privacy Statement is the commitment to keep our clients' personal information confidential. TD AMERITRADE does not sell, license, lease or otherwise disclose your personal information to any third party for any reason, except as noted earlier and as described below:

- To help us improve our services to you, we may engage another business to help us to carry out certain internal functions such as account processing, fulfillment, client service, client satisfaction surveys or other data collection activities relevant to our business. We may also provide a party with client information from our database to help us to analyze and identify client needs and notify clients of product and service offerings. Use of the information shared is strictly limited to the performance of the task we request and for no other purpose.
- Periodically, we may invite you to participate in advertisements, promotions and special offers offered by TD AMERITRADE or by other sponsoring organizations. These could include retailers, airlines and Internet service providers. Your participation may require us to gather and share your personal information or may require you to supply personal information to the promotion sponsor. For example, a referral program may require that we provide your name as a reference to a prospective client. It is always your choice whether or not to participate.

All third parties with which we share personal information are required to protect personal information in a manner similar to the way we protect personal information. Examples of information shared are identifying information such as name, mailing address, e-mail address, telephone number, and information on account activity.

If at any time you choose to purchase a product or service offered by another company, any personal information you share with that company will no longer be controlled under our Privacy Statement.

TD AMERITRADE also reserves the right to disclose your personal information to third parties where permitted by law or where required by law to regulatory, law enforcement or other government authorities. We may also disclose your information as necessary to credit reporting or collection agencies, or when necessary to protect our rights or property.

**Does our Privacy Statement apply to the sites to which we link?**
No. We are not responsible for the privacy policies or the content of sites we link to and have no control of the use or protection of information provided by you or collected by those sites. Whenever you elect to link to a co-branded Web site or to a linked Web site, you may be asked to provide registration or other information. Please note that the information you are providing is going to a third party, and you should familiarize yourself with the privacy policy provided by that third party.

**What steps do we take to protect our clients' personal information?**

We have made a significant investment in leading-edge security software, systems, and procedures to offer you a safe and secure trading environment and protect your personal, financial and trading information. While no security system is absolutely impenetrable, we are constantly reviewing, refining and upgrading our security technology, as new tools become available.

When you open an account with us, you are issued a unique account number and a personal identification number (PIN). Upon logon, you may also be asked to create a UserID and password to access the Web site. Only a limited number of TD AMERITRADE employees who have a need to know this information will have access to your account number, PIN, UserID, and password. Remember: you are ultimately responsible for maintaining the secrecy of your account number, PIN, UserID, and password. We strongly recommend that you do not disclose this information.

On our trading Web site, we also use technology to encrypt information transmitted by or to you through our Web site. And we use VeriSign™ certificates to authenticate our Web site, allowing you to verify that you are connected to our Web site. In order to activate this technology, you need to utilize a browser like Netscape® or Microsoft® Internet Explorer. We recommend that you choose a browser with strong encryption capabilities.

**What about "cookies" and other tracking devices?**
We use cookies to assist us in securing your trading activities and to enhance the performance of our Web site. (Cookies are small text files sent from the Web server to your computer.) Cookies used by TD AMERITRADE do not contain any personal information nor do they contain account, PIN, or password information. They merely allow the site to recognize that a page request comes from someone who has already logged on.

Cookies also may be placed by third parties when you access their sites through linking from this Web site. We do not have access to these cookies or any information that these cookies may contain. Please contact the third-party site for more information on these cookies. Although we encourage third parties to adhere to appropriate privacy policies and standards, we are not responsible for the actions or policies of such parties.

TD AMERITRADE may share Web site usage information about visitors to the Web site with reputable advertising companies for targeting our Internet banner advertisements on this site and other sites. For this purpose pixel tags (also called clear gifs) may be used to note the pages you've visited. The information collected by the advertising company through the use of these pixel tags is not personally identifiable. These advertising companies have their own privacy policies. For more information about their privacy policies, including information on opting out of their tracking methods, please visit our **third-party tracking opt-out page**.

To administer and improve the TD AMERITRADE Web site, we may use a third party to track and analyze usage and volume statistical information, including page requests, form requests, and click paths. All data collected for this purpose is owned and used by TD AMERITRADE. The third party may use cookies to track behavior and may set cookies on behalf of TD AMERITRADE. These cookies do not contain any personally identifiable information.

**Can I opt out of sharing my personal information with non-affiliated third parties?**
Yes. As previously discussed in our Privacy Statement, we may disclose non-public personal information to non-affiliated third parties. However, you may direct us not to disclose non-public personal information to certain non-affiliated third parties.

If you want to opt out of sharing non-public personal information with non-affiliated third parties, please log on to your account, click the Privacy Statement link at the bottom of the page and follow the opt-out instructions. Or you can send an e-mail to **optout@tdameritrade.com** with the words "opt out" in the subject line and your TD AMERITRADE account number in the body copy. In so doing, you will be identified as a client whose non-public personal information is not to be shared with a non-affiliated third party. An opt-out election made by one account owner of a Joint account is applicable to all account owners of the Joint account. An opt-out election must be made for each separate account you hold at TD AMERITRADE, Inc.

If we propose to share information in a manner not covered in this Privacy Statement, we will notify you of this change

by posting an addendum on the Web site, a notice in the "Announcements" or "What's New" section of the Web site, and if appropriate, provide you an opportunity to opt out of such use.

<u>California and Vermont residents only:</u> Your non-public personal information will not be shared with non-affiliated third parties. Please note that this does not apply if we need to disclose the information to effect, service, administer or process a transaction, product or service you have authorized or requested; to protect against fraud, liability or damages to property; to respond to judicial process; in connection with settling a transaction; or as otherwise permitted by law.

### Can I opt out of receiving certain information?

Yes. If you want to opt out of receiving direct communication from TD AMERITRADE, you can send an e-mail to **unsubscribe@tdameritrade** with the word "unsubscribe" in the subject line and your TD AMERITRADE account number in the body copy. In doing so, you will be identified as a client who does not care to be contacted by us through direct communication for additional product and services offerings or inquires. An opt-out election made by one account owner of a Joint account is applicable to all account owners of the Joint account. An opt-out election must be made for each separate account you hold at TD AMERITRADE. This opt out will not apply to communications required to service your account.

### Will I be able to review, change or correct my information?

Yes. Personal identifying information may be reviewed, changed or corrected at any time. You are responsible for maintaining the accuracy and completeness of your personal and other information. We urge you to review your information regularly to ensure that it is correct and complete. If you would like to review your personal information, or if you believe that any of your information is incorrect, or if you have any questions regarding your personal information, or if you have any other questions or concerns regarding this privacy policy, simply contact a Client Services representative for assistance.

### How will I know if there are any changes to this Privacy Statement?

In the event TD AMERITRADE materially changes this Privacy Statement, the revised Privacy Statement will promptly be posted to the Web site and we will post a notice on the Web site informing you of such changes. Additionally, this Privacy Statement has an effective date displayed in the lower, left corner indicating when it first came into effect. You should review this Privacy Statement periodically to remain informed of any changes. You agree to accept posting of a revised Privacy Statement electronically on the Web site as actual notice to you.

AMTD 800 F 02/07

VeriSign is a trademark of VeriSign, Inc. All rights reserved. Netscape is a registered trademark of Netscape Communications Corporation in the United States and in other countries. All rights reserved. Microsoft is a registered trademark of Microsoft Corporation in the United States and in other countries. All rights reserved.

About Us | Careers | Site Map | Minimum requirements | Privacy | Security Center | Forms & Agreements
TD AMERITRADE Holding Corp. | TD AMERITRADE Institutional | International TDW URLs | TD AMERITRADE Store

Market volatility, volume and system availability may delay account access and trade executions.

*The Best Web Browser-Based Online Broker by Barron's, 3/5/2007 based on Trade Experience, Trading Technology, Usability, Range of Offerings, Research Amenities, Portfolio Analysis & Reports, Customer Service & Access, and Costs. Barron's is a registered trademark of Dow Jones, L.P.

TD AMERITRADE, Division of TD AMERITRADE, Inc., member NASD/SIPC. This is not an offer or solicitation in any jurisdiction where we are not authorized to do business. TD AMERITRADE is a trademark jointly owned by TD AMERITRADE IP Company, Inc. and The Toronto-Dominion Bank. ©2007 TD AMERITRADE IP Company, Inc. All rights reserved. Used with permission.