MAYER, BROWN, ROWE & MAW LLP
LEE H. RUBIN (SBN 141331)
SHIRISH GUPTA (SBN 205584)
Two Palo Alto Square, Suite 300
Palo Alto, CA  94306
Telephone: (650) 331-2000
Facsimile:  (650) 331-2060
lrubin@mayerbrownrowe.com
sgupta@mayerbrownrowe.com

Counsel for Defendant TD AMERITRADE, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| MATTHEW ELVEY, an individual, and GADGETWIZ, INC., an Arizona corporation, on their own behalf and on behalf of all others similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>TD AMERITRADE, INC., a New York corporation, and DOES 1 to 100,<br><br>Defendants. | Case No. C-07-2852 MJJ<br><br>**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MOTION FOR CLASS CERTIFICATION**<br><br>Judge Martin J. Jenkins<br><br>Date: September 18, 2007<br>Time: 9:30 a.m.<br>Location:  Courtroom 11, 19th Floor<br>            450 Golden Gate Ave.<br>            San Francisco, CA 94102 |

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION ................................................................................ 1

4

STATEMENT OF FACTS .................................................................. 3

5

ARGUMENT ....................................................................................... 5

6

I.    PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF ............................... 5

7

      A.    Plaintiffs Have Failed To Show That There Is Even A Fair Chance
            That They Will Succeed On The Merits. ............................................. 6

8

9

            1.    CLRA claim. .......................................................................... 6

10

            2.    UCL claim. ............................................................................. 8

            3.    Fiduciary duty claim. ........................................................... 8

11

      B.    Plaintiffs Have Not Established An Irreparable Injury. ...................... 9

12

13

            1.    Fear of future identity theft is too speculative to warrant
                  injunctive relief. ................................................................. 10

14

            2.    Any injury from the receipt of spam e-mails is *de minimis*,
                  at most. ................................................................................. 12

15

16

            3.    Injury caused by spam-based securities manipulation is
                  neither irreparable nor immediately threatened. ................. 13

17

      C.    Plaintiffs Have Not Shown A Need For The Preliminary Injunction
            Sought .................................................................................................. 14

18

19

            1.    A mandatory injunction requiring TD AMERITRADE to detect,
                  identify, and disclose stock touted by spam should be denied ............... 14

20

            2.    A mandatory injunction requiring an "accounting" of TD
                  AMERITRADE's systems and the implementation of protective
                  measures determined by Plaintiffs' counsel should be denied ............... 17

21

22

            3.    A mandatory injunction requiring TD AMERITRADE to
                  amend its Privacy Statement to make a disclosure concerning
                  e-mails being leaked from the Company's computer systems
                  should be denied. ................................................................. 19

23

24

            4.    The prohibitory injunctions requested by Plaintiffs should be
                  denied as unnecessary. ........................................................ 21

25

26

II.   THE COURT SHOULD DENY CLASS CERTIFICATION. .................................... 21

27

      A.    Class Certification Is Unnecessary. ..................................................... 21

28

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MOTION FOR CLASS CERTIFICATION
CASE NO. C 07 2852 MJJ

# TABLE OF CONTENTS
## (Continued)

Page

B.      Class Certification Is Inappropriate. ...................................................... 22

CONCLUSION ...................................................................................................................... 24

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                               **Page(s)**

3   *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629 (9th Cir. 2007) .......................... 5

4   *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317 (9th Cir. 1997)................................. 22

5   *Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89 (N.D. Cal. 1972)) ....................................... 21

6   *Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783 (N.D. Cal. 1994)............................... 16, 21

7   *Beardslee v. Woodford*, 395 F.3d 1064 (9th Cir. 2005)................................................... 5

8   *Cal. Ass'n of Dispensing Opticians v. Pearle Vision Ctr., Inc.*,
         143 Cal. App. 3d 419 (4th Dist. 1983)........................................................... 10

9   *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) .................................. 9

10  *Churchill Vill., L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119 (N.D. Cal. 2000)............. 5, 6, 14

11  *Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006)................................................. 3, 6, 11, 12

12  *Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ....................................................... 18

13  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663 (2d Dist. 2006)........... 9, 14, 19

14  *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022 (N.D. Cal. 2005) ................. 18

15  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005) ...................... 15

16  *DeSciose v. Chiles, Heider & Co.*, 239 Neb. 195 (1991) ............................................... 8

17  *Duffy v. Cavalier*, 215 Cal. App. 3d 1517 (1st Dist. 1989) .......................................... 8

18  *Forbes v. Wells Fargo Bank, N.A.*, 420 F. Supp. 2d 1018 (D. Minn. 2006)............................. 11

19  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ................................................... 15

20  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) ................................................. 22

21  *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992)....................................... 22, 23

22  *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295 (9th Cir. 1992).................... 7, 20

23  *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975)........................................... 22

24  *Key v. DSW, Inc.*, 454 F. Supp. 2d 684 (S.D. Ohio 2006) ............................................. 11

25  *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197 (9th Cir. 1980) ................................ 5, 13

26  *Leach v. City of San Marcos*, 213 Cal. App. 648 (4th Dist. 1989) .................................... 10

27

28

- iii -

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Cases**                                                         **Page(s)**

3

*LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150 (9th Cir. 2006)..................... 6

4

*Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528 (E.D. Wis. 1990).............. 17

5

*Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998).......................... 16

6

*Preminger v. Principi*, 422 F.3d 815 (9th Cir. 2005) ................................................... 9

7

*Quon v. Stans*, 309 F. Supp. 604 (N.D. Cal. 1970)........................................................ 9

8

*Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1 (D.D.C. 2007) ..................... 11, 12

9

*Remsburg v. Docusearch, Inc.*, 816 A.2d 1001 (N.H. 2003)........................................ 7

10

*Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394 (1996) ................................... 8

11

*Shields v. Smith*, No. C-90-0349, 1991 WL 319032 (N.D. Cal. Nov. 4, 1991)........................ 23

12

*Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324 (W.D. Wash. 1998) ............................ 23

13

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ....................................... 5, 9

14

*Suzuki v. Hitachi Global Storage Techs., Inc.*, No. C 06-07289,
    2007 WL 2070263 (N.D. Cal. July 17, 2007)................................................. 23

15

16

*Twomey v. Mithcum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690 (1st Dist. 1968).............. 8

17

*Univ. of Tex. V. Camenisch*, 451 U.S. 390 (1981)........................................... 6

18

*Walker v. Woodford*, 454 F. Supp. 2d 1007 (S.D. Cal. 2006) .................................... 13

19

*Woods v. Young*, 53 Cal. 3d 315 (1991) .........................................................7, 20

20

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1985)............................................... 22

21

22

**Statutes and Rules**                                                       **Page(s)**

23

17 C.F.R. § 248.1 *et seq.*....................................................................... 4

24

15 U.S.C. § 78i....................................................................................... 15

25

15 U.S.C. § 78j....................................................................................... 15

26

15 U.S.C. § 78l(k)................................................................................... 15

27

15 U.S.C. § 78u...................................................................................... 15

28

- iv -

**TABLE OF AUTHORITIES**
(Continued)

**Statutes and Rules**                                                    **Page(s)**

15 U.S.C. § 78w ..................................................................................... 15

15 U.S.C. § 6801(b) ................................................................................ 4

15 U.S.C. § 7706(g)(1) .......................................................................... 24

Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................... 7

Cal. Civ. Code § 1750 *et seq.* ............................................................... 7

Cal. Civ. Code § 1798.82 ....................................................................... 7

Cal. Civ. Code § 1798.82(a) ................................................... 2, 7, 19, 20

Cal. Civ. Code § 1798.82(e) ........................................................ 2, 19, 20

Fed. R. Civ. P. 23(a)(3) .................................................................. 22, 24

Fed. R. Civ. P. 23(c)(1)(c), 2003 advisory committee note .................. 22

Fed. R. Civ. P. 65 .................................................................................. 18


**Other Authorities**                                                     **Page(s)**

Cal. Dep't of Consumer Affairs, *Recommended Practices on Notice of Security
    Breach Involving Personal Information* 12 (2007), *available at*
    http://privacyprotection.ca.gov/recommendations/secbreach.pdf ................................. 20

Petition for Commission Action to Protect the Investing Public from Unlawful and
    Deceptive Securities Promotions (Apr. 24, 2006), *available at*
    http://sec.gov/rules/petitions/petn4-519.pdf .................................................. 15

Press Release, SEC Suspends Trading of 35 Companies Touted in Spam Email
    Campaign (Mar. 8, 2007), *available at*
    http://sec.gov/news/press/2007/2007-34.htm ........................................... 5, 15

SEC, *Be Alert When You Receive Spam E-mail or Faxes*,
    www.sec.gov/answers/unsolicitedquotations.htm ....................................... 16

SEC, *The Investor's Advocate:  How the SEC Protects Investors*,
    www.sec.gov/about/whatwedo.shtml .................................................... 15

**INTRODUCTION**

Plaintiffs' motion for preliminary injunction goes well beyond simply maintaining the status quo until the merits of this controversy can be decided. In effect Plaintiffs seek a mandatory injunction, which would impose sweeping new obligations on TD AMERITRADE, Inc. ("TD AMERITRADE" or "the Company") without Plaintiffs having to prove their case. It is not surprising that Plaintiffs have attempted to side step the merits because the law and facts do not support the injunctive relief they seek. Plaintiffs have not cited a single analogous case from any jurisdiction in which a court has granted the type of injunction that Plaintiffs have requested here. Furthermore, Plaintiffs' argument for the necessity of a preliminary injunction is disingenuous. According to their complaint, they were aware of spamming events in October 2006. They waited more than seven months to even file this suit.

Plaintiffs completely fail to satisfy their demanding burden to obtain a preliminary injunction. As discussed below, such an injunction requires proof of likely success on the merits, imminent irreparable injury, and hardships that outweigh those the injunction would impose on the respondent and third parties. Strong proof on one of these requirements can compensate for weaker proof on another. However, a plaintiff must establish at least a fair chance of success on the merits and at least the threat of imminent irreparable injury. In addition, where, as here, the bulk of Plaintiffs' requests for preliminary relief seek mandatory injunctive relief, Plaintiffs must show that the facts and the law clearly favor their position. Plaintiffs fail to make even the minimal showings of a fair chance of success and a threat of irreparable injury, much less meet the heightened standard required to obtain a mandatory injunction.

First, Plaintiffs cannot demonstrate probable success on the merits of their claims. As discussed in the Company's Motion to Dismiss, none of those claims even state a cause of action. To take just one example, the claims on which Plaintiffs seek preliminary relief all allege that the Company's Privacy Statement misrepresented and omitted facts regarding the possibility of security breaches affecting customer personal information. But the Privacy Statement expressly advises that "no security system is absolutely impenetrable." Hale Decl., Ex. 2. The

1     Privacy Statement further advises that the Company has "made a significant investment in

2     leading-edge security software, systems, and procedures to offer [its customers] a safe and secure

3     trading environment and protect [its customers'] personal, financial and trading information"

4     (*id.*), and Plaintiffs can demonstrate no evidence to the contrary. Plaintiffs simply have no

5     cognizable claim that TD AMERITRADE made misleading representations or omissions or

6     otherwise owed and breached any fiduciary duty. The utter lack of merit to Plaintiffs' claims, by

7     itself, requires denial of the preliminary injunction Plaintiffs seek.

8          Nor can Plaintiffs show imminent and irreparable injury required to obtain a preliminary

9     injunction. All of their alleged injuries are too speculative, too insubstantial, or too unlikely in

10    the immediate future to warrant a preliminary injunction, or could be addressed, if necessary,

11    through money damages. For instance, Plaintiffs argue that they face the threat of irreparable

12    injury due to identity theft. However, Plaintiffs offer no evidence, and the Company has no

13    information, that any unauthorized person acquired "Sensitive Personal Information" from the

14    Company that could give rise to identity theft, such as names linked to social security numbers

15    ("SSN") or credit card numbers.[1] Moreover, courts have uniformly held that where plaintiffs can

16    only point to a speculative increased risk of future injury from identity theft, they do not state a

17    claim as a matter of law, let alone have a sufficient basis for a preliminary injunction.

18         Finally, the hardships the requested injunction would impose on TD AMERITRADE and

19    third parties significantly outweigh the speculative and insubstantial injuries that Plaintiffs could

20    suffer absent an injunction. For example, Plaintiffs offer no factual basis for proposing that the

21   [1]  Section 1798.82 of the California Civil Code provides that when certain specified personal
information "was, or is reasonably believed to have been, acquired by an unauthorized person" a

22   company must give notice to California resident customers to enable them to take steps to avoid
identity theft if they deem it appropriate. Cal. Civ. Code § 1798.82(a). The specified

23   information that triggers the notice requirement does not include customer e-mail addresses,
which are the principal subject of Plaintiffs' motion. Instead, the sensitive personal information

24   includes: "an individual's first name or first initial and last name in combination with any one or
more of the following data elements, when either the name or the data elements are not

25   encrypted: (1) Social security number. (2) Driver's license number or California Identification
Card number. (3) Account number, credit or debit card number, in combination with any

26   required security code, access code, or password that would permit access to an individual's
financial account." Cal. Civ. Code § 1798.82(e). TD AMERITRADE intends to refer to the

27   personal information that would trigger the notice requirement under California law when it uses
the term "Sensitive Personal Information" in this brief.

28

Company give notice to customers that the Company cannot assure the security of customer personal information and that, as a result, its customers are at risk of becoming victims of identity theft. Such notice, however, could seriously damage the Company's business and reputation. There is no evidence that Sensitive Personal Information that could give rise to identity theft has been acquired by unauthorized third parties. Furthermore, the public report on all aspects of the Company's information security systems that Plaintiffs demand would only increase the risk of future security breaches and place the Company at a significant competitive disadvantage since it would require that the Company reveal sensitive, confidential proprietary information to potential hackers and competitors. In addition, the Court should not enter a mandatory preliminary injunction ordering the Company to implement costly unspecified additional security measures, especially when such measures could actually degrade the Company's systems or unnecessarily interfere with the service it provides to customers.

For each and all of these reasons, Plaintiffs' motion for preliminary injunction should be denied.

## STATEMENT OF FACTS

In accord with the advice in TD AMERITRADE's Privacy Statement that "no security system is absolutely impenetrable," it is generally understood and courts have recognized that even a well-designed information security system is not immune to security breach. Indeed, the U.S. Court of Appeals for the D.C. Circuit recently observed, in vacating a preliminary injunction in a case involving an allegedly deficient information security system, that "'it is generally considered impossible to create a perfectly secure IT environment.'" *Cobell v. Kempthorne*, 455 F.3d 301, 315 (D.C. Cir. 2006).

Nevertheless, federal securities regulators have developed standards to guide brokerage firms like TD AMERITRADE in their efforts to protect customer information. The Gramm-Leach-Bliley Act ("GLB Act") instructed financial institution regulators to "establish appropriate standards . . . relating to administrative, technical, and physical safeguards-- (1) to insure the security and confidentiality of customer records and information; (2) to protect against any

anticipated threats or hazards to the security or integrity of such records; and (3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer."  15 U.S.C. § 6801(b).  Pursuant to the GLB Act, the Securities and Exchange Commission ("SEC") has promulgated Regulation S-P to guide broker-dealer efforts to ensure the security and confidentiality of customer information.  17 C.F.R. § 248.1 *et seq*.  The SEC and the Financial Industry Regulatory Authority ("FINRA")[2] examined TD AMERITRADE's information security systems in 2006 and 2007 and did not report any failures to comply with regulatory standards. Hale Decl. ¶¶ 3-4.

After learning that unauthorized persons may have acquired some number of customer e-mail addresses, TD AMERITRADE began an investigation to determine whether and how such information had been acquired.  *Id.* ¶ 5.  The Company is currently in the midst of evaluating newly discovered information and intends to confer further with its regulators regarding the matter.  *Id.* ¶ 6.[3]  At this point in its investigation, the Company has found no evidence that an unauthorized person has acquired Sensitive Personal Information from its information systems that the Company believes could be used to commit identity theft. *Id.* ¶ 7. The Company has seen no pattern of increasing numbers of requests to restrict accounts due to identity theft from unknown sources.  *Id.* ¶ 8.

Furthermore, a stock spamming scheme is inconsistent with an identity theft scheme.  Identity theft is a clandestine operation that depends on keeping the theft undiscovered, while stock spamming necessarily involves communicating with a potential trader or investor, thereby alerting recipients to possible theft of their information.  Finally, although Plaintiffs have offered in connection with their motion customer complaints drawn from the Internet concerning stock spam, Plaintiffs have not submitted any evidence of identity theft linked in any way to the

---

[2]  FINRA is a self-regulatory organization that oversees its broker-dealer members.  FINRA was formed in July 2007 through the consolidation of National Association of Securities Dealers ("NASD") and the member regulation, enforcement, and arbitration functions of the New York Stock Exchange.  For the sake of consistency, this brief uses FINRA to refer to both FINRA and its NASD predecessor.
[3]  After the Company further evaluates its recent discoveries and has the opportunity to consult with its regulators, it anticipates seeking leave to file an updated statement of its position before the hearing of Plaintiffs' motion for preliminary injunction.

1    Company, although it has been nearly one year since Plaintiffs claim that they began receiving

2    stock spam.

3         Turning to Plaintiffs' stock spam allegations, in the past, when the SEC has concluded

4    that stock spam was being employed to artificially inflate the prices of a security, it has directed

5    TD AMERITRADE to stop processing orders to trade that security and the Company has done

6    so.  Hale Decl. ¶ 9; Press Release, SEC Suspends Trading of 35 Companies Touted in Spam

7    Email Campaign (Mar. 8, 2007), *available at* http://sec.gov/news/press/2007/2007-34.htm (last

8    visited Aug. 17, 2007).

9                                    **ARGUMENT**

10   **I.     PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF.**

11        "A preliminary injunction is an extraordinary and drastic remedy, one that should not be

12   granted unless the movant, by a clear showing, carries the burden of persuasion." *Churchill Vill.,*

13   *L.L.C. v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1125 (N.D. Cal. 2000).  To obtain a preliminary

14   injunction, a movant must show either (1) a likelihood of success on the merits and the

15   possibility of irreparable injury or (2) the existence of serious questions going to the merits and

16   the balance of hardships tipping in the movant's favor.  *Abercrombie & Fitch Co. v. Moose*

17   *Creek, Inc.*, 486 F.3d 629, 633 (9th Cir. 2007).  "These two alternatives represent extremes of a

18   single continuum, rather than two separate tests." *Beardslee v. Woodford*, 395 F.3d 1064, 1067

19   (9th Cir. 2005) (internal quotation marks omitted).  Nonetheless, the movant must make the

20   "irreducible minimum" showing "that there is a fair chance of success on the merits." *Stanley v.*

21   *Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994) (internal quotation marks omitted).  A

22   failure to show a threatened imminent irreparable injury likewise precludes injunctive relief.

23   *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) (finding that lower

24   court "erred in issuing a preliminary injunction because there was no showing of irreparable

25   injury").

26        A movant's effort to meet this already substantial burden is subject to "heightened

27   scrutiny" where, as here, the movant seeks a "mandatory" injunction ordering the respondent to

28                                    - 5 -

affirmatively undertake certain conduct. *Churchill Vill.*, 169 F. Supp. 2d at 1125. A mandatory preliminary injunction may not be granted "unless the facts and law clearly favor the moving party." *Id.* (internal quotation marks omitted). Indeed, mandatory preliminary relief is "particularly disfavored" because the relief "goes well beyond simply maintaining the status quo"—the purpose of a preliminary injunction. *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1158 (9th Cir. 2006); *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

Plaintiffs cannot meet their burden under the conventional preliminary injunction standard, much less under the heightened standard for mandatory preliminary relief.

### A.    Plaintiffs Have Failed To Show That There Is Even A Fair Chance That They Will Succeed On The Merits.

Plaintiffs argue that they are likely to prevail on the merits of their claims that TD AMERITRADE allegedly violated California's Consumer Legal Remedies Act ("CLRA"), California's Unfair Competition Law ("UCL"), and the Company's fiduciary duties to accountholders through various alleged misrepresentations and omissions in the Company's Privacy Statement. Pls.' Mot. at 4-7. The Company's Motion to Dismiss demonstrated, in detail, why Plaintiffs cannot prevail on those claims. Here, we only summarize the key points in that motion and further show that the factual record is devoid of support for Plaintiffs' claims.

### 1.    CLRA claim.

Consider first Plaintiffs' CLRA claim. There has been no actionable misrepresentation or omission. Mot. to Dismiss at 11-13, 15. The Privacy Statement expressly states that "no security system is absolutely impenetrable." Hale Decl., Ex. 2. This statement is consistent with the generally accepted view that information security systems cannot be made perfectly secure. *See, e.g., Cobell*, 455 F.3d 315 ("it is generally considered impossible to create a perfectly secure IT environment"). No one could have reasonably thought that the Company was representing that customer data never could be acquired or used without authorization. Furthermore, Plaintiffs offer no evidence that the Company has not carried through with its Privacy Statement

- 6 -

representation to have "made a significant investment in leading-edge security software, systems, and procedures to offer [its customers] a safe and secure trading environment and protect [its customers'] personal, financial and trading information."  Hale Decl., Ex. 2.  Accordingly, the unauthorized acquisition of customer e-mail information about which Plaintiffs complain does not render any aspect of the Company's Privacy Statement false or misleading.

Nor does the CLRA impose an independent duty to disclose any such unauthorized acquisition of customer e-mail information.  First, the Privacy Statement contains no statement or promise that the Company will notify customers of any and all unauthorized acquisition of customer information.  Second, as discussed above, section 1798.82 of the California Civil Code does not require notice based upon the unauthorized acquisition of customer e-mail addresses or other information that does not constitute Sensitive Personal Information.  Section 1798.82, as the more specific and more recent statute, controls over the CLRA.[4]  Cal. Civ. Code § 1798.82(a); *Woods v. Young*, 53 Cal. 3d 315, 324 (1991) ("a later, more specific statute controls over an earlier, general statute"); *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992) (when two statutes are inconsistent, generally, the later and more specific statute prevails).  Notably, Plaintiffs have not pursued a claim under section 1798.82.[5]

Furthermore, to the extent the claim is directed at so-called "pump and dump" securities fraud schemes, federal law expressly and impliedly preempts Plaintiffs' CLRA claim because it alleges fraud in connection with securities transactions and would interfere with ongoing SEC efforts to combat spam-based pump-and-dump schemes.  Mot. to Dismiss at 6-8.  Likewise, the choice-of-law provision in the Client Agreements governing Plaintiffs' relationship with the Company requires that Nebraska law govern any dispute between the parties, foreclosing the CLRA claim.  Mot. to Dismiss at 4-6.  Finally, Plaintiffs have not even alleged, much less

---

[4] Section 1798.82 was enacted in 2002 (Cal. Civ. Code § 1798.82), while the CLRA was enacted in 1970 (Cal. Civ. Code § 1750 *et seq.*) and the UCL was enacted in 1977 (Cal. Bus. & Prof. Code § 17200 *et seq.*).

[5] Plaintiffs' passing reference to the duty of care that the New Hampshire Supreme Court placed on parties that sell personal information (in *Remsburg v. Docusearch, Inc.*, 816 A.2d 1001 (N.H. 2003)) has no relevance here, where the Company did not sell any of the customer information at issue and Plaintiffs have made no showing that California follows New Hampshire law on this subject.

established, sufficient damage to satisfy the strict standing requirements of the CLRA. Mot. to Dismiss at 9-10. As we explain below, their alleged injuries are non-existent, thoroughly speculative, or *de minimis*. *See* pp. 10-13, *infra*.

### 2. UCL claim.

Every one of the legal and factual infirmities of Plaintiffs' CLRA claim equally dooms Plaintiffs' UCL claim. There is no actionable misrepresentation or omission, federal law and the choice of law provision preempt the claim, and Plaintiffs lack standing to assert the claim. Mot. to Dismiss at 4-8, 13-15. In addition, Plaintiffs cannot pursue their UCL claim because the claim is based in part on an alleged scheme to manipulate securities prices and the UCL does not apply to securities transactions. Mot. to Dismiss at 15.

### 3. Fiduciary duty claim.

Like their CLRA and UCL claims, Plaintiffs' fiduciary duty claim fails because federal law preempts the claim and the Company simply did not make the misrepresentations and omissions through which Plaintiffs claim it breached its fiduciary duties Mot. to Dismiss at 6-8, 16. Furthermore, Plaintiffs simply have not established that they had the type of relationship with TD AMERITRADE that could give rise to a breach of fiduciary duty claim. Mot. to Dismiss at 16-18. A fiduciary relationship does not arise where a broker-dealer, such as TD AMERITRADE, simply processes unsolicited orders and does not provide advice to its accountholders regarding stocks. *DeSciose v. Chiles, Heider & Co.*, 239 Neb. 195, 206 (1991). Even the California cases that Plaintiffs cite find that the scope of a broker's fiduciary duties are limited where it only processes orders. *See Duffy v. Cavalier*, 215 Cal. App. 3d 1517, 1535 (1st Dist. 1989) (noting scope of brokerage fiduciary duties limited where plaintiff simply placed *unsolicited* order); *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 425-26 (1996) (finding no authority for extending fiduciary obligations of broker who just sold mutual funds to oral disclosure of arbitration provision); *Twomey v. Mithcum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690 (1st Dist. 1968) (distinguishing between fiduciary duty owed where broker only processes *unsolicited* orders and duty owed where broker provides advice to customer). It is

undisputed that the Company's relationship with Plaintiffs extended no further than processing unsolicited orders.

*        *        *

Plaintiffs have offered no evidence in support of their preliminary injunction motion that overcomes TD AMERITRADE's dismissal arguments or its factual showing that the Company has not made any misrepresentations or actionable omissions with respect to the protection and use of customer information or the promotion of stock through spam e-mails.  Plaintiffs thus have failed to make even the "irreducible minimum" showing necessary to obtain a preliminary injunction:  "that there is a fair chance of success on the merits."  *Stanley*, 13 F.3d at 1319.  And they certainly have not met their burden to prove that the facts and the law bearing on the merits of their claims clearly favor them, as required to obtain mandatory relief.  Accordingly, the Court should deny their preliminary injunction motion for this reason alone.  *See id.* at 1326 (district court properly denied mandatory relief where plaintiff did not make clear showing of success on the merits).

### B.    Plaintiffs Have Not Established An Irreparable Injury.

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm."  *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  *Id.*  The same is true of injury that is less than substantial.  *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (preliminary injunctive relief unwarranted where plaintiffs failed to demonstrate "significant irreparable harm"); *Quon v. Stans*, 309 F. Supp. 604, 607 (N.D. Cal. 1970) (denying preliminary injunction where irreparable harm claimed by plaintiff was "speculative at best and probably *de minimis*.").  And the requisite injury must be one likely to occur in the immediate future.  *Caribbean Marine*, 844 F.2d at 674 (moving party must demonstrate immediate threatened injury); *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 702 (2d Dist. 2006) ("[I]n order to grant injunctive relief under [the UCL], there must be a threat that the wrongful conduct will continue.").

Plaintiffs claim three injuries in support of their requests for injunctive relief: (1) "the risk of identify theft" (2) "e-mail addresses [being] leaked to spammers"; and (3) "damage caused by Ameritrade's failure to disclose that particular stocks were manipulated by spammers." Pls.' Mot. at 8-11.[6] None of these alleged injuries are irreparable, nonspeculative, substantial, and immediately threatened, as required to meet the irreparable injury requirement for issuing a preliminary injunction.

### 1.    Fear of future identity theft is too speculative to warrant injunctive relief.

Plaintiffs maintain that they will suffer "grave irreparable harm" from the "risk of identity theft" (Pls.' Mot. at 8-9), but they fail to make any factual showing of such imminent harm. Instead, they simply assert, without any support, that, because stock spammers may have acquired e-mail addresses without authorization, it is likely that identity theft operators acquired Sensitive Personal Information. Plaintiff Elvey also disingenuously points to the fact that he was the victim of identity theft, but his declaration reveals that the instances of identity theft occurred *before* he began receiving stock spam. Elvey Decl. ¶¶ 1, 4; FAC ¶¶ 22-24. In addition, although Plaintiffs offer hearsay evidence from the Internet of TD AMERITRADE customers complaining about receiving stock spam as a result of information allegedly acquired from the Company, Plaintiffs have not offered any evidence of TD AMERITRADE customers contending that they also were victims of identity theft as a result of the Company's conduct. Finally, as discussed above, the Company has seen no indication that Sensitive Personal Information that could result in identity theft has been acquired by unauthorized persons.

Furthermore, courts around the country have uniformly held that a speculative increased risk of future injury from identity theft is insufficient to sustain a cause of action – either because there is no legally cognizable injury sufficient to confer standing to sue or because the plaintiff

---

[6] Plaintiffs claim that irreparable harm must be presumed on their CLRA and UCL claims. Pls.' Mot. at 7. But the case on which they rely for that proposition, *Cal. Ass'n of Dispensing Opticians v. Pearle Vision Ctr., Inc.*, 143 Cal. App. 3d 419, 434 (4th Dist. 1983), has been limited by subsequent authority to cases in which a government entity seeks an injunction or a statute provides that a showing of irreparable harm is unnecessary. *Leach v. City of San Marcos*, 213 Cal. App. 3d 648, 661-62 (4th Dist. 1989) (affirming denial of preliminary injunction on statutory claim, where movant failed to demonstrate irreparable harm).

cannot establish the injury element of the cause of action.  Courts have dismissed various types of claims based upon alleged breaches of information security systems in circumstances where the risk of identity theft was far more likely and immediate than it is on this record.  In one recent decision, for instance, a district court dismissed claims against a defendant from which unauthorized persons acquired confidential financial information (including credit card, debit card, and checking account numbers) for the defendant's customers, where the only alleged injury was a "substantial increased risk of identity theft or other related financial crimes."  *Key v. DSW, Inc.*, 454 F. Supp. 2d 684, 688-89 (S.D. Ohio 2006).  Noting that "[i]n the identity theft context, courts have embraced the general rule that an alleged increase in risk of future injury is not an 'actual or imminent' injury," the *Key* court applied that general rule in concluding that the plaintiff lacked standing because her claims were "based on nothing more than speculation that she will be the victim of wrongdoing at some unidentified point in the indefinite future."  *Id.* at 689-90; *see also Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 7 (D.D.C. 2007) (where names, addresses, and Social Security numbers of clients of investment advisor were stolen, finding that "mere speculation that at some unspecified point in the indefinite future [the plaintiffs] will be the victims of identity theft" is insufficient injury to support a claim); *Forbes v. Wells Fargo Bank, N.A.*, 420 F. Supp. 2d 1018, 1021 (D. Minn. 2006) (where unencrypted customer information including names, addresses, Social Security numbers and account numbers of bank customers were stolen, finding that "the plaintiffs' injuries are solely the result of a perceived risk of future harm.  Plaintiffs have shown no present injury or reasonably certain future injury to support damages for any alleged increased risk of harm.").

Significantly, moreover, the D.C. Circuit has overturned a preliminary injunction where the plaintiffs offered only the threat of a future security breach as their irreparable harm.  *Cobell*, 455 F.3d 301.  In *Cobell*, the Department of the Interior appealed a district court order of injunctive relief requiring many of the Department's computer systems to be disconnected from the Internet and internal computer networks because the systems housed or provided access to individual Indian trust data ("IITD").  *Id.* at 303.  The appellate court ruled that the class

-11-

members had not demonstrated that they would "necessarily suffer harm without t[he] injunction," even though "the evidence of flaws in Interior's IT security [was] extensive." *Id.* at 315. The court stated:

> We do not mean to understate the dangers of lax IT security, but as the district court acknowledged, 'it is generally considered impossible to create a perfectly secure IT environment.' The inherently imperfect nature of IT security means that if we granted injunctive relief here, based only on Interior's security vulnerabilities and not on a showing of some imminent threat or specific reason to be concerned that IITD is a target, we would essentially be justifying perpetual judicial oversight of Interior's computer systems. In order to return to normal operations, Interior would be faced with the nearly impossible task of ensuring that its systems have no exploitable weaknesses whatsoever, rather than addressing a more specific danger to IITD.

*Id.* Essentially, the court found that the speculative injury alleged was insufficient to support the mandatory relief the plaintiffs sought.

Here, Plaintiffs offer nothing more than conjecture and speculation that they face an increased risk of identity theft. Indeed, there is no evidence that an unauthorized person has acquired Sensitive Personal Information, much less that such information was actually targeted for use in an identity theft scheme. Under the relevant authorities, Plaintiffs' "mere speculation that at some unspecified point in the indefinite future [they] will be the victims of identity theft" (*Randolph,* 486 F. Supp. 2d at 7) consequently falls short of the required showing to obtain mandatory injunctive relief.

### 2.    Any injury from the receipt of spam e-mails is *de minimis*, at most.

Plaintiffs further claim that leaked e-mail addresses threaten irreparable injury in the form of spam e-mail. But any injury from the receipt of spam e-mail is *de minimis*, at most. Plaintiff Elvey alleges that he received 80 spam e-mails at two e-mails addresses over the course of nine months. FAC ¶¶ 23-24. That volume of spam results in no substantial loss of time or computing resources. Indeed, Plaintiffs can simply delete any spam e-mail with a click of the mouse. All the more, Plaintiffs could discontinue using their unique e-mail addresses, which they only created for the purposes of obtaining evidence for this litigation. Elvey Decl. ¶ 2; Griffiths Decl. ¶ 2. Or Plaintiffs could use a spam filter to block receipt of unwanted spam. A minor and easily

1  avoided inconvenience is not a substantial injury warranting the injunctive relief Plaintiffs seek.

2  *See*, *e.g.*, *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1031 (S.D. Cal. 2006) ("The question is

3  not whether Plaintiffs will suffer inconvenience during the pendency of the lawsuit, but whether

4  they will suffer irreparable injury, such as serious, permanent physical or mental damage, if they

5  are not immediately granted the relief they seek.").

6  **3.    Injury caused by spam-based securities manipulation is neither
          irreparable nor immediately threatened.**

7
8  Plaintiffs finally claim that they will suffer injury warranting injunctive relief as a result

   of the Company's failure to disclose that spammers may be manipulating the prices of certain
9
   securities.    But any such injury from purchasing manipulated securities certainly is not
10
   irreparable.  If accountholders could satisfy the elements of a securities fraud or other cause of
11
   action based upon the purchase or sale of securities in reliance upon anonymous spam e-mails
12
   touting stocks (which would be subject to dispute), they could seek full compensation in the form
13
   of money damages.  And where money damages are possible, an injury is not irreparable.  *L.A.*
14
   *Mem'l Coliseum*, 634 F.2d at 1202 ("It is well established, however, that such monetary injury is
15
   not normally considered irreparable.").
16
   Moreover, Plaintiffs, who allege that they are typical of purported class members, do not
17
   allege that they were ever deceived by stock spam in buying or selling securities.  And Plaintiffs
18
   offer absolutely no evidence suggesting that any measurable number of purported class members
19
   have been injured by acting upon anonymous stock tips in spam e-mail.  Accordingly, there is no
20
   reason to think that any such injury is imminent.  Since it is neither irreparable nor immediately
21
   threatened, the possibility of injury from spam-based securities manipulation does not warrant
22
   the injunction Plaintiffs seek.
23
                              *      *      *
24
   In short, Plaintiffs have failed to show even the possibility of  irreparable injury required
25
   for preliminary injunctive relief.   It follows that they have not met their burden to show that the
26
   law and facts clearly establish the  imminent threat of such an injury.  On that basis alone,
27
   Plaintiffs are not entitled to an injunction.  *See L.A. Mem'l Coliseum*, 634 F.2d at 1202 (finding
28

-13-

1  that lower court "erred in issuing a preliminary injunction because there was no showing of
2  irreparable injury").

3    **C.    Plaintiffs Have Not Shown A Need For The Preliminary Injunction Sought.**

4        The injunction that Plaintiffs request is unprecedented and unwarranted.  It would impose
5  hardships on TD AMERITRADE far greater than any that Plaintiffs would suffer in its absence.
6  And it is detrimental to the public interest.  Thus, even if Plaintiffs had shown that they had a
7  likelihood of success on the merits and faced an imminent irreparable injury (which they have
8  not done and cannot do), equitable factors still would preclude the preliminary injunctive relief
9  they seek.

10        **1.    A mandatory injunction requiring TD AMERITRADE to detect,
           identify, and disclose stock touted by spam should be denied.**

11        Plaintiffs ask the Court to order TD AMERITRADE to detect spam sent to its
12  accountholders, identify stocks touted by such spam, and display a disclosure to California
13  accountholders attempting to purchase the stock reading:

14

15        **THIS STOCK SHOULD BE PURCHASED ONLY WITH EXTREME
        CAUTION.**  THIS STOCK HAS RECENTLY BEEN TOUTED IN
16        UNSOLICITED COMMERCIAL EMAIL.  IT IS LIKELY THAT THE
        PERSONS SENDING THESE EMAILS ARE MANIPULATING THE VALUE
17        OF THIS STOCK AS PART OF A FRAUDULENT INVESTMENT SCHEME.
        THIS SCHEME MAY CAUSE ANY INVESTMENT IN THIS STOCK TO
18        LOSE ITS VALUE NOTWITHSTANDING THE COMPANY'S FINANCIAL
        PERFORMANCE.

19
20  Pls.' Mot. at iii.  On top of that, the injunction Plaintiffs seek would order the Company to
21  provide a means to require each purchaser to affirmatively indicate that they have read the
   warning before executing the transaction.  *Id.*
22
23        Plaintiffs offer no authority for this extraordinary mandatory *preliminary* injunction,
24  aside from a factually unrelated case affirming a *final* injunction under the UCL that required a
25  limited disclosure correcting prior representations that the defendant's products were made in the
26  United States.  *See Colgan*, 135 Cal. App. 4th at 701-02.  That is hardly the clear showing of fact
27  and law that plaintiffs must make in order to obtain relief.  *See Churchill Vill.*, 169 F. Supp. 2d at

28

1125.  The facts and the law on the subject actually show that the injunction directed at spam-based manipulation that Plaintiffs seek would be wholly inappropriate.

Most significantly, the requested injunction would effectively thrust the Court and TD AMERITRADE into the roles of federal securities regulators.  If the Court granted Plaintiffs' requested relief, the Company would have the obligation to pronounce that the price of certain securities is likely being manipulated.  This type of securities market oversight, however, is the province of the SEC (and other market regulators), not a broker-dealer such as TD AMERITRADE.  *See* 15 U.S.C. §§ 78i, 78j, 78l(k), 78u, 78w; SEC, *The Investor's Advocate: How the SEC Protects Investors*, www.sec.gov/about/whatwedo.shtml (last visited Aug. 16, 2007).  Indeed, spam-based pump-and-dump schemes are the focus of ongoing SEC regulatory and enforcement efforts.  The SEC has before it a proposal to regulate stock promotion.  Petition for Commission Action to Protect the Investing Public from Unlawful and Deceptive Securities Promotions (Apr. 24, 2006), *available at* http://sec.gov/rules/petitions/petn4-519.pdf (last visited Aug. 19, 2007).  The Commission also recently suspending trading in 35 stocks subject to spam-based pump-and-dump schemes.  Press Release, SEC Suspends Trading of 35 Companies Touted in Spam Email Campaign (Mar. 8, 2007), *available at* http://sec.gov/news/press/2007/2007-34.htm. (last visited Aug. 17, 2007).  And the SEC has periodically directed brokerage firms to stop processing orders to trade certain stocks that the regulators believe are the subject of spam messages that may be intended to artificially inflate stock prices.  Hale Decl. ¶ 9.

The conflict between Plaintiffs' requested injunction and the regime of securities regulation is palpable.  An order that the Company start telling its customers that certain stock prices are manipulated undoubtedly would frustrate the orderly functioning of the nation's securities markets, a central objective of federal securities regulation.  The federal securities laws, therefore, preempt any such relief.  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869-74 (2000) (frustration of federal objective gives rise to implied conflict preemption); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1134-36 (9th Cir. 2005) (same, finding preemption by SEC-approved NASD rules).

-15-

For TD AMERITRADE, the burden of detecting, identifying, and disclosing spam-based manipulation would be enormous.  The Company would not only have to institute procedures to ascertain what stocks are being touted by spam and reconfigure its systems to provide the required disclosure (which is burdensome enough), it would also have to alter its basic relationship with the vast majority of its customers.  The Company's customer accounts are "self-directed," and the Company ordinarily does not provide investment advice to its customers. Hale Decl., Ex. 1.  The injunction requested by Plaintiffs in this regard would effectively put the Company in the position of providing such advice to its customers.  Plus, a spammed stock's price may not in fact have been manipulated.  And once spammers understand that TD AMERITRADE has been compelled to disparage spammed stocks, they undoubtedly will try to use the Company as a means to effect manipulation schemes designed to drive downward the prices of stocks.  Certainly the $1,000 bond Plaintiffs propose will offer the Company scant protection from the damages that the Company is likely to suffer as a result of the injunction.[7]

We have already shown that Plaintiffs themselves face no hardship in the absence of a requested disclosure regarding spam-based manipulation, because—like the many investors who follow the SEC's advice on the subject, *see* SEC, *Be Alert When You Receive Spam E-mail or Faxes*, www.sec.gov/answers/unsolicitedquotations.htm (last visited Aug. 16, 2007)—they do not trade spam-touted stocks and they know all about the dangers of spam-based manipulation. The balance of hardships thus plainly tips against a preliminary injunction.  *See Atari Corp. v. Sega of Am., Inc.*, 869 F. Supp. 783, 792 (N.D. Cal. 1994) ("[W]eighing the certainty of harm to [the defendant] and the non-party retailers, software developers and peripheral manufacturers against the speculative possibility of irreparable harm to [the plaintiff], the balance tips against issuance of a preliminary injunction").  So does the public interest.  An order effectively making

[7] This case is not remotely like the civil rights and public interest cases against government entities and officials that Plaintiffs cite (at 14) in support of their minimal bond offer.  Where serious commercial damages are threatened by a preliminary injunction, a substantial bond is in order.  *See Michaels v. Internet Entm't Group, Inc.*, 5 F. Supp. 2d 823, 842-43 (C.D. Cal. 1998) (rejecting request for minimal bond).  Although the size of any bond here would depend on the precise relief ordered—if the Court found any injunction were appropriate in the first place (which it is not)—the bond would certainly need to be very substantial.

1  TD AMERITRADE a securities regulator would interfere with the anti-manipulation and broker-

2  dealer regulatory efforts of the SEC and other market regulators, and it could adversely affect

3  many issuer companies whose stock may be subject to the proposed manipulation disclosures.

4          **2.    A mandatory injunction requiring an "accounting" of TD
           AMERITRADE's systems and the implementation of protective
5          measures determined by Plaintiffs' counsel should be denied.**

6          Plaintiffs ask the Court to order that TD AMERITRADE provide them (and their

7  counsel) with an "accounting" of the Company's "record systems" containing the personal

8  information of California accountholders.  Pls.' Mot. at iii.  Plaintiffs plan to use the accounting

9  for two purposes:  (1) to prepare a report they want the Court to order the Company to distribute

10 to all current and former accountholders; and (2) to develop unspecified security measures they

11 want the Court to order the Company to implement.  *Id.* at iv.  This extraordinary injunctive

12 relief is completely improper.

13         First, as discussed above, Plaintiffs have not produced any evidence indicating that the

14 representations in the Privacy Statement are false or misleading or that the Company has an

15 affirmative duty to supply additional information to Plaintiffs.  For that reason alone, they should

16 not be granted this relief.  Second, Plaintiffs seek information on all aspects of the Company's

17 security systems even though the only evidence they offer in support of their position involves

18 the unauthorized acquisition of customer e-mail addresses.  There is no evidence that Sensitive

19 Personal Information has been acquired by an unauthorized person.  Accordingly, there is no

20 basis for ordering a system-wide accounting.  If Plaintiffs' claims are not dismissed, any need for

21 additional information can be satisfied through discovery, subject to an appropriate protective

22 order to protect confidential information about the Company's security systems and also limited

23 in scope to the information that is necessary to resolve whatever issues remain.[8]

24 ───────────────
   [8]  Even if the Company were required to provide detailed information regarding its security
25 systems to Plaintiffs and their counsel under protective order, there would still be a serious risk
   of harm.  Courts have recognized that protective orders are imperfect at best and have limited
26 discovery to only the most essential confidential information, even where a protective order is in
   effect.  *See, e.g., Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D.
27 Wis. 1990) ("There is a constant danger inherent in disclosure of confidential information
   pursuant to a protective order. Therefore, the party requesting disclosure must make a strong
28 showing of need . . . .").  The highly sensitive nature of the information that would be involved in
                                                                                  (cont'd)

-17-

Third, an "accounting" relates to a statement of financial accounts or transactions. *See County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022, 1032 (N.D. Cal. 2005) ("An accounting is an equitable remedy by which a party opens its books so that the other side may calculate amounts owed."). We are not aware of any case in which a court has ordered an "accounting" of a company's information security system. The lone authority Plaintiffs cite in support of their request for such an accounting is not to the contrary. The accounting ordered in the *Cobell* case was an accounting of money in Indian trust accounts, the accurate completion of which the court tried to ensure by requiring the Interior Department to establish written computer and business system architecture policies. *Cobell v. Norton*, 391 F.3d 251, 254 (D.C. Cir. 2004). The court did not order an "accounting" of information security systems. Plaintiffs' requested accounting is literally unprecedented.

Fourth, the proposed injunction is also impermissibly vague regarding TD AMERITRADE's obligations. There is no description of what particular information would be required by the requested accounting of records systems. And, of course, no one knows what yet-to-be-developed information security changes Plaintiffs want the Court to force the Company to implement. This lack of detail is inconsistent with Fed. R. Civ. P. 65, which requires that injunctions state their terms "specifically" and "describe in reasonable detail" the acts required.

Finally, presenting a public report that contains information concerning the Company's proprietary and confidential security systems would only encourage future attempts by hackers to gain access to the Company's computers as well as expose proprietary and confidential information to competitors, contrary to the interests of the Company, its customers, and stockholders. In addition, this injunction would be extremely burdensome for TD AMERITRADE. The Company's computer systems are extensive and, depending upon its scope, an "accounting" could require extraordinary time and expense to complete. Then, the Company would presumably have to expend significant time and effort complying with whatever

---

an accounting, combined with the practical limitations on a Court's ability to ensure strict compliance by parties (or their experts) with a protective order, constitutes a separate and independent reason to deny Plaintiffs' request for an accounting of the Company's elaborate information security systems.

1    security measures Plaintiffs and their counsel concoct.  Again, Plaintiffs' offer to post a $1,000

2    bond is cold comfort.

3              **3.    A mandatory injunction requiring TD AMERITRADE to amend its
                        Privacy Statement to make a disclosure concerning e-mails being
4                       leaked from the Company's computer systems should be denied.**

5           Plaintiffs request that the Court require TD AMERITRADE to amend its Private

6    Statement and any other communications with accountholders to include a five-paragraph

7    statement that begins:

8           **ALERT: AMERITRADE'S INFORMATION SYSTEMS ARE NOT
             NECESSARILY SECURE AND WE CANNOT ASSURE THE SECURITY
9            OF YOUR PERSONAL INFORMATION.**  THERE IS EVIDENCE THAT
             SOME ACCOUNTHOLDERS' EMAIL ADDRESSES HAVE LEAKED FROM
10           AMERITRADE'S COMPUTER SYSTEMS TO SPAMMERS.  AMERITRADE
             HAS AN ONGOING INVESTIGATION INTO THIS SITUATION.  **YOUR
11           NAME, SOCIAL SECURITY NUMBER, AND YOUR EMAIL ADDRESS
             MAY HAVE BEEN LEAKED AS WELL.**
12

13   Pls.' Mot. at iv.  The proposed statement goes on to recommend that accountholders take a

14   variety of steps to protect themselves from identity theft.  *Id.*

15          Once again, the only basis Plaintiffs offer for this extraordinary relief is the *Colgan*

16   court's approval of a *final* injunction requiring a "corrective disclosure."  135 Cal. App. 4th at

17   701-02.  That ruling does not remotely support a *preliminary* injunction requiring a corrective

18   disclosure in this case.  A corrective disclosure simply is not appropriate at the preliminary

19   injunction stage when there has been no determination that the defendant made a

20   misrepresentation or omission in violation of the UCL or CLRA or otherwise breached any duty.

21   And that is particularly true here, given that Plaintiffs cannot show even a likelihood that they

22   will eventually succeed on their CLRA and UCL claims.  *See* pp. 6-9, *supra.*

23          The injunction requiring disclosure that Plaintiffs seek also is inappropriate because it

24   would allow them to circumvent the statutory requirements for such a disclosure under section

25   1798.82 of the California Civil Code.  As already explained, that statute requires disclosure only

26   when Sensitive Personal Information, such as SSN, are reasonably believed to have been

27   acquired by an unauthorized person.  Cal. Civ. Code § 1798.82(a), (e).  Acquisition of e-mail

28

                                              -19-

addresses triggers no disclosure obligation. *Id.* And being more recent and more specific, section 1798.82 controls over the CLRA and UCL on the question of when a business must disclose a breach in the security of computerized data. *See Woods*, 53 Cal. 3d at 324 ("a later, more specific statute controls over an earlier, general statute"); *Hellon & Assocs.*, 958 F.2d at 297 (when two statutes are inconsistent, generally, the later and more specific statute prevails). As explained above, Plaintiffs offer nothing but unfounded speculation that Sensitive Personal Information has been acquired by an unauthorized person. Plaintiffs should not be able to circumvent the California legislature's apparent judgment that no disclosure is necessary under the circumstances here, by simply claiming that the failure to make a disclosure violates the UCL, CLRA, and common law fiduciary duty principles.

The balance of hardships weigh against granting Plaintiffs this injunctive relief, as well. If TD AMERITRADE were required to publish the misleading, alarmist, and speculative disclosure drafted by Plaintiffs' counsel, the Company would suffer irreparable harm to its reputation and goodwill. The Company would likely lose customers because the warning would create unwarranted fear and anxiety for those customers that they were likely going to fall prey to identify theft. This, in turn, would undoubtedly cause many accountholders to undertake unnecessary but burdensome steps to protect themselves from identity theft. Indeed, California's Department of Consumer Affairs has specifically warned against "false positive" notifications because they place burdens on customers, credit bureaus, and a wide variety of businesses as customers act to prevent identity theft. Cal. Dep't of Consumer Affairs, *Recommended Practices on Notice of Security Breach Involving Personal Information* 12 (2007), *available at* http://www.privacyprotection.ca.gov/recommendations/secbreach.pdf (last visited Aug. 19, 2007). And even if the lack of such a disclosure actually caused the injuries Plaintiffs allege— receipt of spam and increased risk of identity theft—those injuries are *de minimis* and speculative, respectively. At this point—when there is no evidence of unauthorized acquisition of Sensitive Personal Information—there is no need to recommend that customers place fraud alerts on their credit accounts and spend money on credit protection. If there becomes reason to

believe that customers' Sensitive Personal Information was acquired without authorization, the Company stands ready to follow the directives of the applicable laws and the regulators monitoring its investigation. Thus, the Court should refuse to order the security-breach disclosure Plaintiffs seek. *See Atari Corp*, 869 F. Supp. at 792.

### 4. The prohibitory injunctions requested by Plaintiffs should be denied as unnecessary.

Plaintiffs also ask that the Court enter an order prohibiting TD AMERITRADE from (1) instructing, directing, or suggesting that its accountholders destroy copies of spam that promotes stocks; and (2) disclosing its accountholders' personal information, including their e-mail addresses, to third parties in a manner inconsistent with its Privacy Statement. Pls.' Mot. at iii. Both of these requests should be denied as unnecessary.

The Company no longer suggests that its accountholders delete spam from their e-mail accounts. Hale Decl. ¶ 11. That original suggestion was prompted by a legitimate concern that the spam might contain viruses that could damage customers' computers. *Id.* However, in light of Plaintiffs' insinuations, the Company stopped making that suggestion. Accordingly, injunctive relief would be inappropriate here, because TD AMERITRADE is not engaging in the conduct that is the subject of the requested relief. *See, e.g., Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89, 92 (N.D. Cal. 1972).

Nor is the other prohibitory relief Plaintiffs request appropriate. The Company has never intentionally disclosed any of its accountholders' e-mail addresses or other information to any unauthorized third parties (Hale Decl. ¶ 12), and Plaintiffs offer no evidence to the contrary. The Court should reject this injunctive relief as "superfluous and inappropriate" as well. *Alsup*, 57 F.R.D. at 92.

## II. THE COURT SHOULD DENY CLASS CERTIFICATION.

### A. Class Certification Is Unnecessary.

As Plaintiffs acknowledge in their brief (at 18), class certification is unnecessary at the preliminary injunction stage where relief for the named plaintiffs would, as a practical matter

-21-

1    extend to all purported class members.[9]  Thus, there is no need for the Court to even take up the

2    class certification question.  *See Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1985) ("as a

3    practical matter, injunctive relief for an individual plaintiff will lead to complete relief for the

4    potential class because defendant will voluntarily treat all alike thereafter").

5                    **B.    Class Certification Is Inappropriate.**

6           No matter the need for class certification, it is clear that class certification to effectuate

7    the preliminary injunctive relief Plaintiffs seek would be inappropriate for at least two reasons.

8    First, class certification proceedings on Plaintiffs' injunctive relief claims are premature.  As

9    Plaintiffs recognize, "the discovery that typically precedes class certification" has not occurred.

10   Pls.' Mot. at 18; *see also Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 210 (9th Cir. 1975) ("[t]he

11   propriety of a class action cannot be determined in some cases without discovery").  Plus, the

12   nature and scope of Plaintiffs' claims have yet to be determined; a dismissal motion testing their

13   legal sufficiency is currently pending.   In these circumstances, the Court cannot conduct the

14   "rigorous analysis" necessary to determine whether Plaintiffs have met their burden to show that

15   their suit satisfies the requirements for class certification.  *Gen. Tel. Co. of Sw. v. Falcon*, 457

16   U.S. 147, 161 (1982).  Class certification, therefore, must be denied until the necessary analysis

17   can be undertaken.  Fed. R. Civ. P. 23(c)(1)(c), 2003 advisory committee note ("A court that is

18   not satisfied that the requirements of Rule 23 have been met should refuse certification until they

19   have been met.").

20          Second, it already is apparent that Plaintiffs cannot meet the class certification

21   requirement that "the claims or defenses of the representative parties are typical of the claims or

22   defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality is missing and "class certification is

23   inappropriate where a putative class representative is subject to unique defenses which threaten

24   to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th

25   Cir. 1992); *see also Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir.

---

26   [9] TD AMERITRADE notes, however, that the only preliminary injunctive relief that Plaintiffs
27   even suggest is related to their CAN SPAM claims (Pls.' Mot. at 17) is the demand that the
     Company be ordered to stop telling its customers to delete spam.  In all other respects, the
     requested preliminary relief relates only to California Resident Class.

28
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MOTION FOR CLASS CERTIFICATION
CASE NO. C 07 2852 MJJ

1   1997) ("[W]hen named plaintiffs are subject to unique defenses which could skew the focus of

2   litigation, district courts properly exercise their discretion in denying class certification.").[10]

3   Here, Plaintiffs' unique factual situations will require them "to meet defenses that are not typical

4   of the defenses which may be raised against other members of the proposed class." *Hanon*, 976

5   F.2d at 508.

6           For instance, Plaintiffs will face unique defenses based on their effort to create evidence

7   for this litigation by opening accounts for the purpose of receiving and cataloging spam. FAC ¶¶

8   22-24, 27-28. Courts have denied class certification on typicality grounds where the named

9   plaintiff manufactured the litigation. In *Hanon*, the Ninth Circuit found that the named plaintiff

10  did not satisfy the typicality requirement and denied class certification in a securities fraud case

11  because the plaintiff bought minimal numbers of shares of stock in various publicly held

12  technology companies in order to bring securities fraud suits, which subjected him to a

13  substantial non-reliance defense. 976 F.2d at 508-09; *see also Shields v. Smith*, No. C-90-0349,

14  1991 WL 319032, at *3 (N.D. Cal. Nov. 4, 1991) (denying class certification on typicality

15  grounds where plaintiff's reliance on market integrity would be "subject to serious rebuttal as a

16  result of [her] professional practice of buying a few shares in troubled companies in order to later

17  serve as class representative").

18          Plaintiffs efforts to subject themselves to spam in order to bring this suit raise the same

19  sort of manufactured-suit defenses that made the *Hanon* plaintiff atypical. Indeed, it is unlikely

20  that they were deceived by any alleged misrepresentation in the Company's Privacy Statement or

21  by any stock spam—a requirement for their CLRA claim. *See Suzuki v. Hitachi Global Storage

22  Techs., Inc.*, No. C 06-07289, 2007 WL 2070263, at *5 (N.D. Cal. July 17, 2007) ("[I]n order to

23  state a claim under the CLRA for injury as a result of a misrepresentation, the plaintiff must

24  believe the alleged misrepresentation to be true."). And they have not alleged that they were

25  deceived. Similarly, the cause of the injuries Plaintiffs allege is their effort to manufacture this

---

26  [10] The passing suggestion to the contrary in *Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d
    1324, 1342 (W.D. Wash. 1998), which Plaintiffs cite in support of their class certification
27  argument, completely ignores the clear Ninth Circuit precedent on the obstacle to typicality that
    unique defenses present.

28

lawsuit, not any representation by the Company. These unique defenses would be a major focus at trial. Clearly, Plaintiffs are not sufficiently typical of the California Resident Class to pass muster under Rule 23(a)(3).

Plaintiffs likewise are atypical of the CAN SPAM class for purposes of the request that the Company be ordered to stop telling its customers to delete spam, which is the only preliminary injunctive relief Plaintiffs even suggest is related to their CAN SPAM claims (Pls.' Mot. at 17). Plaintiffs have never alleged, much less demonstrated, that the Company told them to delete spam. And, even if the Company had not already stopped advising customers to delete spam (Hale Decl. ¶ 11), there certainly would be no risk that they would delete spam at the Company's urging in the future, given their efforts to preserve "evidence" (FAC ¶¶ 22-24, 27-28). This unique defense to a spoliation claim makes Plaintiffs atypical.[11]

## CONCLUSION

For the foregoing reasons, TD AMERITRADE respectfully asks that the Court deny Plaintiffs' motions for a preliminary injunction and for class certification.

Dated: August 23, 2007                     MAYER, BROWN, ROWE & MAW LLP

                                            By:  _____/s/___ Lee H. Rubin_____
                                                 Lee H. Rubin
                                            Counsel for Defendant  TD AMERITRADE, Inc.

Of Counsel
MAYER, BROWN, ROWE & MAW LLP
Robert J. Kriss
71 South Wacker Drive
Chicago, Illinois 60606-4637

---

[11] Plaintiffs face another unique CAN SPAM defense given the serious questions about whether their "businesses" actually qualify as "Internet access service" providers eligible to bring suit under the CAN SPAM Act. *See* 15 U.S.C. § 7706(g)(1); Mot. to Dismiss at 20-21. There is no evidence that Elvey has any users for the services he supposedly provides. And a third party maintains, stores, and gives internet connectivity to service which provides the supposed services of both plaintiffs. FAC ¶¶ 26, 28.

-24-