Alan Himmelfarb
LAW OFFICES OF ALAN HIMMELFARB
2757 Leonis Blvd
Los Angeles, CA 90058
Telephone: (323) 585-8696
Fax: (323) 585-8198
consumerlaw1@earthlink.net

Scott A. Kamber
Ethan Preston
KAMBER & ASSOCIATES, LLC
11 Broadway, 22d Floor
New York, NY 10004
Telephone: (212) 920-3072
Fax: (212) 202-6364
skamber@kolaw.com
epreston@kolaw.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| MATTHEW ELVEY, an individual, and GADGETWIZ, INC., an Arizona corporation, on their own behalf and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> TD AMERITRADE, INC., a New York corporation, and DOES 1 to 100, <br><br> Defendants. | No. C 07 2852 MJJ <br><br> Judge Martin J. Jenkins <br><br> **PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS** <br><br> Date: September 18, 2007 <br> Time: 9:30 a.m. <br> Location: Courtroom 11, 19th Floor <br> 450 Golden Gate Ave. <br> San Francisco, CA 94102 |

# Table of Contents

Page

I.     California Law Applies to Claims of California Resident Class Members ...............1

II.    Elvey's Claims Cannot Be Mischaracterized as Securities Claims ........................3

      A.     Ameritrade Cannot Stretch SLUSA Preemption to Cover the FAC's Claims ......3

      B.     Ameritrade's Implied Preemption Argument Fails .............................................6

      C.     The FAC Does Not Fall Within Securities Exception to the UCL, to the Extent
           Such Exception Even Exists ..............................................................................7

III.   Elvey and California Resident Class Members State UCL and CLRA Claims ......8

      A.     Elvey's Alternate Allegation That Ameritrade Intentionally Disclosed Email
           Addresses States Claims Under the CLRA and UCL .........................................8

      B.     Ameritrade's Omissions and Misrepresentations About the Security Breach
           Violated the CLRA And UCL..............................................................................9

      C.     California Civil Code § 1798.82 Does Not Restrict Elvey's Claims..................11

      D.     Ameritrade's CLRA and UCL Violations Damaged Elvey and the Other
           California Resident Class Members .................................................................11

      E.     Ameritrade's Arguments Concerning Plaintiffs' Use of Unique Email Addresses
           Are Disingenuous and Legally Baseless............................................................14

IV.    Ameritrade Breached Its Fiduciary Duties to Elvey and the Other California
     Resident Class Members ...........................................................................................15

V.     Ameritrade's Arguments Against the CFAA Claim Ignore Directly Applicable
     Precedent ...................................................................................................................16

      A.     Ameritrade Can Be Liable for the Does' CFAA Violation Under the Applicable
           Respondeat Superior Principles.......................................................................17

      B.     The FAC Adequately Alleges That Does' Actions Were Unauthorized.............19

# Table of Contents

Page

**VI.    Ameritrade's Faulty Arguments Against the CAN SPAM Claim Cannot Prevail**...........................................................................................20

    A.    Plaintiffs Have Standing to Bring CAN SPAM Claims As Adversely Affected Internet Access Service Providers......................................................20

    B.    As the Origin of the Traced Spam, Ameritrade Is Liable Under the CAN SPAM Act For "Initiating" the Traced Spam ...............................................23

**Table of Authorities**

**Federal Cases**                                                                    **Page**

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*, 174 F. Supp. 2d 890 (D. Iowa 2001) ..13 n.17

*Arc Ecology v. U.S. Air Force*, 411 F.3d 1092 (9th Cir. 2005)......................................25 n. 37

*Barnhill v. Johnson*, 503 U.S. 393 (1992)...........................................................................21-22

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)................................................................21 n.29

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ...........................................................9 n.9

*Blum v. Stenson*, 465 U.S. 886 (1984).........................................................................................4

*Botosan v. Paul McNally Realty*, 216 F.3d 827 (9th Cir. 2000)......................................23 n.33

*Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149 (9th Cir. 1992) .......................17-18 & n.23

*Brown v. Gardner*, 513 U.S. 115 (1994)...........................................................................24 n.36

*Butera & Andrews v. IBM*, 456 F. Supp. 2d 104 (D.D.C. 2006)..................................17 & n.21

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) ...................................................................6

*Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138 (N.D. Cal. 2005)...............................10

*Chavez v. Blue Sky Natural Bev. Co.*,
    No. 06-6609, 2007 U.S. Dist. LEXIS 44487 (N.D. Cal. Jun. 11, 2007) ..............12 n.15

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059 (E.D. Cal. 2006).........3 n.2

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ...................................................6

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) ................................................6 n.6

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)..........................................................................22 n.32

*Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546 (2005)...................................22 & n.30

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002)..................................................14

*Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*,
    267 F. Supp. 2d 1268 (S.D. Fla. 2003).........................................................13 n. 17, 15

*In re Gerwer*, 898 F.2d 730 (9th Cir. 1990) ............................................................................25

*Gordon v. Ascentive, LLC*,
    No. 05-5079, 2007 U.S. Dist. LEXIS 44207 (E.D. Wash. June 19, 2007) ...........21 n.28

*Gordon v. Virtumundo, Inc.*,
    No. 06-204, 2007 U.S. Dist. LEXIS 35544 (W.D. Wash. May 15, 2007)...21-23 & n. 31

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)..................................4, 5

**Table of Authorities**

**Federal Cases**                                                                 **Page**

*Hart v. McLucas*, 535 F.2d 516 (9th Cir. 1976).........................................................25

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................14

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ...................................7-8

*Hypertouch, Inc. v. Kennedy-Western Univ.*,
    04-5303, 2006 U.S. Dist. LEXIS 14673 (N.D. Cal. Mar. 8, 2006) ............................21

*Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50 (2004) ..........................24 n.36

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005) ....................10 n.10

*Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698 (D. Or. 1997)..14 n.18

*L.A. News Serv. v. Reuters Tv Int'l*, 149 F.3d 987 (9th Cir. 1998) ................................23 n.33

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996) ............................6 n.6

*Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842 (N.D. Cal. 2000) .................3 n.2

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117 (1973) .......................6 n.6

*Myspace, Inc. v. Globe.com, Inc.*,
    06-3391, 2007 U.S. Dist. LEXIS 44143 (C.D. Cal. Feb. 27, 2007) ...........................21

*Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994) .......................23

*Omni Innovations, LLC v. Impulse Mktg. Group, Inc.*,
    No. 06-1469, 2007 U.S. Dist. LEXIS 51867 (W.D. Wash. July 18, 2007)............23 n.34

*Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002) .....17, 18, 19 & n.24

*Petro-Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349 (3d Cir. 1987)..........................17-18

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*,
    422 F.3d 949 (9th Cir. 2005).........................................................................23

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006) ..............................5, 9, 11 n.12, 12, 13, 20 n.26, 21 n.27

*Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526 (M.D. Pa. 2006).......16 n.21

*Theofel v. Farey-Jones*, 341 F.3d 978 (9th Cir. 2003) .........................................16-17

*Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931 (9th Cir. 2001) ...............................3 n.2, 7-8

*United States v. Hockings*, 129 F.3d 1069 (9th Cir. 1997) .......................................4

*United States v. Middleton*, 231 F.3d 1207 (9th Cir. 2000) .................................13 n.17, 14-15

*United States v. Stevens*, 462 F.3d 1169 (9th Cir. 2006)..........................................24

# Table of Authorities

**Federal Cases**                                                                                 **Page**

*ViChip Corp. v. Lee*,
     No. C 04-2914, 2006 U.S. Dist. LEXIS 41756 (N.D. Cal. June 9, 2006)........19-20 n.25

*Williams v. Gerber Prods. Co.*, 439 F. Supp. 2d 1112 (S.D. Cal. 2006) ....................10 n.11, 11

**Federal Statutes**                                                                              **Page**

15 U.S.C. § 77p (2007) ........................................................................................3, 4, 5

15 U.S.C. § 77r (2007).................................................................................................5

15 U.S.C. § 77bb (2007) ...................................................................................3, 4, 5

15 U.S.C. § 6807 (2007) ............................................................................................7

15 U.S.C. § 7702 (2007) ...........................................................................21, 23, 24-25

15 U.S.C. § 7704 (2007) ...............................................................................20, 23, 24

15 U.S.C. § 7706 (2007) .......................................................................1, 20, 23 & n.33

18 U.S.C. § 1030 (2007) .................................................................................1, 13 n.17

18 U.S.C. § 1962 (2007) ..............................................................................17-18 n.23

47 U.S.C. § 230 (2007) ...........................................................................................22 n.29

47 U.S.C. § 231 (2007) ..............................................................................................20

**Federal Regulations**                                                                           **Page**

17 CFR § 230.146 (2007) ........................................................................................5 n.4

17 CFR § 248.17 (2007) ..............................................................................................7

**California Cases**                                                                              **Page**

*Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544, 36 Cal. Rptr. 3d 229 (Cal. Ct. App. 2005) .....2-3

*Bardin v. DaimlerChrysler Corp.*,
     136 Cal. App. 4th 1255, 39 Cal. Rptr. 3d 634 (Cal. Ct. App. 2006)....................10 n.11

*Bowen v. Ziasun Techs., Inc.*,
     116 Cal. App. 4th 777, 11 Cal. Rptr. 3d 522 (Cal. Ct. App. 2004)....................7 & n.8

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
     20 Cal. 4th 163, 973 P.2d 527 (1999) ............................................................7

*Cohen v. DIRECTV, Inc.*,
     142 Cal. App. 4th 1442, 48 Cal. Rptr. 3d 813 (Cal. Ct. App. 2006)........................2 n.1

**Table of Authorities**

**California Cases**                                                                                       **Page**

*Colgan v. Leatherman Tool Group, Inc.,*
 135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36 (Cal. Ct. App. 2006)..................................8

*Consumer Advocates v. Echostar Satellite Corp.,*
 113 Cal. App. 4th 1351, 8 Cal. Rptr. 3d 22 (Cal. Ct. App. 2003)..................................8

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 999 P.2d 706 (2000) ..5 & n.3, 8

*Daugherty v. American Honda Motor Co., Inc.,*
 144 Cal. App. 4th 824, 51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2006)......................10 n.11

*Discover Bank v. Superior Court*, 36 Cal. 4th 148, 113 P.3d 1100 (2005)................................2

*Discover Bank v. Superior Court,*
 134 Cal. App. 4th 886, 36 Cal. Rptr. 3d 456 (Cal. Ct. App. 2005)................................2

*Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 938 P.2d 903 (1997)...............12

*Estate of Sanders*, 40 Cal. 3d 607, 710 P.2d 232 (1985) ...........................................16

*Ferguson v. Friendfinders,*
 94 Cal. App. 4th 1255, 115 Cal. Rptr. 2d 258 (Cal. Ct. App. 2002)...................13 n.16

*Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571 (Cal. Ct. App. 2007) ........................2 n.1

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 45 P.3d 243 (2002) ......................................8, 10

*L. Byron Culver & Assocs. v. Jaoudi Indus. & Trading Corp.,*
 1 Cal. App. 4th 300, 1 Cal. Rptr. 2d 680 (Cal. Ct. App. 1991)....................................16

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 907 P.2d 358 (1995) .......19-20

*Meyer v. Sprint Spectrum L.P.*, 150 Cal. App. 4th 1136 (Cal. Ct. App. 2007) ................13 n.15

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP,*
 150 Cal. App. 4th 384, 58 Cal. Rptr. 3d 516 (Cal. Ct. App. 2007)................................19

*Perez v. Van Groningen & Sons*, 41 Cal. 3d 962, 719 P.2d 676 (1986)....................................19

*Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688 (Cal. Ct. App. 2007)...7

*Outboard Marine Corp. v. Superior Court,*
 52 Cal. App. 3d 30, 124 Cal. Rptr. 852 (Cal. Ct. App. 1975).......................................10

*Petersen v. Securities Settlement Corp.,*
 226 Cal. App. 3d 1445, 277 Cal. Rptr. 468 (Cal. Ct. App. 1991)............................15, 16

*Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 926 P.2d 1061 (1996) .................15-16

*Roskind v. Morgan Stanley Dean Witter & Co.,*
 80 Cal. App. 4th 345, 95 Cal. Rptr. 2d 258 (Cal. Ct. App. 2000)...................................8

**Table of Authorities**

**California Cases**                                                                 Page

*Stevens v. Marco*, 147 Cal. App. 2d 357, 305 P.2d 669 (Cal. Ct. App. 1956) ..................16 n.21

*Szetela v. Discover Bank*,
    97 Cal. App. 4th 1094, 118 Cal. Rptr. 2d 862 (Cal. Ct. App. 2002) ........................2 n.1

*Torres v. Parkhouse Tire Serv.*, 26 Cal. 4th 995, 30 P.3d 57 (2001) .........................................19

**Oregon Cases**                                                                   Page

*Fearing v. Bucher*, 328 Ore. 367, 977 P.2d 1163 (1999) .................................................19 n. 23

**California Statutes**                                                            Page

Cal. Civ. Code § 1782 (2007) ...............................................................................................1

Cal. Civ. Code § 1798.82 (2007).........................................................................................11

Cal. Civ. Code § 1798.84 (2007).........................................................................................11

Cal. Civ. Code § 2349 (2007) .............................................................................................20

Cal. Bus. & Prof. Code § 17203 (2007) ................................................................................1

Cal. Bus. & Prof. Code § 17529 (2007) ........................................................................13 n.16

**Miscellaneous**                                                                  Page

Rainer Böhme & Thorsten Holz, *The Effect of Stock Spam on Financial Markets* (Apr. 2006),
    *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=897431 ...........................5-6 n.5

The Concise Oxford Dictionary (9th ed. 1995).................................................................24 n.35

Federal Trade Commission, *You've Got Spam: How to "Can" Unwanted Email*, *at*
    http://www.ftc.gov/bcp/conline/pubs/online/inbox.shtm (Apr. 2002)..........................14

Laura Frieder & Jonathan Zittrain, *Spam Works: Evidence from Stock Touts and
    Corresponding Market Activity* (Mar. 14, 2007), *at*
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=920553 .............................5-6 n.5

H.R. 105-803 (1998).............................................................................................................4

2 The New Shorter Oxford English Dictionary (4th ed. 1993).........................................24 n.35

The Oxford American Desk Dictionary (1998)...............................................................24 n.35

10 Oxford English Dictionary (2d ed. 1989)...................................................................24 n.35

Ethan Preston & Paul Turner, *The Global Rise of a Duty to Disclose Information Security
    Breaches*, 22 J. Marshall J. Computer & Info. L. 457 (2004) ..............................25 n.38

Restatement (Second) of Torts, § 519 (1977)...................................................................25 n.38

1

**Table of Authorities**

2

**Miscellaneous**                                                                                            **Page**

3

S. Rep. No 105-182 (1998) ....................................................................4

4

S. Rep. No. 108-102 (2003) ....................................14, 22 n.32, 24 n.36

5

U.S. Equal Employment Opportunity Commission, *EEOC NOTICE No. 915.002*, *at*
      http://www.eeoc.gov/policy/docs/testers.html (May 22, 1996)...........14 n.19

6

John K. Webb, *Prosecuting Social Security Number Misuse: Attacking Identity Theft at its
      Source*, 53 U.S. Att'ys Bull. 1, 1-2 (Jan. 2005), *available at*
      http://www.usdoj.gov/usao/eousa/foia_reading_room/usab5301.pdf...................16 n.21

7

ZDNet, *Intel gives home to eBay servers*, *at*
      http://news.zdnet.com/2110-9595_22-871656.html (Mar. 29, 2002)...........................22

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS**

Plaintiffs Matthew Elvey ("Elvey") and Gadgetwiz, Inc. ("Gadgetwiz"), respectfully file their Opposition to TD AMERTRADE, Inc.'s ("Ameritrade") Motion to Dismiss the Plaintiffs' First Amended Complaint ("FAC"). The FAC states claims on behalf of Ameritrade accountholders residing in California ("California Resident Class") under California's Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1782(a)), Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17203), and the federal Computer Fraud and Abuse Act (18 U.S.C. § 1030), and for breach of fiduciary duty regarding, *inter alia*, Ameritrade's disclosure (involuntary or not) of emails and possibly other personal information, and its failure to disclose an ongoing security breach. The FAC also states claims under the CAN SPAM Act (15 U.S.C. § 7706(g)) on behalf of domain name/email service providers for Ameritrade accountholders ("CAN SPAM Class") which received spam due to Ameritrade's disclosure of email addresses ("Traced Spam"). The CAN SPAM Class's claims arise from the receipt of spam that Class members would not have received but for Ameritrade's disclosure of its accountholders' email addresses.

Ameritrade's Motion advances a flurry of arguments, none of which sustain scrutiny. Ameritrade advances several underdeveloped arguments in its Motion. This Opposition had to strain to comprehensively address all such arguments, lest Ameritrade exploit Plaintiffs' failure to rebut its barest arguments in its Reply (when Plaintiffs have no ability to respond). Moreover, many of Ameritrade's arguments depend heavily on Ameritrade's improper factual contentions. Time and again, Ameritrade effectively asks the Court to assume its version of the facts are true. This is improper: Plaintiffs have a right to the opportunity to prove their claims.

**I.    California Law Applies to Claims of California Resident Class Members**

The Nebraska choice of law clause in Ameritrade's Client Agreement is not enforceable. Ameritrade concedes that a choice of law clause which violates California public policy is not enforceable. (Def.'s Mot 5, citing *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 468, 834 P.2d 1148, 1153 (1992)). The elephant in the room that Ameritrade attempts

to ignore is Section 13 in its Client Agreement, which contains a class action waiver in an arbitration clause. (Attach. A to Def.'s Mot., §13: "No person will bring a class action to arbitration . . .") California courts have definitively rejected these provisions as unconscionable and unenforceable. *See Discover Bank v. Superior Court*, 36 Cal. 4th 148, 159-61, 113 P.3d 1100, 1107-08 (2005).[1] Application of the Nebraska law clause would strip Elvey of the ability to vindicate his rights in a class action that he enjoys under California law. *Cf. Discover Bank v. Superior Court*, 134 Cal. App. 4th 886, 36 Cal. Rptr. 3d 456 (Cal. Ct. App. 2005) (enforcing class action waiver under Delaware law, where California resident choose to attempt national class action under Delaware law).

Ameritrade cannot accomplish with its Nebraska choice of law clause that which it could not accomplish with a class action waiver. Choice of law provisions that impair California residents' right to a class action are just as void against public policy as class action waivers. *See Discover Bank*, 36 Cal. 4th at 158, 113 P.3d at 1106-1107 (choice of law clause was "the 'functional equivalent' of a waiver of class action lawsuits," quoting *Am. Online v. Superior Court*, 90 Cal. App. 4th 1, 5, 108 Cal. Rptr. 2d 699, 702 (Cal. Ct. App. 2001) with apparent approval). This is true as a matter of general contract law in California, and is not limited (as Ameritrade suggests) to Elvey's CLRA claim. *Aral v. Earthlink, Inc.*, 134 Cal. App. 4th 544, 36 Cal. Rptr. 3d 229 (Cal. Ct. App. 2005) found that, although the defendant's Georgia choice of law clause had a reasonable basis, it was not enforceable where the plaintiff resided in California, sought to represent only California consumers in a class action, and

---

[1]        [Class action waivers are] not only harsh and unfair to [class members] who might be owed a relatively small sum of money, but it also serves as a disincentive for [a class action defendant] to avoid the type of conduct that might lead to class action litigation in the first place. [Class action waivers] essentially grant [class action defendants] a license to push the boundaries of good business practices to their furthest limits, fully aware that relatively few, if any, customers will seek legal remedies, and that any remedies obtained will only pertain to that single customer without collateral estoppel effect. The potential for millions of customers to be overcharged small amounts without an effective method of redress cannot be ignored.

*Szetela v. Discover Bank*, 97 Cal. App. 4th 1094, 1101, 118 Cal. Rptr. 2d 862, 868 (Cal. Ct. App. 2002). *See also Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 582 (Cal. Ct. App. 2007); *Cohen v. DIRECTV, Inc.*, 142 Cal. App. 4th 1442, 48 Cal. Rptr. 3d 813 (Cal. Ct. App. 2006).

relied solely on California law claims:

> The fundamental policy at issue is not simply the right to pursue a class action remedy, but the right of California to ensure that its citizens have a viable forum in which to recover minor amounts of money allegedly obtained in violation of the UCL. [D]epriving [consumers] of any hope of class litigation would pose an insurmountable barrier to recovery of small sums unjustly obtained, and undermine the protections of the UCL. There is no doubt that California has a materially greater interest than Georgia in the determination of [this] particular issue . . .

*Id*, 134 Cal. App. 4th at 564, 36 Cal. Rptr. 3d at 244. Elvey resides in California, seeks to represent only California class members, and relies solely on California and federal law claims. Thus, the Nebraska choice of law clause is unenforceable. Ameritrade's authorities are easily distinguished, as they involve the arms' length negotiation by commercial entities, and do not implicate California's policy of protecting its consumers' right to class actions.[2]

## II.  Elvey's Claims Cannot Be Mischaracterized as Securities Claims

Ameritrade attempts to parlay its status as a securities broker into defenses that apply in securities fraud claims. Ameritrade must fail because Elvey's claims simply do not hinge on the purchase of securities: as Ameritrade concedes, "Plaintiffs do not allege that they . . . traded in any stock touted by the Traced Spam." (Def.'s Mot. 13.) Rather, Elvey's claims relate to the misrepresentations in Ameritrade's Privacy Statement.

### A.  Ameritrade Cannot Stretch SLUSA Preemption to Cover the FAC's Claims

Federal preemption under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") extends only to claims "in connection with the purchase or sale of a covered security." 15 U.S.C. §§ 77p(b), 77bb(f)(1) (2007). Ameritrade's argument that SLUSA preempts the FAC's California claims falls apart on examination. First, Ameritrade's

---

[2] *Cf. Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) (commercial litigation between two corporations that did not involve class actions); *Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842, 861 (N.D. Cal. 2000) (involving "a choice of law made by sophisticated commercial parties through arms length negotiation"). Further, this Court is bound to apply California's contractual law as determined by the California Supreme Court and articulated in the *Discover Bank* decision – not as determined by its brother courts in *Medimatch* and *Continental Airlines*. "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (punctuation, citation omitted; cited in *Orkin v. Taylor*, 487 F.3d 734 (9th Cir. 2007)).

interpretation of SLUSA stretches it so far that it would apply to a Three-card Monte confidence man operating outside a stock broker's office, because there was some connection to the purchase of a security. Elvey's claims, that Ameritrade violated its privacy policy and concealed a security breach, are unrelated to the purchase of securities and are well outside the subject matter of the Securities and Securities Exchange Acts. *United States v. Hockings*, 129 F.3d 1069, 1071 (9th Cir. 1997) (statutory interpretation "constru[es] the provisions of the entire law, including its object and policy, to ascertain the intent of Congress"). At the very most, it is ambiguous whether the phrase "in connection with the purchase or sale of a covered security" applies to claims solely because a defendant happens to be a stock broker, particularly where the claims ***do not necessarily involve any purchase of securities***. *See Blum v. Stenson*, 465 U.S. 886, 896 (1984) (legislative history used to assist statutory construction when statutory language is ambiguous). It is obvious from the legislative history that Congress's intent under SLUSA was to eliminate private securities fraud class actions in state courts. *See* H.R. 105-803, at 13-15 (1998); S. Rep. No 105-182, at 3-8 (1998). Applying SLUSA to this case exceeds the Congressional intent behind SLUSA.

Second, the only allegations in the FAC in which the omission of material facts *are* connected with the purchase of stocks fall outside of the definition of a "covered class action." 15 U.S.C. §§ 77p(f)(2)(A), 78bb(f)(5)(B) (2007) (definition of "covered class action" is "lawsuit in which . . . damages are sought"). The FAC seeks injunctive relief (corrective disclosures) – not damages – with respect to its claims that Ameritrade fails to disclose that the Traced Spam touts certain stocks to California Resident Class members who purchase such stocks. (*Cf.* FAC ¶¶ 61-76, 89 *with* Pl.s' Mot. Prelim. Inj.) The FAC thus falls outside SLUSA's scope: federal courts recognize long-standing distinctions between claims for damages, on the one hand, and claims for equitable relief, on the other. *See, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 215 (2002) ("restitution, in contrast to damages, is a remedy commonly ordered in equity cases and therefore an equitable remedy . . . which damages . . . are not"). Likewise, the common law distinction between equity and damages shields all of the FAC's state law claims for equitable relief from preemption under

1  SLUSA.[3] *Cf. id.* at 213 ("a plaintiff could seek restitution *in equity* . . . where money or

2  property identified as belonging in good conscience to the plaintiff could clearly be traced to

3  particular funds or property in the defendant's possession") (emphasis in original) *with Cortez*

4  *v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 174-78, 999 P.2d 706, 712-16 (2000)

5  (restitution under UCL was equitable, even where restitution included damages element).

6        Third, the the FAC does not concern "covered securities," as defined in 15 U.S.C. §§

7  77p(f)(3), 77r(b), 78bb(f)(5)(e). The FAC alleges that the Traced Spam "touts low-priced,

8  speculative stocks of smaller companies traded on exchanges like Pink Sheets and OTCBB."

9  (FAC ¶ 31.)[4] Ameritrade received a copy of the Traced Spam sent to Elvey as an exhibit to the

10  Motion for Preliminary Injunction (filed on July 10), and has had every chance to examine it

11  since but has abjectly failed to identify any Traced Spam which mentions "covered securities."

12  Ameritrade claims "it is fair to infer from the FAC" that Elvey's claims "undoubtedly

13  involve[] a 'covered security' . . ." (Def.'s Mot. 8-9.) This argument is contrary to the law: on a

14  motion to dismiss, the FAC's "allegations and reasonable inferences are taken as true, and the

15  allegations are construed in the light most favorable to" Plaintiffs. *Simpson v. AOL Time*

16  *Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006). The FAC alleges the Traced Spam touts

17  "small, thinly-traded compan[ies] . . . whose prices can be driven up easily" in order to have

18  an appreciable effect on the stock's value. (FAC ¶ 18.) Stocks on the major exchanges are not

19  prone to manipulation by stock spam, as the spam's effect would be lost against the vastly

20  larger trading volumes of stocks listed on the major exchanges. It is far more reasonable to

21  infer that the stocks touted in the Traced Spam exclusively trade on smaller exchanges and

22  therefore does not fall within SLUSA's definition of "covered security."[5]

23

24  [3] For instance, the California Resident Class's UCL claim cannot be a "covered class action"
   because, unlike equitable relief such as restitution, "[d]amages are not available under section

25  17203." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 173, 999 P.2d 706, 712
   (2000). Likewise, SLUSA does not preempt the FAC's breach of fiduciary duty and CLRA

26  claims for equitable restitution and disgorgement. (FAC ¶¶ 63, 76.)
   [4] The exchanges which trade "covered stocks" as defined in SLUSA are listed in 17 CFR §

27  230.146(b) (2007). Section 230.146(b) does not list either the Pink Sheets or OTCBB
   exchanges, and so stocks traded on those exchanges do not qualify as "covered securities."

28  [5] The authors of one empirical study of stock spam found that "[t]he touted stocks in our
   sample are nearly always found listed on the Pink Sheets market, and sometimes additionally
   on the . . . OTCBB . . . [and] are not listed on any major exchange, nor are they traded in large

**B.    Ameritrade's Implied Preemption Argument Fails**

Ameritrade also argues that the federal securities laws, and specifically the SEC's activities with respect to stock spam, implicitly preempt the FAC's claims. (Def.'s Mot. 8.) There is no implied preemption unless "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). There is no "federal policy against States imposing liability in addition to that imposed by federal law. [S]tate causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law . . ." *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) (no federal preemption of state antitrust laws that permitted antitrust claims which were not permitted under federal law).

Ameritrade's argument fails because it does not show how Elvey's suit could possibly disrupt the SEC's activities, and utterly fails to "overcome the pre-sumption against finding pre-emption of state law in areas traditionally regulated by the States" including "regulation to prevent the deception of consumers." *Id.* at 101 (quotation marks omitted). It would be plainly unfair for Ameritrade to attempt to rectify this deficiency in its Reply (to which Plaintiffs have no opportunity to respond) when it could and should have been addressed in its Motion. Ameritrade's argument also fails to account for the widespread enforcement of state securities laws (which led to the passage of SLUSA in the first place)[6] or the savings clauses in federal

---

total dollar amounts, making them amenable to manipulation." Laura Frieder & Jonathan Zittrain, *Spam Works: Evidence from Stock Touts and Corresponding Market Activity*, 2 (Mar. 14, 2007), *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=920553. *See also* Rainer Böhme & Thorsten Holz, *The Effect of Stock Spam on Financial Markets* 5 (Apr. 2006), *at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=897431 (study of 391 unique spam-touted stocks, all were traded on either the Pink Sheets or OTCBB because spam's impact was greater on stocks with low trading volumes).

[6] "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996). *See also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 83 (1987) (no implied preemption where Indiana securities law "furthers the federal policy of investor protection"). *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 135-36 (1973) (Securities Exchange Act did not preempt California labor law where broker defendant did not demonstrate that "nationwide uniformity of an exchange's housekeeping affairs is necessary or desirable" under Exchange Act and the relationship between California  labor law's subject matter and Act's interests of "fair dealing and investor protection" was "extremely attenuated and peripheral, if it exists at all.")

privacy laws that mandated Ameritrade's Privacy Statement expressly limit preemption of

state law. *See* 15 U.S.C. § 6807(a) (2007); 17 CFR § 248.17(a) (2007).

**C.    The FAC Does Not Fall Within Securities Exception to the UCL, to the Extent Such Exception Even Exists**

Ameritrade's argument that *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 11

Cal. Rptr. 3d 522 (Cal. Ct. App. 2004) restricts the UCL's application to securities transactions

is both irrelevant and contrary to the law. (Def.'s Mot. 15.)[7] First, *Bowen* is simply irrelevant

because this case falls outside of *Bowen*'s narrow application.

> Whether one agrees with *Bowen* or not, its holding that securities transactions are not covered under the UCL bars lawsuits based on deceptive conduct in the sale and purchase of securities, nothing more. [*Bowen* does not apply where the plaintiff's] *claims do not arise from any stock transactions between the parties*.

*Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 715-16 (Cal. Ct. App.

2007) (emphasis in original). *Bowen* does not apply Ameritrade did not sell stock to the

California Resident Class members – *Bowen* does not apply simply because Ameritrade is the

California Resident Class members' stock broker.[8]

Second, *Bowen* contradicts the California Supreme Court's sweeping interpretation of

the UCL: "unfair competition . . include[s] any unlawful, unfair or fraudulent business act or

practice[,] . . . embracing anything that can properly be called a business practice . . ." *Cel-*

*Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, 973 P.2d 527, 539

(1999) (punctuation, citations omitted). This Court must apply *Cel-Tech*'s broad interpretation

of the UCL. In a diversity action, the Court is "bound by the pronouncements of the state's

highest court on applicable state law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939

(9th Cir. 2001) (citation omitted). Moreover, the Court cannot assume that the California

Supreme Court will adopt *Bowen*'s restrictions on the UCL. "If the particular issue has not

---

[7] Ameritrade argues in a footnote that "the logic foreclosing the application of the UCL to securities transaction should apply to foreclose application of the CLRA." (Def.'s Mot. 15-16 n.4.) Ameritrade concedes it has no authorities to support this argument, and it must be discarded just as the UCL argument.
[8] The UCL claims in *Bowen* dealt with securities transactions between the defendant and plaintiff. The only defendant on appeal in *Bowen* was the company offering its stock. *Bowen*, 116 Cal. App. 4th at 779 n.2, 11 Cal. Rptr. 3d at 523 n.2. Applying *Bowen* to this case would exceed its actual holding.

1    been decided, federal courts must predict how the state's highest court would resolve it. . . . *In*

2    *making that prediction, federal courts look to existing state law without predicting potential*

3    *changes in that law.*" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1203 (9th Cir. 2002)

4    (punctuation, citations omitted, emphasis added). Other California appellate courts have

5    contradicted *Bowen*'s reasoning, further undermining Ameritrade's assumption that the

6    California Supreme Court would reverse *Cel-Tech* in favor of *Bowen*. *See Roskind v. Morgan*

7    *Stanley Dean Witter & Co.*, 80 Cal. App. 4th 345, 350-56, 95 Cal. Rptr. 2d 258, 261-65 (Cal.

8    Ct. App. 2000) (UCL claim against stock broker which delayed client's trades, cited and

9    followed by *Overstock.com*, 151 Cal. App. 4th at 715-16).

10   **III.    Elvey and California Resident Class Members State UCL and CLRA Claims**

11            Elvey's UCL and CLRA claims arise from false and misleading representations in the

12   Privacy Statement. The Privacy Statement represents that "TD AMERITRADE does not . . .

13   disclose your personal information to any third party for any reason . . ." (FAC ¶ 21.) The

14   disclosure of Ameritrade accountholders' email addresses renders the non-disclosure assertion

15   false and misleading – regardless of whether the disclosure was intentional or not. (*Id.*)

16   Elvey's claim under the UCL only requires "that members of the public are likely to be

17   deceived." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951, 45 P.3d 243, 250 (2002) (citations

18   omitted). "The UCL imposes strict liability [on] conduct that constitutes an unfair business

19   practice." *Cortez*, 23 Cal. 4th at 181, 999 P.2d at 717. The CLRA and the UCL share the same

20   standard of liability. *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351,

21   1360, 8 Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2003) (cited by *Colgan v. Leatherman Tool Group,*

22   *Inc.*, 135 Cal. App. 4th 663, 680, 38 Cal. Rptr. 3d 36, 46 (Cal. Ct. App. 2006)). "Conduct that

23   is 'likely to mislead a reasonable consumer' thus violates the CLRA." *Colgan*, 135 Cal. App.

24   4th at 680, 38 Cal. Rptr. 3d at 46.

25            **A.    Elvey's Alternate Allegation That Ameritrade Intentionally Disclosed**
26                    **Email Addresses States Claims Under the CLRA and UCL**

27            The FAC alleges in the alternative that "Ameritrade's disclosure of its accountholders'

28   email addresses was intentional. " (FAC ¶ 44.) Ameritrade addresses this allegation by

contending that "the mere fact that e-mail addresses ended up in the possession of spammers cannot reasonably support" the FAC's allegation. (Def.'s Mot. 12.) Ameritrade's factual contention is contrary to established pleading standards: on motion to dismiss, the FAC's "allegations and reasonable inferences are taken as true." *Simpson*, 452 F.3d at 1046.

As the FAC alleges, Ameritrade had a motive to disclose accountholder email addresses to spammers "because its accountholders trade stocks based on tips in the Traced Spam and Ameritrade earns commissions on those trades." (FAC ¶ 31.) This is enough to state a claim, and the FAC withstands the Motion to Dismiss on the strength of its alternative "intentional disclosure" theory alone.[9] "When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements." Fed. R. Civ. P. 8(e)(2).

## B.    Ameritrade's Omissions and Misrepresentations About the Security Breach Violated the CLRA And UCL

The FAC's core theory is that there is an ongoing security breach at Ameritrade. Ameritrade induced Elvey and continues to induce customers into providing personal information on the Privacy Statement's representation that Ameritrade does not disclose information to third parties: that representation was knowingly and intentionally false during times when Ameritrade was aware of the possibility of a specific, existing security breach. (FAC ¶ 40.) Ameritrade argues that the unauthorized disclosure of accountholder email addresses "is in no way inconsistent with the Privacy Statement," because the statement statement "no security system is absolutely impenetrable" in the Privacy Statement disclosed the possibility of a security breach. (Def.'s Mot. 12.) Read in conjunction with Ameritrade's promise not to disclose personal information to third parties, however, this statement only discloses ***the general possibility of a future breach*** – the Privacy Statement fails to disclose Ameritrade's knowledge of ***a specific, ongoing security breach which presently threatened***

---

[9] *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (requirement that complaint allege "plausible grounds" for claim "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting claim).

*to disclose accountholders' personal information*. The UCL and CLRA prohibit misleading omissions of material facts, not just affirmative fraud. *Kasky*, 27 Cal. 4th at 951, 45 P.3d at 250 (UCL prohibits representations which "although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public"); *Outboard Marine Corp. v. Superior Court*, 52 Cal. App. 3d 30, 38, 124 Cal. Rptr. 852, 857 (Cal. Ct. App. 1975) (CLRA prohibits omission of material facts). *See also Chamberlan v. Ford Motor Co.*, 369 F. Supp. 2d 1138, 1144-46 (N.D. Cal. 2005) (omission of automobile defects could violate UCL, CLRA).

When the Privacy Statement's generalized warning that "no security system is absolutely impenetrable" is read in conjunction with the promise not to disclose information, it is clear that the Privacy Statement does not discharge Ameritrade's obligation to disclose its investigation into a specific, ongoing security breach.[10] *Ameritrade's fixation on its disclosure of the possibility of a unspecified future security breach is besides the point – **the relevant material omission is the specific, existing security breach that Ameritrade is now investigating***. Thus, the authorities cited by Ameritrade to argue that it owes no duty to disclose the security breach do not apply.[11] The statement that "TD AMERITRADE does not . . . disclose your personal information to any third party for any reason" creates a reasonable expectation that Ameritrade does not disclose email addresses to spammers. Conversely, the

---

[10] Although this is decidedly not a securities case, Ameritrade's argument is analytically similar to an unsuccessful defense under bespeaks caution doctrine. Under the bespeaks caution doctrine, cautionary language only exculpates misleading statements when

> it puts a [consumer] sufficiently on notice of the danger of the [transaction] investment to make an intelligent decision about it according to her own preferences for risk and reward . . . Put differently, the cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.

*In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (quotations omitted).
[11] *Cf. Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 39 Cal. Rptr. 3d 634 (Cal. Ct. App. 2006) (no duty to disclose alleged exhaust manifold defect where defendant made no affirmative representations and public had no expectations or assumptions regarding exhaust manifolds); *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2006) (same; car engine). *See also Williams v. Gerber Prods. Co.*, 439 F. Supp. 2d 1112, 1115 (S.D. Cal. 2006) (product packaging which depicted fruits was not misleading under UCL because it did not make "specific affirmative representation that the product contains those fruits" and ingredient list on packaging made specific disclosure.

statement "no security system is absolutely impenetrable" amounts to no more than a
generalized caution that future security breaches are possible. Indeed, Ameritrade's own
authority holds that "misdescriptions of specific or absolute characteristics" are actionable.
*Williams v. Gerber Prods. Co.*, 439 F. Supp. 2d 1112, 1115 (S.D. Cal. 2006) (generalized
puffery is not action, but "consumer reliance [is] induced by specific rather than general
assertions").

### C.    California Civil Code § 1798.82 Does Not Restrict Elvey's Claims

Ameritrade misstates the law when it implies that the California legislature limited its
duty to disclose security breaches under Cal. Civ. Code § 1798.82(e). (Def.'s Mot. 12-13.)
Section 1798.82's remedy is found in Cal. Civ. Code § 1798.84, which explicitly provides that
"rights and remedies available under this section are ***cumulative . . . to any other rights and
remedies available under law***." Cal. Civ. Code § 1798.84(g) (2007) (emphasis added).
Section 1798.82 mandates disclosure of security breaches regardless of whether there is a
contract or privacy policy. Cal. Civ. Code § 1798.82(a) (2007). Conversely, Elvey's CLRA and
UCL claims hinge on the misleading representations in the Privacy Statement: his claims are
entirely independent of Cal. Civ. Code § 1798.82. Restricting those claims to section 1798.82
would pervert the legislative intent behind the savings clause in section 1798.84(g). Even if
section 1798.82 could be read to limit Ameritrade's disclosure obligations to security breaches
that expose Social Security numbers, the FAC alleged that. (FAC ¶¶ 41-42.)[12]

### D.    Ameritrade's CLRA and UCL Violations Damaged Elvey and the Other California Resident Class Members

The FAC alleges that the damage from Ameritrade's CLRA and UCL violations

> includes the loss of the benefit of bargain on Ameritrade's brokerage fees,
> which were premised, in part, on Ameritrade's compliance with the privacy
> statement and full disclosure of facts relevant to the security of accountholders'
> information. The damage from the Traced Spam includes California Resident
> Class members' lost time required to sort, read, discard and attempt to prevent
> future Traced Spam, and lost storage space, Internet connectivity, and
> computing resources on the personal computers on which they received the

---

[12] Hence, Plaintiffs are entitled to take discovery on the matter. *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1046 (9th Cir. 2006) (on motion to dismiss, FAC's "allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to" Plaintiffs).

Traced Spam. Further, California Resident Class members are subject to a identity theft to the extent Ameritrade's security has been breached.

(FAC ¶¶ 62, 68.) Ameritrade argues that the FAC fails to allege damages to state either a UCL or CLRA claim, by attempting to gloss over this allegation. (Def.'s Mot. 9-10, 14.)

Ameritrade's lone argument as to the loss of the benefit of the bargain is that the FAC does not allege that "the non-receipt of spam was material to the bargain made with [Ameritrade] or that [it] failed to provide any of the brokerage services sought or purchased." (*Id.* 9.) Plaintiffs are not obliged to plead their complaint to specifications desired by Ameritrade: Ameritrade can presents absolutely no authority to support its assertion that the FAC had to explicitly use the word "material" with respect to its CLRA and UCL claims.[13] Moreover, it is reasonable to infer from the FAC's CLRA and UCL allegations that the non-disclosure of Elvey's email address *was* a material term to the Privacy Statement. *Simpson*, 452 F.3d at 1046.[14] Elvey lost the benefit of his bargain under the Privacy Statement when Ameritrade disclosed his email addresses to spammers: the FAC gives a detailed explanation of why the confidentiality and security of Elvey's personal information was material. (FAC ¶¶ 26, 28, 39-43 (describing costs of receiving spam, and risks of an ongoing security breach).) The Privacy Statement's representations are material "if a reasonable man would attach importance to [their] existence or nonexistence in determining his choice of action in the transaction in question, and as such [their] ***materiality is . . . a question of fact***" that cannot be resolved on a motion to dismiss. *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 977, 938 P.2d 903, 919 (1997) (citations, punctuation omitted, emphasis added). Because Ameritrade's representation that it would not disclosure Elvey's email address was material, Ameritrade's authorities are inapplicable to Elvey's claims.[15]

---

[13] Doubtless if the FAC had alleged *only* that the Privacy Statement was material, Ameritrade would complain the allegation was insufficient because it was conclusory.

[14] The FAC does allege in the breach of fiduciary duty claim that "[t]he security of personal information given to Ameritrade was a *material* fact, because exposure of accountholders' personal information subjects the accountholders to spam and increased risk of identity theft." (FAC ¶ 72) (emphasis added).

[15] *Chavez v. Blue Sky Natural Bev. Co.*, No. 06-6609, 2007 U.S. Dist. LEXIS 44487 (N.D. Cal. Jun. 11, 2007) found that damages stemming from alleged promises regarding the origin of the defendant's soft drinks were "nonexistent because [the] alleged promise had no value." *Id.* at *9. Keeping one's email address out of the hands of spammers plainly has a benefit and value beyond the value of the promise that a soft drink was made in one place, rather than

1

2        Ameritrade belittles the harms caused to its customers alleged in the FAC: "Plaintiffs

3    attempt to dress up the 'damage' by alleging generally lost time to read and discard spam e-

4    mails and lost storage space and 'Internet connectivity,' but this is unavailing . . ." (Def.'s Mot.

5    10.) California recognizes the precise effects alleged in the FAC as damage.[16] Likewise, the

6    CFAA's definition of damages undermines Ameritrade's argument.[17] Ameritrade urges that the

7    FAC's damages allegations are inadequate because "Elvey's alleged lost time is de minimis

8    and alleged '80' spam messages could not have any appreciable impact on such systems or

9    functions." (Def.'s Mot. 10.) Again, Ameritrade's factual contention, which essentially

10   concedes Elvey has alleged *some* damage, must be resolved in Plaintiffs' favor on a motion to

11   dismiss. *Simpson*, 452 F.3d at 1046.

12       Ameritrade – indifferent to the potential risks to its accountholders – also derides the

13   FAC's allegations about the possible risk of identity theft as "conjur[ing] speculative harms

14   that they do not allege actually occurred." (Def.'s Mot. 10). It is significant that, while

15   Ameritrade has no hesitation in contesting the FAC's factual allegations (and going so far as

16   to introduce evidence), it does not contest the FAC's core allegation that there is an ongoing

17   security breach. (FAC ¶ 42.) Without any evidence that Ameritrade managed to secure Elvey's

18   Social Security number but not his email address, there is no reason to believe that the use of

19   ───────────────
     another. *Chavez* is not applicable. Likewise, *Meyer v. Sprint Spectrum L.P.*, 150 Cal. App. 4th
20   1136 (Cal. Ct. App. 2007) found that allegations that the terms of a wireless service were
     unconscionable failed to allege damages, where the plaintiffs did not allege the relevant terms
21   ever constrained them in any way, and the wireless service performed as represented under the
     contract. *Id.* at 1144. In contrast, Elvey has alleged damages: Ameritrade did not perform its
22   services as represented under the Privacy Statement by disclosing Elvey's email address.
     [16] Cal. Bus. & Prof. Code § 17529(e) (2007) ("spam imposes a cost on users, using up
23   valuable storage space in e-mail inboxes, as well as costly computer band width, and on
     networks and the computer servers that power them, and discourages people from using e-
24   mail"); *Ferguson v. Friendfinders*, 94 Cal. App. 4th 1255, 1267-1268, 115 Cal. Rptr. 2d 258,
     267 (Cal. Ct. App. 2002) (spam recipients "experience increased Internet access fees because
25   of the time required to sort, read, discard and attempt to prevent future sending of UCE").
     [17] *See* 18 U.S.C. § 1030(e)(8) (2007) (defining damages for CFAA claim as "any impairment
26   to the integrity or availability of data, a program, a system, or information"); *United States v.
     Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000) (damages under CFAA include costs used to
27   resecure a computer to avoid further damage); *Four Seasons Hotels & Resorts B.V. v.
     Consorcio Barr*, S.A., 267 F. Supp. 2d 1268, 1323 (S.D. Fla. 2003) (where "unauthorized
28   broadcast traffic . . . caused congestion on" computer, the availability of that computer to
     other systems in the network was impaired and constituted damage under the CFAA); *Am.
     Online, Inc. v. Nat'l Health Care Disc., Inc.*, 174 F. Supp. 2d 890, 899 (D. Iowa 2001)
     (detailed explanation of why spam constitutes damage under CFAA).

Elvey's Social Security number in a recent identity theft crime was not connected with the breach at Ameritrade. (*Id.* ¶¶ 41-42.)

### E.    Ameritrade's Arguments Concerning Plaintiffs' Use of Unique Email Addresses Are Disingenuous and Legally Baseless

Plaintiffs' use of unique email addresses was essential to detecting the leakage of their email address was the only way to identify spam's source. It is typically impossible to identify the persons responsible for transmitting spam. S. Rep. No. 108-102, at 5 (2003) (testimony that 90 percent of all of the spam sent worldwide is ''untraceable'' to its actual source). Thus, the FTC recommends using unique email addresses as a "best practice" for email users. Federal Trade Commission, *You've Got Spam: How to "Can" Unwanted Email*, *at* http://www.ftc.gov/bcp/conline/pubs/online/inbox.shtm (Apr. 2002). Unique email addresses email users to identify firms that leak email addresses to spammers, and (as Ameritrade itself notes) to limit the damage caused by such leaks by "discontinuing the use of these unique email addresses." (Def.'s Mot. 10.) Courts recognize damages and standing where statutory violations can only be detected through such investigative techniques: "testers" have standing to claim damages under a wide variety of discrimination laws where violations are difficult to detect.[18] "[A] tester may . . . fully expect[] that he would receive false information [regarding the availability of housing], and without any intention of buying or renting a home, [but that] does not negate the simple fact of injury . . ." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982). A tester suffers injury because it devotes "resources . . . to identifying and counteracting [statutory violations], and this diversion of resources frustrate[s]" the tester's other goals. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002).[19] Here, Plaintiffs have sustained injury because they were obliged to devote time and energy towards identifying the source of the spam sent to them. Time spent on preventative measures and "investigating and repairing" a CFAA violation are compensable damages under the CFAA.

---

[18] *See Independent Living Resources v. Oregon Arena Corp.*, 982 F. Supp. 698, 761 n.86 (D. Or. 1997) (tester standing "may reflect a doctrine of necessity" where "[t]esting [is] the most effective method – and perhaps the only effective method – of enforcing" statute).

[19] *See also* U.S. Equal Employment Opportunity Commission, *EEOC NOTICE No. 915.002*, *at* http://www.eeoc.gov/policy/docs/testers.html (May 22, 1996).

*United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000). *See also Four Seasons Hotels & Resorts B.V. v. Consorcio Barr*, S.A., 267 F. Supp. 2d 1268, 1309 (S.D. Fla. 2003) (CFAA damages include cost of investigating CFAA violation).

Ameritrade argues that Elvey "manufactured a 'harm' for the sole purpose of bringing suit" by using unique email addresses. (Def.'s Mot. 1.) On reflection, this argument is ridiculous – *Ameritrade chides Plaintiffs for collecting evidence that Ameritrade disclosed their email addresses*.[20] While Ameritrade disingenuously implies that Plaintiffs have no claim because they used unique email addresses, Ameritrade would surely argue Plaintiffs lacked sufficient evidence to prove liability without such email addresses. Doubtless, Ameritrade prefers a damned-if-you-do-damned-if-you-don't resolution that allows it to avoid liability in either situation – but it must be rejected.

**IV.    Ameritrade Breached Its Fiduciary Duties to Elvey and the Other California Resident Class Members**

The FAC states claims for breach of fiduciary duty, notwithstanding Ameritrade's arguments. Ameritrade's central argument is that Nebraska law applies. This is wrong, as discussed in Section I, *infra*.

Ameritrade cites *Petersen v. Securities Settlement Corp.*, 226 Cal. App. 3d 1445, 277 Cal. Rptr. 468 (Cal. Ct. App. 1991) for its argument under California law that it owes no fiduciary duty to accountholders, as a "broker simply process[ing] unsolicited trade orders." (Def.'s Mot. 17.) This is wrong: the *Peterson* court had "no doubt [defendant] owed [plaintiffs] the duties of a fiduciary" but found that investment advice was beyond scope of those duties. *Petersen*, 226 Cal. App. 3d at 1451, 277 Cal. Rptr. at 470. *Petersen* only follows the rule that "[g]rant[s] the existence of a fiduciary relationship between securities brokers and their customers, [but holds] the scope of the duty varies with the facts of the relationship."

---

[20] Ameritrade also complains that "Elvey waited more than seven months after he began receiving spam to file this action . . . and collected spam e-mail with which to pursue this litigation" during that time. (Def.'s Mot. 1.) As discussed in Plaintiffs' Opposition to Ameritrade's Motion to Extend Time, there are many good reasons for that delay, which include Ameritrade's own emails indicating the situation was under control, Elvey's due diligence investigation to "[t]o ensure that he was not responsible for leaking" his email addresses, FAC ¶ 24, and the relative difficulty of locating legal representation that would represent him economically in a case like this. (Pl.s' Opp. Extension of Time 4.)

*Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 425, 926 P.2d 1061, 1080 (1996). In *Petersen*, the defendant's contract with the plaintiffs stated that the defendant's services were limited to clearing the plaintiffs' orders, and refuted any suggestion of agency by the defendant. *Petersen*, 226 Cal. App. 3d at 1452-53, 277 Cal. Rptr. at 470-471. Here, conversely, the Privacy Statement stated that Ameritrade would not disclose its accountholders' information. That representation defines Ameritrade's fiduciary duty, which includes "disclos[ure of] all information in the agent's possession relevant to the subject matter of the agency," to its accountholders. *L. Byron Culver & Assocs. v. Jaoudi Indus. & Trading Corp.*, 1 Cal. App. 4th 300, 304, 1 Cal. Rptr. 2d 680, 682 (Cal. Ct. App. 1991). *See also Estate of Sanders*, 40 Cal. 3d 607, 616, 710 P.2d 232, 237 (1985) (fiduciary's disclosure must be "full and complete," any material concealment amounts to fraud). Ameritrade's disclosure of accountholder email addresses and omission of an ongoing security breach violated its California-law fiduciary duties to the California Resident Class.[21]

**V.    Ameritrade's Arguments Against the CFAA Claim Ignore Directly Applicable Precedent**

The FAC alleges that Ameritrade's employees or agents (the "Does") violated the CFAA by obtaining accountholder information from Ameritrade's information systems. (FAC ¶¶ 77-89.) The Ninth Circuit has rejected the precise argument advanced by Ameritrade, that Plaintiff's CFAA claim fails because Ameritrade owns the computers involved in the CFAA violation. (Def.'s Mot. 18.) The CFAA's civil remedy "extends to *any person* who suffers damage or loss by reason of a violation of this section." *Theofel v. Farey-Jones*, 341 F.3d 978, 986 (9th Cir. 2003) (citations, punctuation omitted, emphasis in original). "Individuals other

---

[21] Ameritrade's other case, *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 427 F. Supp. 2d 526 (M.D. Pa. 2006), is easily distinguished because it did not involve a *per se* fiduciary like a stock broker. Still more critically, it did not involve the collection of sensitive material like Social Security numbers under the promise of confidentiality. *Cf. Stevens v. Marco*, 147 Cal. App. 2d 357, 372-74, 305 P.2d 669, 678-79 (Cal. Ct. App. 1956) (fiduciary relationship exists where investor who entrusts confidential information to another and the other party agrees to use information in return for royalties to be paid to inventor) *with* John K. Webb, *Prosecuting Social Security Number Misuse: Attacking Identity Theft at its Source*, 53 U.S. Att'ys Bull. 1, 1-2 (Jan. 2005), *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usab5301. pdf (availability of Social Security number is critical vulnerability with respect to identity theft).

than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it." *Id.* (reversing district court). Ameritrade's other arguments do not fare any better.

### A.  Ameritrade Can Be Liable for the Does' CFAA Violation Under the Applicable Respondeat Superior Principles

Ameritrade erroneously asserts that, under *Butera & Andrews v. IBM*, 456 F. Supp. 2d 104 (D.D.C. 2006), it cannot be liable on the FAC's CFAA claim because "there is no respondeat superior liability under the CFAA when the access is without authorization." (Def.'s Mot. 19.) In fact, *Butera* only found that the plaintiff failed to allege facts under which IBM could be held liable under the District of Columbia's principles of respondeat superior.[22]

The Ninth Circuit and the California courts – rather than *Butera* or the law of the District of Columbia – determine the respondeat superior principles at play in this case, and they dictate a different result. *See Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768 (9th Cir. 2002) (respondeat superior liability under Racketeer Influenced and Corrupt Organizations claims); *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149 (9th Cir. 1992) (same). Under the Ninth Circuit's test, "[i]f an employer benefit[s] from its employee's RICO violation, traditional principles of respondeat superior determine whether the employer is liable for the acts of its employees." *Oki*, 298 F.3d at 775. As the FAC alleges, "Ameritrade benefited from (in the form of commissions on trades prompted by the Traced Spam) the Does' violation of the CFAA." (FAC ¶ 85.) Respondeat superior liability can apply whenever the employer is not "*merely* the victim . . . of the racketeering." *Brady*, 974 F.2d at 1155 (emphasis added).[23] "[S]o long as the enterprise does in fact benefit from the racketeering

---

[22] Ameritrade quotes *Butera* ("[i]f the attacks were not authorized by IBM, there are no grounds whatsoever for bringing an action against IBM . . . as each requires 'intentional' conduct on the part of the defendant") to support its argument against respondeat superior liability. (Def.'s Mot. 19-20, quoting *Butera & Andrews v. IBM*, 456 F. Supp. 2d 104, 100 (D.D.C. 2006).) This quotation is deeply misleading, as it applies to a completely distinct claim against IBM for direct liability. *Butera* only dismissed the respondeat superior liability claim after analyzing D.C.'s respondeat superior law. *Butera*, 456 F. Supp. 2d at 111-23.

[23] The Court should reject any analogy Ameritrade draws from its own status as owner of the computers at issue to *Brady*'s limitation of respondeat superior liability "when the enterprise and person are not distinct." *Brady v. Dairy Fresh Products Co.*, 974 F.2d 1149 (9th Cir. 1992). This limitation on respondeat superior liability exists only to prevent circumvention of the rule, peculiar to 18 U.S.C. § 1962(c), that the RICO defendants must be distinct from the

activity challenged, there is no reason why we must ignore the corporation's role in the

activity . . . and no reason why an injured third party may not recover from the enterprise."

*Petro-Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1361 (3d Cir. 1987) (cited by *Brady*,

974 F.2d at 1155).

> Liability may arise . . . under . . . respondeat superior principles when the
> individual or entity is benefited by its employee or agent's RICO violations. . . .
> By giving full effect to RICO's broad net of liability, the doctrines of
> respondeat superior and agency liability will encourage victims of racketeering
> to act as private attorneys general and help eradicate racketeering activity. . . .
> This will further both the compensatory and deterrent goals of RICO. . .

*Brady*, 974 F.2d at 1155 (citations, punctuation omitted). The CFAA's goals are no less

compelling than those of the RICO Act, and the FAC's allegations bring Elvey's claims well

within the scope of respondeat superior liability recognized by the Ninth Circuit. Ameritrade's

attempt to carve out some "victim" exception to respondeat superior liability cannot succeed,

as virtually every employer who is liable under respondeat superior has been damaged by its

employee's misconduct. Respondeat superior liability would be gutted if every employer

could defeat a respondeat superior claim with the argument advanced by Ameritrade.

Ameritrade is liable for the Does' CFAA violations under the "traditional principles of

respondeat superior," where the employees who committed the security breach gained access

to Ameritrade's information systems and had the opportunity to misappropriate

accountholders' personal information as part of their employment with Ameritrade (even if

such violations were perforce not authorized by Ameritrade). (FAC ¶ 85.) "Respondeat

superior is a form of strict liability": the "traditional principles of respondeat superior" extend

liability where an "employee's acts were committed within the course and scope of her

employment." *Oki*, 298 F.3d at 775. The applicable principle of respondeat superior law in

California depends on "whether the tort was, in a general way, foreseeable from the

employee's duties. . . . The employment, in other words, must be such as predictably to create

RICO enterprise, and the limitation. *Id.* (citing, e.g., *Petro-Tech, Inc. v. Western Co. of N. Am.*,
824 F.2d 1349, 1360 & n.11 (3d Cir. 1987)). Notably, the Ninth Circuit does not recognize
any such limitation on respondeat superior liability with respect to claims under 18 U.S.C. §
1962(a), where the person-enterprise distinction is not required. *Id.* at 1155 (citing *Petro-Tech*,
824 F.2d at 1360-61).

the risk employees will commit intentional torts of the type for which liability is sought." *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal. 4th 291, 299, 907 P.2d 358, 362 (1995). (*Cf.* FAC ¶ 85.)[24] Here, Ameritrade's employees' opportunity to abuse the information to which they had access as part of their job was clearly foreseeable, and respondeat superior liability should attach. *See Torres v. Parkhouse Tire Serv.*, 26 Cal. 4th 995, 1009, 30 P.3d 57, 64 (2001) (even employees' criminal torts "may be committed within the scope of employment, thus rendering their employers liable under respondeat superior"); *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 390-93, 58 Cal. Rptr. 3d 516, 521-23 (Cal. Ct. App. 2007) (law firm could be liable for partner's removal property from client's house that belonged to receiver). The fact that the Does might have violated Ameritrade's policies in the course of violating the CFAA "is immaterial" to Ameritrade's respondeat superior liability. *See Perez v. Van Groningen & Sons*, 41 Cal. 3d 962, 968-69, 719 P.2d 676, 679 (1986).

**B.    The FAC Adequately Alleges That Does' Actions Were Unauthorized**

Ameritrade erroneously asserts that the FAC's alternative allegation in Paragraph 86 fails because "[i]t is not possible to direct and encourage access without authorizing access within the meaning of the CFAA." Ameritrade essentially argues that it could have authorized the Does to do what it could not under the terms of the Privacy Statement. (*Cf.* FAC ¶ 81, "the Does' access of Ameritrade's computer systems was without authorization . . . because it was in violation of the Privacy Statement.") This is plainly wrong because it is the *accountholders' authorization* – embodied by the Privacy Statement – that controls. Traditional agency principles control the CFAA's authorization element: employees' agency relationships with their employers defines their authorization to access the employers' computer.[25] Ameritrade is

---

[24] In *Oki*, the Ninth Circuit relied on Oregon law to "help[] delineate the 'traditional respondeat superior and agency principles'" in a case from the District of Oregon. *Id.* at 776 & n.4. Even if Ameritrade argues the California respondeat superior standard does not apply, there is no relevant distinction between California and Oregon law. Oregon law recognizes respondeat superior liability when an employee's tortious acts are "the culmination of a progressive series of actions that began with and continued to involve [the employee's] performance of [his] ordinary and authorized duties." *Fearing v. Bucher*, 328 Ore. 367, 375, 977 P.2d 1163, 1167 (1999).

[25] *ViChip Corp. v. Lee*, No. C 04-2914, 2006 U.S. Dist. LEXIS 41756, at *33-34 (N.D. Cal.

a fiduciary of the accountholders, and the Does are Ameritrade's employees and agents.
Ameritrade cannot give the Does more authority over accountholders' personal information to
the Does than what it has itself. The Privacy Statement defines the scope of the Does'
authorization because the terms of the Privacy Statement control and limit Ameritrade's
authority over accountholders' information. "An agent . . . can [only] delegate his powers to
another person . . . [w]hen such delegation is specially authorized by the principal." Cal. Civ.
Code § 2349 (2007).

**VI.    Ameritrade's Faulty Arguments Against the CAN SPAM Claim Cannot Prevail**

Ameritrade contests Plaintiffs' standing to bring CAN SPAM claims, and argues that it
is not liable under CAN SPAM for the Traced Spam.[26] Ameritrade's arguments are flawed and
do not prevail.

**A.    Plaintiffs Have Standing to Bring CAN SPAM Claims As Adversely Affected Internet Access Service Providers**

As "provider[s] of Internet access service[s] adversely affected by a violation of
section 7704(a)(1)," Plaintiffs have a CAN SPAM Act claim under 15 U.S.C. § 7706(g)(1).
The CAN SPAM Act does not define the term "adversely affected," but specifically defines
"Internet access services" ("IAS") as "service[s] that enables users to access content,
information, electronic mail, or other services offered over the Internet." 47 U.S.C. §
231(e)(4) (2007) (incorporated by reference by 15 U.S.C. § 7702(11)). Plaintiffs maintain a
domain name, provide that domain name with email and web (http) services, and provide their
users with some form of email service. (FAC ¶¶ 5, 6.) Plaintiffs enable third-party Internet
users to access their domain names, their websites, and to email users at their domain names.[27]

June 9, 2006) (citing *Int'l Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006));
*Shurgard Storage Ctrs. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1124-25 (W.D.
Wash. 2000).
[26] Ameritrade believes it advances its cause by nitpicking that Paragraph 95 of the FAC does
not explicitly allege that Gadgetwiz brings a claim on behalf of the CAN SPAM Class. (Def.'s
Mot. 1 n.1.) It is reasonable to infer from the FAC's allegations that Gadgetwiz suffered harm
and that Ameritrade's CAN SPAM violations harmed both "Plaintiffs," that Gadgetwiz does
bring a CAN SPAM claim. (FAC 94.) Thus, the FAC must be construed to state a CAN SPAM
claim on Gadgetwiz's behalf. *Simpson*, 452 F.3d at 1046 (on motion to dismiss, all reasonable
inferences from FAC's allegations taken as true, and allegations are "construed in the light
most favorable to" Plaintiffs).
[27] Ameritrade claims that Elvey "does not allege that he actually has any users for these

Plaintiffs' standing as IAS providers is consistent with several cases that construe 15 U.S.C. § 7702(11), which "includes traditional Internet Service Providers ('ISPs'), any email provider, and even most website owners." *Myspace, Inc. v. Globe.com, Inc.*, 06-3391, 2007 U.S. Dist. LEXIS 44143 (C.D. Cal. Feb. 27, 2007). "The plain language of the statute indicates that a provider of e-mail service alone, without any other services, qualifies" as an IAS provider. *See Hypertouch, Inc. v. Kennedy-Western Univ.*, 04-5303, 2006 U.S. Dist. LEXIS 14673, at *9 (N.D. Cal. Mar. 8, 2006). Even Ameritrade's primary authority concurs on this point. *Gordon v. Virtumundo, Inc.*, No. 06-204, 2007 U.S. Dist. LEXIS 35544, at *25 (W.D. Wash. May 15, 2007) (conceding that "it is fairly clear that [plaintiffs who leased space on a server to host a domain name and provided email to other users] . . . qualify as an IAS").

Ameritrade cites *Virtumundo* to support its argument that Plaintiffs do not have standing under CAN SPAM. (Def.'s Mot. 21.) In *Virtumundo*, the court granted summary judgment on the grounds that plaintiffs lacked sufficient evidence that they were "adversely affected" as required under CAN SPAM. *Id.* at *22-30.[28] *Virtumundo*'s reasoning is flawed. *Virtumundo*'s first err was finding that the term "Internet access service" was ambiguous and "capricious," even though it conceded that the statutory definition Congress provided the term was "exceedingly broad." *Id.* at *17, 25. A statutory definition is not ambiguous or "capacious" simply because it is broad.[29] Consequently, *Virtumundo* erred by resorting to statutory history. "[A]ppeals to statutory history are well taken only to resolve statutory

---

'services.'" (Def.'s Mot. 19.) Elvey does have users (besides himself), and it is proper for the Court to construe the FAC's allegations accordingly. *Simpson*, 452 F.3d at 1046.

[28] *Virtumundo* is thus procedurally distinguishable, as it was decided on a motion for summary judgment, and should not be applied on this Motion to Dismiss. Plaintiffs should have the opportunity to take discovery to support their claims. In comparison, *Gordon v. Ascentive, LLC*, No. 05-5079, 2007 U.S. Dist. LEXIS 44207 (E.D. Wash. June 19, 2007) refused to dismiss of the exact same plaintiff's CAN SPAM claims, finding that dismissal prior to discovery was "premature." *Id.* at *10.

[29] For instance, in *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003), the Ninth Circuit did not hesitate to construe a similar statutory definition as broadly as Congress wrote it: thus, a website and email newsletter fell within the definition of a "provider[s] or user[s] of an interactive computer service" under 47 U.S.C. § 230(c)(1), contrary to the interpretation below that the phrase covered only services that provided access to the Internet. *Id.* at 1030. "[S]ervices providing access to the Internet as a whole are only a subset of the services to which the statutory immunity applies." *Id.*

ambiguity." *Barnhill v. Johnson*, 503 U.S. 393, 401 (1992).[30]

*Virtumundo*'s second err was scouring CAN SPAM's legislative history to find a single comment by a single legislator to support its conclusion that Congress intended private CAN SPAM claims to be "limited" to "bona fide Internet service providers."[31] The legislative construction in *Virtumundo* was precisely the "exercise in looking over a crowd and picking out your friends" that the Supreme Court prohibits. *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005).[32]

Although *Virtumundo* conceded that Congress defined IAS broadly, it undermined Congress by construing the phrase "adversely affect" to restrict standing to private plaintiffs who experience "significant" harm "of the type uniquely experienced by IASs." *Virtumundo*, 2007 U.S. Dist. LEXIS 35544, at *23, 26-27. The *Virtumundo* court's third err was to subvert the broad definition of an IAS provider by limiting standing under CAN SPAM to entities which fit its idiosyncratic view of "bona fide" IAS providers. *See id*. at *23. This result effectively renders Congress's broad definition of IAS provider irrelevant. *Virtumundo* indicated that IAS providers that "depend[] on other entities" for connectivity "might not be an IAS as Congress envisioned" them. *Id*. at *24-25. This distinction unravels when one considers that large traditional ISPs (which are undoubtedly "bona fide" IAS providers) must use backbone providers to connect to the rest of the Internet, and that large Internet firms like eBay often host their servers with a third party. *See* ZDNet, *Intel gives home to eBay servers*, *at* http://news.zdnet.com/2110-9595_22-871656.html (Mar. 29, 2002). Likewise, the "significant" harm requirement invents a totally arbitrary standard of liability that leaves both

---

[30] "[T]he authoritative statement is the statutory text, not the legislative history [which has] a role in statutory interpretation only to the extent [it] shed[s] a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 568 (2005).

[31] *Virtumundo*, 2007 U.S. Dist. LEXIS 35544, at *22 (citing 150 Cong. Rec. E72-73 (Jan. 28, 2004)).

[32] The Supreme Court has "repeatedly stated" that, when courts must survey legislative history, "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill." *Eldred v. Ashcroft*, 537 U.S. 186, 210 n.16 (2003). Nothing in the Senate report on CAN SPAM even hints at any interest in limiting the private right of action beyond the Act's plain language and certainly does not discuss "bona fide" IAS providers. *Cf*. S. Rep. No. 108-102 (2003).

plaintiffs and defendants guessing how much harm is "significant." *Virtumundo*, 2007 U.S. Dist. LEXIS 35544, at *27. The result in *Virtumundo* frustrates the well-established purposes of the statutory damages in 15 U.S.C. § 7706(g)(3), including "compensat[ing] victims when actual loss is hard to prove," *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 963 n.7 (9th Cir. 2005), or "penaliz[ing statutory violations] and . . . deter[ing] future violations." *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994).[33] *Virtumundo* subverted Congress's intent by narrowly limiting standing for CAN SPAM's private right of action and effectively reading the broad definition of IAS out of the statute.

### B. As the Origin of the Traced Spam, Ameritrade Is Liable Under the CAN SPAM Act For "Initiating" the Traced Spam

Ameritrade's last argument is that it is not liable because it did not initiate the Traced Spam. (Def.'s Mot. 23.) 15 U.S.C. § 7704(a)(1) prohibits the "initiat[ion]" of the Traced Spam, which includes "originat[ing] or transmit[ting]" spam. 15 U.S.C. § 7702(9) (2007). The FAC alleges that Ameritrade "originated the Traced Spam" because the Traced Spam would not have been sent "[b]ut for Ameritrade's disclosure" of Plaintiffs' email addresses. (FAC ¶ 93.)

Ameritrade's sole argument on this point is that "the plain meaning of the word 'originate' is '[t]o bring into being; create,'" and that it did not create the spam, so it is not liable under section 7704(a)(1). (Def.'s Mot. 23, citing American Heritage Dictionary (4th ed. 2004). The FAC alleges that Ameritrade had a role in creating the Traced Spam by providing the spammers with accountholders' email addresses. Ameritrade's argument is not consistent with CAN SPAM's express instruction that "more than one person may be considered to have initiated" spam. 15 U.S.C. § 7702(9) (2007).[34] Second, Ameritrade's argument hinges on a

---

[33] Where 15 U.S.C. § 7706(f)(1)(B)(i) provides an alternate remedy for actual damages, the result in *Gordon* is contrary to the rule that "proof of actual damages is not a prerequisite to recovery of statutory minimum damages." *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000). *See also L.A. News Serv. v. Reuters Tv Int'l*, 149 F.3d 987, 996 (9th Cir. 1998) (statutory damages are available "whether or not there is adequate evidence of the actual damages suffered by plaintiff").

[34] *Omni Innovations, LLC v. Impulse Mktg. Group, Inc.*, No. 06-1469, 2007 U.S. Dist. LEXIS 51867, at *6 (W.D. Wash. July 18, 2007) (corporate officer alleged to have assisted company

single dictionary's restrictive definition of "originate": many other dictionaries (including the Oxford English Dictionary) contain definitions of the words "originate"[35] that support the FAC's causation allegations. If statutory construction is merely a matter of dueling dictionaries, Plaintiffs prevail. Unless the meaning of the word "originate" in section 7702(9) includes causation, section 7704(a)(1)'s application is strictly limited to defendants who transmitted or procured spam. This would render the word "originate" superfluous, contradicting the doctrine of statutory interpretation that "statutory construction which renders some words surplusage is to be avoided." *United States v. Stevens*, 462 F.3d 1169, 1171 (9th Cir. 2006). The rest of the CAN SPAM statute confirms Plaintiffs' interpretation.[36]

Ameritrade appears to argue that "initiation" under section 7702(9) has some volitional element or intent requirement. First, the FAC alleges in the alternative that Ameritrade's disclosure of email addresses *was* intentional. (FAC ¶ 44.) Moreover, this argument violates established rules for statutory construction. 15 U.S.C. § 7702(9) defines "initiate" as "originat[ing] or transmit[ting]" spam *or* "procur[ing] the origination or transmission" of spam. However, the word "intent" exists only in the separate definition of "procure" in 15 U.S.C. § 7702(12), and not at all in 15 U.S.C. § 7702(9). Where the word "intent" appears only in one of two prongs in a statute, reading an "intent" element into the other prong of the statute renders the statute "hopelessly redundant and one or the other phrase . . . surplusage." *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976) (regulation's "intentionally false" prong was not "synonymous" with its "fraudulent" prong). *Cf. Stevens*, 462 F.3d at 1171 (surplusage in statutory construction prohibited). Likewise, under the statutory canon of *expressio unius*

---

in sending spam could be liable for "initiation" under CAN SPAM).

[35] 10 Oxford English Dictionary 935 (2d ed. 1989) ("To . . . cause to arise or begin . . ."); 2 The New Shorter Oxford English Dictionary 2022 (4th ed. 1993) ("Cause to begin . . ."); The Concise Oxford Dictionary 962 (9th ed. 1995) ("cause to begin"); The Oxford American Desk Dictionary 421 (1998) ("cause to begin").

[36] "A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). "Ambiguity is a creature not of definitional possibilities but of statutory context . . ." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Nonetheless, to the extent these multiple definitions of "originate" lead to the conclusion that the term is ambiguous, there is nothing in CAN SPAM's statutory history precludes Plaintiff's definition of originate. See S. Rep. No. 108-102, at 15.

*est exclusio alterius*, the specific exclusion of "routine conveyance" of spam from the definition of "initiate" indicates that Congress did not intend any other exclusions or limitations on the definition of "initiate."[37] "[E]xpress enumeration [of one exception to a rule] indicates that other exceptions should not be implied." *In re Gerwer*, 898 F.2d 730, 732 (9th Cir. 1990). The Court should not narrow the plain meaning of "originate" or read limitations into the CAN SPAM Act beyond those Congress explicitly wrote into the statute.

Ameritrade's security breach demonstrates that collection of personal information entails risks, and it should share in those risks.[38] Liability under CAN SPAM is an appropriate avenue to do so where it is consistent with the Act's language.

Dated: August 27, 2007

By:/s/Alan Himmelfarb

Alan Himmelfarb
LAW OFFICES OF ALAN
HIMMELFARB
2757 Leonis Blvd
Los Angeles, CA 90058
Telephone: (323) 585-8696
Fax: (323) 585-8198
consumerlaw1@earthlink.net

Scott A. Kamber
Ethan Preston
KAMBER & ASSOCIATES, LLC
11 Broadway, 22d Floor
New York, NY 10004
Telephone: (212) 920-3072
Fax: (212) 202-6364
skamber@kolaw.com
epreston@kolaw.com

---

[37] The "doctrine of *expressio unius est exclusio alterius* . . . teaches that omissions are the equivalent of exclusions when a statute affirmatively designates certain . . . manners of operation." *Arc Ecology v. U.S. Air Force*, 411 F.3d 1092, 1099-1100 (9th Cir. 2005).
[38] Restatement (Second) of Torts, § 519 (1977) ("One who carries on an abnormally dangerous activity is subject to liability for harm to the person . . . another resulting from the activity, although he has exercised the utmost care to prevent the harm"); Ethan Preston & Paul Turner, *The Global Rise of a Duty to Disclose Information Security Breaches*, 22 J. Marshall J. Computer & Info. L. 457, 492 (2004) ("if data collectors must become reconciled to the growing risk in data collection because of potential liability, it is because data collection has always been risky for data subjects").