Alan Himmelfarb
LAW OFFICES OF ALAN HIMMELFARB
2757 Leonis Blvd
Los Angeles, CA 90058
Telephone: (323) 585-8696
Fax: (323) 585-8198
consumerlaw1@earthlink.net

Scott A. Kamber
Ethan Preston
KAMBER & ASSOCIATES, LLC
11 Broadway, 22d Floor
New York, NY 10004
Telephone: (212) 920-3072
Fax: (212) 202-6364
skamber@kolaw.com
epreston@kolaw.com

*Counsel for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| MATTHEW ELVEY, an individual, and GADGETWIZ, INC., an Arizona corporation, on their own behalf and on behalf of all others similarly situated, | No. C 07 2852 MJJ |
| | Judge Martin J. Jenkins |
| Plaintiffs | **PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| TD AMERITRADE, INC., a New York corporation, and DOES 1 to 100, | Date: September 18, 2007 Time: 9:30 a.m. Location: Courtroom 11, 19th Floor 450 Golden Gate Ave. San Francisco, CA 94102 |
| Defendants. | |

# Table of Contents

Page

I.   Ameritrade Fails to Present Viable Objection to the Proposed Prohibitory
     Relief ................................................................................................................1

II.  Plaintiffs Are Entitled to Injunction for Corrective Disclosure and an
     Accounting .......................................................................................................3

     A.   Ameritrade Fails to Rebut the Reasonable Inference That a Security Breach
          Exposed Accountholders' Social Security Numbers ...............................3

     B.   Disclosure of Email Addresses to Spammers Alone Creates Risk of Irreparable
          Harm Sufficient to Justify Injunction .................................................5

     C.   The Basis of Plaintiffs' Claims Is Ameritrade's Failure to Disclose the Security
          Breach, Not the Security Breach Itself ................................................6

     D.   Plaintiffs Are Entitled to the Proposed Corrective Notice ...................7

     E.   Plaintiffs Are Entitled an Accounting .................................................9

III. Plaintiffs Are Entitled to Injunction Warning Against the Purchase of Spam-
     Touted Stock ...................................................................................................11

IV.  Ameritrade Makes *Ad Hominen* Attacks on Elvey to Distract Attention From Its
     Own Misconduct ............................................................................................13

V.   The Court Should Not Hesitate to Grant Class Certification, If It Is Required ....15

Conclusion ............................................................................................................15

# Table of Authorities

**Federal Cases**                                                                                           **Page**

*Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89 (N.D. Cal. 1972)...................................2 & n.2

*Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) ...................................................................15

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) ...................................................................12

*Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006) ........................................................4 & n.5

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) ..............................................................2

*Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005) .................13 n.9

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).............................................11-12

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) .......................................................12

*De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945) .....................................7-8

*Dimick v. Schiedt*, 293 U.S. 474 (1935) .............................................................................9 n.8

*Fair Hous. of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2002).................................................15

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)..................................................2

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) .........................................................13 n.9

*Jaffee v. Redmond*, 518 U.S. 1 (1996) ...............................................................................9 n.8

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ................................................................11

*Key v. DSW, Inc.*, 454 F. Supp. 2d 684 (S.D. Ohio 2006)......................................................4 n.5

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996) ..................................................12

*In re Niles*, 106 F.3d 1456 (9th Cir. 1997) .....................................................................9-10, 11

*OpenTV v. Liberate Techs.*, 219 F.R.D. 474 (N.D. Cal. 2003)..................................................10

*Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665 (9th Cir. 2003) .............................................12

*Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002)...................................2

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132 (9th Cir. 1986)...............................2-3

*Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1 (D.D.C. 2007) .....................4 n.5

*In re Sulfuric Acid Antitrust Litig.*, 230 F.R.D. 527 (N.D. Ill. 2005)......................................10

*United States v. Gourde*, 440 F.3d 1065 (9th Cir. 2006)...........................................3, 4, 11

*Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) ..................................................................5-6

**Table of Authorities**

**Federal Rules**                                                                          **Page**

Fed. R. Civ. P. 26 ...............................................................................10

Fed. R. Civ. P. 30 ...............................................................................10

Fed. R. Civ. P. 33 ...............................................................................10

**California Cases**                                                                       **Page**

*Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 38 Cal. Rptr. 3d 36 (Cal. Ct.
    App. 2006)....................................................................................7

*Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 8 Cal. Rptr. 3d 22
    (Cal. Ct. App. 2003)........................................................................2

*Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 999 P.2d 706 (2000) ...............2

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 45 P.3d 243 (2002) ...........................................7

*McAdams v. Monier, Inc.*,
    151 Cal. App. 4th 667, 60 Cal. Rptr. 3d 111 (Cal. Ct. App. 2007)...............................14

*Mfrs. Life Ins. Co. v. Superior Court*, 10 Cal. 4th 257, 895 P.2d 56 (1995) .............................9

**California Statutes**                                                                    **Page**

Cal. Civ. Code § 1785.11.2 (2007)....................................................................8

Cal. Civ. Code § 1798.82 (2007) ...................................................................8-9

Cal. Civ. Code § 1798.84 (2007) .....................................................................9

**Miscellaneous**                                                                          **Page**

Alessandro Acquisti et al., *Is There A Cost to Privacy Breaches? An Event Study*, 5 Econ.
    Info. Security (2006), *at* http://weis2006.econinfosec.org/docs/40.pdf ...................6 n.7

H.R. Rep. No. 109-522 (2006)....................................................................3 n.3

Ethan Preston & Paul Turner, *The Global Rise of a Duty to Disclose Information Security
    Breaches*, 22 J. Marshall J. Computer & Info. L. 457 (2004) ........................................6

Stuart E. Schechter & Michael D. Smith, *How Much Security is Enough to Stop a Thief? The
    Economics of Outsider Theft via Computer Systems and Networks*, 7 Int'l Fin.
    Cryptography Conf. (2003), *at*
    http://www.eecs.harvard.edu/~stuart/papers/fc03.pdf...........................................7-6 n.7

S. Rep. No. 108-102 (2003) ..........................................................................14

U.S. Dep't of Justice, *Six Defendants Plead Guilty in Internet Identity Theft and Credit Card
    Fraud Conspiracy*, *at*
    http://www.cybercrime.gov/mantovaniPlea.htm (Nov. 17, 2005) ...........................3 n.3

# Table of Authorities

**Miscellaneous**                                                                 **Page**

U.S. Equal Employment Opportunity Commission, *EEOC NOTICE No. 915.002, at*
    http://www.eeoc.gov/policy/docs/testers.html (May 22, 1996)....................................15

U.S. General Accounting Office, Personal Information: Data Breaches Are Frequent, but
    Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown
    (GAO-07-737 2007).............................................................................................5 & n.6

### PLAINTIFFS' REPLY TO TD AMERITRADE'S OPPOSITION
### TO THE MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Matthew Elvey ("Elvey") and Gadgetwiz, Inc. ("Gadgetwiz"), respectfully file this Reply to TD AMERTRADE, Inc.'s ("Ameritrade") Opposition to the Motion for Preliminary Injunction.

Ameritrade's Opposition does not advance any argument that undermines the urgency of the relief Plaintiffs seek or their right to that relief. Ameritrade rehashes its arguments from its Motion to Dismiss the Plaintiffs' First Amended Complaint ("FAC"). (*Id*. 6-9.) Plaintiffs' Opposition to the Motion to Dismiss discredited these arguments.[1]

Rather, Ameritrade's Opposition reveals its fundamental misunderstandings about Plaintiffs' claims and the injunctive relief they seek. These misunderstandings lead to many irrelevant arguments that either do not address Plaintiffs' claims, misstate Plaintiffs' requested relief, or devolve into meritless *ad hominen* attacks on Plaintiffs. Plaintiffs' claims do not arise from Ameritrade's security breach itself, but from its failure to give accountholders adequate notice of the security breach. The relief Plaintiffs seek is not necessarily geared towards correcting Ameritrade's security, but to ensure Ameritrade provides consumers accurate information about the security of data provided to it.

### I.     Ameritrade Fails to Present Viable Objection to the Proposed Prohibitory Relief

Plaintiffs seek injunctive relief prohibiting Ameritrade from 1) disclosing its customers' personal information, including their email addresses, in a manner inconsistent with the Privacy Statement, and 2) directing its customers to delete spam. (Pl.s' Mot. iii.)

---

[1] This Reply confines itself to those arguments Ameritrade developed more in the Opposition than its Motion to Dismiss: its arguments concerning Cal. Civ. Code § 1798.82 (addressed in Section II.D, on pages 8-9) and its arguments concerning implied preemption (addressed in Section III, on pages 12-13). With respect to the other arguments which Ameritrade references, Plaintiffs refer to their Opposition to the Motion to Dismiss: Elvey's claims are not preempted under the Securities Litigation Uniform Standards Act because they are not "in connection with" securities transactions, nor are they a "covered class action," nor do they concern "covered securities." (Pl.s' Opp. Mot. Dismiss 3-5.) The Nebraska choice of law clause in Ameritrade's Client Agreement is unenforceable, because it would impair Elvey's right under California law to bring a class action. (*Id*. 1-3.) Further, the FAC does allege damages: Elvey lost the benefit of the bargain on his transaction fees and maintenance of his account balance because of the misleading representations in the Privacy Statement. (*Id*. 11-12.) Nor can Ameritrade evade its fiduciary duty to its customers, where it expressly promised not to disclose their personal information. (*Id*. 15-16.)

Ameritrade claims this relief is unwarranted and improper under *Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89 (N.D. Cal. 1972), because it avers it never "intentionally disclosed any of its accountholders' e-mail addresses or other information to any unauthorized third parties," and it has ceased telling accountholders to delete spam. (Def.'s Opp. 21.)[2] Ameritrade does not present sufficient evidence to support its arguments.

Ameritrade does not deny that it discloses accountholder email addresses, contrary to the representations in the Privacy Statement. That this disclosure is unintentional is no defense to the proposed injunction. *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 181, 999 P.2d 706, 717 (2000) (UCL imposes "strict liability"); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360, 8 Cal. Rptr. 3d 22, 29 (Cal. Ct. App. 2003) (UCL and CLRA share the same "consumer confusion" liability standard). To the extent Ameritrade proves it is unable to stop disclosure of email addresses "categorically and in detail," it can mount a defense against civil contempt for violating the injunction. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239, 1241 (9th Cir. 1999). Ameritrade advances no excuse not to prohibit the disclosure of its customers' personal information.

Ameritrade's assertion that it has stopped directing customers to delete spam is not sufficient enough to foreclose the injunction, either. "[T]he standard for determining whether a case has been rendered moot by the defendant's voluntary conduct is stringent"; it must be "absolutely clear" the conduct cannot be reasonably expected to recur. *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1178 (C.D. Cal. 2002). Ameritrade's voluntary cessation of this conduct can only moot the injunction where "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (punctuation, citations omitted). Some spam has doubtlessly been deleted, and so the loss of that evidence cannot be irrevocably eradicated. Ameritrade ignored Elvey's requests to stop its conduct until Elvey brought suit in federal district court; Plaintiffs

should not [be] require[d] . . . also to introduce concrete evidence that

---

[2] Not surprisingly, *Alsup* is not on point – it merely *declined to certify a class action* under Rule 23(b)(2), in part, because the defendant corrected its statutory violations. *Alsup v. Montgomery Ward & Co.*, 57 F.R.D. 89, 92 (N.D. Cal. 1972).

> [Ameritrade is] likely to [engage in the conduct] again. If the [Ameritrade] sincerely intend not to [resume its conduct], the injunction harms [it] little; if [it does], it gives [Plaintiffs] . . . protection . . ."

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135-36 (9th Cir. 1986) (reversing denial of injunction prohibiting trademark infringement based on voluntary cessation). (*Cf.* FAC ¶¶ 34-35.)

## II.    Plaintiffs Are Entitled to Injunction for Corrective Disclosure and an Accounting

Plaintiffs also seek an injunction requiring 1) Ameritrade to provide a notice of the probable security breach and 2) provide an accounting of any of its records systems which store accountholders' personal information. (Pl.s' Mot. iii-iv.) Ameritrade does not present any argument that justifies denying this relief.

### A.    Ameritrade Fails to Rebut the Reasonable Inference That a Security Breach Exposed Accountholders' Social Security Numbers

Ameritrade does not contest that spammers obtained its accountholders' email addresses, and admits that it is now investigating into the "unauthorized acquisition" of these email addresses "from [its] computer systems." (Hale Decl. ¶ 5; Ex. H to Pl.'s Mot. Prelim. Inj. (email disclosing investigation).) It is reasonable to infer that the spammers who accessed and downloaded email addresses from those computer systems also downloaded other data stored on those systems. *United States v. Gourde*, 440 F.3d 1065, 1070-71 (9th Cir. 2006) (criminal defendant had access to website with illegal images and intent to view such images: inference that defendant downloaded illegal images was reasonable, "common sense"). Likewise, it is reasonable to infer that spammers who used the email addresses to spam Ameritrade customers would also abuse other personal information obtained in the security breach – especially where black markets exist for both email addresses and Social Security numbers.[3] Although Ameritrade asserts there is no evidence of possible identity theft, it advances no evidence or argument to counter these inferences.[4] (Def.'s Opp. 2, 4, 10.)

The uncontested evidence that 1) email addresses were obtained in a security breach at

---

[3] *See* H.R. Rep. No. 109-522, at 5-6 (2006); U.S. Dep't of Justice, *Six Defendants Plead Guilty in Internet Identity Theft and Credit Card Fraud Conspiracy*, at http://www.cybercrime.gov/mantovaniPlea.htm (Nov. 17, 2005).
[4] Ameritrade has not, for instance, produced any evidence that its computer systems segregated access to email addresses from access to Social Security numbers.

Ameritrade and 2) these email addresses were used to spam accountholders dispositively distinguishes Elvey's claims from each and every security breach case cited by Ameritrade. (Def.'s Opp. 11-12.) In those cases, the plaintiffs only alleged that a security breach occurred, but not that any evidence the information stolen in the security breach was ever misused by the parties responsible.[5] (*Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006), is particularly inapplicable, as the injunction in that case required the defendant to *completely disconnect from the Internet* – here, Plaintiffs seek only a corrective notice and an accounting.) Ameritrade does not contest that someone obtained Elvey's email addresses and misused it – the only question is whether that person also obtained his Social Security number. The reasonable, common sense inference is that it was. *Gourde*, 440 F.3d at 1070-71.

Ameritrade also tries to argue that the absence of consumer complaints about identity theft linked to Ameritrade's security breach is evidence that there was no "identity theft linked in any way to [Ameritrade,] although it has been nearly one year since Plaintiffs claim that they began receiving stock spam." (Def.'s Opp. 4-5, 10.) The fact that consumers cannot link identity theft incidents back to Ameritrade is not evidence that the security breach did not expose Social Security numbers to criminals. Unlike email addresses, consumers cannot provide unique Social Security numbers that allow them to trace identity theft back to a security breach at a particular firm – and Social Security numbers stolen in a security breach

---

[5] In *Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 3 (D.D.C. 2007), the plaintiffs did not allege that the theft of computers containing their information "was anything other than a common burglary or that it was undertaken for the purpose of accessing" their information. *Id.* at 3. The *Randolph* plaintiffs did not present any evidence that their information had been misused. *Id.* at 4. In *Key v. DSW, Inc.*, 454 F. Supp. 2d 684 (S.D. Ohio 2006), the plaintiff did not allege that anyone used her personal information for identity theft or, indeed, allege any "evidence that a third party intends to make unauthorized use of her financial information or of her identity." *Id.* at 688, 690. Likewise, *Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006) dissolved a preliminary injunction on the grounds that there was no evidence that anyone had "tak[en] advantage of [the Department of] Interior's security flaws, nor that such actions are imminent" and that the preliminary injunction

> was not tailored to protect the integrity of the specific data Interior will need to perform an accounting. While the class members may face some risk of harm if [financial data] housed on Interior's computers were compromised, we have not been shown that this possibility is likely, nor that it would substantially harm the class members' ability to receive an accounting.

*Id.* at 315, 317.

*"may be held for up to a year or more before being used to commit identity theft."*[6] Ameritrade also attempts to discount Elvey's own allegations of identity theft are "disingenuous" because the identity theft "occurred before he began receiving stock spam. " (*Id.* 1) First, Elvey was an accountholder at Ameritrade long before he gave Ameritrade his first unique email address in October 2006. (*Cf.* Elvey Decl. Mot. Prelim. Injunct. ¶¶ 1-2.) Elvey has no way of knowing whether Ameritrade first disclosed his email address *prior* to October 2006. Secondly, Ameritrade presents no reason to think that identity thieves had to wait to use Elvey's Social Security number until after spamming him.

**B.    Disclosure of Email Addresses to Spammers Alone Creates Risk of Irreparable Harm Sufficient to Justify Injunction**

Ameritrade also argues that the "de minimis" damage caused by spam is not sufficient irreparable harm to justify a preliminary injunction. (Def.'s Opp. 12-13.) Again, the law does not support Ameritrade. (Pl.'s Opp. 13, 14-15.) Putting aside Ameritrade's cavalier attitude, it misunderstands the irreparable harm proffered in the Motion. The irreparable harm is not the spam itself, but the disclosure of email addresses to spammers – once spammers have those email addresses, they will never be spam-free again. (Pl.s' Mot. 8.) Again, Ameritrade overlooks the fact that the injunction not only protect Plaintiffs' email addresses from disclosure, but also protects other Class members' email addresses. The damages from this disclosure are not de minimis simply because they are difficult to calculate – but the difficulty in calculating and collecting the damages from the spam does constitute irreparable harm. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) (when movant for preliminary injunction cannot calculate its damages, movant "has no adequate legal remedies and irreparable harm

---

[6] U.S. General Accounting Office, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (GAO-07-737 2007).

> Determining the link between data breaches and identity theft is challenging for several reasons. First, identity theft victims often do not know how their personal information was obtained. . . . Second, victims may misattribute how their data were obtained. . . . Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, [measurements of the] harm resulting from data breaches cannot necessarily rule out all future harm.

*Id.* at 28-29

1   exists"). The risk of irreparable harm from disclosure of email addresses alone justifies the

2   proposed notice.

3   **C.      The Basis of Plaintiffs' Claims Is Ameritrade's Failure to Disclose the
4           Security Breach, Not the Security Breach Itself**

5           Ameritrade contends that its information security is reasonable (or passes regulatory

6   muster) and that perfect security is impossible. (Def.'s Opp. 4.) Ameritrade also claims the

7   Privacy Statement never guaranteed that "customer data never could be acquired or used

8   without authorization." (Def.'s Opp. 6.) These arguments are entirely besides the point:

9   Elvey's claims relate to Ameritrade's ***failure to disclose*** the ongoing security breach to its

10  customers – which rendered the Privacy Statement misleading and actionable under the CLRA

11  and UCL. To put it in terms Ameritrade understands, if consumers have access to accurate

12  information about security breaches – which they are entitled under the UCL and CLRA,

13  consumers will demand secure businesses and create market incentives for businesses to

14  secure their computer systems:

15              Requiring businesses to disclose information security violations provides
                [firms] with a market incentive to ensure that their security is adequate. . . .
16              Customers will be reluctant to transact with businesses that fail to adequately
                secure their databases. . . .Disclosure permits . . . customers to identify and
17              avoid businesses that do not take their computer security seriously or are unable
                to do so.
18
19  Ethan Preston & Paul Turner, *The Global Rise of a Duty to Disclose Information Security

20  Breaches*, 22 J. Marshall J. Computer & Info. L. 457, 460 (2004). Conversely, Ameritrade

21  distorts the market for security by concealing information about the security breach. In this

22  light, Ameritrade's expressed concerns that disclosure "could seriously damage [its] business

23  and reputation," harm its "goodwill" and cause the loss of customers are precisely the point.

24  (Def.'s Opp. 2, 20.) There cannot be a healthy information security market without market

25  incentives to avoid disclosing security breaches.[7]

---

26  [7] Ameritrade doubtlessly exaggerates the harms the disclosure will cause. One empirical study
    of privacy incidents and breach data indicates that the impact on stock price caused by
27  disclosure of security breaches is "is significant and negative, although it is short-lived."
    Alessandro Acquisti et al., *Is There A Cost to Privacy Breaches? An Event Study*, 5 Econ.
28  Info. Security 18 (2006), *at* http://weis2006.econinfosec.org/docs/40.pdf . Likewise,
    Ameritrade underestimates the deterrence benefits it can reap through providing a full
    disclosure. Stuart E. Schechter & Michael D. Smith, *How Much Security is Enough to Stop a*

The Privacy Statement represents that "TD AMERITRADE does not . . . disclose your personal information to any third party for any reason . . ." (FAC ¶ 21.) Despite this statement, Ameritrade argues that the UCL and CLRA do not "impose an independent duty" to notify customers that it disclosed their email addresses because it did not promise to do so in the Privacy Statement. Contrary to Ameritrade's strained reading, the UCL and CLRA prohibit any representation which "although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951, 45 P.3d 243, 250 (2002). One could reasonably believe, under the Privacy Statement, that Ameritrade did not have any specific knowledge or evidence of a security breach which disclosed customer email addresses to spammers. It is Ameritrade's failure to correct that misleading impression which violates the CLRA and UCL.

Ameritrade rehashes its argument that the statement "no security system is absolutely impenetrable" renders the Privacy Statement not misleading. This argument is undermined by Ameritrade's own arguments about the potential costs of Plaintiffs' proposed security notice. (Def.'s Opp. 20.) *If Ameritrade had truly disclosed the security breach, there would be no further consequences security breach notice sought in the Motion for Preliminary Injunction.* (The Opposition to the Motion to Dismiss provides Plaintiffs' complete argument that the statement above only warns about the general possibility of a future security breach – failing to disclose the specific, ongoing security breach. (Pl.s' Opp. 9-11.))

### D.     Plaintiffs Are Entitled to the Proposed Corrective Notice

As Ameritrade concedes, corrective disclosures are available as injunctive relief under the CLRA and UCL. *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 677-78, 38 Cal. Rptr. 3d 36, 44-45 (Cal. Ct. App. 2006). Ameritrade still seeks to deny its customers an accurate disclosure of its security breach, arguing that the "*final* injunction" for a corrective disclosure in *Colgan* does not support "a *preliminary* injunction" here. (Def.'s Opp. 14, 19.) (emphasis in original). Once again, Ameritrade's arguments are contrary to the law. "A

---

*Thief? The Economics of Outsider Theft via Computer Systems and* Networks, 7 Int'l Fin. Cryptography Conf. 8, 11 (2003), *at* http://www.eecs.harvard.edu/~stuart/papers/fc03.pdf (sharing information about attacks makes firms less attractive targets).

preliminary injunction is *always appropriate* to grant intermediate relief of the same character

as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S.

212, 220 (1945) (emphasis added). Although Ameritrade calls the proposed security notice

"misleading, alarmist, and speculative," (Def.'s Opp. 20), it accurately reflects the facts

underlying this dispute:

> **ALERT: AMERITRADE'S INFORMATION SYSTEMS ARE NOT NECESSARILY SECURE AND WE CANNOT ASSURE THE SECURITY OF YOUR PERSONAL INFORMATION.** THERE IS EVIDENCE THAT SOME ACCOUNTHOLDERS' EMAIL ADDRESSES HAVE LEAKED FROM AMERITRADE'S COMPUTER SYSTEMS TO SPAMMERS. AMERITRADE HAS AN ONGOING INVESTIGATION INTO THIS SITUATION. **YOUR NAME, SOCIAL SECURITY NUMBER, AND YOUR EMAIL ADDRESS MAY HAVE BEEN LEAKED AS WELL.**

(Pl.s' Mot. iv.)  Ameritrade does not contest that it has disclosed its accountholders' email

addresses, and concedes it is investigating a security breach relating to these disclosures.

Ameritrade cannot contest the the statement that accountholders' names and Social Security

numbers *may have been leaked* either, because Ameritrade itself claims that the representation

in the Privacy Statement that "no security system is absolutely impenetrable" *already*

discloses the possibility "that customer data . . . could be acquired or used without

authorization." (Def.'s Opp. 6.)

Given that the security breach notice set forth above is entirely accurate, the potential

loss of goodwill and reputation of which Ameritrade complains are not cognizable costs. (*Id*.

20.) Ameritrade also argues, however, the notice would cause "many accountholders to

undertake . . . burdensome steps to protect themselves from identity theft." (Def.'s Opp. 20.)

Ameritrade at once downplays the risk of identity theft without a sound basis for doing so, as

it exaggerates the costs of responding to identity theft to consumers. Consumers can place a

security freeze on their credit report by simply sending a written request to consumer credit

reporting agencies by certified mail. Cal. Civ. Code § 1785.11.2(a) (2007). This is not the

onerous procedure Ameritrade makes it seem.

Finally, Ameritrade emphatically argues that Cal. Civ. Code § 1798.82 represents the

outer limit of any obligation to disclose a security breach. Ameritrade cannot use section

1798.82 to circumvent its liability for misleading omissions in the Privacy Statement under the UCL and CLRA. First, the three different statutes regulate two different matters: the UCL and the CLRA prohibit the misleading omissions in Ameritrade's Privacy Statement. Section 1798.82 requires disclosures in situations where there is no contractual obligation or applicable privacy policy. Cal. Civ. Code § 1798.82(a) (2007). Section 1782.92 is merely cumulative to the CLRA and UCL, and does not displace them. *See Mfrs. Life Ins. Co. v. Superior Court*, 10 Cal. 4th 257, 263, 284, 895 P.2d 56, 58, 72 (1995) (California Unfair Insurance Practices Act did not create exemption to UCL). The legislation explicitly confirms this conclusion. The remedy for violations of section 1798.82 is found at Cal. Civ. Code § 1798.84. Section 1798.84 expressly provides that the "***rights and remedies available under this section are cumulative . . . to any other rights and remedies available under law***." Cal. Civ. Code § 1798.84(g) (2007) (emphasis added). Ameritrade's interpretation would violate California's statutory construction rules by rendering section 1798.84(g) meaningless. *Mfrs. Life*, 10 Cal. 4th at 274, 895 P.2d at 65.[8]

### E.    Plaintiffs Are Entitled an Accounting

While the proposed notice is uncontestably accurate as far as it goes, both Ameritrade and accountholders are served best by an accurate, detailed account of the security breach. This is why Plaintiffs seek an accounting – to provide a public that report accurately and completely discloses the security breach to Ameritrade accountholders. (Pl.s' Mot. iii.)

Ameritrade's assertion that Plaintiffs' "need for additional information can be satisfied through [ordinary] discovery" is wrong. (Def.'s Opp. 17.) Ameritrade, as a fiduciary, bears the burden of rendering the accounting after it breached its duties by concealing material information from its accountholders. *In re Niles*, 106 F.3d 1456, 1461 (9th Cir. 1997).

> The burden that the common law places on the fiduciary to account is more than a shifting of the burden of coming forward with evidence. . . . By failing to

---

[8] To the extent that Plaintiffs' proposed accounting is *truly* unprecedented, that is not, by itself, any reason not to grant the accounting. "[T]he common law is susceptible of growth and adaptation to new circumstances and situations . . ." *Dimick v. Schiedt*, 293 U.S. 474, 487 (1935). "[T]he common law is not immutable but flexible, and by its own principles adapts itself to varying conditions." *Jaffee v. Redmond*, 518 U.S. 1, 8 (1996) (citation, quotation omitted).

1  keep and submit accounts, [the fiduciary assumes the burden of repelling the presumption and disproving negligence and faithlessness.

2  *Id.* at 1462. Likewise, Plaintiffs should not be obliged to run down the details of the security

3  breach: as a fiduciary, Ameritrade is obliged to provide them to Plaintiffs in the accounting.

4  Discovery is therefore not an acceptable substitute for an accounting. The Federal Rules place

5  quantitative limits on discovery. *See* Fed. R. Civ. P. 26(b)(2)(B) (limiting production of

6  documents identified "as not reasonably accessible because of undue burden or cost");

7  30(a)(2) (limiting number of depositions to 10, and restricting redeposing deponents);

8  30(d)(2) (depositions limited to one day of seven hours); 33(a) (limiting the number of

9  interrogatories to 25). These quantitative limits necessitate that "especially in complex cases, .

10  . . almost all [discovery] will be under-inclusive." *In re Sulfuric Acid Antitrust Litig.*, 230

11  F.R.D. 527, 532 (N.D. Ill. 2005) (discussing time limit on depositions). Moreover, the cost of

12  producing documents can shift to requesting parties. *OpenTV v. Liberate Techs.*, 219 F.R.D.

13  474, 476-79 (N.D. Cal. 2003) (partly fixing costs of computer production on requesting

14  party). Any trial court will recognize that gamesmanship in discovery is a terrible temptation

15  to which even the most serious-minded litigants may fall prey. By shifting the burden of proof

16  and production, an accounting eliminates that temptation and ensures that Ameritrade will

17  provide its accountholders the precise and detailed description of the security breach that they

18  deserve. Ameritrade argues that the proposed accounting does not adequately specify which

19  "particular information would be required by the requested accounting of records systems."

20  (Def.'s Mot. 18.) The accounting dovetails snugly with the proof of impossibility required to

21  defend a contempt charge on the injunction prohibiting the disclosure of accountholder

22  information. Under either the accounting or the injunction prohibiting the disclosure of

23  accountholder information, Ameritrade must prove that it is unable to stop disclosure of email

24  addresses. Plaintiffs cannot be asked to identify exactly what information is needed to

25  discharge Ameritrade's fiduciary obligations when they do not have access to the underlying

26  evidence.

27      Ameritrade marches a parade of horribles before the Court to argue against the

28  accounting: it complains that the public report "would only encourage future attempts by

hackers" and "expose proprietary and confidential information," and that the security measures that may be proposed by Plaintiffs' counsel after the accounting are too indefinite under Rule 65. (Def.'s Mot. 18.) Ameritrade conveniently ignores that Plaintiffs' requested relief must be "***approved by the Court upon completion of the accounting***." (Pl.s' Mot. iv.) (emphasis added). Both these remedies will be fully briefed and approved by the Court after the accounting and will fully comply with Rule 65. In combination with the parties' imminent protective order, Ameritrade will have all the protection it needs.

Ameritrade claims that "there is no basis for ordering a system-wide accounting" where Plaintiffs only have evidence that email addresses were disclosed in the security breach. (Def.'s Opp. 17.) The accounting sought by Plaintiffs is not system-wide, but limited to Ameritrade records systems which store personal information of Plaintiffs or the accountholder class members. (Pl.s' Mot. iii.) Again, it is reasonable to presume that if the spammers responsible had access to the email addresses stored on these systems, they had access to any other information stored on those systems. *Gourde*, 440 F.3d at 1070-71.

Ameritrade finally argues that the equitable remedy of an accounting is strictly limited to a financial statement, and that the accounting of Ameritrade's information systems Plaintiffs seek is "literally unprecedented." (Def.'s Opp. 18.) Ameritrade mischaracterizes the relief Plaintiffs seek yet again. This lawsuit only concerns Ameritrade's information system to the extent they store Plaintiffs' personal information. "[T]he obligation to render an accounting is triggered by proof that the plaintiff entrusted property to the defendant in a fiduciary relationship." *In re Niles*, 106 F.3d at 1462 n.4. Here, Plaintiffs entrusted personal information to Ameritrade and had vested property rights to that information under the terms of the Privacy Statement. *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) ("one of the most essential sticks in the bundle of rights that are commonly characterized as property [is] the right to exclude others").

### III. Plaintiffs Are Entitled to Injunction Warning Against the Purchase of Spam-Touted Stock

Plaintiffs seek an injunction requiring Ameritrade to provide a notice before

accountholders purchase stock that has been touted by spam that the stock has been so touted, and that its value may be manipulated. (Pl.s' Mot. iii.)

Ameritrade's implied preemption argument is at its zenith here, and it still fails. (Def.'s Opp. 7.) Implied preemption applies only where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). There is no "federal policy against States imposing liability in addition to that imposed by federal law. [S]tate causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law . . ." *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989).

Ameritrade argues that the stock notice sought in Plaintiffs' Motion "would frustrate the orderly functioning of the nation's securities markets . . ." (Def.'s Opp. 15.) Although Ameritrade notes that "spam-based pump-and-dump schemes are the focus of ongoing SEC regulatory and enforcement efforts," it fails to produce any evidence or argument that Plaintiffs' proposed remedy would actually interfere with the SEC's efforts. (*Id.*) Ameritrade does not establish a implied preemption defense without "overcom[ing] the pre-sumption against finding pre-emption of state law in areas traditionally regulated by the States . . ." *ARC Am. Corp.*, 490 U.S. at 101. This includes securities law. "Congress plainly contemplated the possibility of dual litigation in state and federal courts relating to securities transactions." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 383 (1996). *See also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 83 (1987) (no implied preemption where Indiana securities law "furthers the federal policy of investor protection"). Ameritrade's burden of proof is high: implied preemption can be found "[o]nly where there is "clear evidence" that Congress meant to assert federal control . . ." *Oxygenated Fuels Ass'n v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003). Plaintiffs' proposed remedy (that Ameritrade provide truthful information prior to the purchase of spam-touted stock) does not conflict with the SEC's activities (halting trading on spam-touted stocks). (Def.'s Opp. 15, 16-17.) Ameritrade's generalized objections that the remedies sought will "frustrate the orderly functioning of the nation's securities

markets" does not carry that burden where Ameritrade utterly fails to demonstrate how, precisely, Plaintiffs' remedies would disrupt the SEC's efforts in this area.[9]

Nor do Ameritrade other arguments against the stock notice hold water. Ameritrade claims that purchases of spam-touted stock do not threaten irreparable harm as accountholders "could seek full compensation in the form of money damages." (Id. 13.)  This damages remedy is illusory because accountholders will generally be unable to establish causation, and therefore unable to calculate their damages – rendering the harm irreparable. Ameritrade also argues that the stock notice is unnecessary because "they do not trade spam-touted stocks and they know all about the dangers of spam-based manipulation." (*Id*. 15.) Clearly, spammers would not engage in pump-and-dump schemes if the spam was entirely unsuccessful. Moreover, Ameritrade entirely discounts investors – including Plaintiffs – who may purchase a stock ***without being aware that it is being manipulated by stock spam***. While investors who make decisions based on stock spam may not heed the stock notice proposed by Plaintiffs, that does not mean Plaintiffs' proposed remedy cannot assist other investors.

Ameritrade also urges that the burden of "detect[ing] spam sent to its accountholders and . . . identify[ing] stocks touted by such spam" would be "enormous." (Pl.s' Mot. iii; Def.'s Opp. 16.) This argument should be taken with a grain of salt: Ameritrade's declarant does not actually quantify the costs of complying with the injunction. Further, Ameritrade has particularized knowledge of the stock spam sent to its accountholders (who forward their spam to Ameritrade), and can easily seed its database with controlled, unique email addresses to obtain the same spam sent to its accountholders (and only that spam). Lastly, the cost of presenting a single, additional pop-up screen to Ameritrade's accountholders cannot be great.

## IV.    Ameritrade Makes *Ad Hominen* Attacks on Elvey to Distract Attention From Its Own Misconduct

Finally, Ameritrade uses its Opposition to mount meritless personal attacks on Plaintiffs. Ameritrade's inflammatory rhetoric is a desperate attempt to deflect attention from

---

[9] In contrast, Ameritrade's cases involved close statutory analysis and concrete examples of how the state laws at issue undermined federal policy. (*Cf*. Def.'s Opp. 15, citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119 (9th Cir. 2005).

1  its own misconduct. Ameritrade calls Elvey "disingenuous" because he waited seven months

2  to file this lawsuit. (*Id.* 1.) Elvey first alerted Ameritrade to the spam issue in *November*

3  2006.[10] (Pl.s' Opp. Mot. Extension for Time 4.) Ameritrade responded by email and indicated

4  it was investigating the matter. After Elvey waited for the resolution of Ameritrade's

5  investigation until February 2007, he set up a separate hard drive with a separate operating

6  system to log onto Ameritrade's website and checking his email "[t]o ensure that he was not

7  responsible for leaking" his email addresses. (*Id.* (quoting FAC ¶ 24.)) While Ameritrade

8  shamelessly demonizes Elvey as a professional plaintiff, Elvey took due diligence to ensure he

9  was not at fault and delayed seeking legal counsel until he understood that his grievances were

10  suitable for the legal system. (*Id.*) Even after he decided to retain counsel, Elvey needed time

11  to locate legal assistance willing to represent him in a case like this on a contingency fee – and

12  his counsel required some time to take due diligence on his claims and draft his complaint.

13  (*Id.*) ***Elvey should not be penalized for carefully investigating his claims, nor for lacking the***

14  ***means to immediately procure counsel.*** Elvey is not a billion-dollar corporation with instant

15  access to multinational law firms, and cannot be expected to act like one.

16          Finally, in its argument against class certification, Ameritrade states that Elvey

17  deliberately "subject[ed] [himself] to spam in order to bring this suit" and that "it is unlikely

18  that [he was] deceived by any alleged misrepresentation in the . . . Privacy Statement." (Def.'s

19  Opp. 23.)[11] The FAC alleges damages – which necessarily incorporates an allegation of

20  reliance in the CLRA. *McAdams v. Monier, Inc.*, 151 Cal. App. 4th 667, 672, 60 Cal. Rptr. 3d

21  111, 113 (Cal. Ct. App. 2007). Moreover, Ameritrade should not be heard to complain about

22  the use of unique email addresses when it would have been impossible to detect Ameritrade's

23  disclosure of email addresses otherwise. *See* S. Rep. No. 108-102, at 5 (2003) (90 percent of

24

25  [10] Elvey first received spam in *November* 2007, not in October 2007, as Ameritrade's
   Opposition claims. (FAC ¶ 23; Elvey Decl. Opp. Mot. Extension for Time ¶ 2 (first spam

26  received on November 11, 2006).)
   [11] Ameritrade justifies this outrageous statement by blaming Elvey for not changing his email

27  address or closing his account. (Preston Decl. ¶ 3.) Neither of these measures would have
   stemmed the flow of spam to Elvey's email servers or reduced the risk of identity theft once

28  his email address and/or Social Security number were disclosed. As of 6:30 pm PST of the
   date of filing, Ameritrade has not provided Plaintiffs' counsel with a factual basis for the
   statement that Plaintiffs were not deceived by the Privacy Statement. (*Id.* ¶¶ 4-5.)

all of spam is "untraceable" to its actual source). Damages exist even when investigative techniques are needed to prove liability: persons who test for discrimination, but do not intend to accept the tested facilities, "who are subjected to unlawful [discrimination] may be entitled to compensatory and punitive damages . . ." U.S. Equal Employment Opportunity Commission, *EEOC NOTICE No. 915.002, at* http://www.eeoc.gov/policy/docs/testers.html (May 22, 1996). *See also Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) (testers suffer damages because testers devotes "resources . . . to identifying and counteracting [statutory violations], and this diversion of resources frustrate[s]" the tester's other activities).

## V.     The Court Should Not Hesitate to Grant Class Certification, If It Is Required

Plaintiffs are not seeking to slip into class certification through the back door, and the parties agree that class certification is unnecessary here, where a preliminary injunction "for the named plaintiffs would, as a practical matter extend to all purported class members." (Def.'s Opp. 21-22.)  However, Plaintiffs are mindful that this does not mean the Court will agree. Ameritrade argues the record does not allow the "rigorous analysis" required of class certification. (Def.'s Opp. 23.) Ameritrade exaggerates the evidentiary basis required for class certification. Class certification is "necessarily bound to some degree of speculation by the uncertain state of the record on which [the court] must rule. An extensive evidentiary showing . . . is not required." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). All that is required is sufficient evidence "to form a reasonable judgment as to each requirement of class certification" under Rule 23. *Id*. There is sufficient evidence before the Court to sustain class certification for the limited purposes for which it may be required.[12]

## <u>CONCLUSION</u>

Plaintiffs respectfully asks that the Court grant their Motions for a Preliminary Injunction and for Class Certification.

---

[12] Ameritrade has refused to conclude the parties' Rule 26(f) conference: Ameritrade should not be able to defeat class certification, and thus a preliminary injunction, by withholding the conclusion of the Rule 26(f) conference.

1

Dated: September 4, 2007

2

By: /s/Alan Himmelfarb

3

4      Alan Himmelfarb
       LAW OFFICES OF ALAN
       HIMMELFARB

5      2757 Leonis Blvd
       Los Angeles, CA 90058

6      Telephone: (323) 585-8696
       Fax: (323) 585-8198

7      consumerlaw1@earthlink.net

8      Scott A. Kamber
       Ethan Preston

9      KAMBER & ASSOCIATES, LLC
       11 Broadway, 22d Floor

10     New York, NY 10004
       Telephone: (212) 920-3072

11     Fax: (212) 202-63640
       skamber@kolaw.com

12     epreston@kolaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28