PAGES 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER, JUDGE

```
IN RE TD AMERITRADE          )
ACCOUNTHOLDER LITIGATION,    )
ET AL.                       )
                             )    NO. C 07-02852 VRW
                             )
_____)
```

SAN FRANCISCO, CALIFORNIA
THURSDAY, JUNE 12, 2008

### **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

```
FOR PLAINTIFF:          KAMBEREDELSON LLC
                        11 BROADWAY
                        22ND FLOOR
                        NEW YORK, NY  10004
                BY:  SCOTT A. KAMBER
                     ETHAN PRESTON
                     ATTORNEYS AT LAW




FOR DEFENDANT:          MAYER BROWN
                        TWO PALO ALTO SQUARE
                        SUITE 300
                        PALO ALTO, CA  94306
                BY:  LEE H. RUBIN
                     ATTORNEY AT LAW
```

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
REPORTED BY:            JAMES YEOMANS, CSR #4039, RPR
                        OFFICIAL REPORTER
```

COMPUTERIZED TRANSCRIPTION BY ECLIPSE

<u>**APPEARANCES**</u>:   **(CONTINUED)**

FOR CLASS:                THE ELVEY PARTNERSHIP
                          3042 SACRAMENTO STREET
                          #04
                          SAN FRANCISCO, CA  94115
                  BY:  **MATTHEW ELVEY**

```
1    THURSDAY, JUNE 12, 2008                               2:30 P.M.

2             (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

3        THE CLERK:  CIVIL DOCKET NUMBER 07-2852, MATTHEW ELVEY

4    VERSUS TD AMERITRADE AND CIVIL 07-4903, BRAD ZIGLER VERSUS TD

5    AMERITRADE.

6             COUNSEL, STEP FORWARD AND STATE YOUR APPEARANCE,

7    PLEASE.

8             MR. RUBIN:  GOOD AFTERNOON, YOUR HONOR.

9             LEE RUBIN FROM MAYER BROWN ON BEHALF OF TD AMERITRADE.

10        THE COURT:  GOOD AFTERNOON.

11        MR. PRESTON:  ETHAN PRESTON ON BEHALF OF MATTHEW

12   ELVEY.

13        THE COURT:  YOU ARE?

14        MR. PRESTON:  ETHAN PRESTON.

15        MR. KAMBER:  SCOTT KAMBER ON BEHALF OF PLAINTIFFS,

16   YOUR HONOR.

17        MR. PARISI:  GOOD AFTERNOON.

18             DAVID PARISI ALSO ON BEHALF OF PLAINTIFFS, YOUR HONOR.

19        MR. ELVEY:  MATTHEW ELVEY.

20        THE COURT:  THIS IS THE PLAINTIFF MR. ELVEY?

21        MR. KAMBER:  YES, YOUR HONOR.

22        THE COURT:  ALL RIGHT.  LET'S SEE, WHERE DO I START.

23   LET ME SEE IF I UNDERSTAND THE TERMS OF THE SETTLEMENT

24   CORRECTLY.

25             THE PRECLUSIVE EFFECT WHICH THIS SETTLEMENT WOULD
```

1    CREATE, WOULD BE OF THE CLASSES -- CLASS CLAIMS, BUT NOT THEIR

2    INDIVIDUAL CLAIMS; IS THAT CORRECT?

3            **MR. KAMBER:**  PARTIALLY, YOUR HONOR.  IT WOULD BE THEIR

4    CLASS CLAIMS FOR EVERYTHING.  THEIR INDIVIDUAL CLAIMS WOULD

5    ONLY SURVIVE WITH RESPECT TO INDIVIDUAL CLAIMS FOR IDENTITY

6    THEFT, NOT INDIVIDUAL CLAIMS FOR RECEIVING SPAM E-MAILS.

7            IT'S SO, WHAT THE SETTLEMENT DOES, IT'S A FULL

8    RELEASE, YOU WOULD BE -- USED TO -- IN ANY CLASS ACTION FOR

9    CLASS AND INDIVIDUAL RELEASES, EXCEPT AS TO IDENTITY THEFT.

10   THE IDENTITY THEFT CLAIMS WOULD SURVIVE FOR -- ON AN INDIVIDUAL

11   BASIS.

12           **THE COURT:**  BUT NOT A CLASS BASIS?

13           **MR. KAMBER:**  CORRECT, YOUR HONOR.

14           **THE COURT:**  WHAT ELSE WOULD SURVIVE, IF ANYTHING?

15           **MR. KAMBER:**  NOTHING ELSE FROM A CLAIMS PERSPECTIVE,

16   NOTHING ELSE WOULD SURVIVE.  THE IDENTITY THEFT THERE'S A

17   MECHANISM.  THE KEY PIECES, ONE OF THE KEY PIECES OF THE

18   SETTLEMENT IN -- ASSOCIATE A PARTICULAR -- THERE'S A BUNCH OF

19   PARTICULAR WRONGS, ONE OF THEM POTENTIAL FOR IDENTITY THEFT.

20           THE TWO BREACH OF THE DATA BASES AT TD AMERITRADE, THE

21   ISSUE WITH THAT, IS THAT THERE'S ID ANALYTICS, WHICH IS

22   PROBABLY THE MOST RESPECTED COMPANY FOR -- THEY RUN THE

23   ALGORITHMS.

24           THEY GOT THIS BIG DATABASE, BECOME ASSOCIATED WITH THE

25   CREDIT AGENCY'S COMPUTERS, AND THEY ARE ABLE TO DETECT THE BEST

1    ANYONE HAS BEEN ABLE TO, ALGORITHMS WITH REGARD TO PRIVATE AND

2    PUBLIC SECTORS REGARDING ORGANIZED MISUSE OF THE DATA.

3            SO IF THERE'S SOMEBODY, THE IDEA IS IT'S UNLIKELY

4    ANYONE COULD TAKE INFORMATION FROM A DATABASE OF 76.2 MILLION

5    PEOPLE AND USE ONE OR TWO OF THE IDENTITIES.  THE IDEA THERE

6    WOULD BE ORGANIZED MISUSE AND THEY GOT --

7            **THE COURT:**  THAT WAS MY NEXT QUESTION:  WHAT'S

8    ORGANIZED MISUSE, AS OPPOSED TO UNORGANIZED MISUSE?

9            **MR. KAMBER:**  ORGANIZED MISUSE AS IT'S BEEN EXPLAINED,

10   AS WE UNDERSTAND, IS THAT SOMEBODY HAS TAKEN THE DATA, IT WAS A

11   CRIMINAL PENETRATION OF THE DATABASES.

12           SOMEBODY HACKED INTO THE DATA BASE AT TD AMERITRADE,

13   JUST KEEPING WITH WHAT IS PUBLICLY AVAILABLE INFORMATION,

14   THE -- WHOEVER DID THAT WE KNOW WHAT HAS BEEN, WE KNOW THAT

15   CERTAIN SPAM WAS SENT TO ALL OF THE E-MAIL ADDRESSES THAT WERE

16   IN THE DATA BASE.

17           **MR. RUBIN:**  NOT ALL OF THEM.

18           **MR. KAMBER:**  NOT EVERY E-MAIL ADDRESS.  CERTAINLY

19   E-MAIL ADDRESSES THAT WERE USED, THERE HAS BEEN, WITH RESPECT

20   TO THE SOCIAL SECURITY NUMBERS, SOMEBODY -- IF THE HACKER WAS

21   GOING TO SELL OR TO USE THAT INFORMATION, IT WOULD BE DONE SO

22   THAT THOSE SOCIAL SECURITY NUMBERS WOULD BE USED IN SOME

23   ORGANIZED WAY.

24           THE ORGANIZED WAY THERE WOULD BE SOME, WOULD NOT

25   NECESSARILY BE ALL 76 MILLION SOCIAL SECURITY NUMBERS, BUT

1    MIGHT BE 500, MIGHT BE A 1,000, MIGHT BE 5,000.

2              AND THE ALGORITHMS AND COMPUTER PROGRAMS DEVELOPED BY

3    ID ANALYTICS CAN DETERMINE WHEN THERE HAS BEEN SUCH AN

4    ORGANIZATION MISUSE.

5              LIKE IF I, FOR INSTANCE, IF YOU SEE THAT CREDIT CARD

6    COMMERCIAL ON TV, YOU'RE GOING TO -- DECIDE YOU'RE GOING TO

7    STEAL THAT PERSON'S IDENTITY BY USING HIS SOCIAL SECURITY

8    NUMBER, ONE INSTANCE OF THAT YOU WOULDN'T KNOW NECESSARILY

9    WHERE THAT ONE -- HOW YOU STOLE THAT PERSON'S IDENTITY OR HOW

10   THAT PERSON'S IDENTITY WAS BEING MISUSED.

11             HOWEVER, IF YOU HAD A BUNCH OF THE SOCIAL SECURITY

12   NUMBERS FROM A PARTICULAR DATABASE AND YOU WERE GOING TO

13   PERPETRATE A FRAUD, AND TO HAVE IDENTITY THEFT YOU WOULD BE

14   USING THEM IN A WAY THAT WOULD SHOW PATTERNS ACCORDING TO

15   ALGORITHMS, SHOW THE PATTERNS IN THEIR USE.

16             YOU WOULD APPLY SOME PATTERN, HOW THE CREDIT CARDS

17   WERE BEING APPLIED FOR, ABOUT THE TIMING OF WHEN THINGS WOULD

18   BE REPORTED CREDIT AGENCIES AND NOT TO GET TOO MUCH INTO WHAT'S

19   PROBABLY MATHEMATICS BEHIND THE ALGORITHM.  THERE WAS A

20   CORRELATION BETWEEN ALL 6.2 MILLION PEOPLE.

21             AND SO, IF THERE ARE PARTICULAR CORRELATIONS THAT ARE

22   PART OF THE ALGORITHMS THAT ARE DETECTED BY THE COMPUTER

23   PROGRAMS AT ID ANALYTICS THAT WOULD BE ORGANIZED MISUSE.  IT'S

24   FAR BEYOND MY CAPACITY TO DUPLICATE OR MAYBE EVEN FULLY

25   UNDERSTAND THE ALGORITHMS.

1        I WOULD SAY, IN OUR WORK IN DISCUSSIONS WITH DEFENDANT

2    AND DISCUSSIONS WITH OUR EXPERT AND DISCUSSIONS WITH PEOPLE

3    AROUND THE COUNTRY REGARDING THE REPUTATION OF ID ANALYTICS HOW

4    TO DETERMINE IDENTITY THEFT, THEY ARE THE COMPANY THAT

5    EVERYBODY POINTS TO AS BEING CAPABLE OF DOING THIS.

6        AND THEY'RE USED WIDELY THROUGHOUT THE PRIVATE SECTOR

7    AND FORTUNE 500 IN DEALING WITH JUST THESE SITUATIONS.

8        **MR. RUBIN:**  IF I MAY, ID ANALYTICS HAS RUN THREE TESTS

9    NOW AND HAS --

10        **THE COURT:**  WHAT?

11        **MR. RUBIN:**  HAS ALREADY RUN THREE TESTS AGAINST THE TD

12    AMERITRADE DATABASE, THUS FAR WE RECEIVED THREE CERTIFICATIONS

13    THERE IS NO EVIDENCE OF ANY ORGANIZED MISUSE.

14        BUT FURTHER TEST WILL BE RUN PURSUANT TO THE

15    SETTLEMENT AGREEMENT AND THAT WAS SOMETHING THAT WAS NEGOTIATED

16    AND AGREED UPON IN THE SETTLEMENT.

17        AND THAT IS, AS MR. KAMBER INDICATES, WHAT TRIGGERS,

18    THAT WOULD TRIGGER TD AMERITRADE'S COMMITMENTS OR OBLIGATIONS.

19        IF ID ANALYTICS DOES IN ITS REMAINING TESTS OR TEST

20    FIND ANY EVIDENCE OF ORGANIZED MISUSE, THOSE INDIVIDUALS WHO

21    IDENTIFIED IN THAT TEST WOULD THEN BE NOTIFIED AND THEN THEY

22    WOULD HAVE AN OPPORTUNITY TO MAKE ANY INDIVIDUAL IDENTITY THEFT

23    CLAIMS.

24        TD AMERITRADE IN THE SETTLEMENT AGREEMENT HAS AGREED

25    TO PROVIDE ASSISTANCE IN TERMS OF IDENTITY THEFT, IN TERMS OF

1    REMEDIATION, CANCELING CREDIT CARDS AND DOING OTHER THINGS, HAS

2    ALSO COMMITTED TO PROVIDING A REASONABLE RESPONSE TO ANY CLAIM.

3           NO COMMITMENT AS TO WHETHER ANY AMOUNT WOULD BE

4    PROVIDED, BUT A REASONABLE RESPONSE THAT WOULD TAKE ACCOUNT OF

5    ALL THE CIRCUMSTANCES.

6           **MR. KAMBER:**  THAT'S REALLY TO ADDRESS -- THAT FOCUSED

7    ON YOUR FIRST QUESTION.  ONE OF THE THINGS THAT'S BEEN A GREAT

8    DEAL OF EFFORT IN MANY MONTHS OF NEGOTIATING THIS -- WHERE THIS

9    SETTLEMENT HAVE NOT BEEN ABLE TO -- THERE IS AN ISSUE

10   CONFRONTING CORPORATE AMERICA REALLY ON A GREATER BASIS DAY TO

11   DAY.

12          AND WHAT THIS SETTLEMENT PROVIDES IS MECHANISM WHICH

13   REALLY HAS BEEN A BIT OF HOLLY GRAIL WHAT THESE PROBLEMS ARE,

14   HOW YOU CREATE A SETTLEMENT OF IDENTITY THEFT ISSUES THAT

15   PROVIDES A COGNIZABLE BENEFIT TO THE CLASS.

16          MAKES IT ABLE TO DEAL WITH IDENTITY THEFT THAT MAY OR

17   MAY NOT HAVE TAKEN PLACE EVEN THOUGH THE BREACH HAS ALREADY

18   TAKEN PLACE AND DOES IT IN A WAY THAT MAKES SENSE.

19          WHAT WE'VE DONE HERE IS WE CREATED A STRUCTURE WITH

20   DEFENDANTS, THAT IN THE NEGOTIATIONS WHAT WE'VE BEEN ABLE TO DO

21   HAVE, ONE, ID ANALYTICS THERE'S IDENTIFICATION THUS FAR, ALL

22   SIGNS POINT TO THE FACT THOSE SOCIAL SECURITY NUMBERS NEVER

23   LEFT THE DATABASE AND WERE NOT MISUSED.

24          IF THEY WERE THEY HAVE A METHODOLOGY, EVERYONE HAS A

25   GREAT DEAL OF CONFIDENCE IN BEING ABLE TO IDENTIFY THOSE

1    PEOPLE.  IF THOSE PEOPLE ARE IDENTIFIED, THE MECHANISM THEY

2    RECEIVE A LETTER FROM TD AMERITRADE BECAUSE IDENTIFY THEFT, THE

3    KEY WITH IDENTIFY THEFT IS EARLY IDENTIFICATION.

4         THEY WOULD BE GIVEN A LETTER SAYING YOU'VE BEEN

5    IDENTIFIED AS BEING A POTENTIAL VICTIM OF IDENTITY THEFT.  PART

6    OF THE SETTLEMENT PROVIDES THEY ARE GIVEN A HOT LINE AND

7    SUPPORT FOR DOING THE THINGS THEY NEED TO DO AS INDIVIDUALS IN

8    ORDER TO PROTECT THEIR IDENTIFY AND LIMIT DAMAGE FROM IDENTITY

9    THEFT, TURNING OFF YOUR CREDIT CARDS, CALLING CREDIT AGENCY, ET

10   CETERA.

11        THE STUDIES ALL SHOW 80 PERCENT OF THE HARM THAT

12   INDIVIDUALS SUFFER FROM IDENTIFY THEFT, THE TIME IT TAKES BOTH

13   FROM -- IN GETTING THE ADMINISTRATIVE TASKS DONE IN ORDER TO

14   ADDRESS IDENTIFY THEFT, AND THE SETTLEMENT SPECIFICALLY

15   PROVIDES ASSISTANCE FOR PEOPLE IN THAT EVENT THAT OCCURS.

16        FURTHER, IT PROVIDES CHOICE OF -- PEOPLE CAN CHOOSE TO

17   GO THROUGH A MEDIATION PROCESS, WHICH WOULD BASICALLY --

18   BECAUSE THEY BEEN IDENTIFIED BY ID ANALYTICS, HAS A FUNCTIONAL

19   PURPOSE OF PROVIDING THAT CAUSATION IS NOT -- WHICH IS USUALLY

20   VERY DIFFICULT TO SHOW HOW IDENTIFY THEFT CAME FROM THAT

21   PARTICULAR BREACH AT THAT PARTICULAR TIME.

22        WE CREATED A MEDIATION OR ARBITRATION PROCESS, IF THEY

23   WERE TOO CLOSE TO GO THROUGH THAT, WHICH WOULD PROVIDE ANY

24   DAMAGES THEY SUFFERED TO BE DEALT WITH FAIRLY BY AMERITRADE.

25        THAT'S WHY THE KEY IS THE INDIVIDUALS AREN'T RELEASING

THEIR CLAIMS IF HE THEY WOULD CHOOSE TO DO AN INDIVIDUAL ACTION

AGAINST TD AMERITRADE, THEY WOULD BE FREE TO DO THAT.  AS A

CLASS A PARTICULAR BENEFIT GOING OUT TO EVERYONE AND DEALS

WITHIN A PARTICULAR CONSTRUCTIVE WAY GOOD FOR THE CLASS AND

ALSO WORKS FOR DEFENDANT AND, I THINK, PROVIDES A MODEL FOR

FUTURE SITUATIONS.

    **THE COURT:**  WHAT YOUR SETTLEMENT IS PREDICATED ON IS

THIS NOTION THAT YOU'RE GOING TO BE ABLE TO IDENTIFY ORGANIZED

HACKING INTO THE DATABASE AND THEFT OF A GROUP, A LARGE NUMBER

OF THE PERSONAL IDENTIFICATION INFORMATION FOR TD AMERITRADE

CUSTOMERS.

    BUT WHAT THE CLASS IS GIVING UP IS ITS CLASS CLAIM,

AND TO THE EXTENT THERE IS ANY INJURY WHICH RESULTS IN THE

FUTURE, IT'S GOING TO BE AN INJURY THAT THE MEMBERS OF THE

CLASS ARE GOING TO HAVE TO PURSUE ON AN INDIVIDUAL BASIS.

    AND IT MAY VERY WELL BE THAT THE ECONOMIC VALUE OF

PURSUING INDIVIDUAL CLAIMS IS NOT GREAT ENOUGH TO MAKE THAT A

VIABLE REMEDY, AND YET THAT'S GOING TO BE THE WAY IN WHICH THAT

COULD BE REMEDIED, THING ABOUT A CLASS ACTION IS GOING TO BE

PRECLUDED UNDER THIS SETTLEMENT.

    **MR. KAMBER:**  I THINK, WOULD BE HELPFUL AT THIS POINT,

IF YOU WOULD INDULGE ME, TAKE ONE STEP BACK.  THERE'S REALLY

FOUR DISTINCT HARMS THAT ARE ADDRESSED IN THE SETTLEMENT.

THEY'RE ADDRESSED IN FOUR DIFFERENT WAYS AND THE IDENTITY THEFT

IS PROBABLY THE MOST COMPLICATED OF THEM.

1      BUT, I THINK, WHEN YOU SEE THE OTHER ONES, THE

2 IDENTITY THEFT WILL SEEM LESS TO COME OUT OF THE BLUE AND IT

3 WILL BECOME MORE CLEAR THAT THAT IDENTITY THEFT SOLUTION IS AN

4 APPROPRIATE SOLUTION HERE.

5      THE FIRST, AND WHAT CAME TO EVERYONE, THE REASON THIS

6 CAME TO EVERYONE'S ATTENTION, IS NOT BECAUSE OF IDENTITY THEFT,

7 LATER ON IT BECAME LEARNED AS A RESULT OF LAWSUIT AND

8 DISCOVERY, ET CETERA, THAT SOCIAL SECURITY NUMBERS WERE PART OF

9 THIS.

10      **MR. RUBIN:**  NOT SOCIAL SECURITY NUMBERS PART OF THIS,

11 THEY WERE IN THE DATABASE, JUST TO BE CLEAR THERE WAS A

12 MALICIOUS UNAUTHORIZED CODE PLACED BY OUTSIDER INTO TD

13 AMERITRADE'S SYSTEM.

14      WHAT IS INDISPUTABLE IS THAT E-MAIL ADDRESSES AND SOME

15 OTHER DEMOGRAPHIC INFORMATION WAS OBTAINED BY THIS OUTSIDER.

16 THERE IS AS OF YET, FORTUNATELY, NO EVIDENCE OF SOCIAL SECURITY

17 NUMBERS OR DATES OF BIRTH BEING OBTAINED.

18      AND THAT DISCLOSURE UPON FINDING THAT, I THINK, WE

19 BRIEFLY TOUCHED UPON THIS IN OUR CMC, THAT DISCLOSURE ONCE TD

20 AMERITRADE IDENTIFIED THE UNAUTHORIZED CODE, ELIMINATED IT.

21      WE SENT A NOTICE TO CLASS MEMBERS INDICATING THAT THIS

22 INFORMATION, THERE HAD BEEN UNAUTHORIZED ACCESS OR ACQUISITION

23 TO THIS INFORMATION.  THAT THE MALICIOUS CODE HAD BEEN

24 ELIMINATED.  THAT E-MAIL ADDRESSES, AT LEAST, E-MAIL ADDRESSES

25 AND SOME DEMOGRAPHIC INFORMATION HAD BEEN OBTAINED.

1          BUT AS OF THAT DATE AND, FORTUNATELY, EVEN AS OF

2     TODAY, NO SOCIAL SECURITY NUMBERS OR DATE OF BIRTH, THERE'S NO

3     EVIDENCE OF THOSE BEING OBTAINED.  SO THAT'S SORT OF HOW WE GOT

4     TO WHERE WE ARE NOW.

5          **MR. KAMBER:**  LET ME BACK TO WHERE I WAS TALKING.  IN

6     THE ORIGINAL COMPLAINT THE ORIGINAL ISSUE, WHAT WAS BEYOND

7     DISPUTE IS THAT THERE WERE E-MAIL ADDRESSES, THERE WERE E-MAIL

8     ADDRESSES BEING USED TO SPECIFIC TD AMERITRADE CUSTOMERS,

9     SPECIFICALLY SPAM.

10          THEY WERE SENT E-MAILS SAYING, HEY, BUY THIS STOCK.

11     THERE WAS EFFORTS TO MANIPULATE THE STOCK MARKET AND THE

12     TRADING IN PARTICULAR SECURITIES BY TARGETING TD AMERITRADE

13     CUSTOMERS.

14          THE INFORMATION FOR THOSE CUSTOMERS, THEIR E-MAIL

15     ADDRESS IS -- NOT THEIR ACCOUNT DATA, THEIR E-MAIL ADDRESSES

16     CAME FROM A PARTICULAR DATABASE THAT WAS HACKED.

17          SO THE FIRST HARM THAT'S BEING ADDRESS IS THE ASPECTS

18     THERE'S A SPAM SENT OUT AND TWO ASPECTS OF THAT SPAM, ONE,

19     THESE PEOPLE ARE GETTING -- TD AMERITRADE NOT SUPPOSE TO SHARE

20     THE E-MAIL ADDRESSES, THEY WERE HACKED, SO THE E-MAIL

21     ADDRESSES, PEOPLE WERE BEING ANNOYED BY JUST RECEIVING SPAM

22     GENERALLY.

23          BUT MORE SPECIFICALLY WAS THE SECOND ASPECT OF THAT,

24     THAT IT'S STOCK SPAM, AN EFFORT TO GET PEOPLE TO TRADE THINLY

25     TRADED STOCKS IN ORDER TO TAKE A PROFIT.  THE REMEDY PARTICULAR

1    TO THAT ASPECT OF THE CLAIM, IS THERE'S TWO PIECES OF IT.

2         ONE, EVERY MEMBER OF THE CLASS, ALL 6.2 MILLION

3    MEMBERS OF THE CLASS, YOUR HONOR, WILL RECEIVE A CODE FOR TREND

4    MICRO INTERNET SECURITY PRO, WHICH IS INTERNET SECURITY

5    SOFTWARE ON THE COMPANY'S WEBSITE.

6         ON TREAD MICRO'S WEBSITE FOR 69.95 PRODUCT, LIKE

7    NORTON THAT PROVIDES VERY SPECIFIC BENEFITS TO KEEP PEOPLE FROM

8    RECEIVING SPAM, BEING VICTIM OF FISHING, FROM DEALING WITH

9    VIRUSES ON THEIR COMPUTERS, ET CETERA, ALL THESE TYPE OF RISKS.

10        SO IT'S A PARTICULAR BENEFIT THAT HAS REAL VALUE TO

11   THE CLASS THAT IS GOING TO THE CLASS THAT ADDRESSES THAT

12   PARTICULAR HARM.

13        FURTHER, THERE WERE WARNING THAT WILL GO UP ON THE TD

14   AMERITRADE WEBSITE.

15        **THE COURT:**  HOW MUCH IS THAT GOING TO COST?

16        **MR. KAMBER:**  I WILL LEAVE THAT TO DEFENSE COUNSEL.

17   THE ONE THING, HAVING DONE IN MY PAST LIFE ON THE DEFENSE SIDE

18   AND THE PLAINTIFF'S SIDE DONE SECURITY CASES MORE, MY PRACTICE

19   IS NOW ALL CONSUMER CASES, THE ONE THING, THE MAIN REASON FOR

20   THAT IS, I APPRECIATE THAT IN CONSUMER CASES THAT IT'S NOT

21   ALWAYS A ZERO SUM GAME, A LOT OF TIMES A LOT OF OPPORTUNITY

22   THERE'S A TRUE BENEFIT THAT GOES TO THE CONSUMER THAT IS NOT

23   NECESSARILY EQUAL TO THE COST INCURRED BY THE COMPANY.

24        **THE COURT:**  HOW MUCH?

25        **MR. RUBIN:**  YOUR HONOR, I CERTAINLY COULD PROVIDE THAT

1  TO YOU.  I DON'T HAVE THE EXACT NUMBER.  I CAN TELL YOU IT'S

2  LESS THEN THE RETAIL AMOUNT.  THAT IS ABSOLUTELY TRUE.

3          TD AMERITRADE'S BASE ON THE VOLUME PURCHASED, IS ABLE

4  TO PURCHASE THE TREND MICRO SECURITY DEVICES AT A COST LESS

5  THEN WHAT THE RETAIL COST IS, I BELIEVE, THE RETAIL COST.

6          **MR. KAMBER:**  69.95 THAT'S THE ACTUAL COST THAT'S SOLD

7  ON THEIR WEBSITE AND ALSO IN STORES.  69.95 IS THE REAL COST

8  THAT PEOPLE PAY FOR THIS PRODUCT.

9          **MR. RUBIN:**  SIGNIFICANTLY LESS.  I DON'T KNOW THE

10  PRECISE NUMBER.  MAY EVEN BE TIERED BASED UPON THE AMOUNT,

11  ULTIMATELY THE AMOUNT OF DEVICES ULTIMATELY ORDERED.  IF THE

12  COURT FINDS THAT MATERIAL I CAN CERTAINLY GET IT, I DON'T KNOW

13  IT TODAY.

14          **THE COURT:**  WHERE IS THAT ADDRESSED IN THE SETTLEMENT

15  PAPER?

16          **MR. RUBIN:**  THE PROVISION OF THE ANTI-SPAM FILTER

17  DEVICES.  I BELIEVE, THAT'S --

18          **THE COURT:**  YES.

19          **MR. RUBIN:**  -- IT'S UNDER SECTION FOUR.

20          **THE COURT:**  PARAGRAPH FOUR?

21          **MR. RUBIN:**  4A4.  SO SETTLEMENT CONSIDERATION

22  COMPANY'S AGREED ACTIONS.  AND IF YOU LOOK UNDER NUMBER FOUR

23  THE COMPANY WILL PROVIDE EACH CLASS MEMBER A UNIQUE IDENTIFIER

24  NUMBER THAT MAY BE USED TO OBTAIN A ONE YEAR'S SUBSCRIPTION OR

25  ONE YEAR RENEWAL FOR ANTI-VIRUS, ANTI-SPAM.

1        **THE COURT:**  ONE YEAR SUBSCRIPTION?

2        **MR. KAMBER:**  THAT'S WHAT'S BEING SOLD ON THE WEBSITE.

3   WHAT HAPPENED YOU CAN GET THE SOFTWARE, PLUS YOU GET ONE YEAR'S

4   OF UPDATES.

5        **THE COURT:**  IS THAT THE SOFTWARE PAID FOR BY THE CLASS

6   MEMBER?

7        **MR. KAMBER:**  NO, IT'S NOT.  TD AMERITRADE, NO COST TO

8   THE CUSTOMER WHATSOEVER.

9        THE CODE, THERE IS NO COST.  YOU DON'T HAVE TO PAY FOR

10  SUBSCRIPTION AFTER A YEAR.  THIS WAS A VERY IMPORTANT PART OF

11  OUR NEGOTIATIONS.  IF AFTER A YEAR THE CUSTOMER WANTS TO

12  DISCONTINUE, WHATEVER THEY WANT TO DO THEY CAN DO.  NO CREDIT

13  CARD NECESSARY, EVERY MEMBER OF THE CLASS GETS A CODE, THEY CAN

14  DO WITH THAT CODE WHAT THEY WILL.

15       IF THEY ALREADY OWN THE SOFTWARE THEY GET ADDITIONAL

16  YEAR ADDED TO THEIR DESCRIPTION.

17       **MR. RUBIN:**  I PROBABLY MISUNDERSTOOD.  THERE IS NO

18  COST TO THE CLASS MEMBERS TO TD AMERITRADE.

19       **MR. KAMBER:**  VERY SENSITIVE TO THAT POINT.

20       **THE COURT:**  ALL RIGHT.

21       **MR. KAMBER:**  THE SECOND ASPECT OF PARTICULAR TOUCHED

22  ON, IS THE STOCK NATURE OF THE SPAM THE PEOPLE MAYBE -- WE

23  DON'T WANT THE CLASS MEMBERS TO FALL VICTIM, THE EFFORTS TO

24  INDUCE THEM TO TRADE A THINLY TRADED STOCK.

25       IT'S A MORE COMPLICATED ISSUE, AS FAR AS NOT

NECESSARILY KNOWING WHETHER THOSE EFFORTS FROM THE COMPANY, ET CETERA, IN THE NEGOTIATIONS, IS THE RELIEF WE DEALT WITH ON TD AMERITRADE'S WEBSITE, PARTICULAR SECURITY ALERTS.

PEOPLE WHEN PEOPLE LOG IN THEY WILL ACTUALLY SEE SPECIFIC EXPLANATION AS TO WHAT STOCK SPAM IS AND HOW STOCK TOUTING WORKS.

SO PEOPLE ARE ON ALERT THAT IF THEY GOT AN E-MAIL, THEY'RE TRADING IN THE STOCKS, MAYBE BECAUSE -- MANY -- SOME WRONGFUL EFFORT THE COMPANY WAS VERY SENSITIVE ABOUT, ABOUT NOT ACCUSING OF -- THE COMPANIES THEMSELVES THAT ARE THE SUBJECT OF THE STOCK TOUTING E-MAIL, OF ACTUALLY BEING THE ONES THAT ARE SENDING OUT THE STOCK TOUTING E-MAIL.

THE THIRD ASPECT IS THAT THERE WAS A SECURITY VULNERABILITY. IT'S BEEN PLAINTIFF'S POSITION THAT IT'S THE SECURITY VULNERABILITY IN THAT DATABASE IN THE FIRST PLACE THAT ALLOWED -- THAT ALLOWED THIS BREACH TO HAPPEN.

AND THAT THERE WERE CERTAIN BEST PRACTICES IN THE SECURITY AREA THAT COULD KEEP SUCH A BREACH FROM HAPPENING IN THE FUTURE.

THE GOOD NEWS ABOUT THIS, IS THAT THERE ARE CERTAIN THINGS THAT ARE BEING DONE, THAT THE COMPANY HAS COMMENCED DOING EVEN BEFORE THE APPROVAL OF THE SETTLEMENT. BECAUSE IN THE WORLD OF SECURITY CASES AND IN TECHNOLOGY CASES, SOMETIMES IT'S NOT TERRIBLY HELPFUL TO -- I ALSO SAY TO SETTLE A TWO-POINT -- SETTLE AOL 2.0 AFTER 5.0 BEING A -- RELEASED. THE

1    COMPANY AGREED TO THE RESPONSIBLE DECISION TO BEGIN THESE

2    PRACTICES IMMEDIATELY.

3          ONE OF THEM WAS TWICE YEARLY PENETRATION TESTING

4    THROUGH DECEMBER 2009, THAT'S WHEN SECURITY COMPANIES COMES

5    THROUGH AND TRACE TRIES TO PENETRATE THE DATABASE, THEY TRY TO

6    BASICALLY DO A HACKER DOES.  THEY GAVE REPORT BACK TO THE

7    COMPANY AND THEY'VE SAY THIS IS WHAT YOU NEED TO DO TO FIX THIS

8    IF THERE'S A VULNERABILITY.

9          FURTHER, THERE'S ACCOUNT SEEDING THAT WILL BE DONE

10   REGULARLY THROUGH THE END OF DECEMBER 2008, THAT'S ALREADY BEEN

11   DONE.  IT'S THE ACCOUNT SEEDING, WHAT THAT MEANS, IS IT ALLOWED

12   THE DETERMINATION IF -- TO FIGURE OUT THE E-MAIL ADDRESS IS --

13   ACTUALLY CAME FROM THE DATABASE IN QUESTION.

14         THEY SET UP, BASICALLY, WITHOUT GETTING INTO MUCH

15   SECURITY JARGON AND DETAILS, THEY BASICALLY CREATE FAKE E-MAIL

16   ACCOUNTS.  THE ONLY PLACE IN THE WORLD THAT E-MAIL ACCOUNT

17   EXISTS IS IN THAT DATABASE AND THEY'RE ABLE TO SEE IF THOSE, IF

18   THAT SEED GROWS.

19         IF SOMEBODY TAKES THAT PARTICULAR E-MAIL ADDRESS AND

20   USES IT, THAT WOULD TELL YOU THAT THE SOURCE WAS FROM THAT

21   PARTICULAR DATABASE.

22         AND BOTH OF THOSE SECURITY PRACTICES ARE PARTICULARLY

23   IMPORTANT.  THEY ALREADY BEGUN.  ONE WILL CONTINUE THROUGH

24   DECEMBER 2009, ONE WILL CONTINUE THROUGH DECEMBER 2008.

25         **MR. RUBIN:**  IF I MAY, JUST FOR A MOMENT, I KNOW THAT

1    GENERALLY MR. KAMBER TRIES TO COUCH HIS REPRESENTATIONS IN

2    TERMS OF PLAINTIFF'S POSITION, PLAINTIFF'S ALLEGATIONS, BUT TO

3    THE EXTENT THERE ANY MISUNDERSTANDING, MR. KAMBER SPOKE OF A

4    SECURITY VULNERABILITY.

5         TD AMERITRADE'S POSITION OF, ALTHOUGH FOUND THE

6    UNAUTHORIZED CODE, WE BELIEVE OUR SYSTEMS WERE AND ARE

7    REASONABLE IN -- AND TAKE ALL REASONABLE SAFEGUARDS TO PROTECT

8    OUR CUSTOMERS INFORMATION.  AND WE DID VIGOROUSLY CONTEST THAT

9    CLAIM AND WOULD HAVE -- WOULD IF THIS LITIGATION CONTINUES.

10        SO I DIDN'T WANT THE COURT TO BELIEVE IN ANY WAY WE

11   WERE CONCEDING OR ACKNOWLEDGING SOME VULNERABILITY ON THE PART

12   OF TD AMERITRADE.

13        OBVIOUSLY, THERE IS THE KIND OF SITUATION WHERE YOU

14   CAN HAVE TWO THINGS THAT ARE TRUE AT THE SAME TIME.  THAT

15   COMPANIES TAKE ALL REASONABLE STEPS TO SAFEGUARD CUSTOMER

16   INFORMATION AND SOME INGENIOUS PERSON CAN ACTUALLY BREAK THEIR

17   WAY INTO THE SYSTEM.

18        **THE COURT:**  HOW MANY CLASS MEMBER DO WE HAVE?

19        **MR. KAMBER:**  6.2 MILLION, APPROXIMATELY.

20        **THE COURT:**  HOW DID YOU COME UP WITH THAT NUMBER?

21        **MR. KAMBER:**  THAT WAS THE NUMBER OF RECORDS IN THE

22   DATABASE.

23        **THE COURT:**  THAT ONE RECORD FOR EACH INDIVIDUAL

24   CUSTOMER?

25        **MR. KAMBER:**  YES, YOUR HONOR.  AS I UNDERSTAND IT.

1          **MR. RUBIN:**  I THINK, THERE CAN OCCASIONALLY BE MORE

2     THAN ONE.

3          **MR. KAMBER:**  THERE CAN, BUT THE EXPECTATION THERE WILL

4     BE 6.2 MILLION CODES THAT WILL BE GIVEN OUT TO PEOPLE AND THAT

5     TIES IN WITH THE NOTICE ITSELF.

6          THE NOTICE, THERE WILL BE DIRECT MAIL NOTICE GIVEN

7     THROUGH EITHER E-MAIL OR PEOPLE HAVE OPTED OUT OF E-MAIL AND I

8     SAID THEY PREFER TO RECEIVE REGULAR MAIL.  A LOT OF PEOPLE ARE

9     VERY E-MAIL AND TEXT SAVEY.

10         IN THAT SITUATION ALL OF THEM WILL BE RECEIVING FROM

11    THE DATABASE DIRECT NOTICE, EITHER BY E-MAIL OR BY POSTCARD

12    NOTICE.

13         **MR. RUBIN:**  IF THE E-MAIL BOUNCES BACK WE'LL DO A

14    POSTCARD NOTIFICATION.

15         **MR. KAMBER:**  IT'S QUITE AN EXTENSIVE NOTICE PROGRAM.

16         THE FINAL, YOUR HONOR, WE COME BACK TO THE ISSUE THAT

17    BROUGHT US TO THIS POINT, WHICH IS YOUR INITIAL POINT, WHICH IS

18    THAT OF IDENTIFY THEFT.

19         THE ISSUE WITH RESPECT TO, THERE IS NO EVIDENCE THUS

20    FAR, AND I'M ONLY COUCHING CERTAIN TERMS BECAUSE THERE WAS A

21    DEPOSITION TAKEN IN THIS CASE THAT'S PARTICULAR RELEVANT, THAT

22    WAS OF THE HEAD SECURITY PERSON AT TD AMERITRADE.

23         BECAUSE OF THE, OBVIOUSLY, PARTICULAR SECURITY ISSUES

24    THAT DEPOSITION WAS DESIGNATED ATTORNEYS EYES ONLY.  AND I'M

25    TRYING TO BE CAREFUL NOT TO GET INTO THE ISSUES IN OPEN COURT

1    THAT CAME SPECIFICALLY FROM THAT DEPOSITION.

2        SO WITH RESPECT TO THE IDENTIFY THEFT, AT THIS

3    JUNCTURE IT APPEARS FROM THE WORK DONE BY ID ANALYTICS AND ALSO

4    INFORMATION FROM THE INFORMATION SECURITY SIDE OF TD

5    AMERITRADE, THAT THERE IS NO EVIDENCE THAT ANY SOCIAL SECURITY

6    NUMBERS WERE EVER TAKEN FROM THE DATABASE.

7        OKAY.  WE AS PLAINTIFF'S COUNSEL AND AS THE PLAINTIFF,

8    MR. ELVEY, AND THE OTHER PLAINTIFFS THOUGHT IT WAS PARTICULARLY

9    IMPORTANT, THAT THE POSSIBILITY OF IDENTIFY THEFT BE ADDRESSED

10   BECAUSE IT IS A POSSIBILITY.

11       THERE'S NO WAY TO PROVE THE NEGATIVE IN THIS CASE.

12   IT'S UNLIKELY, THERE HASN'T BEEN ANYTHING DEMONSTRATED TO SHOW

13   THAT IT'S HAPPENED, BUT IT'S IMPORTANT TO BE ABLE TO ADDRESS

14   IT.

15       THAT'S A KEY ASPECT REALLY OF THIS WHOLE SETTLEMENT,

16   AND THE PIECE OF THAT IS THAT ID ANALYTICS, A LOT OF THIS COMES

17   FROM ID ANALYTICS, FROM THE INTEREST SHOWN.

18       THE COURT WERE TO GRANT PRELIMINARY APPROVAL, AT THE

19   TIME OF THE FINAL APPROVAL AT THE FAIRNESS HEARING, I THINK, IT

20   WOULD PROBABLY BE APPROPRIATE TO HAVE EITHER SOMEBODY FROM ID

21   ANALYTIC COME INTO TESTIFY REGARDING THE PROGRAM OR, AT LEAST,

22   SUBMIT AN EXTENSIVE AFFIDAVIT TO THE COURT DETAILING WHAT IT IS

23   ID ANALYTICS DOES AND THE CONFIDENCE -- AND WHY WE HAVE THE

24   CONFIDENCE WHAT THEY DO THEY DO RIGHT.

25       AND IN THIS PARTICULAR SITUATION, YOUR HONOR, THE IDEA

1    IS, WE'RE SETTLING SOMETHING TODAY, BUT WE WON'T KNOW FOR

2    ANOTHER YEAR, FOR ANOTHER EIGHT MONTHS.

3            AND WHEN WE WERE DEALING WITH THE SETTLEMENT AGREEMENT

4    IT WAS ABOUT A YEAR AWAY, WE DIDN'T KNOW FOR SURE WHETHER THOSE

5    SOCIAL SECURITY NUMBERS WERE USED FOR IDENTIFY THEFT OR NOT.

6            THE TERM ORGANIZED MISUSE, IT'S NOT MEANT TO BE A TERM

7    WITH A WIGGLE ROOM, NOT MEANT TO BE, OKAY, THERE'S SUCH A THING

8    AS DISORGANIZED MISUSE.  THERE REALLY ISN'T, YOUR HONOR.

9            ORGANIZED MISUSE REFLECTS THE IDEA THAT SOMEBODY BROKE

10   INTO THIS DATABASE, TOOK THE SOCIAL SECURITY NUMBERS AND USED

11   THEM.  IF THEY'RE WALL PAPERING THEIR HOUSE WITH THOSE SOCIAL

12   SECURITY NUMBERS NOT A LOT OF DAMAGE, NOT PARTICULARLY

13   RELEVANT.

14           IT BECOMES RELEVANT TO THE CUSTOMERS IN -- THE CLASS

15   MEMBERS IN THE CASE IF THE SOCIAL SECURITY NUMBERS ARE ACTUALLY

16   USED.  THAT USE OF THE SOCIAL SECURITY NUMBERS WHEN IT'S DONE

17   NOT JUST ON AN INDIVIDUAL BASIS BUT ON A MULTI-TIER BASIS IS

18   QUOTE-UNQUOTE "ORGANIZED MISUSE."

19           SO I WANT TO MAKE SURE THE COURT DIDN'T THINK WE WERE

20   USING THAT TERM AS A WIGGLE ROOM.

21           **THE COURT:**  LET ME THROW IN A QUESTION.  HOW DO I

22   VALUE THIS SETTLEMENT?

23           **MR. KAMBER:**  THERE ARE LOT OF WAYS ONE COULD VALUE THE

24   SETTLEMENT, FROM THE CLASS MEMBER AS A CONSUMER CASE, TO A

25   CLASS MEMBER THE VALUE OF THIS SETTLEMENT IS THE INTERNET

1    SECURITY PRODUCT THEY ARE RECEIVING.  IT IS THE FURTHER

2    CONFIDENCE THEY'LL HAVE THEIR INFORMATION IS PROTECTED GOING

3    FORWARD.

4            AND IT IS THE FURTHER PROTECTION THAT IF THERE WAS --

5    SOCIAL SECURITY NUMBER WAS TAKEN AND THEY ARE VICTIM OF

6    IDENTITY THEFT DUE TO THIS PARTICULAR BREACH, THAT THEY HAVE A

7    MECHANISM THAT IS AS PAINLESS OF THE MECHANISM AS POSSIBLE FOR

8    DEALING WITH IDENTIFY THEFT, WHICH IS A REALLY NASTY PROBLEM TO

9    DEAL WITH.

10           THAT'S HOW -- AND THAT IS HOW A PLAINTIFF WOULD VALUE

11   THE SETTLEMENT.

12        **THE COURT:**  LET ME ASK MR. RUBIN, HOW A DEFENDANT

13   WOULD VALUE THE SETTLEMENT?

14        **MR. RUBIN:**  OBVIOUSLY, YOUR HONOR, THIS IS -- IT CAN

15   BE DIFFICULT IN CERTAIN RESPECTS TO MONETIZE THIS.  I THINK,

16   CLASS -- WHAT THE COURT'S ASKING IT CAN BE BECAUSE YOU'RE

17   LOOKING AT SOME RESPECTS PEACE OF MIND.

18           IT'S SOME FUTURE SECURITY ASSUREDLY THAT YOUR

19   INFORMATION IS SAFE.  SOME PREVENTIVE MEASURES.  IF IT TURNS

20   OUT, ALTHOUGH, THERE'S NO EVIDENCE OF IT NOW, THERE WAS SOME

21   INDICATION SOMEBODY USING YOUR SOCIAL SECURITY NUMBER, YOU HAVE

22   SOME PROCEDURES IN PLACE THAT MAY HELP YOU RESOLVE THAT.

23           HOW TO PLACE A NUMBER ON IT, I THINK, IS DIFFICULT.  I

24   THINK, YOU PROBABLY -- WOULD PROBABLY BE ABLE TO GET SOME

25   BUSINESS VALUATION EXPERTS TO COME AND BEGIN TO TALK ABOUT SOME

```
1    OF THOSE ASPECTS.

2              BUT ONE POINT I DO WANT TO MAKE IS, I THINK,

3    TYPICALLY, AND I DON'T WANT TO PREDICT WHERE YOUR QUESTION'S

4    GOING, BUT OFTENTIMES SETTLEMENT FEES AND COST ARE BASED UPON

5    THINGS LIKE HOW MUCH IS THE SETTLEMENT WORTH.

6              YOU HAVE A COMMON FUND CASE SECURITY FRAUD ACTION YOU

7    HAVE AN AMOUNT.

8              THE COURT:  WE HAVE HERE A LOSS WHICH HAS NOT YET

9    ARISEN.

10             MR. RUBIN:  FOR THAT PIECE, RIGHT, IT'S PREVENTIVE

11   MEASURE.

12             THE COURT:  RIGHT.

13             MR. RUBIN:  THERE'S NO LOSS YET ARISEN.

14             BY THE WAY, GOING BACK TO YOUR PRIOR POINT ABOUT WHEN

15   YOU WERE INITIALLY POSING THE QUESTION MR. KAMBER,

16   UNDERSTANDING WHAT CLASS CLAIMS WERE BEING GIVEN AWAY VERSUS

17   INDIVIDUAL CLAIMS.

18             OUR POSITION THAT WE STATED, I THINK, RATHER ADAMANTLY

19   AND FORTHRIGHTLY, MR. KAMBER WAS -- IT WOULD BE A VERY

20   DIFFICULT, IF NOT POSSIBLE CAUSATION CASE HERE, EVEN IF IT WERE

21   TO OCCUR AND THE UNLIKELY EVENT --

22             THE COURT:  THEN IF WHAT?

23             MR. RUBIN:  SOME ORGANIZED MISUSE OF TD AMERITRADE

24   CUSTOMERS' INFORMATION, EVEN IF IT WERE TO OCCUR, LET'S ASSUME

25   JUST FOR PURPOSE OF EXAMPLE THERE WAS SOME ORGANIZED MISUSE
```

1    FOUND, AS A CLASS MATTER IF THIS WERE TO BE LITIGATED, TK

2    AMERITRADE WOULD HAVE EXTREMELY STRONG ARGUMENTS GIVEN THE

3    NATURE OF THE BREACH UNAUTHORIZED ACCESS.

4          IT DID ALL THE LAW WOULD EVER REQUIRE IN TERMS OF

5    REASONABLE SAFEGUARDS, AND ESSENTIALLY A CRIMINAL ACT OCCURRED,

6    IT CAN'T BE HELD RESPONSIBLE FOR, IS THERE IS NO STRICT

7    LIABILITY SIMPLY BECAUSE WE LOST THE INFORMATION AND SOMEBODY

8    ILLEGALLY IN AN UNAUTHORIZED MANNER OBTAINED THE INFORMATION,

9    DOESN'T UNDER THE LAW, AT LEAST, AS WE READ THE LAW, WOULDN'T

10   HOLD TD AMERITRADE LIABLE FOR THAT.

11         WE DON'T THINK THE CLASS CLAIMS HAVE MUCH VALUE, BUT

12   ON THE OTHER HAND, WE HAVE CUSTOMER SATISFACTION ISSUE.  AND

13   WE'RE CONCERNED, OBVIOUSLY, PUTTING ASIDE THE LIABILITY HERE,

14   WE WERE, OBVIOUSLY, CONCERNED WITH THE CLASS, WE SENT OUT

15   NOTICES.

16         **THE COURT:**  LET'S TALK ABOUT THAT LINE.  WHAT'S YOUR

17   OPINION ABOUT THE SETTLEMENT WHAT YOUR CLIENT IS OBTAINING,

18   MR. RUBIN, IS PRECLUSION OF ANY OF THESE CLAIMS OF LIABILITY?

19         **MR. RUBIN:**  FOR CLASS ONLY ON THE IDENTIFY THEFT?

20         **THE COURT:**  CORRECT.

21         **MR. RUBIN:**  FOR THE OTHER CLAIMS ALL RELEASES, RIGHT.

22         **THE COURT:**  YOU CAN GO OUT AND BUY AN INSURANCE POLICY

23   AGAINST THAT, WE HAVE A DISCRETE PERIOD OF TIME HERE, DON'T WE?

24         **MR. RUBIN:**  A PERIOD OF TIME, RIGHT.

25         **THE COURT:**  WHICH THIS EXPOSURE IS GOING TO OCCUR OR

1    NOT OCCUR, BUT THAT'S A INSURABLE RISK, ISN'T IT?

2        **MR. RUBIN:** I WOULD ASSUME THE OLD ADAGE, THERE'S

3    INSURANCE FOR EVERYTHING, SURE.

4        **THE COURT:** HOW MUCH IS THE PREMIUM GOING TO BE ON

5    THAT POLICY?

6        **MR. RUBIN:** THAT WOULD BE ONE WAY TO MONETIZE THIS.

7        **THE COURT:** WHAT IS THAT?

8        **MR. RUBIN:** I DO NOT KNOW, YOUR HONOR. I DON'T KNOW

9    WHAT AN INDIVIDUAL CLAIM OR INDIVIDUAL POLICY WOULD BE.  THERE

10   ARE -- I CERTAINLY KNOW THAT THERE ARE INSURANCE COMPANIES OR

11   INSURANCE POLICIES THAT DO PROVIDE PROTECTION AGAINST IDENTIFY

12   THEFT NOW.

13       **THE COURT:** OF COURSE.  CAN I ASK YOU TO GET THAT

14   QUOTE?

15       **MR. RUBIN:** SURE.  HAD, OF COURSE, WITH A LOT OF --

16       **THE COURT:** THAT WILL TELL US WHAT THIS EXPOSURE IS

17   WORTH, WON'T IT?

18       **MR. RUBIN:** I CAN TELL YOU PURPOSE, FOR TD

19   AMERITRADE'S PURPOSE IN TERMS OF THE ACTUAL WORD HERE, AS YOU

20   SAW IN THE SETTLEMENT AGREEMENT WE COULDN'T AGREE ON FEES, WE

21   WERE FAIRLY FAR APART ON FEES, SO WE HAD TO TURN TO A JAMS

22   MEDIATOR, WAS AGREED UPON BY THE PARTIES IN A MEDIATION

23   SESSION.  WE WILL CERTAINLY PROVIDE THIS INFORMATION.

24       I CAN TELL YOU FROM OUR ADVANTAGE POINT TD AMERITRADE

25   DID NOT ATTEMPT TO VALUE ALL PIECES OF THE SETTLEMENT IN TERMS

OF AN AWARD AND ANALYZED IT AS A COMMON FUND CASE.

WE LOOKED WHAT WE THOUGHT WAS A REASONABLE LOAD STAR EFFORT, BASE THE NEGOTIATIONS IN THAT SETTING WHICH, I THINK, IS -- AND WE, OBVIOUSLY, PUSH AS HARD AS WE COULD TO KEEP IT AS LOW AS WE COULD UNTIL WE REACHED AGREEMENT.

I CERTAINLY CAN AND WILL GET YOU TO INFORMATION.  I DON'T THINK IT'S THE ONLY WAY TO GO ABOUT UNDERSTANDING.

**THE COURT:**  ARE THERE OTHER WAYS OF UNDERSTANDING THE SETTLEMENT?

OTHER WAYS OF VALUING THE SETTLEMENT BESIDES FIGURING OUT WHAT IT WOULD COST TO INSURE AGAINST THIS RISK?

THAT YOUR CLIENT IS BEING PROTECTED AGAINST BY THIS SETTLEMENT?

**MR. RUBIN:**  I THINK, EVEN THE INSURANCE IS, AND AGAIN, JUST THINKING ABOUT THIS IN THE MONETIZING SENSE, A CREDIT CARD COMPANY, MOST CREDIT CARD COMPANIES WOULD NOT HOLD YOU RESPONSIBLE FOR ANY FRAUDULENT CHARGES, OBVIOUSLY.

SO TO THAT EXTENT, IN OTHER WORDS, SOMEBODY GOES OUT AND GETS INSURANCE, THEY'RE COVERING ESSENTIALLY FOR THE SURPLUS AMOUNT.  THIS REALLY WAS CREATING PROCEDURALLY STATE OF MIND EASE OF THE CUSTOMER.

EVEN THE INSURANCE POLICY COULD BE DIFFERENT THAN THE VALUE HERE.  OBVIOUSLY, FOR THE ANTI-SPAM DEVICES THAT IS, I THINK, EASIER TO MONETIZE.

AS MR. KAMBER SAID THERE'S A RETAIL AMOUNT HOW MUCH

1    SOMEBODY WOULD HAVE TO PAY FOR THE DEVICE OFF-THE-SHELF OR IF

2    THEY WANTED TO PURCHASE IT, AND THAT PART, I THINK, CAN BE

3    MONETIZE OR MAKING SOME CONTRIBUTIONS TO ORGANIZATIONS THAT

4    DEVOTE THEMSELVES TO CYBER SECURITY.

5         THAT CAN BE MONETIZED, THAT'S AN ACTUAL MONETARY

6    AMOUNT THAT WE'RE PROVIDING.  SO, I THINK, CERTAIN SEGMENTS OF

7    THIS, BUT I CERTAINLY CAN GET THE INFORMATION.

8         **THE COURT:**  YOUR CLIENT IS PAYING WHATEVER THE

9    SETTLEMENT IS GOING TO COST, AND WHAT I'M SUGGESTING IS THERE

10   MAY BE SOME ALTERNATIVES TO CONSIDER WHICH MAY GIVE US AN IDEA

11   WHAT THE VALUE OF THIS SETTLEMENT REALLY IS.

12        **MR. RUBIN:**  I APPRECIATE THAT AND WE CAN CERTAINLY, I

13   THINK, THAT WOULD BE ONE ALTERNATIVE.

14        **THE COURT:**  THIS IS THE CASE IN WHICH WE'RE NOT HAVING

15   A SETTLEMENT FOR A CERTAIN AMOUNT OF MONEY.  BASICALLY WHAT

16   YOUR -- WHAT THIS SETTLEMENT DOES, PRECLUDE CLAIMS IN THE

17   FUTURE WHICH MAY OR MAY NOT ARISE.

18        **MR. RUBIN:**  MAY I INTERJECT SOMETHING HERE WITH

19   RESPECT TO THE VALUATION?

20        I UNDERSTAND WE'VE APPROACHED THIS AND, I THINK, MY

21   PAST EXPERIENCE ON DEFENSE SIDE FAIRLY GOOD EXPERIENCE WITH

22   RESPECT TO VALUING THINGS FROM THE DEFENSE SIDE.  I THINK, ONE

23   THING, I DETECT TWO TIERS.

24        **THE COURT:**  YOU BEEN ON BOTH SIDES OF THIS KIND OF

25   CASE, COUNSEL?

1      **MR. RUBIN:**  I HAVE.

2      **THE COURT:**  I'VE BEEN ON ALL THREE SIDES.

3      **MR. RUBIN:**  THAT'S RIGHT.  AND WHAT I WANTED TO ADD

4  HERE, YOUR HONOR, WHICH I THINK IS RELEVANT BECAUSE I DETECT

5  TWO TIERS TO YOUR QUESTION.

6      I THINK, KIND OF UNUSUALLY DEFENSE COUNSEL MR. RUBIN

7  WAS ADDRESSING IT FROM A FEE PROSPECTIVE, I WAS ALSO HEARING

8  FROM YOUR HONOR THE QUESTION OF YOUR TRYING TO ALSO VALUE IT,

9  WHETHER TO EVALUATE WHAT THE CLASS IS GETTING IS FAIR FOR WHAT

10  THEY'RE GIVING UP.

11      **THE COURT:**  TRYING TO PUT A VALUE ON THE SETTLEMENT, A

12  MONETARY VALUE ON THE SETTLEMENT THAT'S GOING TO TELL US

13  SOMETHING ABOUT THE REASONABLENESS OF THE FEE AWARD THAT'S

14  BEING APPLIED FOR.

15      OVERALL WHEN YOU LOOK AT IT FROM THE PLAINTIFF'S

16  PROSPECTIVE, NO MATTER HOW YOU VALUE THE SETTLEMENT INCOME,

17  ANYWAY THE SETTLEMENT CAN BE VALUED FROM THE CONSERVATIVE END

18  ON, THE FEE AWARD YOU CAN VALUE IT IN ANY PARTICULAR WAY, NOT

19  COMING TO YOU AS PLAINTIFF'S COUNSEL AND NEEDING A PARTICULAR

20  TYPE OR QUANTITY OF EVALUATION, FROM THE DISCUSSION WITH YOU

21  AND MR. RUBIN REALLY FOCUSING ON WHAT THAT IS WORTH TO DEFEND

22  IT AS FAST AS THE COST.

23      AS A PLAINTIFF'S COUNSEL ONE OF THE THINGS THAT'S

24  IMPORTANT AND ONE OF THE REASONS THINGS WE REALLY FOCUS ON ON

25  CONSUMER CASES, ONE OF THE REASONS MY FIRM HAS BEEN

PARTICULARLY SUCCESSFUL IN RESOLVING CONSUMER CASES IS THIS

ABILITY TO LOOK AT IT.

ALSO, UNDERSTAND WE'RE NOT HERE AS PLAINTIFFS TO

PUNISH THE DEFENDANT, OUR PROSPECTIVE IS TO GET THE BENEFIT FOR

THE CLASS THAT MAKES THEM BETTER OFF DOING THIS SETTLEMENT THAN

NOT.

IN THIS PARTICULAR CASE WHAT WE ARE GETTING THE CLASS

FOR IDENTIFY THEFT, WE HAVE A HIGH LITIGATION RISK WITH RESPECT

TO ANY CLASS CERTIFICATION ISSUES ON IDENTIFY THEFT.  I DON'T

THINK THERE IS A SINGLE INSTANCE WHERE IDENTITY THEFT, WHERE

DAMAGE CLAIM FOR IDENTIFY THEFT HAVE BEEN CERTIFIED FOR CLASS

LITIGATION.  A HIGH RISK THERE.

WHAT THE CLASS IS GETTING WITH RESPECT TO IDENTIFY

THEFT, IF THEY ARE VICTIM OF IDENTIFY THEFT THEY'RE GETTING,

FROM OUR LOOKING AT IT, THEY'RE GETTING FULL VALUE BACK.

THE DAMAGES, THE GREAT MAJORITY OF DAMAGES IT'S BEEN

ESTIMATED TO BE ANYWHERE FROM 70 TO 90 PERCENT FROM -- MY

NUMBERS ARE OFF FROM THE WHITE PAPER, RIGHT, IN THE DAMAGES

FROM IDENTIFY THEFT ARE THE TIME PEOPLE MISS FROM WORK AND

DOING THINGS TO GET ALL THE PAPERS WORK IN ORDER.

BANKS WON'T HOLD YOU RESPONSIBLE IF THEY'RE PROMPTLY

NOTIFIED, CREDIT CARD COMPANIES DON'T HOLD YOU RESPONSIBLE IF

THEY'RE PROPERLY NOTIFIED, THE KEY IS THE PROMPT NOTIFICATION.

WHAT WE GIVE CLASS MEMBERS HERE IS PROMPT

NOTIFICATION.  THERE IS ID ANALYTICS AND MR. RUBIN CAN TELL YOU

1    HOW MUCH THEY'RE PAYING TO ID ANALYTICS, OBVIOUSLY, I BELIEVE

2    THAT IS A FAIRLY LARGE QUANTITY OF MONEY THAT IS BEING PAID TO

3    THEM RELATIVELY SPEAKING.

4         THAT WHAT THEY ARE GETTING IS BESIDES THE PROMPT

5    NOTIFICATION IF THERE IS SUCH IDENTITY THEFT, THEY ARE GETTING

6    A CUSTOMER SUPPORT HOT LINE, WHICH WILL HELP EACH INDIVIDUAL

7    PERSON WHO'S VICTIM OF THE IDENTITY THEFT NOTIFY THEIR BANKS

8    AND CREDIT CARD COMPANIES, ET CETERA, WITH AN EXPERTISE FROM

9    THE CUSTOMER HOT LINE.

10        SO THAT IS ALLOWING PEOPLE TO SAVE THE TIME THAT MAKES

11   SOME THE GREAT BULK OF DAMAGES IN IDENTITY THEFT.

12        **THE COURT:**  ARE THESE THINGS THAT THE CLASS WOULD NOT

13   GET WITHOUT THIS LITIGATION?

14        **MR. KAMBER:**  THAT IS CORRECT.

15        **THE COURT:**  THAT TRUE, MR. RUBIN?

16        **MR. RUBIN:**  THEY CERTAINLY WOULD NOT IN THIS RESPECT.

17   THE PROCEDURES THAT ARE SET FORTH IN 800 NUMBER AND THE

18   METHODOLOGY IT CERTAINLY WOULDN'T HAVE BEEN IN PLACE.  WOULD

19   CUSTOMER SERVICE REPRESENTATIVES BE AVAILABLE TO HELP AND HEAR

20   COMPLAINT?

21        YES, OF COURSE, WE'RE A CUSTOMER SERVICE COMPANY,

22   WE'RE AN ON LINE BROKERAGE FIRM AND ALSO BROKERAGE HOUSE.

23        **THE COURT:**  IF YOU HAD EVIDENCE.

24        **MR. RUBIN:**  I SO CAN'T, SO I DON'T THINK THE

25   PROCEDURES THAT ARE IN PLACE --

1          **THE COURT:**  AND IF YOU --

2          **MR. RUBIN:**  -- ENHANCED.

3          **THE COURT:**  CLIENT HAD NOTICE OF ORGANIZED MISUSE OF

4     THIS DATA IT WOULD NOT PROMPTLY NOTIFY ITS CUSTOMERS?

5          **MR. RUBIN:**  WELL, ID ANALYTIC.

6          **THE COURT:**  THAT WHAT YOU'RE SAYING?

7          **MR. RUBIN:**  AM I SAYING IT WOULDN'T NOTIFY ITS

8     CUSTOMERS?

9          **THE COURT:**  YES.

10         **MR. RUBIN:**  NO.  IF WE HAD RETAINED, TO THE EXTENT ID

11    ANALYTICS HAS ALREADY BEEN RETAINED, WHICH AS YOU KNOW IT HAS,

12    AND THERE WERE INDICATION OF PARTICULAR INDIVIDUALS POTENTIALLY

13    BEING THE SUBJECTS OF ORGANIZATION MISUSE, OF COURSE, TD

14    AMERITRADE.

15         **THE COURT:**  YOU WOULDN'T SET UP A HOT LINE TO DEAL

16    WITH THIS?

17         **MR. RUBIN:**  IT'S SPECULATIVE.

18         **MR. KAMBER:**  WITH ALL DUE RESPECT --

19         **THE COURT:**  MR. KAMBER, I'M TALKING TO MR. RUBIN.

20         **MR. KAMBER:**  I'M SORRY.

21         **MR. RUBIN:**  THE PROCEDURES THAT WERE NEGOTIATED AND

22    SET OUT HERE ARE ENHANCED PROCEDURES.  THERE WAS, OBVIOUSLY, AN

23    EYE TOWARD CREATING A MECHANISM THAT WOULDN'T NECESSARILY HAVE

24    BEEN IN PLACE WITHOUT THE LITIGATION, WITHOUT THE PROPOSED

25    SETTLEMENT, THAT WILL ENHANCE THE EASE WITH WHICH PEOPLE ARE,

1    WHO ARE IDENTIFIED UNDER ID ANALYTIC'S PLANS, THE EASE WHICH

2    THEY CAN DEAL WITH THESE PEOPLE.

3           PROBLEMS I DON'T HAVE ANY REASON TO SUGGEST THERE WHAT

4    WOULD BE A DEVOTED GROUP OF PEOPLE THAT WERE DEDICATED TO THIS

5    IN THE ABSENCE OF THE SETTLEMENT, WHAT I'M SIMPLY SAYING IS

6    WOULD PEOPLE, WOULD THE COMPANY TRY TO TAKE CARE OF ITS

7    CUSTOMER?  OF COURSE, IT WOULD.

8           WOULD STEPS BE TAKEN?  YES, BUT IT WOULDN'T

9    NECESSARILY BE IN THE MECHANISM.  AND THERE'S A PROVISION THAT

10   SAYS THE COMPANY WILL EVALUATE, WE WOULD AGREE TO A FORUM.

11          SO IF ID ANALYTICS IN ITS TEST FINDS THAT THERE'S

12   ORGANIZED MISUSE, WE IDENTIFY THESE INDIVIDUALS, THERE'S GOING

13   TO BE AN AGREED UPON FORUM AND IT STREAMLINES THE PROCESS THAT

14   IS, MR. KAMBER SAID I THINK IT'S TRUE OTHERWISE CAN BE VERY

15   TIME CONSUMING, FRUSTRATING.

16          AND SO THEY'RE NOT GOING TO JUST DEAL WITH JOHN SMITH

17   ON THE TD AMERITRADE CUSTOMER LINE, THERE WILL BE A DEDICATED

18   GROUP OF PEOPLE WHO ARE DEALING WITH THIS -- IF I COULD JUST

19   FINISH.

20          **MR. KAMBER:**  OKAY, NO, THERE'S -- YOU WEREN'T INVOLVED

21   IN THOSE NEGOTIATIONS, THOSE ANSWER TO THE JUDGE'S QUESTION.

22          **THE COURT:**  I WAS INVOLVED.

23          **MR. KAMBER:**  NOT YOU, MR. RUBIN.

24          **MR. RUBIN:**  YES, GO AHEAD.

25          **MR. KAMBER:**  MR. RUBIN MISSING A PIECE, HE WAS NOT

1    INVOLVED IN THE NEGOTIATIONS.  REASON I'M BEING EMPATHETIC, I

2    APOLOGIZE IF I WAS RUDE, WHEN YOU LOOK AT THIS, THIS WAS ONE OF

3    THE MOST CONTENTIOUSLY NEGOTIATED PARTS, IT TOOK PLACE OVER

4    SEVERAL MONTHS.

5          THE REASON TD AMERITRADE WOULD NOT, COULD NOT AND

6    WOULD DO THIS, IS NO ONE COMPANY HAS EVER DONE THIS SYSTEM.  MY

7    OFFICE DEVELOPED THIS PARTICULAR SET OF PROCEDURES.

8          THE NEGOTIATIONS TO GET INTO BE APART OF THE

9    SETTLEMENT AGREEMENT WERE PARTICULARLY CONTENTIOUS.  IF YOU

10   LOOK AT THE HISTORY OF THE BREACH, YOUR HONOR, WE FILED OUR

11   COMPLAINT MAY 31ST, TD AMERITRADE DID NOT PUBLICLY ACKNOWLEDGE

12   WHAT WE PLED IN THE COMPLAINT AS BEING ACCURATE UNTIL

13   SEPTEMBER, UNTIL SEPTEMBER 14TH, YOUR HONOR.  IT WAS ONLY AFTER

14   WE MOVED FOR PRELIMINARY INJUNCTION FOR THEM TO DISCLOSE THE

15   INFORMATION THAT IT WAS DISCLOSED.

16         TIME CHRONOLOGICALLY.  IF YOU LOOK AT THE CHRONOLOGY

17   MAY 31ST WE FILED OUR COMPLAINT, WE MOVED FOR PRELIMINARY

18   INJUNCTION ON JULY 10TH, THERE WERE -- WE THEN GO THROUGH,

19   THERE'S SOME BRIEFING AND THEN TD AMERITRADE DISCLOSED THIS

20   INFORMATION IN SEPTEMBER.

21         PLAINTIFFS BROUGHT PARTICULAR VALUE TO THIS, WE WERE

22   THE ONES WHO FIRST IDENTIFIED THIS PUBLICLY.  WE MOVED FOR

23   PRELIMINARY INJUNCTION BEFORE THIS WAS PUBLICLY ACKNOWLEDGED.

24   AND WE TOOK THE DEPOSITION OF THE SECURITY OFFICER ON LESS THAN

25   A WEEK AFTER THE PUBLIC DISCLOSURE.

1          THE NEGOTIATIONS REGARDING SETTLEMENT BEGAN

2     IMMEDIATELY, THE SAME EVENING AS THE DEPOSITION TERMINATED

3     AGAINST THE SECURITY OFFICER AND CONTINUED FOR MANY MONTHS

4     THEREAFTER.

5          TO SUGGEST, AND I THINK IF MR. CHRIS WAS HERE OR

6     COUNSEL FOR THE IN-HOUSE COUNSEL FOR AMERITRADE, I THINK, THEY

7     WOULD CERTAINLY ACKNOWLEDGE THAT THE SYSTEM PUT INTO PLACE IN

8     THIS SETTLEMENTS FOR IDENTIFY THEFT IS BOTH UNIQUE AND IT WAS,

9     IT CAME AS A PRODUCT OF INTENSE NEGOTIATIONS, AND ITSELF WAS

10    DEVELOPED BY PLAINTIFF'S COUNSEL.

11         AND, I THINK, THAT IS AN IMPORTANT POINT BECAUSE WE

12    TAKE GREAT PRIDE IN HAVING PUT TOGETHER THIS SETTLEMENT IN A

13    WAY THAT WE THINK IS SENSITIVE TO THE BUSINESS SIDE OF THINGS,

14    BUT ACCOMPLISHES WHAT THE CLASS NEEDS.  AND WE THINK IS THE

15    SINGLE BEST SETTLEMENT TO THE AREA OF SECURITY THAT'S EVER BEEN

16    PRESENTED FOR APPROVAL.

17         BECAUSE NO OTHER SETTLEMENT HAS BEEN ABLE TO DEAL WITH

18    THIS PARTICULAR ISSUE, WE THINK IT'S VERY PROGRESSIVE.  I

19    APPRECIATE THE QUESTION YOUR HONOR ASKING, CERTAINLY A LOT OF

20    TIMES YOU SEE SETTLEMENTS AND YOU SEE LITIGATION THAT YOU GO

21    THEY WOULD HAVE DONE THAT ANYWAY AND THERE'S A FEE AT THE END

22    OF THE DAY, THAT'S NOT THE CASE HERE.

23         WE BELIEVE THAT THE DISCLOSURE ROSE DIRECTLY OUT OF

24    THIS LITIGATION AND THAT WE TAKE A PRIDE OF AUTHORSHIP IN

25    DEVELOPING THESE THINGS AND WE ARE PLEASE WITH EFFORTS TD

1    AMERITRADE HAS MADE IN BEGINNING TO IMPLEMENT SOME OF THESE

2    THINGS BEFORE THE SETTLEMENT IS PUT INTO PLACE.

3         **MR. RUBIN:**  SIMPLY BECAUSE THINGS COULD BE MISSTATED

4    ON SOME PUBLIC RECORD, I DO WANT TO JUST SIMPLY SAY, AND I

5    DON'T WANT THIS TO TURN INTO A MOTION FOR PRELIMINARY

6    INJUNCTION OR MOTION TO DISMISS INSTEAD OF A PRELIMINARY

7    APPROVAL, BUT GOING TO MR. KAMBER'S POINT, HE CERTAINLY IS

8    ENTITLED TO SAY HE WAS A CATALYST OR IMPETUS.

9         I DO WANT TO POINT OUT TO THE COURT THE CLASS

10   DISCLOSURE WAS MADE TO OUR CUSTOMER SEPTEMBER 14TH.  WAS A

11   DISCLOSURE THAT WAS MADE AFTER WE HAD IDENTIFIED THE MALICIOUS

12   CODE THAT HAD BEEN PLACED IN OUR SYSTEM WHICH, I THINK, DURING

13   THE CMC AS WE EXPLAINED TO THE COURT WAS ON OR ABOUT

14   AUGUST 19TH.

15        SO I WILL JUST GIVE LEAVE IT AT THAT, BUT THAT WAS THE

16   PRECIPITATING EVENT IN TERMS OF HAVING SOMETHING CONCRETE AND

17   SPECIFIC TO SAY TO OUR CUSTOMERS TWO WEEKS LATER, A FEW WEEKS

18   LATER, AFTER WE FIGURED OUT WHAT IT WAS AND ELIMINATED IT TO

19   EXPLAIN TO CUSTOMERS WHAT HAD HAPPENED.

20        **THE COURT:**  ALL RIGHT.  WELL, LET ME SUBMIT THE MATTER

21   AND GIVE IT SOME FURTHER NOT.

22        THANK YOU, COUNSEL.

23        **MR. RUBIN:**  CAN YOU IDENTIFY, ONE THING THAT MAY GIVE

24   YOU SOME COMFORT WHICH HASN'T COME OUT AND NOT ANY PAPERS WILL

25   TAKE TWO SECONDS.

1          **THE COURT:**  WHO AM I TO REJECT ANY COMPORT.

2          **MR. RUBIN:**  YOUR HONOR --

3          **MR. KAMBER:**  REFERRING TO YOUR HONOR'S DECISION IN RE

4     CHEVRON, WILL COMFORT THE COURT THAT IN ORDER TO GET TO THE

5     1.87 NUMBER, WHICH IS THE FEE NUMBER, THAT FOLLOWING YOUR

6     JUDGE'S PRIOR DECISIONS THAT WE ARE SQUARELY DOWN THE MIDDLE OF

7     THE PLATE WITH RESPECTS TO MULTIPLIER.

8          AND EVEN IF ONE WERE TO USE THE LAFFEY (PHONETIC)

9     MATRIX FOR HOURLY RATE, ET CETERA, WE STILL COMPLY AND FIT AND

10    CONFORM TO YOUR JUDGE'S PRIOR DECISION.

11         **THE COURT:**  DO YOU HAVE THAT DATA?

12         **MR. KAMBER:**  THE DATA, YES.

13         **THE COURT:**  DO WE?

14         **MR. KAMBER:**  DOES THE COURT, NO, WE HAVE NOT SUBMITTED

15    OUR TIME WITH RESPECT TO, I ACTUALLY NEVER DONE THAT

16    PRELIMINARY, I'M HAPPY TO DO THAT, IF IT WOULD PLEASE THE

17    COURT.

18         **THE COURT:**  BE HAPPY TO RECEIVE IT.

19         **MR. KAMBER:**  THANK YOU.

20         **THE COURT:**  MR. ELVEY.

21         **MR. ELVEY:**  MAY I SPEAK?

22         **THE COURT:**  OF COURSE.

23         **MR. ELVEY:**  I JUST WANT TO SAY, EXPRESS SOME

24    RESERVATIONS I HAD ABOUT THE SETTLEMENT.

25         **THE COURT:**  THIS IS THE CLASS REPRESENTATIVE?

1          **MR. ELVEY:** YES. SO AS YOU KNOW, THE BREACH ACTUALLY

2     WENT SIGNIFICANTLY FURTHER BACK THEN, IS ANNOUNCED IN THE

3     COMPLAINT, IT WAS IN OCTOBER OF 2005 THAT AMERITRADE WAS

4     INFORMED OF THE BREACH, OCTOBER 2005, NOT '06.

5          SO IN OTHER WORDS, IT TOOK THEM TWO YEARS TO ADDRESS

6     THE ISSUE. THERE WAS AN ONGOING SECURITY BREACH IN THEIR

7     SYSTEMS FOR TWO YEARS.

8          **THE COURT:** HOW IS IT THAT YOUR AWARE OF THIS?

9          **MR. ELVEY:** THERE PUBLIC REPORTS OF PEOPLE WHO

10    PROVIDED INFORMATION TO AMERITRADE, VERY CREDIBLE INFORMATION

11    OF THE SAME KIND THAT I PROVIDED, SHOWING THERE HAD BEEN A

12    SECURITY BREACH, EXCEPT THEY PROVIDED IT A YEAR EARLIER AND

13    THERE ARE ACKNOWLEDGMENTS FROM TD AMERITRADE TO HAVING RECEIVED

14    THAT INFORMATION.

15         **THE COURT:** YOU SAY PUBLIC REPORTS?

16         **MR. ELVEY:** I CAN PROVIDE THEM. THEY WERE ON THE

17    INTERNET, FROM PEOPLE THAT I KNOW.

18         **THE COURT:** I SEE, THIS IS NOT SOME SEC FILING OR

19    SOMETHING OF THAT KIND?

20         **MR. ELVEY:** NO, I'D BE HAPPY TO FILE IT WITH THE

21    COURT, IF YOU LIKE.

22         **THE COURT:** ALL RIGHT.

23         **MR. ELVEY:** SO THAT'S THE FIRST POINT I WANTED TO

24    MAKE. AND SO I DON'T WANT TO GO OVER EVERYTHING, BUT I DID

25    WANT TO POINT OUT THAT -- I'M SKIMMING HERE, I GOT FIVE PAGES,

1    I DON'T WANT TO TAKE UP TOO MUCH OF YOUR TIME.

2    **THE COURT:**  THAT'S FINE, I'M HERE TO TRY TO DEAL WITH

3    THIS.

4    **MR. ELVEY:**  SO --

5    **THE COURT:**  SO WHAT'S THE IMPLICATION OF WHAT YOU'RE

6    SAYING?

7    LET'S ASSUME THAT THERE WERE THESE COMPLAINTS THAT

8    WENT BACK BASICALLY A YEAR, NO, I GUESS, TWO YEARS EARLIER THEN

9    ARE ALLEGED IN THE PRESENT ACTION, WHAT'S THE IMPLICATION OF

10    THAT?

11    **MR. ELVEY:**  IT WAS JUST SAID THE DISCUSSIONS A LITTLE

12    EARLIER THAT AMERITRADE RESPONDED PROMPTLY AND REASONABLY, THEY

13    DID ALL THEY SHOULD HAVE, I THINK, WHAT WAS SAID.  THEY KNEW

14    ABOUT IT FOR TWO YEARS BEFORE THEY CLOSED THE BREACH.

15    I DON'T THINK THAT'S DOING ALL THAT YOU CAN REASONABLY

16    BE EXPECTED TO DO.  THAT'S JUST MY FIRST POINT.

17    **THE COURT:**  THAT'S SUGGESTING THAT THE DEFENDANT DID

18    NOT ACT PROMPTLY IN ADDRESSING THE PROBLEMS?

19    **MR. ELVEY:**  YES.

20    **THE COURT:**  ALL RIGHT.  THERE'S ANOTHER ANGLE TO THAT,

21    THOUGH, ISN'T THAT IS IF THERE WAS THIS BREACH AS LONG AGO AS

22    2005 AND THERE'S NOT BEEN SOME ORGANIZED MISUSE OF THE DATA,

23    THEN THAT SUGGESTION THAT THE EXPOSURE OR THE DANGER OF THE

24    ACCESS OF TD AMERITRADE INFORMATION MAY NOT BE VERY GREAT.

25    **MR. ELVEY:**  I'D LIKE TO ADDRESS THAT POINT.  I

1    DISAGREE IN TERMS WHETHER THERE HAS BEEN ORGANIZED MISUSE, I

2    HAVE SOME INFORMATION ON THAT.

3         **THE COURT:**  DO YOU HAVE EVIDENCE OF THAT?

4         **MR. ELVEY:**  WELL . . .

5         **THE COURT:**  COUNSEL, TELL ME THERE HAS BEEN NO

6    ORGANIZED MISUSE?

7         **MR. KAMBER:**  THERE, YOUR HONOR, JUST TO INTERJECT,

8    THERE IS INFORMATION THAT I HAVE THAT MR. RUBIN HAS, THERE WAS

9    AN EXTENSIVE DEPOSITION THAT WAS DONE FOR ATTORNEY'S EYES ONLY,

10   WE KNOW SPECIFICALLY WHEN THE BREACHES BEGAN, ET CETERA.

11        IF THE JUDGE WOULD LIKE TO GO IN CAMERA WE ARE HAPPY

12   TO SHARE INFORMATION THAT IS OTHERWISE EXTREMELY SENSITIVE, FOR

13   THE INFORMATION FROM THAT DEPOSITION COULD ENABLE SOMEBODY TO,

14   MORE LIKELY FOR SOMEBODY TO BE ABLE TO COMPROMISE TD

15   AMERITRADE'S SECURITY SYSTEM.

16        **MR. ELVEY:**  FIRST, I'M AN IDENTITY THEFT VICTIM.

17   EVERYBODY POINTS TO THE THEFT OF MY IDENTITY BEING A RESULT OF

18   THIS BREACH.  I DON'T HAVE ANY OTHER LEADS AS TO HOW MY SOCIAL

19   SECURITY NUMBER, ET CETERA, WAS STOLEN.

20        SECONDLY, I HAVE A PRETTY GOOD UNDERSTANDING OF

21   STATISTICAL EVIDENCE TOOLS BY THE KIND USED BY ANALYTIC'S GRAPH

22   BASE ANOMALY PROTECTION, I DON'T BELIEVE IT'S CREDIBLE BASED ON

23   MY UNDERSTANDING OF COMPUTER SCIENCE.

24        I HAVE A COMPUTER SCIENCE DEGREE FROM YALE, WE STUDIED

25   THIS STUFF.  I'VE SPOKEN TO STATISTICIANS.  I DON'T BELIEVE

1    YOU'VE BEEN GIVEN THE ACCESS THAT THEY PRESUMABLY HAVE TO THE

2    ENTIRE COUNTRY, CREDIT REPORTS THEY CAN IDENTIFY HOW LEVELS OF

3    IDENTITY THEFT OF SAY THE HUNDREDS THAT WERE MENTIONED.

4         AND, THIRD, I WANTED TO MENTION CHRIS HOFFNAGEL

5    PROFESSOR AT STANFORD AND CALIFORNIA LAW, HE OBTAINED SOME DATA

6    FROM FTTC UNDER FOIA AND THAT INDICATES THERE WERE

7    APPROXIMATELY 2,200 IDENTIFY THEFT IN 2006 AND 2007 RELATED TO

8    AMERITRADE.  SO I THINK THE CLAIM --

9         **THE COURT:**  WHAT'S YOUR POSITION WITH REFERENCE TO THE

10   SETTLEMENT THAT'S BEFORE THE COURT?

11        **MR. ELVEY:**  I HAVE BEEN OPPOSED TO THE SETTLEMENT.

12        **THE COURT:**  WHY?

13        **MR. ELVEY:**  I'VE BEEN OPPOSED TO IT ALL ALONG.

14        FIRST OF ALL, I DON'T BELIEVE THE FIRST COMPONENT OF

15   THE SETTLEMENT IS THE SOFTWARE.  IT'S A PIECE OF SOFTWARE

16   THAT'S AVAILABLE FOR FREE AFTER REBATE.  I HAVE A COUPON,

17   MAKING THAT AVAILABLE FROM THE PAPER A COUPLE WEEKS AGO.

18        I DO BELIEVE IT'S A GOOD COMPONENT OF THE SETTLEMENT,

19   IT'S VALID FOR ONE YEAR, BUT I WOULD SIMPLY POINT OUT IT IS

20   AVAILABLE FOR FREE AFTER REBATE.

21        AND SECOND POINT --

22        **THE COURT:**  IT'S AVAILABLE FOR FREE.

23        **MR. ELVEY:**  FOR FREE AFTER REBATE.  I CAN GO DOWN TO

24   FRIES AND I CAN GET IT, I PAY $50 OR $70 AND THEN I SUBMIT A

25   COUPON AND I GET MY MONEY BACK, I BELIEVE, INCLUDING SALES TAX.

1    SO THAT'S THE FIRST POINT.

2              SECOND POINT IS --

3         **THE COURT:**  THEY SELL IT TO YOU, THEN THEY GIVE YOU A

4    REBATE FOR ONE YEAR HOPING THAT YOU'RE GOING TO RENEW IT AT THE

5    END OF THE YEAR AND THAT'S WHERE THEY'RE GOING TO MAKE MONEY,

6    IS THAT THE BUSINESS MODEL?

7         **MR. ELVEY:**  THAT IS THE BUSINESS MODEL, YES.  ONE OF

8    THE THINGS I SUGGESTED, WE MAKE THIS SOFTWARE AVAILABLE FOR

9    THREE YEARS AS A MORE SUBSTANTIAL SETTLEMENT.

10             SECOND POINT IS MOST PEOPLE HAVE -- WHO ARE TD

11   AMERITRADE CUSTOMER HAVE BROADBAND ACCESS AND BROADBAND ACCESS

12   FOR MOST MAJOR PROVIDERS COMES WITH SECURITY SOFTWARE ROUGHLY

13   COMPARABLE TO WHAT'S BEING OFFERED HERE.

14             I THINK, IT'S A GOOD COMPONENT OF THE SETTLEMENT.  I

15   DO THINK IT'S A WIN WIN TO HAVE THIS BE APART OF THE COMPONENT,

16   BUT JUST IN TERMS OF HOW WE VALUE IT, I WOULD TAKE THOSE THINGS

17   INTO CONSIDERATION.

18             THE ONLY REASON I LIKE IT AS A COMPONENT, IT ADDRESSES

19   THE BROADER ISSUE OF COMPUTER SECURITY WORLD-WIDE BEING A

20   COMPONENT IN THIS ISSUE.

21             SECOND THING IS I DID WANT TO ASK THE COURT TO

22   CONSIDER ALLOWING ME TO SEE A COPY OF THIS DEPOSITION?

23             I COULD GO INTO CREDENTIALS I HAVE AS A COMPUTER

24   PROFESSIONAL AND INTO WHY I THINK I COULD HANDLE THAT

25   INFORMATION SUCCESSFULLY, IF YOU LIKE.

1          **THE COURT:**  THIS IS SOMETHING THAT YOU NOT RECEIVED?

2          **MR. ELVEY:**  CORRECT.  I HAVE REQUESTED IT REPEATEDLY,

3     IT'S BEEN MARKED ATTORNEY'S EYES ONLY.  WE REQUESTED IT FROM

4     COUNSEL OR WAS REQUESTED ON MY BEHALF THAT I BE GRANTED ACCESS

5     TO IT AND I AM A COMPUTER PROFESSIONAL.

6          I HAVE -- I CAN GET PLENTY OF REFERENCES FROM, FOR

7     EXAMPLE, MEMBERS OF THE SWISS GOVERNMENT, IF ANYBODY --

8          **THE COURT:**  TELL ME WHAT YOUR PROFESSION IS, WHAT YOUR

9     EDUCATION IS AND SO FORTH?

10         **MR. ELVEY:**  OKAY.  I'M JUMPING AROUND.  I HAVE A

11    COMPUTER SCIENCE DEGREE FROM YALE.  I --

12         **THE COURT:**  COMPUTER SCIENCE?

13         **MR. ELVEY:**  COMPUTER SCIENCE.

14         **THE COURT:**  WHEN DID YOU RECEIVE THAT?

15         **MR. ELVEY:**  1995.

16         **THE COURT:**  AND IS THAT A BACHELOR OF SCIENCE?

17         **MR. ELVEY:**  YES.  I ALSO COMPLETED ALL THE

18    REQUIREMENTS FOR THE MAJOR IN MECHANICAL ENGINEERING,

19    COMPLETELY SEPARATELY.

20         **THE COURT:**  ALL RIGHT.

21         **MR. ELVEY:**  I HAVE WORKED IN IT SECURITY AND IT IN

22    GENERAL, IT MEANING INFORMATION TECHNOLOGY, SINCE BEFORE I

23    GRADUATED, UNDER MORE OR LESS CONTINUOUS BASIS.  I WORK AT

24    GOLDMAN SACHS, I'VE BEEN THROUGH THEIR ENTIRE TRAINING PROGRAM.

25    I --

1          **THE COURT:**  WHAT DID YOU DO AFTER GRADUATING FROM YALE

2     IN 1995?

3          **MR. ELVEY:**  FIRST THING I DID WAS WORK AT GOLDMAN

4     SACHS FOR TWO YEARS.

5          **THE COURT:**  UNTIL 1997?

6          **MR. ELVEY:**  YES.

7          **THE COURT:**  THEN WHAT?

8          **MR. ELVEY:**  I WORKED FOR FIND SVB, IT'S A RELATIVELY

9     SMALL COMPANY.

10          **THE COURT:**  FIND SVB?

11          **MR. ELVEY:**  YES.

12          **THE COURT:**  WHERE ARE THEY LOCATED?

13          **MR. ELVEY:**  THEY'RE OUT OF NEW YORK CITY.

14          **THE COURT:**  ALL RIGHT.  AND HOW LONG DID YOU WORK FOR

15     FIND SVP?

16          **MR. ELVEY:**  APPROXIMATELY, TWO YEARS.

17          **THE COURT:**  UNTIL ABOUT '99?

18          **MR. ELVEY:**  YES.

19          **THE COURT:**  WHAT DID YOU DO AT FIND SVB?

20          **MR. ELVEY:**  I WAS DIRECTOR OF THEIR IT, ESSENTIALLY

21     DIRECTOR OF IT INFRASTRUCTURE AND DATABASE DEVELOPMENT, I

22     THINK.

23          **THE COURT:**  YOU WERE A TRAINEE, I THINK, YOU SAID AT

24     GOLDMAN SACHS?

25          **MR. ELVEY:**  YES.  THEN I MOVED TO THE WEST COAST WHERE

```
1    I DID A VARIETY OF COMPUTER RELATING THINGS.  FOR EXAMPLE, I

2    HELPED DEVELOP THE INFRASTRUCTURE FOR, PERHAPS, THE LARGEST

3    SWISS BANK IN THE WORLD WORTH A TRILLION DOLLARS IN ASSETS, I

4    DEVELOPED THE INFRASTRUCTURE FOR THEIR WEBSITE.

5              THE COURT:  FOR UBS?

6              MR. ELVEY:  CREDIT SWISS.

7              THE COURT:  AND?

8              MR. ELVEY:  I DO HAVE SOME FAMILIARITY.

9              THE COURT:  DO THAT AS EMPLOYEE OR INDEPENDENT

10   CONTRACTOR?

11             MR. ELVEY:  I WAS A SUBCONTRACTOR.

12             THE COURT:  THAT WAS BEGINNING WHAT, ABOUT '99?

13             MR. ELVEY:  THAT WAS LITTLE LATER ON, YEAH, '99, 2000,

14   2001.

15             THE COURT:  ALL RIGHT.

16             MR. ELVEY:  I CAN SUBMIT A RESUME.

17             THE COURT:  PERHAPS -- YOU HAVE A RESUME WITH YOU?

18             MR. ELVEY:  I DO NOT.

19             THE COURT:  PERHAPS, MR. KAMBER SUBMIT THAT.

20             MR. KAMBER:  I WOULD BE HAPPY TO SUBMIT THAT.

21             MR. ELVEY:  I WOULD LIKE PERMISSION TO FILE THAT

22   MYSELF.

23             THE COURT:  WHAT IS THIS?

24             MR. ELVEY:  JUST SO I CAN ELECTRONIC FILE THINGS.  I

25   DON'T KNOW IF THAT'S THE WAY TO DO IT OR NOT.  I ALREADY SIGNED
```

1    UP WITH PACER, I ALREADY SIGNED UP WITH ECF.

2              **THE COURT:**  I SEE.  THIS IS ALREADY ON THE WEBSITE, IS

3    IT?

4              **THE CLERK:**  YES, THAT'S THE FORM HE HAS TO SUBMIT AND

5    THEN HE CAN BE ELECTRONIC COURT FILING USER.

6              **THE COURT:**  ALL RIGHT.  NO LONGER PRACTICING LAW I

7    HAVEN'T SEEN THAT BEFORE.

8              ALL RIGHT.  ANYWAY, SO YOU WORKED THEN CREDIT SWISS

9    FOR A WHILE AND THEN WHAT?

10             **MR. ELVEY:**  I WORKED -- WELL, I WORKING FOR COMPANY

11   CALLED FIND, SORRY, I WAS WORKING FOR ACCOMPANY CALLED SILICON

12   REEF (PHONETIC) WHO IS THE SUBCONTRACTOR FOR CREDIT SWISS.

13             THEN I'VE BEEN DOING MORE SMALL BUSINESS CONSULTING,

14   SO I HANDLED THE IT NEEDS, FOR EXAMPLE, OF ONE OF THE

15   WEALTHIEST FAMILY IN SAN FRANCISCO.  SO I HAVE ACCESS TO THEIR

16   FINANCIAL RECORDS, SECURITY NUMBERS, THAT SORT OF THING.

17             **THE COURT:**  YOU BEEN DOING THAT SINCE APPROXIMATELY

18   THE YEAR 2000?

19             **MR. ELVEY:**  MORE OR LESS THERE WAS A BUSINESS I WAS

20   INVOLVED IN WITH MY FATHER THE ELVEY PARTNERSHIP, WE STARTED A

21   VENTURE CAPITAL FUND I WAS INVOLVED WITH THAT.

22             **THE COURT:**  OKAY.

23             **MR. ELVEY:**  I WAS INVOLVED IN A COUPLE OF START UPS.

24             **THE COURT:**  ALL RIGHT.  WHAT ARE YOU DOING NOW?

25             **MR. ELVEY:**  INDEPENDENT CONSULTING STILL.

1          **THE COURT:**  IN THAT SAME FIELD?

2          **MR. ELVEY:**  YES, SO I HAVE SMALL INVESTMENT BANK AS A

3   CLIENT, THAT SORT OF THING.

4          **THE COURT:**  ALL RIGHT.  AND YOU LIVE HERE IN SAN

5   FRANCISCO?

6          **MR. ELVEY:**  YES.

7          **THE COURT:**  I BELIEVE YOU'RE THE ONLY CLASS

8   REPRESENTATIVE, ARE YOU NOT?

9          **MR. KAMBER:**  NO, YOUR HONOR, THERE ARE THREE CLASS

10  REPRESENTATIVES YOUR HONOR, THERE'S MR. ZIGLER, MR. GRIFFITH

11  AND MR. ELVEY.

12         **MR. ELVEY:**  I ALSO POINT OUT, I ACTUALLY FOUND MR. --

13  THE GADGET GUY, ONE OF THEM HAD BROUGHT HIM TO COUNSEL TO BE A

14  REPRESENTATIVE.

15         **THE COURT:**  THIS WAS -- WHO DID YOU FIND?

16         **MR. ELVEY:**  IT'S IN MY NOTES.

17         **MR. KAMBER:**  THE OWNER OF GADGET MR. GRIFFITHS.  THE

18  CONTENTION --

19         **THE COURT:**  I'M SORRY, JOEL GRIFFITH.  ALL RIGHT.

20         **MR. ELVEY:**  SO BASICALLY IN A SENSE IT WAS MY CASE, I

21  FOUND THE BREACH, I DID BUNCH OF LEGAL RESEARCH, I FOUND

22  COUNSEL WHO KIND OF CREDIBLE AND FOUND THE CLAIMS CREDIBLE.

23         **THE COURT:**  HOW DID YOU FIND MR. KAMBER?

24         **MR. ELVEY:**  I ACTUALLY FOUND IT AND I FOUND COLLEAGUE

25  THROUGH ETHAN PRESTON.

1        **THE COURT:**  YES.

2        **MR. ELVEY:**  MR. PRESTON HAD CONTACTED ME REGARDING

3    SOME THINGS I DONE ON THE INTERNET THAT HE THOUGHT I MIGHT HAVE

4    SOME INFORMATION ON ANOTHER CASE.  SO I KEPT HIS INFORMATION

5    AROUND.

6        **THE COURT:**  I SEE.  HAVE YOU BEEN DEPOSED IN THE CASE?

7        **MR. ELVEY:**  I SUBMITTED A, WHAT DO YOU CALL IT, A

8    TESTIMONY?

9        **THE COURT:**  A DECLARATION?

10        **MR. ELVEY:**  DECLARATION, YES.

11        **THE COURT:**  YOU HAVEN'T BEEN DEPOSED?

12        **MR. ELVEY:**  NO, I HAVE NOT.

13        **THE COURT:**  I SEE.  ALL RIGHT.  VERY WELL.  VERY

14    INTERESTING PROCEEDING.  THANK YOU, COUNSEL.

15        **MR. KAMBER:**  YOUR HONOR, I WILL SAY, I WOULD HAVE, HAD

16    I KNOWN OF THE PRESENTATION, I CERTAINLY WOULD HAVE PUT THE

17    COURT ON NOTICE.

18        I SHOULD FURTHER ADD NOT WANTING TO GET INTO A BIGGER

19    DISCUSSION, WE HAVE A GREAT DEAL OF RESPECT FOR MR ELVEY AND

20    HIS OPINION AND HIS CREDIBILITY IN THIS AREA AND CERTAINLY AS

21    OUR PAPERS SUBMIT HE WAS VERY IMPORTANT PART OF THIS CASE.

22        I THINK, WHAT'S ALL IMPORTANT TO UNDERSTAND, I HAD

23    NUMEROUS CONVERSATIONS WITH MR. ELVEY REGARDING THE SETTLEMENT.

24    MR. ELVEY SIGNED THE SETTLEMENT AGREEMENT, ALL THE PLAINTIFF'S

25    CLASS REPRESENTATIVES SIGNED THE SETTLEMENT AGREEMENT.

1          AT TIME MR. EVLEY HAD CONSISTENTLY BEEN IN FAVOR AND

2     IN SUPPORT OF ALL THE TERMS OF SETTLEMENT.  WHEN HE WAS DENIED

3     ACCESS TO THE DEPOSITION AN ATTORNEY'S EYES ONLY, I THINK, THAT

4     WAS A BIT OF A TURNING POINT.  I THINK, THAT HE WAS UPSET BY

5     THAT.

6          I THINK, IN MY PRACTICE IN DEALING WITH SECURITY

7     CASES, ET CETERA, DEFENDANTS REQUEST THEY WOULD ONLY DO THE

8     DEPOSITION AS ATTORNEY'S EYES ONLY, AND GIVEN THE DETAILS OF

9     THE SECURITY PROCEDURES I THOUGHT THAT THAT WAS THE

10    ALTERNATIVE, THAT WAS A FAIR ALTERNATIVE AND THAT CERTAINLY

11    JUDGMENT OF COUNSEL WAS THAT WE WOULD BE ABLE TO EVALUATE AND

12    STILL WORK WITH THE SETTLEMENT.

13         I THINK THAT MUCH OF WHAT MR. ELVEY HAS TO SAY WOULD

14    PROBABLY HAVE NOT BEEN THE CASE HAD HE HAD ACCESS TO THAT

15    INFORMATION.  BUT AS COUNSEL AND COUNSEL FOR THE CLASS WITH A

16    FIDUCIARY OBLIGATION TO THE CLASS, I THOUGHT THE RESPONSIBLE

17    THING TO DO WAS TO NOT -- WAS TO KEEP THAT DESIGNATED

18    ATTORNEY'S EYES ONLY.  ESPECIALLY AFTER DEFENDANTS REFUSED TO

19    SHARE THAT INFORMATION, THAT CERTAINLY WASN'T TO ME A

20    DISPOSITIVE ELEMENT OF THE PARTICULAR SETTLEMENT.

21         THE OTHER THING IS THERE MAY HAVE BEEN REBATE COUPONS

22    ON OCCASION FOR THIS SOFTWARE, IT IS NOT CONSIDERED AND IS IT

23    NOT A FREE PIECE OF SOFTWARE.  YOU CAN BUY THE SOFTWARE FOR THE

24    PRICE ON THE PURCHASE PRICE ON THE WEBSITE.  THE REBATE IS NOT

25    OFFERED.

1          THERE MAY BE TIMES WHERE REBATES ARE OFFERED, BUT THAT

2     GOES TO A BREAKAGE ISSUE.  THIS SOFTWARE IS AN IMPORTANT PIECE

3     OF THE SETTLEMENT, BY NO MEANS IS THE ONLY PIECE OF THE

4     SETTLEMENT.

5          **THE COURT:**  ALL RIGHT, COUNSEL.

6          **MR. ELVEY:**  CAN I ADDRESS THAT?

7          **MR. RUBIN:**  I THINK, IT'S MY TURN.  I DO JUST WANT TO

8     EXPLAIN THIS DEPOSITION, IT DID CONTAIN THE SPECIFIC DETAILS OF

9     TD AMERITRADE SECURITIES SYSTEMS WHICH WE THINK LIE AT HEART OF

10    OUR ABILITY TO PROTECT CUSTOMER INFORMATION.

11         SO THE DESIGNATION OF HIGHLY CONFIDENTIAL DIDN'T HAVE

12    ANYTHING TO DO WITH MR. EVLEY PARTICULAR, BUT ABOUT ANYTHING

13    OTHER THEN ATTORNEY'S EYES, OTHER OUTSIDE COUNSEL.

14         AND AS MR. KAMBER SAID SHARING WITH THE COURT IS A

15    DIFFERENT MATTER, BUT THESE ARE THE DETAIL ABOUT WHICH

16    DATABASES AND SYSTEMS WERE UNLAWFULLY INTRUSIVE AND I JUST

17    WANTED TO EXPLAIN.

18         **THE COURT:**  I UNDERSTAND ALREADY.  THANK YOU, COUNSEL.

19         **MR. KAMBER:**  THANK YOU.  THANK YOU, MR. EVLEY.

20         **MR. ELVEY:**  CAN I ADDRESS THAT?

21         **THE COURT:**  ADDRESS WHAT?

22         **MR. ELVEY:**  THE CHRONOLOGY OF EVENTS WILL SHOW THAT'S

23    NOT THE CASE IF I CAN PRESENT THEM.

24         **THE COURT:**  YES.

25         **MR. ELVEY:**  WHETHER OR NOT I SAW THAT DEPOSITION HAD

1    NOTHING TO DO WITH HOW I FEEL ABOUT THE SETTLEMENT.

2          **THE COURT:**  WELL, I DON'T THINK THAT REALLY IS, I

3    DON'T THINK THAT'S REALLY IMPORTANT.  WHAT DOES CONCERN ME,

4    OBVIOUSLY, ONE OF THE CLASS REPRESENTATIVES OPPOSES THE

5    SETTLEMENT.

6          **MR. RUBIN:**  IT WAS REPRESENTED TO US THAT OBVIOUSLY

7    MR. EVLEY SIGNED IT VOLUNTARILY AND FREELY AND ADOPTED THE

8    SETTLEMENT, SO THIS IS NEWS TO US.

9          **MR. KAMBER:**  IT NEWS TO US, HE SIGNED THE SETTLEMENT,

10   HE APPEARS AT THE CMC WITH YOUR HONOR A FEW WEEKS AGO, HE SAT

11   HERE WITH US SPEAKING, HE DID NOT INTERJECT WE SPOKE OF THE

12   SETTLEMENT AND PRESENTED HERE.

13         THIS IS FIRST I HEARD MR. EVLEY HAS ANY RESERVATION

14   REGARDING THE SETTLEMENT THAT WOULD MAKE HIM IN THE POSITION

15   NOT TO APPROVE IT.

16         **MR. ELVEY:**  I HAVE LOTS OF RECORDS THAT DISPUTES THAT.

17   I WAS THREATENED, YOUR HONOR.

18         **THE COURT:**  WELL, MAYBE I GIVE THIS MATTER SOME

19   THOUGHT.  YOU CAN CONSULT WITH ONE ANOTHER AND POSSIBLY IRON

20   SOME OF THESE PROBLEMS OUT.  IF NOT, WE'LL SIMPLY DEAL WITH

21   THEM ONE WAY OR THE OTHER.

22         THANK YOU VERY MUCH.

23

24               (PROCEEDINGS ADJOURNED.)

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 13TH DAY OF JUNE, 2008.


/S/  JAMES YEOMANS

_____

JAMES YEOMANS, CSR, RPR