1  Scott A. Kamber (*pro hac vice*)
   KAMBEREDELSON, LLC
2  11 Broadway, 22d Floor
   New York, NY 10004
3  (212) 920-3072

4  Ethan Preston (*pro hac vice*)
   KAMBEREDELSON, LLC
5  The Monadnock Building
   53 West Jackson, Suite 550
6  Chicago, IL 60604
   (312) 589-6370

7
   David C. Parisi (SBN 162248)
8  Suzanne Havens Beckman (SBN 188814)
   Parisi & Havens LLP
9  15233 Valleyheart Drive
   Sherman Oaks, CA 91403
10 (818) 990-1299

11 *Counsel for Plaintiffs*

12                    **UNITED STATES DISTRICT COURT**

                    **NORTHERN DISTRICT OF CALIFORNIA**
13

14 | **In re TD AMERITRADE** | Master File No. |
   | **ACCOUNTHOLDER LITIGATION** | |
15 | | C 07-2852 VRW |
   | | |
16 | **This Document Relates to: All Actions** | Class Action |
17 | | **PLAINTIFFS' RESPONSE TO THE** |
   | | **COURT'S JUNE 13, 2008 ORDER** |
   | | **AND FURTHER SUPPORT FOR** |
18 | | **PRELIMINARY APPROVAL OF** |
   | | **SETTLEMENT** |
19
20
21
22
23
24
25
26
27
28

1

2

# TABLE OF CONTENTS

3

I.     PLAINTIFF'S COUNSEL CAN DEMONSTRATE A BASIS FOR ITS FEE

4      REQUEST PRIOR TO FINAL APPROVAL .............................................................2

5

II.    THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS TO THE CLASS
       INDEPENDENT OF ITS SIGNIFICANT COST TO THE DEFENDANT..................5

6      A.     Remediating the Risk of Identify Theft.............................................................6
       B.     Combating Unwanted Spam..............................................................................9

7      C.     Remedying the Security Breach ......................................................................11

8

9

III.   THE PARTIES PREVIOUSLY DISCLOSED THE NUMBER OF OPT-OUTS THAT
       TRIGGERS AMERITRADE'S OPTION OF WITHDRAWING FROM THE

10     SETTLEMENT......................................................................................................11

11

12

IV.    TD AMERITRADE WILL DISCLOSE THE ACTUAL COST OF THE SPAM-
       BLOCKING SOFTWARE .....................................................................................12

13

14

V.     MR. ELVEY'S CONDUCT DEMONSTRATES THAT HIS INTERESTS ARE
       ADVERSE TO THE CLASS AND THAT CLASS COUNSEL SHOULD BE

15     PERMITTED TO WITHDRAW FROM HIS REPRESENTATION.........................12

16

17

VI.    PLAINTIFFS GRIFFITHS AND ZIGLER ARE ADEQUATE CLASS
       REPRESENTATIVES TO PROTECT THE INTERESTS OF THE CLASS .............16

18

VII.   CONCLUSION......................................................................................................17

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**United States Circuit Court Cases:**

*Armstrong v. Board of School Directors of City of Milwaukee,*
        616 F.2d 305, 314 (7th Cir. 1980)................................................................5

*Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003) .................................. 13 n. 10

*County of Suffolk v. Alcorn*, 907 F.2d 1295, 1325 (2d Cir. 1990) .........................14

*In re Rindlisbacker*, 225 B.R. 180, 183 (9th Cir. BAP 1998)..........................13 n.10

*Kincade v. General Tire and Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981).......................15

*Salinas v. Roadway Express Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) ....................................14

*Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003) .........................................15

*Stollenwerk v. Tri-West Health Care Alliance,*
        254 Fed. Appx. 664, 668 (9th Cir. 2007) ...........................................7

*Tipton-Whittingham v. City of L.A.*, 316 F.3d 1058, 1061-63 (9th Cir. 2003)..........................5

**United States District Court Cases:**

*Aclara Biosciences, Inc. v. Caliper Techs. Corp.*, No. 99-1968, 2001 WL 777083
        (N.D. Cal. June 16, 2000) ........................................................ 13 n. 10

*Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 170 (S.D. Ohio 1992) .................................7

*County of Suffolk v. Alcorn*, 710 F. Supp. 1428 (E.D.N.Y. 1989) .........................................14

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007) .................................4

*Heit v. Van Ochten*, 126 F. Supp. 2d 487, 494 (W.D. Mich. 2001) .......................................16

*In Re Chiron*, 2007 US Dist LEXIS 91140 (N.D. Cal 2007)..............................................4 n.4

*In re HPL Technologies Securities Litigation,*
        366 F. Supp. 2d 912 (N.D. Cal. 2005)..........................................................4 n.4

*In re Initial Public Offering Sec. Litig.,*
        226 F.R.D. 186, 197 n.63 (S.D.N.Y. 2005)..........................................6 n.5

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
　　962 F. Supp. 450, 558 (D.N.J. 1997)..........................................................6 n.5

*In re Tableware Antitrust Litig.*,
　　484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)...................................................5

*In re Western Union Money Transfer Litig.*, No. 01-335,
　　2005 WL 3709932, at *12 (E.D.N.Y. Oct. 29, 2004).....................................9

*Jaffe v. Morgan Stanley & Co., Inc.*, No. 06-3903,
　　2008 WL 346417, at *4-5 (N.D. Cal. Feb. 7, 2008)....................................15

*Maywalt v. Parker & Parsley Petroleum*,
　　864 F. Supp. 1422, 1430 (S.D.N.Y. 1994)...................................................15

*Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 612 (N.D. Cal. 2004).....................................16

*O'Keefe v. Mercedes-Benz United States, LLC*,
　　214 F.R.D. 266, 304 (M.D. Pa. 2003)........................................................6 n.5

*Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 938 (E.D. Mich. 2007).........................15-16

*Perovich v. Humphrey*, No. 97-3209,
　　1997 WL 674975, at *6 (N.D. Ill. Oct. 28, 1997)........................................14

*Rodriguez v. West Pub. Corp.*, No. 05-3222,
　　2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007)..................................15

*Shaw v. Toshiba America Infomation Systems*,
　　91 F. Supp. 2d 942, 960-61 (E.D. Tex. 2000)..............................................9

*Tardiff v. Knox County*, 247 F.R.D. 225, 229-30 (D. Me. 2008)..........................................14

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
　　209 F.R.D. 159, 165 (C.D. Cal. 2002).........................................................1

*Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981).........................................................14

**California Supreme Court Cases:**

*Arden v. State Bar of Cal.*, 52 Cal.2d 310, 320 (1959)...................................................13 n.10

*Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 101 P.3d 140 (2004)...........................4

**California Appellate Court Cases:**

*Cazares v. Saenz*, 256 Cal. Rptr. 209, 214 (4th Dist. 1989) .................................................... 4

**Statutes:**

Cal. Evid. Code § 958 (2008) ......................................................................... 13 n.10

Fed. R. Civ. P. 23(a)(4) (2008) ............................................................................. 16

Fed. R. Civ. P. 23(e)(2) (2008) .............................................................................. 5

**Miscellaneous:**

 Federal Trade Commission, 2006 Identity Theft Survey Report 3 (Nov. 2007), *at*

http://www.ftc.gov/os/ 2007/11/SynovateFinalReportIDTheft2006.pdf ...................... 6 n.5, 8

John K. Webb, Prosecuting Social Security Number Misuse: Attacking Identity Theft at its Source, 53 U.S. Att'ys Bull. 1, 1-2 (Jan. 2005), available at http://www.usdoj.gov/usao/eousa/foia_reading_room/ usab5301.pdf ................................... 6

Manual for Complex Litigation, § 21.642 16 (3d ed. 1995) ................................................ 15

Manual for Complex Litigation, § 30.41 (3d. ed. 1995) ...................................................... 5-6

*U.S. General Accounting Office, Identity Theft: Prevalence and Cost Appear to be Growing* 56 (GAO-02-363 2002) ................................................................. 8, 8 n.8

1

2

**INTRODUCTION**

3

4

   On June 13, 2008, this Court Ordered the Parties to disclose certain aspects regarding

5

the Settlement agreement.  Summarized with the corresponding numbering of the Court's

June 13th Order:[1]

6

7

   1.    Plaintiffs' counsel's lodestar at this time equals $701,884.50 at the prevailing

8

hourly rates of plaintiffs' counsel.  These rates are between those permitted by the Department

9

of Justice's Laffey Matrix ($574,125.97) and the adjusted Laffey Matrix ($821,796.07)

10

adopted by other courts. Because much work necessarily remains to be completed, this figure

11

is due to increase substantially as the settlement progresses, raising the possibility that a

12

lodestar cross-check at this time is premature.  Furthermore, attorney's fees in this case do not

13

hinge entirely on the settlement's benefits, and find further support under California law's

14

catalyst theory for the actions triggered by Plaintiffs having moved for preliminary injunction.

*See Infra* at I.

15

   2.    It is the understanding of plaintiffs' counsel that TD Ameritrade will respond to

16

the Court's request for insurance quotes as a valuation tool.  It is important to maintain an

17

appreciation, however, of the fact that the focus of preliminary approval asks whether the

18

settlement is, on the whole, fair, reasonable and adequate.  The instant settlement provides

19

substantial benefits to remedy identity theft, unwanted spam, and security breaches, while at

20

the same time accounting for the substantial risk inherent in litigation.  While Plaintiffs'

21

Counsel understands that the $6 million being paid to Trend Micro for software is only one

22

component of the overall cost of settlement to Ameritrade, the value to the Class is much

23

greater.  *See Infra* at II.

24

   3.    The Settlement's notice, which was provided to the Court as an exhibit to the

25

26

_____

[1] The summary set forth below draws upon the July 10, 2008 Declaration of Scott A. Kamber, a true and accurate copy of which is attached as Exhibit A.

27

28

1   preliminary approval papers, discloses that TD Ameritrade may withdraw from the settlement

2   if more than 400 opt outs are received.  (Dkt. 53-2, at 38.)  It was not the intention of the

3   parties to conceal this number from the Court or the class.  *See Infra* at III.

4       4.      The value of the spam-blocking software is substantial and the assertions made

5   at the hearing by Mr. Elvey were demonstrably baseless.  TD Ameritrade has indicated it will

6   disclose to the Court the actual cost of the spam-blocking software available to Class

7   members.  Plaintiffs have learned the cost of this component alone is in excess of $6 million.

8   Again, however, it is important to note that a settlement's benefits are not necessarily tied to

9   the cost to the Defendant. *See Infra* at IV.  The cost of obtaining this software by the members

10  of the class would be far greater thus providing an asymmetric benefit.

11      5.      Plaintiffs' counsel, both KamberEdelson and Parisi & Havens sought to obtain

12  the CV of Mr. Elvey.  Mr. Elvey has refused to provide the CV to counsel and asserts that he

13  will submit it to the court himself.  In response to the Court's request to clarify the

14  circumstances of Mr. Elvey's assent to the Settlement, Mr. Kamber has submitted his

15  declaration detailing the communications underlying the signing of the settlement agreement.

16  Never was Mr. Elvey threatened, or even pressured, in any manner.  When the settlement was

17  finally reached, Mr. Elvey was informed that counsel and the two other class representatives

18  believed that this settlement was in the best interests of the class and were committed to

19  moving forward to seek Court approval.  Mr. Elvey was advised of his legal rights if he did

20  not sign the settlement including his right to opt-out or object.  After the hearing, Mr. Elvey

21  told Plaintiffs' counsel that this advisement was the "threat" he had referenced in open Court.

22  It is not in dispute that Mr. Elvey signed the settlement agreement and emailed it to counsel.

23  After signing the Settlement Agreement, Mr. Elvey participated in the CMC, had breakfast

24  with Counsel, and exchanged several e-mails with counsel, yet never once indicated he did

25  not desire for the Settlement to be approved.  As detailed herein, the actions of Mr. Elvey in

26  the past two weeks have included actions that amount to a constructive discharge of counsel

27

28

by directly contacting defense counsel and making inaccurate representations to the Court

regarding the factual basis of his case.[2]  His instant Counsel respectfully requests leave of

Court to withdraw from representing him.  He has received the required notice of intent to

seek withdrawal as required by the local rules. *See Infra* at V.

6.    Finally, both Plaintiff Griffiths and Zigler meet the definition of adequate class

representatives and possess the attributes of "ideal" class representatives.  As is evident from

their declarations, they have closely followed the litigation, understand the Settlement's

benefits, and are ready to serve the best interests of the Class. Each is highly sophisticated:

Mr. Zigler as a well-known financial writer and Mr. Griffiths as a computer professional who

manages email security for a major corporation.  *See Infra* at VI.

I.    **PLAINTIFF'S COUNSEL CAN DEMONSTRATE A BASIS FOR ITS FEE
REQUEST PRIOR TO FINAL APPROVAL**

The Order states that plaintiffs' counsel has not established the basis for its fee request,

including substantiation that would permit the court to perform a lodestar cross-check.  (Order

at 2.)  As documented in the attached Declarations, the breakdown of the lodestar for

Plaintiffs' counsel is as follows:

| Attorney (Pos. – Firm) | Hours | Rate[3] |
|---|---|---|
| S. Kamber  (Mang. Member – KE) | 645.90 | $510.00 |
| A. Himmelfarb (Partner – KE) | 15.50 | $495.00 |

---

[2] Mr. Elvey has further demonstrated a hostility to the interests of the class by hiding web tracking bugs in emails to counsel.

[3] As demonstrated in the Declaration of Scott A. Kamber, Plaintiffs' counsel's lodestar falls in between the rates generated under the Department of Justice's Laffey Matrix and the adjusted Laffey Matrix (Kamber Decl. ¶ 7).  Under the Justice Dep't matrix, a multiplier of 3.27 would be necessary at this time, while the adjusted Laffey matrix would require a multiplier of 2.28. Plaintiffs do not waive any objections to the use of either Laffey Matrix, but merely refer to each as support for the reasonableness of counsel's current hourly rates.

| E. Preston (Partner – KE) | 731.30 | $395.00 |
|---|---|---|
| D. B. Rubin (Associate – KE) | 32.30 | $385.00 |
| S. Lezell (Associate –KE) | 51.40 | $300.00 |
| K. Alspach (Paralegal –KE) | 3.30 | $130.00 |
| D. Parisi (Partner – PH) | 80.9 | $450.00 |
| S.H. Beckman (Partner – PH) | 25.0 | $450.00 |

(Kamber Decl. ¶ 5 Ex. A; *see also* Declaration of D. Parisi, ¶¶3-4, a true and accurate copy of which is attached Exhibit B.)  The total lodestar of Plaintiffs' counsel through July 6, 2008 is $654,229.50 from KamberEdeson LLC plus $47,655 from Parisi & Havens LLP for a total of $701,884.50.  Hence, Plaintiffs' counsel's lodestar at this time only requires a multiplier of 2.67 to reach the maximum $1.875 million attorneys' fee provided by the Settlement[4].

The Court should take two other points into consideration when evaluating the attorneys' fees.  First, the Parties bargained the amount of fees in a mediation before a former Judge and reducing Plaintiffs' counsel's fee will not result in any additional corresponding benefit to the Class members.  *See Cazares v. Saenz*, 256 Cal. Rptr. 209, 214 (4th Dist. 1989) (where bargaining process is fair, courts defer to the parties' agreement as the best measure of the value of performance).  *See also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007).

Second, Plaintiffs' counsel's right to an attorneys' fee does not hinge entirely on the

---

[4]Plaintiffs' counsel has not yet put their fee request before the Court because the case is not yet complete. This is in contrast to the procedural posture in *In re HPL Technologies Securities Litigation*, 366 F.Supp.2d 912 (N.D. Cal. 2005), which concerned a fee request following final approval of a settlement. *See id*. at 913. Also, although the Settlement allows Plaintiffs' counsel to apply for a maximum of $1.875 million in fees, they have not yet come to the conclusion as to what amount will be requested. The figure above therefore understates the ultimate lodestar of Plaintiffs' counsel because the Settlement still requires both preliminary and final approval, but even at this juncture handily avoids the 8 -10 multiplier of concern in *In Re Chiron*, 2007 US Dist LEXIS 91140 (N.D. Cal 2007).

Settlement or the benefits it provides. California law recognizes the catalyst theory of attorneys' fees, under which a plaintiff may qualify for attorneys' fees where the plaintiff's litigation prompts the defendant to change its behavior. *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 101 P.3d 140 (2004). The Ninth Circuit defers to California law on whether attorneys' fees can be awarded under the catalyst theory with respect to claims under

California law. *See Tipton-Whittingham v. City of L.A.*, 316 F.3d 1058, 1061-63 (9th Cir. 2003).

It was Plaintiffs, not Ameritrade, who first discovered and disclosed the signs of a data breach. (Dkt. No. 11-2 ¶¶ 1-3.) The first action in this consolidated proceeding (No. 07-2852) was filed on May 31, 2007 and was later amended to include Mr. Griffiths' company. On July 10, 2007, the plaintiffs in the first action filed a motion for preliminary injunction and for class certification that sought, *inter alia*, relief requiring Ameritrade to alert its customer base of a potential security breach. On September 14, 2007 (two days after receiving a voluntary continuance on the motion for preliminary injunction), Ameritrade publicly disclosed the unauthorized access of its customer database at issue in this proceeding. On September 18, 2007, counsel deposed William Edwards, Ameritrade's Chief Security Officer. Immediately following that deposition's conclusion, the parties began settlement discussions. The second action in this proceeding (No. 07-4903 VRW) was filed on September 21, 2007.

Ameritrade took no action to disclose or correct the problem until *after* plaintiffs filed their complaint in May 2007 and *after* plaintiffs moved for a preliminary injunction in July 2007. Ameritrade failed to disclose the unauthorized database access until September 14, 2007. This is a sufficient showing to trigger an attorneys' fee award under the catalyst theory. Accordingly, even at this preliminary stage, Plaintiffs' counsel has already gone quite far in establishing their entitlement to the maximum fee award available under the Settlement.

**II.    THE SETTLEMENT CONFERS SUBSTANTIAL BENEFITS TO THE CLASS INDEPENDENT OF ITS SIGNIFICANT COST TO THE DEFENDANT**

The Court may approve a class action settlement when it is found to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  At this time, Plaintiffs seek preliminary—as opposed to final—approval, which is subject to a more relaxed standard of scrutiny.  *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980).  Notice of a settlement should be sent where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007). *Cf.* Manual for Complex Litigation, § 30.41 (3d. ed. 1995).  The Court ordered TD Ameritrade to provide insurance quotes to assist the Court's evaluation of the settlement's cost to the defendant, which it has done.  (See "Decl. of J. Bollman," a copy of which is attached to TD Ameritrade's submission.)   While the cost to the Defendant may be of some interest[5], Plaintiffs urge the adoption of the traditional analysis that asks whether under all circumstances the settlement is fair, reasonable and adequate.  Here, the Settlement falls well within the range of possible approval as each of its benefits has been carefully tailored to remedy a specific injury alleged in this action.

---

[5] See *O'Keefe v. Mercedes-Benz United States, LLC*, 214 F.R.D. 266, 304 (M.D. Pa. 2003) (settlements should be valued according to their "benefit to the class and not the cost to the defendant," quoting, *e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 558 (D.N.J. 1997) ("[t]he cost of the relief to [the defendant] is not the measure of class member benefit . . .[t]he value of the relief to the Class . . . is what matters," quoted by *In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 197 n.63 (S.D.N.Y. 2005)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Remediating the Risk of Identify Theft

Foremost, the Settlement addresses identity theft— the fraudulent use of the victims' credentials to set up some kind of account (whether financial or not) and incur a corresponding debt.[6]  *See* John K. Webb, *Prosecuting Social Security Number Misuse: Attacking Identity Theft at its Source*, 53 U.S. Att'ys Bull. 1, 1-2 (Jan. 2005), available at http://www.usdoj.gov/usao/eousa/foia_reading_room/usab5301.pdf.  The theft of social security numbers (along with corresponding names and birth dates) creates the risk of identity theft.  Although it is possible that accountholders' sensitive information was not downloaded during the TD Ameritrade security breach, compromised computers cannot provide reliable evidence, meaning neither Ameritrade nor Plaintiffs can know for certain whether its accountholders' personal information was compromised.

The Settlement provides Class members a mechanism to detect and prove that Ameritrade's security breach caused their identity theft losses.  (Settlement ¶¶ IV.A.5, IV.A.6.)  Establishing a causal link between identity theft damages and the instant security breach presents certain burdens, especially in a class proceeding.  Absent the settlement, Class members would have to demonstrate that the security breach at TD Ameritrade, as opposed to some other source, was the source of the credentials used in each claimed identity theft loss.  Thus, Class members would be forced to prove causation by demonstrating that they have not otherwise exposed their personal information to any other party, that they take security measures to prevent identity theft, and have not otherwise suffered identity theft.  *See Stollenwerk v. Tri-West Health Care Alliance*, 254 Fed.Appx. 664, 668 (9th Cir. 2007).

---

[6] The ambient risk of identity theft is substantial – approximately 3.7 percent of the adult population suffered some form of identity theft (including 0.8 percent attributable to the "new account" fraud which typifies misuse of Social Security Numbers). Federal Trade Commission, 2006 Identity Theft Survey Report 3 (Nov. 2007), *at* http://www.ftc.gov/os/2007/11/SynovateFinalReportIDTheft2006.pdf.

The instant Settlement eliminates these burdens by giving Class members access to ID Analytics' services.  (Settlement ¶¶ IV.A.5, IV.A.6.)  "ID Analytics is a leading provider of identity intelligence software and services to Fortune 1000 companies….[who] use ID Analytics…to assess the identity risk of potential customers so they can make more accurate business decisions."  (See "Decl. of M. Cook," a copy of which is attached as an exhibit to TD Ameritrade's submission.)  As part of the Settlement, ID Analytics will identify any Class members whose "information may have been subject to organized misuse" "involving data contained in the Company's database that was the subject of the incident reported to Settlement Class Members by the Company on September 14, 2007."[7]  (Settlement ¶¶ IV.A.5, IV.A.6.)  In exchange, Class members release only "identity theft claim[s] included as part of or in a class, mass or any other type of collective action [but not] any claim for identity theft commenced and maintained by a [Class member] only on that [Class member's] individual behalf." (Settlement ¶¶ I.W, IV.B.2.) *Cf. Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 170 (S.D. Ohio 1992) (approving settlement providing payment for psychological consultation in exchange for limited release of emotional distress claims, but otherwise preserving class claims).

    If ID Analytics identifies a causal link to the security breach, the Settlement further provides redress for the costs of identity theft.  Affected Class members will receive "dedicated customer support assistance trained to help remediate any harm from any identity theft." (Settlement ¶ IV.A.7(a).)  This is valuable because identity theft victims' losses, especially the time associated with remediating the identity theft, are very often nonmonetary. *U.S. General Accounting Office, Identity Theft: Prevalence and Cost Appear to be Growing* 56 (GAO-02-363 2002); *see also* 2006 Identity Theft Survey Report at 37-39 (discussing large

---

[7] TD Ameritrade has indicated that since the initial filing of preliminary approval papers, it has agreed to have ID Analytics to perform an extra inspection on behalf of class members in addition to the inspections already performed under the Settlement Agreement.

1    percentages of victims having reported no monetary loss); *see* Zigler Decl. ¶¶18-19, a true and

2    accurate copy of which is attached as Exhibit C.  Given the general absence of monetary

3    losses, providing dedicated and trained customer assistance is a more direct and efficient way

4    of remedying these damages than monetary compensation.

5         Additionally, in the instances where a Class member suffered monetary losses, the

6    Settlement affords Class members a claims procedure for seeking redress.[8]  TD Ameritrade

7    must provide "reasonable" offers of compensation to Class members who submit a claim.

8    (Settlement ¶ IV.A.7(b) (c)), with the Court retaining jurisdiction to ensure the reasonableness

9    of such offers.  Further, Class members retain their right to bring individual arbitration claims

10   under the FINRA regulations irrespective of whether they receive an offer from TD

11   Ameritrade.  (Settlement ¶ IV.A.7(d).)   Where ID Analytics demonstrates causation, Class

12   members need only prove their damages on their identity theft claim.  As the identity theft

13   damages attributable to the TD Ameritrade security breach will vary from Class member to

14   Class member, Class members' individual damages will be resolved on an individual basis.

15   The FINRA arbitration process is better suited for this type of claims resolution–the process

16   does not require the hiring of attorneys and the filing fees are equivalent to or lower than most

17   court fees.  Thus, the Settlement provides a net gain to Class members.

18

19

20

21

22

23

---

24   [8] Identity theft victims' cash expenses for remediating their losses are relatively small,
     because they are generally not held liable for fraudulent debts. *See* 2006 Identity Theft Survey
25   Report at 37 (in most expensive category of identity theft, 75 percent of victims reported
     monetary loss under $1,000); *Identity Theft: Prevalence and Cost Appear to be Growing*, 56-
26   57 (only 2.8 percent of identity theft victims reported monetary losses in study, and 1.9
     percent of victims reported losses under $1,000).

27

28

### B.    Combating Unwanted Spam

The Settlement provides Class members with security software, Trend Micro Internet Security Pro, which reduces the risk of spam, viruses, and other security threats.  (Settlement ¶ IV.A.4.)[9]  The security breach in TD Ameritrade's systems was ultimately traced to stock-touting spam sent to the Class members:  this spam caused a variety of noneconomic harms, including "lost time required to sort, read, discard and attempt to prevent future Traced Spam, and lost storage space, internet connectivity, and computing resources on the personal computers on which they received the Traced Spam."  (No. 07-2852 Am. Compl. ¶¶ 62, 67, 75; No. 07-4903 Compl. ¶¶ 47, 52, 64, 72 80.)

The non-cash nature of the Settlement's software component is an adequate remedy for the noneconomic injuries associated with the spam.  *Cf.*, *e.g.*, *Shaw v. Toshiba America Infomation Systems*, 91 F.Supp.2d 942, 960-61 (E.D. Tex. 2000) (in-kind benefits which provide economic value to class members are appropriate for class action settlements).  The Settlement's software component has the "attributes of a well-designed, valuable [in-kind] settlement", (1) the Settlement provides Class members a product which they "are likely to purchase even without" the Settlement (*see* Zigler Decl. ¶17), (2) the software "is readily available and does not have idiosyncratic features that make it a poor substitute" for other security software, (3) the Settlement provides identifiers which can be used to obtain the software "immediately upon receipt," (4) the Settlement does not limit the time in which the software can be obtained through the identifiers, and (5) the software can be transferred.  *Cf. In re Western Union Money Transfer Litig.*, No. 01-335, 2005 WL 3709932, at *12 (E.D.N.Y. Oct. 29, 2004) (discussing elements of useful in-kind class benefits).

At the June 12 hearing, Mr. Elvey asserted that the business model of the software's

---

[9] Since the initial filing of the preliminary approval papers, TD Ameritrade has agreed to make comparable software available to users of Apple Macintosh based systems as well as to PC users.

publisher was to distribute the software freely (with the expectation that some of customers

would pay to renew the software).  (Dkt. No. 62, at 42:3-7.)  <u>This assertion is false</u>.  TD

Ameritrades has filed a declaration from Trend Micro that demonstrates the software is not

freely distributed, that Trend Micro actually sells this software for $69.95 on its website

(Parisi Decl. ¶9), and that while it is possible for individual retailers to fund rebates as a loss-

leader, Trend Micro does not fund such programs.  Moreover, Plaintiffs' counsel has found

the following evidence on the value of the Trend Micro Internet Security Pro software:

- Frys.com sells a three user edition for $69.99, or $9.99, depending on whether a rebate is available.  A rebate was not available on June 13, 2008, but was available on June 26, 2008.  (Parisi Decl. ¶6, Exhs. 2 & 3);
- Newegg.com sells a three user edition of the software for between $57.99 and $59.99 (Parisi Decl. ¶7, Exh. 4);
- Amazon.com sells a three-user edition of the software for $59.99 and $52.00 (Parisi Decl. ¶9, Exh. 5) (the non-pro version sells for $39.99).

Evidence from the resale market for this software on eBay suggests the software's resale

value is around $20.00.  (Parisi Decl. ¶10, Exh. 6.) (See also Decl. of W. Thomas, ¶¶6-8, a

copy of which is attached as an exhibit to TD Ameritrade's submission.)

It is likely that TD Ameritrade used volume and single payment as a means to

negotiate a substantial discount when acquiring this software.  Even still, the cost of the

software to TD Ameritrade is expected to exceed $6 million.  (See W. Thomas Decl. ¶11.)

This is an excellent example of an asymmetric benefit from a settlement:  the value of the

software to the Class is much higher than the cost to the defendant.  If one discounts the

software's resale value (approximately $20 minimum) by half to account for the costs of

selling the software, the value of the software is $10 per Class member.  As more than 6

million Class members may ultimately benefit from the Settlement, the resale value of the

Settlement's software component could exceed $60 million.  Simply put, the distribution of

this software will provide a substantial benefit to the Class by protecting members from the

harms associated with spam at a significant expense to the Defendant.

1

2

### C.     Remedying the Security Breach

The Settlement requires TD Ameritrade to take remedial steps to address the security breach by "retain[ing] independent experts to conduct bi-annual penetration tests" through the end of 2009, and to remediate any material vulnerabilities that may be discovered. (Settlement ¶ IV.A.2.)  This will help identify vulnerabilities that might lead to future security breaches, as well as existing security breaches.  In addition, TD Ameritrade agrees to perform account seeding—inputting fictitious personal information into its own database through the end of 2008. (Settlement ¶ IV.A.3.)  This will help TD Ameritrade detect future security breaches that expose its accountholders' personal information.  Because TD Ameritrade's commitment to account seeding is public, it will also help deter such security breaches. It is Plaintiffs' understanding that TD Ameritrade will submit further details regarding remediation of the security breach.

Accordingly, this Court should hesitate to focus on the cost to the Defendant as a basis for valuating the Settlement.  Given the factual and procedural issues, the settlement surely bestows fair, reasonable and adequate benefits on the Class.  At the same time, the costs to TD Ameritrade have been shown in any case to be substantial, thereby further warranting the entry of preliminary approval and the dissemination of Class Notice.

### III.    THE PARTIES PREVIOUSLY DISCLOSED THE NUMBER OF OPT-OUTS THAT TRIGGERS AMERITRADE'S OPTION OF WITHDRAWING FROM THE SETTLEMENT

The Order states that the Settlement provides TD Ameritrade the right to cancel the Settlement if the number of Class members who opt-out exceeds a "magic" number. Following the Settlement's execution, the parties concluded that this number should be disclosed publicly.  Page five of the Settlement's full notice, which was attached as an exhibit to the Plaintiffs' preliminary approval papers, states: "If more than 400 class members submit requests for exclusion, the Company will have the option of withdrawing from the

settlement." (Dkt. 53-2, at 38.)  Accordingly, there is no need for an *in camera* review of this figure as it has been previously disclosed to the Court in a publicly filed document and will ultimately be sent to the Class if the Settlement is granted preliminary approval.

## IV.  TD AMERITRADE WILL DISCLOSE THE ACTUAL COST OF THE SPAM-BLOCKING SOFTWARE

Plaintiffs have been given an estimate that the cost of the software will exceed $6 million.  *See* discussion II(B), *supra*.  (Decl. W. Thomas ¶11.)  Furthermore, the assertion by Mr. Elvey that the software is generally available for free is demonstrably false.  (Decl. W. Thomas ¶8.)  According to Trend Micro's Director of North American Sales, one of Trend Micro's retailers had in the past dropped the software's price to consumers to equal that of the rebate, but generally the price of the software ranges from $49.99 to $79.99 notwithstanding limited rebate periods.  (Decl. W. Thomas ¶¶6-8.)  Plaintiffs' counsel understands that TD Ameritrade cannot disclose the cost of the ID Analytics component of the settlement due to confidentiality obligations.

## V.  MR. ELVEY'S CONDUCT DEMONSTRATES THAT HIS INTERESTS ARE ADVERSE TO THE CLASS AND THAT CLASS COUNSEL SHOULD BE PERMITTED TO WITHDRAW FROM HIS REPRESENTATION

The Order's fifth directive asks Plaintiff's counsel to provide Mr. Elvey's CV to the Court, along with a clarification by counsel of the Mr. Elvey's statements to the Court. Regrettably, Mr. Elvey has created a conflict between his interests and those of the Class.  He has restricted communication with his counsel, has failed to respond to his attorneys' (and Mr. Parisi's) requests for his CV (Kamber Decl. ¶28), has compromised his communications with counsel by hiding surreptitious computer code in his email, and has sought to further undermine the settlement by seeking to directly contact Defendant's counsel.  (Kamber Decl. ¶29.)  It is with great regret that plaintiffs' counsel must conclude that Mr. Elvey has not been forthright with Plaintiffs' Counsel or this Court.  (Kamber Decl. ¶30.)  While Mr. Elvey served admirably as an engaged class plaintiff for much of the case, his recent actions

1   demonstrate that he has now placed his own idiosyncratic views and personal agenda above

2   his fiduciary duties to absent Class members.

3       The underlying details are set forth in the accompanying declaration of Scott A.

4   Kamber.[10]  In summary:

5   • Mr. Elvey explained to counsel after the hearing that "threatened" meant he was
      informed the settlement could proceed without his signature.  (Kamber Decl. ¶27.)
6

7   • Plaintiffs' Counsel informed Mr. Elvey of his legal rights including his right to
      object or opt out. Counsel also made clear that as fiduciary to the class, counsel
8     believed settlement was in best interests of class as a whole.  (Kamber Decl. ¶22.)

9   • For reasons unknown, counsel were informed that Mr. Elvey attempted to contact
      the Court on an ex parte basis despite warnings and instructions from the clerk not
10    to do so.  (Kamber Decl. ¶¶19-20.)

11
    • Mr. Elvey signed the settlement agreement and on May 27, 2008, returned it to his
12    counsel.  (Kamber Decl. ¶24.)

13  • Mr. Elvey attended the Case Management Conference on May 29, 2008, appeared
      before the court, asked questions of the Court and did not state any reservations
14    about the settlement when discussing the matter with the Court.  (Kamber Decl.
      ¶25.)
15

16  • Mr. Elvey informed counsel that he would likely not attend preliminary approval
      hearing on June 12, 2008.  (Kamber Decl. ¶26.)
17

18  • Mr. Elvey is unwilling to engage in dialogue at this point and has contacted
      defense counsel in an attempt to change the settlement terms.  (Kamber Decl. ¶29.)
19    Mr. Elvey has also refused to discuss he concerns about the settlement with Mr.

20  _____

21  [10] Facts are disclosed here only to the extent required to rebut allegations of attorney wrong-
    doing. "[T]here is no privilege . . . as to a communication relevant to an issue of breach, by the
22  lawyer or by the client, of a duty arising out of the lawyer-client relationship." Cal. Evid. Code
    § 958 (2008).  "[A]ttorney[s] [are] released from the obligations of secrecy when the disclosure
23  of communications, otherwise privileged, becomes necessary to the protection of the attorney's
    own rights, such as when the attorney's integrity, good faith, authority or performance of duties
24  is questioned." *In re Rindlisbacher*, 225 B.R. 180, 183 (9th Cir. BAP 1998) (quoting *Arden v.
    State Bar of Cal.*, 52 Cal.2d 310, 320, 341 P.2d 6 (1959)); *see also Aclara Biosciences, Inc. v.
25  Caliper Techs. Corp.*, No. 99-1968, 2001 WL 777083, at *11 (N.D. Cal. June 16, 2000);
    *Bittaker v. Woodford*, 331 F.3d 715, 718 (9th Cir. 2003) (describing "fairness principle"
26  exception to attorney-client privilege).

27

Parisi, counsel for class representative Zigler.  (Parisi Decl. ¶12-14.)

- Mr. Elvey incorrectly stated to this Court that the Settlement fails to take into consideration data from Professor Chris Hoffnagel finding over 2,000 identity thefts related to TD Ameritrade.  (June 12, 2008 transcript, 41:4-8.)  Professor Hoffnagel submits herewith a Declaration that Mr. Elvey's statement to the Court is "not supported by the data"  (Decl. of C. Hoffnagel, ¶4, a true and accurate copy of which is attached as Exhibit D).

- Mr. Elvey further stated to the Court that the Trend Micro product is freeware that has no economic value.  Again Mr. Elvey is mistaken and his claim is rebutted in detail.  *Infra* at IIb.

- Mr. Elvey further stated to the Court that he is a computer consultant who seeks free-lance work writing software for banks.  While his motives are irrelevant, it is worth noting that he chose to meet with reporters outside the courtroom immediately after the preliminary approval hearing and refused to meet with his counsel.  (Kamber Decl. ¶ 14.)

- Pursuant to Local Rule 11-5, Mr. Elvey has been provided written notice that KamberEdelson is withdrawing as his counsel and will continue to send him any documents served on counsel in this case to his address until he 1) obtains new counsel or 2) enters and appearance himself.  (Kamber Decl. ¶ 30.)

"A class representative must always put the interest of the class ahead of her personal interest [,] is a fiduciary for the class [and] has a duty of loyalty to the putative class." *Tardiff v. Knox County*, 247 F.R.D. 225, 229-30 (D. Me. 2008) (class representative may not renege enforceable class action settlement).  Where a class representative brings a lawsuit "on principle," and "refuse[s] to accept a beneficial . . . settlement offer [unless] defendants . . . show[ed] a certain degree of contrition for their acts," the class representative may be atypical (and therefore, an inadequate representative) of the class.  *Perovich v. Humphrey*, No. 97-3209, 1997 WL 674975, at *6 (N.D. Ill. Oct. 28, 1997); *see also County of Suffolk v. Alcorn*, 710 F. Supp. 1428 (E.D.N.Y. 1989), *aff'd in relevant part*, 907 F.2d 1295, 1325 (2d Cir. 1990).  "[A] class can be as easily injured by the rejection of a favorable settlement as by the acceptance of an unfavorable settlement." *Watson v. Ray*, 90 F.R.D. 143, 146 (S.D. Iowa 1981); *see also Salinas v. Roadway Express Inc.*, 802 F.2d 787, 790 (5th Cir. 1986) (a

compromise cannot possibly satisfy every class member's particular desires; rather, the decree must embody the best settlement available to the class as a whole).

Mr. Elvey's current litigation goals ignore his counsel's evaluation of the risks of litigation and fail to place the appropriate value on the benefits that the Settlement provides. Although Mr. Elvey may very well understand how the terms could be improved, such a greater value was not agreed to by TD Ameritrade and ignores established legal principles. In presenting his position to the Court, Mr. Elvey emphasized his undergraduate degree and work history in networking, as well as his relatives' business relationships. Mr. Elvey's background simply does not provide a basis for an independent understanding of the litigation risks against which the Settlement's benefits must be balanced. Nor are his own professional credentials superior to that of the other class representatives who enthusiastically advocate for preliminary approval. *See Supra* at VI.

To be sure, Mr. Elvey's status as a named representative does not provide him "an automatic veto over the [Settlement.]" *Rodriguez v. West Pub. Corp.*, No. 05-3222, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007) (*quoting Maywalt v. Parker & Parsley Petroleum*, 864 F. Supp. 1422, 1430 (S.D.N.Y. 1994)) (punctuation and other citations omtted). Indeed, where "class representatives have placed individual interests ahead of the class's and impeded a settlement that is advantageous to the class as a whole, the judge may "remov[e] the class representatives." Manual for Complex Litigation § 21.642. *See also Tardiff*, 247 F.R.D. at 230; *Jaffe v. Morgan Stanley & Co., Inc.*, No. 06-3903, 2008 WL 346417, at *4-5 (N.D. Cal. Feb. 7, 2008) (post-certification substitution of class representative); *Olden v. LaFarge Corp.*, 472 F. Supp. 2d 922, 938 (E.D. Mich. 2007) ("[i]f the named class representatives object to a settlement recommended by class counsel that the court otherwise finds in the better interests of the class as a whole, then class counsel cannot continue to represent that party and the class representatives ought to be replaced.")

Finally, Mr. Elvey's actions have created an irreconcilable conflict between his

individual interests and the undersigned counsel's duties to the Class. "Because the 'client' in a class action consists of numerous unnamed class members as well as the class representatives, and because the class itself often speaks in several voices, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole." *Olden*, 472 F. Supp. 2d at 932 (quoting *Kincade v. General Tire and Rubber Co.*, 635 F.2d 501, 508 (5th Cir. 1981)); *see also Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). Where counsel believes that a proposed class settlement is in the class's interest, and the named representative does not support the settlement, the resulting conflict typically requires counsel to withdraw from representing the named representative. *Olden*, 472 F. Supp. 2d at 937-98; *Heit v. Van Ochten*, 126 F. Supp. 2d 487, 494 (W.D. Mich. 2001). Thus, this Court should grant Plaintiffs' counsel leave to withdraw from representation of Mr. Elvey. Mr. Elvey has been notified under the local rules of Counsel's intent to withdraw.

## VI.  PLAINTIFFS GRIFFITHS AND ZIGLER ARE ADEQUATE CLASS REPRESENTATIVES TO PROTECT THE INTERESTS OF THE CLASS

In response to the Order's final directive, Plaintiff Joel Griffiths is a Senior Linux Engineer at a major domain name registrar. (Griffiths Decl. ¶4, a true and accurate copy of which is attached as Exhibit E.) Brad Zigler is a noted financial writer who developed a prominent stock index and writes and speaks on commodities. (Zigler Decl. ¶¶3-8.). Each of these plaintiffs was kept fully informed of the case by Counsel and supports the Settlement agreement. (Griffiths Decl. ¶¶9-12; Zigler Decl. ¶¶ 13; 15-20.).

The Plaintiffs are adequate class representatives under Rule 23(a)(4). More significantly, both of these representatives are intimately familiar with the facts of the case. (Griffiths Decl. ¶¶9-12; Zigler Decl. ¶¶13; 15-16.) Mr. Zigler was so concerned with the issues raised by this lawsuit that, once he learned of the suit, he sought counsel and asked to be directly involved in the litigation. (Zigler Decl. ¶11.) Mr. Griffiths sought out counsel

after he determined that Ameritrade leaked his email address. (Griffiths Decl. ¶ 8.) Further, these Plaintiffs were informed of the negotiations leading up to the Settlement and have personally reviewed and approved it. (Griffiths Decl. ¶¶9-12; Zigler Decl. ¶15; 20.)

> The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim, and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case. . . . It is not necessary that a representative be intimately familiar with every factual and legal issue in the case; rather, it is enough that the representative understand the gravamen of the claim.

*Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 612 (N.D. Cal. 2004) (citations and punctuation marks omitted); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 165 (C.D. Cal. 2002) (plaintiffs who "have at least a rudimentary understanding of the nature of the present action and . . . have a demonstrated willingness to assist counsel in the prosecution of the litigation" were adequate). Both Mr. Griffiths and Mr. Zigler surpass the requirements of this standard and have not demonstrated any interest antagonistic to that of the Class as a whole.

## VII.    CONCLUSION

The parties have used their best efforts to thoroughly respond to each directive contained in this Court's order denying preliminary approval. Plaintiffs' counsel has shown a basis for attorneys' fees and will continue to do so through final approval. Further, the Settlement provides the Class members with fair, reasonable, and adequate compensation for their claims. Although the cost to the Defendant is not to be considered the lynchpin of the analysis, it has been disclosed that the cost here to TD Ameritrade will be substantial. Additionally, the Court, and ultimately the Class, has been apprised of the number of opt outs required to trigger cancellation (401).

Mr. Elvey was never threatened in any way to agree to the settlement but his recent actions have demonstrated an antagonism to the interests of the Class as a whole. Conversely, Plaintiffs Griffiths and Zigler enthusiastically support the settlement and have been

1  demonstrated to be adequate representatives whose interests are aligned with the Class.

2      Plaintiffs have come before this Court with a settlement worthy of the consideration of

3  the class.  All legal requirements have now been met and each of the elements of this Court's

4  Order of June 13, 2008, have been satisfied.  Thus, Plaintiffs' respectfully request that this

5  settlement be granted preliminary approval.

6  Date: July 10, 2008                    By: /s/ Scott A. Kamber

7

8                                         Scott A. Kamber (*pro hac vice*)
                                          KAMBEREDELSON, LLC
                                          11 Broadway, 22d Floor
9                                         New York, NY 10004
                                          (212) 920-3072

10
                                          Ethan Preston (*pro hac vice*)
11                                        KAMBEREDELSON, LLC
                                          53 West Jackson, Suite 550
12                                        Chicago, IL 60604
                                          (312) 589-6370

13
                                          David C. Parisi
14                                        Suzanne Havens Beckman
                                          Parisi & Havens LLP
15                                        15233 Valleyheart Drive
                                          Sherman Oaks, CA 91403

16                                        *Counsel for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28