# EXHIBIT A

Ethan Preston (*pro hac vice*)
KAMBEREDELSON, LLC
The Monadnock Building
53 West Jackson, Suite 550
Chicago, IL 60604
(312) 589-6370
epreston@kamberedelson.com

Scott A. Kamber (*pro hac vice*)
KAMBEREDELSON, LLC
11 Broadway, 22d Floor
New York, NY 10004
(212) 920-3072
skamber@kamberedelson.com

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
(818) 990-1299
dcparisi@parisihavens.com
shavens@parisihavens.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re TD AMERITRADE ACCOUNTHOLDER LITIGATION** | Master File No.<br><br>C 07-2852 VRW |
| **This Document Relates to: All Actions** | Class Action<br><br>**DECLARATION OF SCOTT A. KAMBER IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE COURT'S JUNE 13, 2008 ORDER** |

## DECLARATION OF SCOTT A. KAMBER

I, Scott A. Kamber, hereby declare as follows:

1. My name is Scott A. Kamber. I am a member of the law firm of KamberEdelson, LLC.

2. I am one of attorneys proposed as lead counsel in the motion filed with the Court which seeks preliminary approval of the settlement in the above-captioned litigation. I make this declaration in direct response to the Court's Order (the "Order") of June 13, 2008 and in further support of plaintiffs' motion for preliminary approval of the settlement and for approval of their application for fees and expenses. I actively participated in all aspects of this litigation, including negotiation of the settlement, and am fully familiar with the proceedings being resolved. If called upon, I am competent to testify that the following facts are true and correct to the best of my knowledge.

3. Based on my knowledge of the case, and my experience in litigating class action lawsuits, it is my opinion that the settlement is fair, reasonable and adequate, and should be approved by this Court. Some of the factors I considered in coming to this conclusion include: the benefits to the class, the timing of relief, and the risk and expense of continued litigation.

4. I have structured this declaration to conform with the six questions presented by the Court in its June 13, 2008 Order.

### QUESTION 1—INFORMATION FOR HOURS AND LODESTAR OF COUNSEL

5. As of July 2, 2008, the total number of attorney hours spent on this case by my law firm was 1,479.70. The following attorneys worked on this case:

| Attorney | Hours | Rate |
|---|---|---|
| Scott A. Kamber (Mang. Member) | 645.90 | $510.00 |
| Alan Himmelfarb (Partner) | 15.50 | $495.00 |
| Ethan Preston (Partner) | 731.30 | $395.00 |

| Dana B. Rubin (Associate) | 32.30 | $385.00 |
| Steven Lezell (Associate) | 51.40 | $300.00 |
| Kris Alspach (Paralegal) | 3.30 | $130.00 |

6.  The rates reflected above are the prevailing rates used at KamberEdelson, LLC. They are the same rates that are used for hourly matters that may be undertaken at the Firm. Based on these rates, the lodestar amount for attorney time based on my law firm's current rates was $654,229.50. The lodestar figure is based on my professional billing rate that my firm charges, which I believe to be commensurate with the market rates for attorneys of my experience and ability. Expenses are accounted for and billed separately and are not duplicated in our professional billing rates. A short firm biography of KamberEdelson, LLC was submitted with the papers in support of preliminary approval of the settlement.

7.  I have reviewed several of this Court's prior rulings on the award of attorneys' fees, including *In re Chiron*, and I understand this Court often reviews the lodestar based on the hourly rate for attorneys provided by the current iteration of the Laffey Matrix, adjusted for geographic market area. To compare our standard rates, I have sought to calculate the lodestar for my firm based on both the version of the Laffey Matrix published by the US Department of Justice as well as the adjusted Laffey Matrix calculated and distributed on the website Laffeymatrix.com[1] (last visited June 26, 2008). According to my rough calculation, my firm's lodestar based on the DOJ Matrix for 2007 (and adjusted for NY) would be approximately $530,925.12 and the lodestar based on the adjusted Laffey Matrix would be approximately $762,422.18. My firm's present lodestar of $654,229.50 falls squarely in between these values. See Laffey Chart, attached as Exhibit 2.

---

[1] Laffeymatrix.com is updated by Michael Kavanaugh, an economist whose *adjusted* Laffey Matrix is based on data gathered more recently than that used by the Department of Justice. *McDowell v. District of Columbia*, Civ. A. No. 00-594 (RCL), 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001) *citing Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13 (D.D.C. 2000). A copy of the adjusted Laffey Matrix is attached as Exhibit 1.

8. If the settlement is granted preliminary approval, I expect that my Firm will devote substantial additional time and resources to this matter prior to final approval, especially with respect to the final approval papers and my firm's responding to inquiries of class members.

9. Throughout my involvement in this case, I did my part in ensuring that the tasks necessary to prosecute this case were allocated among the attorneys in my office and were conducted efficiently, without undue duplication of effort, and at minimal expenses. Not being paid by the hour, plaintiffs' counsel in this case had an incentive to conduct their efforts efficiently. So too, being responsible for advancing all expenses, plaintiffs' counsel had an incentive not to expend funds unnecessarily.

**QUESTION 2—VALUATION INFORMATION AND INSURABILITY OF RISK**

10. This was a question directed to TD Ameritrade and it is my understanding that responsive information will be provided by defendant as part of its submission.

11. It is my understanding upon information and belief that TD Ameritrade's cost associated with this settlement are well in excess of the $6 million paid to Trend Micro. Considering an undisclosed cost of ID Analytics as well as costs to comply with enhanced security, I believe that the total costs of this settlement will approach $10 million.

**QUESTION 3—DISCLOSURE OF OPT-OUT NUMBER**

12. Prior to filing the motion for preliminary approval, I personally reviewed this Court's decision in *In re Chiron*. Based on that decision, the opt-out number was included in our papers in support of preliminary approval and was specifically referenced in the long-form notice that would be sent or emailed to the class. (Dkt. 53-2, at 38.) Because we have previously disclosed this number in public filings, I believe it is appropriate to disclose this number in these papers rather than in camera. If the number of opt-outs exceeds 400, defendant may terminate the settlement.

## QUESTION 4—THE COST OF THE TREND MICRO SOFTWARE TO BE DISTRIBUTED TO THE CLASS

13. This was a question directed to TD Ameritrade and it is my understanding that responsive information will be provided by defendant. It is my understanding that the cost of the software will exceed $6 million. Mac Compatible software will able be provided by another software provider further increases the costs to TD Ameritrade. I also understand that TD Ameritrade will explain that the statements by Mr. Elvey about the retail sales price of the program to this Court on June 12, 2008, were inaccurate, in that the limited rebates offered by retailers do not result in customers being able to receive the software for free unless the retailer sells the software for a loss. Further, TD Ameritrade will submit a declaration from ID Analytics detailing their qualifications and revealing the cost to TD Ameritrade of their services. Based on my understanding of the work of ID Analytics, I expect that this declaration will demonstrate that the questions about the quality of their work expressed by Mr. Elvey at the hearing for preliminary approval of the settlement were not based in fact.

## QUESTION 5—CLARIFICATION OF ACCUSATION OF MATTHEW ELVEY

14. At the hearing for preliminary approval of the settlement, I was very surprised that Mr. Elvey addressed the Court and announced his desire for this Court to deny preliminary approval. When at the conclusion of his remarks Mr. Elvey explained that he had only signed the settlement papers because he was "threatened" by counsel I knew there was no basis whatsoever for his accusation. When he walked out of the courtroom and sought out the press to reiterate his meritless accusation, I was taken aback.

15. I can say in no uncertain terms that I did not threaten Mr. Elvey in any way to get him to sign the settlement agreement. I believe that I can prove this to the Court without a broad waiver of attorney-client privilege. It is my intent to reveal

communication with Mr. Elvey only to the extent necessary to rebut Mr. Elvey's allegation and respond to this Court's inquiry.[2]

16. Following the settlement reached at the mediation, I personally discussed the settlement agreement's terms with Mr. Elvey. It had been my understanding that in addition to the updates Mr. Elvey received from me, Mr. Elvey regularly checked PACER for case activity and, in fact, had his own PACER account. Mr. Elvey reiterated this at the hearing on June 12, 2008.

17. During the week of May 19, 2008, I repeatedly sought to get in touch with Mr. Elvey via telephone and email in order to obtain his signature on the final draft of the settlement agreement. None of the substantive terms of the settlement had changed since my prior contact with Mr. Elvey.

18. Mr. Elvey eventually responded and asked that we send him the agreement to approve.

19. At this point, my partner and I discussed whether Mr. Elvey was trying to avoid contact with us. Later on May 23, 2008, Mr. Preston received a call from this Court's clerk, who indicated to Mr. Preston that Mr. Elvey had attended one or more hearings in other cases before Judge Walker and had attempted *ex parte* communications with the Court despite instructions from this Court's clerk not to do so. Mr. Preston immediately relayed the details of the call to me after getting off the phone with the clerk.

20. Because the statements by the Court's clerk concerned an *ex parte* contact, I believed that the firm had an obligation to inform defense counsel of the call from the clerk and I informed counsel for TD Ameritrade of the call.

---

[2] California law states that "[t]here is no privilege . . . as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship." Cal. Evid. Code § 958 (2008). "[A]ttorney[s] [are] released from the obligations of secrecy when the disclosure of communications, otherwise privileged, becomes necessary to the protection of the attorney's own rights, such as when the attorney's integrity, good faith, authority or performance of duties is questioned." *In re Rindlisbacher*, 225 B.R. 180, 183 (9th Cir. BAP 1998) (quoting *Arden v. State Bar of Cal.*, 52 Cal.2d 310, 320, 341 P.2d 6 (1959)).

21. When my office asked Mr. Elvey about his interactions with the Court, Mr. Elvey eventually responded to Mr. Preston by email and denied ever attempting an *ex parte* communication with the Court.

22. Finally, approximately one week later, I was able to have a telephone conversation with Mr. Elvey and Mr. Preston. I explained that I had a fiduciary obligation to the class and that I believed this settlement was in the best interest of the class given the benefit obtained, the timing of the benefit and the risks of further litigation. I expressed to Mr. Elvey that we already had the consent of the other two class representatives and that it was my intent to present the settlement to the Court for approval with or without his signature. Finally, I explained his legal right to object or to opt out of the settlement in accordance with our ethical rules and our retainer agreement.

23. I also informed Mr. Elvey during that telephone call that there was a Case Management Conference scheduled for Thursday, and I desired to have the settlement papers finalized before the Conference. Thus, we informed Mr. Elvey that we needed his response by the end of the day Tuesday.

24. At 11:30 pm PST on May 27, 2008, Mr. Elvey sent me his executed signature page to the settlement agreement by email saying "Signature page attached, agreeing to the settlement you sent me today, ahead of the deadline you set." At the same time Mr. Elvey also sent me notes of our telephone conversation. No where in those notes did Mr. Elvey state or even suggest that he had been threatened by me or anyone else.

25. On Thursday May 29, 2008, approximately 36 hours after Mr. Elvey signed the settlement agreement, I attended the Case Management Conference before this Court. Mr. Elvey was also in attendance at the Conference. During the Conference, the settlement was detailed for the Court by counsel. On at least two occasions during the Conference, the Court asked Mr. Elvey if he had anything he would like to add. On both occasions Mr. Elvey responded in the negative. At the conclusion of the Conference, Mr. Elvey and I went out for a light bite to eat as we walked together

toward Union Square. During the approximate 1.5 hours I was with Mr. Elvey after the Conference, he never mentioned to me that he objected or disapproved of the settlement.

26. Two weeks later, on the morning of the preliminary approval hearing, I emailed Mr. Elvey to remind him of the hearing and to offer to get together 15 minutes early. Mr. Elvey responded that he might not be able to attend the hearing.

27. Given this context, I was surprised by Mr. Elvey's statements to the Court that he had always been opposed to the settlement and his accusation that we threatened him in order to obtain his signature. Immediately following the July 13, 2008 hearing, Mr. Elvey explained to me what he meant when he said he was "threatened." Mr. Elvey stated that believed it was a threat when he was advised that the other two class representatives could proceed with settlement even if he refused to execute the agreement.

28. Since the hearing, David Parisi and I have sought to obtain Mr. Elvey's CV in order to satisfy the request of the Court. Mr. Elvey has not provided the CV to either of us. Further, Mr. Elvey has stated that I should not attempt to call him, or speak to him if I see him in Court. In the only other email I have since received from Mr. Elvey, I discovered a surreptitious computer code placed in the email that could be characterized as "spyware" or a "web bug."

29. Since the hearing, Mr. Elvey has also sought to undermine my ability to fulfill my obligations to the class by contacting defense counsel directly in order to seek to negotiate changes to the settlement agreement.

30. It is with great regret that I find myself in a position that requires my firm to withdraw from its representation of Mr. Elvey. At this juncture, Mr. Elvey has made several factually inaccurate statements to the Court, which may damage the prospects for the approval of the settlement. Mr. Elvey he has also conducted himself in a manner that is clearly adverse to the class. His present inability to interact constructively with counsel is in essence a constructive termination of the representation. My firm has

notified Mr. Elvey in writing of our intent to seek leave to withdraw from acting as his attorneys from the Court.

31. Pursuant to the local rules, my firm will forward copies of any filings we receive to Mr. Elvey until he can make alternative arrangements.

### QUESTION 6—THE ADEQUACY OF ZIGLER AND GRIFFITHS

32. My firm represents Mr. Griffiths and I am personally familiar with his involvement in the litigation.

33. Since Mr. Griffiths' Griffiths retention of the firm, either Mr. Preston or myself have responded to the inquiries of Mr. Griffiths and have acted to keep him informed of the progress of the litigation.

34. On or about May 22, I personally spoke to Mr. Griffiths and answered his questions regarding the settlement and further explained the terms of the settlement prior to his execution of the Settlement Agreement.

35. Mr. Griffiths' background and opinions about the settlement are detailed in his declaration which is attached as an exhibit to the Plaintiffs' Response to the Court's June 13, 2008 Order and Further Support for Preliminary Approval of Settlement.

36. Plaintiff Brad Zigler's background and qualifications as a class representative are detailed in his declaration and the declaration of David Parisi, filed concurrently herewith.

37. Based on my experience as a class action attorney who has served as lead counsel in numerous cases and has also been involved in the defense of class actions at a former time in my career, I believe that Mr. Griffiths and Mr. Zigler are adequate class representatives who will continue to discharge their obligations to the class in good faith.

38. Contrary to the statement made by Mr. Elvey to the Court at the hearing on June 12th, Mr. Griffiths was not referred to our firm by Mr. Elvey. Further, I have no knowledge that Mr. Griffiths had known Mr. Elvey at all prior to this litigation.

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: July 10, 2008

                         /s/ Scott A. Kamber
                            Scott A. Kamber

**EXHIBIT A-1**











|  |  |  | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| Year | Adjustmt Factor** | Paralegal/ Law Clerk | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/07- 5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06- 5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05- 5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04- 5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03- 6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02- 5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01- 5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00- 5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99- 5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98- 5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97- 5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96- 5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95- 5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94- 5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has

been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

\* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

\*\* The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

**EXHIBIT A - 2**

| ATTORNEY (POS., FIRM) | CITY | YEARS | FIRM RATES* | 2007-08 Laffey Rate | 2008 Adj. Laffey Rate | TOTAL HOURS | LAFFEY LODESTAR | FIRM LODESTAR | ADJ. LAFFEY LODESTAR |
|---|---|---|---|---|---|---|---|---|---|
| S. Kamber (Mang. Mem. KE) | NY | 17 | $510.00 | $409.50 | $562.80 | 645.90 | 264,496.05 | 329,049.00 | 363,512.52 |
| A.Himmelfarb (Partner KE) | LA | 29 | $495.00 | $460.24 | $674.67 | 15.50 | 7,133.72 | 7,672.50 | 10,457.39 |
| E.Preston (Partner KE) | CHI | 8 | $395.00 | $324.45 | $489.25 | 731.30 | 237,270.29 | 288,863.50 | 358,154.18 |
| D.Rubin (Associate KE) | NY | 9 | $385.00 | $329.49 | $498.75 | 32.30 | 10,642.53 | 12,435.50 | 16,109.63 |
| S.Lezell (Associate KE) | CHI | 3 | $300.00 | $221.45 | $276.04 | 51.40 | 11,382.53 | 15,420 | 14,188.46 |
| KE TOTALS | | | | | | 1451.1 | 530,925.12 | 654,229.50 | 762,422.18 |
| D.Parisi (Partner PH) | LA | 16 | $450.00 | $407.94 | $560.66 | 80.90 | 33,002.35 | 36,405.00 | 45,357.39 |
| S.H. Beckman (Partner PH) | LA | 11 | $450.00 | $407.94 | $560.66 | 25.0 | 10,198.50 | 11,250.00 | 14,016.50 |
| TOTALS | | | | | | 1,521 | $574,125.97 | $701,884.50 | 821,796.07 |
| Multiplier | | | | | | | 3.27 | 2.67 | 2.28 |

**2008 Locality Pay Differentials**
WASH-BAL   20.89
NEW YORK   26.36 (+5% accd. *In re Chiron*)
LOS ANG   25.26 (+4.6 accd. *In re Chiron*)
CHI   23.16 (+3)
*All Laffey Values shown solely for purpose of establishing reasonableness of the Firm Rates used by KamberEdelson LLC and Parisi & Havens LLP
Assumes NY adjustment of 5%, LA 4.6%, and Chicago 3% (www.opm.gov/oca/08tables/indexGS.asp)

2007-2008 DOJ, United States Attorney for the District of Colombia

| EXPERIENCE | NEW YORK RATE PER HOUR (+5% adjustment) | LOS ANGELES RATE PER HOUR (+4.6% adjustment) | CHICAGO RATE PER HOUR (+3% adjustment) |
|---|---|---|---|
| 20+ Years | 462.00 | 460.24 | 453.20 |
| 11-19 Years | 409.50 | 407.94 | 401.70 |
| 8-10 Years | 330.75 | 329.49 | 324.45 |
| 4-7 Years | 267.75 | 266.73 | 262.65 |
| 1-3 Years | 225.75 | 224.89 | 221.45 |

2008 Adjusted Laffey Matrix, www.laffeymatrix.com

| EXPERIENCE | NEW YORK RATE PER HOUR (+5% adjustment) | LOS ANGELES RATE PER HOUR (+4.6% adjustment) | CHICAGO RATE PER HOUR (+3% adjustment) |
|---|---|---|---|
| 20+ Years | 677.25 | 674.67 | 664.35 |
| 11-19 Years | 562.80 | 560.66 | 552.08 |
| 8-10 Years | 498.75 | 496.58 | 489.25 |
| 4-7 Years | 345.45 | 344.13 | 338.87 |
| 1-3 Years | 281.40 | 280.32 | 276.04 |