MAYER BROWN LLP
LEE H. RUBIN (SBN 141331)
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306
Telephone: (650) 331-2000
Facsimile: (650) 331-2060
lrubin@mayerbrown.com

MAYER BROWN LLP
ROBERT J. KRISS
CHARLES E. HARRIS, II
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
rkriss@mayerbrown.com
charris@mayerbrown.com

Counsel for Defendant TD AMERITRADE, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| In re TD AMERITRADE ACCOUNTHOLDER LITIGATION | Master File No.<br><br>C 07 2852 VRW<br><br>**TD AMERITRADE INC.'S MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT**<br><br>Chief Judge Vaughn R. Walker |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT ......................................................................................................2

I.    **The Fairness Of The Settlement To The Class Should Be Evaluated First And Separately From Plaintiffs' Fee Petition** ................................................2

II.    **The Settlement Is Fair, Reasonable And Adequate** ...................................3

    A.    Strength Of Plaintiffs' Case ................................................................3

    B.    The Risk, Expense, Complexity, And Likely Duration Of Further Litigation ..........8

    C.    The Risk Of Maintaining Class Action Status Throughout The Trial.....................8

    D.    The Amount Offered In Settlement ....................................................9

    E.    The Extent Of Discovery Completed And The Stage Of The Proceedings.............10

    G.    The Presence Of A Governmental Participant ....................................11

    H.    The Reaction Of Class Members To The Proposed Settlement............................12

    I.    The Procedure By Which The Settlement Was Reached....................................12

III.    **The Objections To The Settlement Do Not Justify Rejection Of The Settlement** .....13

    *Matthew Elvey's Objections* ................................................................13

    A.    Benefits ................................................................................13

    B.    Scope of Release ....................................................................14

    C.    Class Notice ..........................................................................15

    D.    Evidentiary Record in the Case ..........................................................16

    E.    Plaintiffs' Attorneys' Fees ..............................................................17

    F.    Elvey's Compensation ..................................................................17

    *Richard Holober's Additional Objections* ....................................................18

    *Elli Weinstein's Additional Objection* ........................................................19

    *Brad Richards and Theodore Frank's Additional Objections* ...................................19

    *Jonathan Lee Riches and Richard Holober's Motions To Intervene Should Be Denied.* .........21

**CONCLUSION** ..................................................................................................22

i

**TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Acosta v. Trans Union, LLC*, 243 F.R.D. 377 (C.D. Cal. 2007) ................................8

*Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605 (S.D.N.Y. 2009) ...........................4

*Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006)............................................5

*Devlin v. Scardelletti*, 536 U.S. 1 (2002) ...............................................................15

*Gordon v. Virtumundo*, __F.3d__, 2009 WL 2393433 (9th Cir. 2009)....................6

*In re Cendant Corporation Litigation*, 264 F. 3d 201 (3d Cir. 2001) .....................15

*In re General Motors Corporation Engine Interchange Litigation*, 594 F.2d 1106
    (7th Cir. 1979)....................................................................................................3

*In re Hannaford Bros. Co. Customer Data Security Breach Litigation,* 613 F.
    Supp. 2d 108 (D. Maine 2009) ..........................................................................4

*In re Initial Public Offering Securities Litigation*, 226 F.R.D. 186 (S.D.N.Y.
    2005)..................................................................................................................10

*In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454 (9th Cir. 2000)................7, 12

*In re Portal Software, Inc. Securities Litigation*, No. C-03-5138, 2007 WL
    4171201 (N.D. Cal. Nov. 26, 2007)...................................................................13

*In re Prudential Insurance Company of America Sales Practices Litig.*, 962 F.
    Supp. 450 (D.N.J. 1997) ...................................................................................10

*In re Tableware Antitrust Litigation*, No. C-04-3514 VRW, 2007 WL 4219394
    (N.D. Cal. Nov. 28, 2007) ..................................................................................3

*Jaffe v. Morgan Stanley & Co.*, No 06-3903, 2008 WL 346417 (N.D. Cal. Feb. 7,
    2008)..................................................................................................................23

*Linney v. Cellular Alaska Patnership*, 151 F.3d 1234 (9th Cir. 1998)....................12

*National Super Spuds v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir.
    1981)..................................................................................................................16

*O'Keefe v. Mercedes-Benz United States, LLC*, 214 F.R.D. 266 (M.D. Pa. 2003)...................10

*Olden v. LaFarge Corp.*, 472 F.Supp.2d 922 (E.D. Mich. 2007)............................15

*Pisciotta v. Old National Bancorp*, 499 F.3d 629 (7th Cir. 2007) .........................4

*Ruiz v. Gap, Inc.,* __F. Supp.2d__, 2009 WL 941162 (N.D. Cal. 2009) ....................4

*Serventi v. Bucks Technical High School*, 225 F.R.D. 159 (E.D. Pa. 2004)............16

ii

1
2
*Shafran v. Harley-Davidson, Inc.*, No. 07 Civ. 01365, 2008 WL 763177
(S.D.N.Y. Mar. 20, 2008) ...................................................................................5

*TJX Companies Retail Security Breach Litigation*, 246 F.R.D. 389 (D. Mass.
3
2007) .................................................................................................................9

4
*Townes v. Trans Union*, LLC, No. 04-1488, 2007 WL 2457484 (D. Del. Aug. 30,
2007) ...............................................................................................................23
5
*Yeagley v. Wells Fargo & Co.*, No. C 05-03403, 2008 WL 171083 (N.D. Cal. Jan.
6
18, 2008) ........................................................................................................22

7
**Statutes, Rules and Regulations**

8
California Civil Code § 1798.82(e) .........................................................................7

9
CAN SPAM Act, 15 U.S.C. § 7701 *et seq.* .............................................................6

10
Class Action Fairness Act, 28 U.S.C. § 1711 *et seq.* ..................................... 14, 23, 24

11
Federal Rule of Civil Procedure 24(a), (b)..............................................................25

12
Regulation S-P: Privacy of Consumer Financial Information, 17 C.F.R. § 248.1 *et*
*seq.* ....................................................................................................................7
13

14
**Other Authority**

15
Senate Report No. 108-102 ....................................................................................6

16
17
18
19
20
21
22
23
24
25
26
27
28

iii

**INTRODUCTION**

Plaintiffs, customers of TD Ameritrade, Inc. ("TD Ameritrade" or the "Company"), brought this purported class action in May 2007 after receiving spam e-mail promoting stock purchases.  Before the suit was filed, the Company had received customer complaints about stock spam and was investigating a possible breach of its information security system.  Several months after the suit was filed, the Company discovered and eliminated the cause of the breach and gave notice of the breach to its customers and other persons potentially affected.  After the Company gave notice of the breach in September 2007 and had its chief information security officer deposed, the parties commenced settlement negotiations and eventually entered into a settlement of this dispute.

As a result of its investigation, TD Ameritrade learned that an unauthorized person had obtained e-mail addresses of TD Ameritrade customers and that those addresses had been used to send stock-touting spam.  There is no evidence that any members of the settlement class have suffered identity theft as a result of the data breach.  Four analyses conducted between September 2007 and June 2008 by ID Analytics, Inc. ("ID Analytics"), a leading security firm, found no instances of identity theft associated with the data breach.

The proposed settlement is fair, reasonable and adequate and should be approved.  It provides significant benefits to the class that most likely could not be achieved through continued litigation on the merits.  The only injuries alleged by plaintiffs are receipt of spam, increased risk of identity theft and alleged loss of benefit of the bargain.  Courts uniformly have dismissed claims for monetary damages and injunctive relief based upon these types of alleged injuries.  Moreover, class certification has been denied for claims alleging actual identity theft. We have found no precedent (and objectors have cited none) for granting monetary or injunctive remedies in this kind of action once a company has given notice of a data breach to potentially affected parties.  In short, if this settlement were not approved, further litigation would likely not yield any benefits to the class.

In contrast, the proposed settlement provides significant benefits that address plaintiffs'

stated concerns.  First, TD Ameritrade will retain an independent expert acceptable to plaintiffs who will conduct penetration tests to determine whether TD Ameritrade's information security system has any vulnerabilities.  If any material vulnerabilities are discovered, they will be remedied.  This component of the settlement is designed to provide class members with additional objective evidence that TD Ameritrade's system is secure and that their information is safe.

Second, TD Ameritrade will retain ID Analytics to conduct another analysis to determine whether the data breach may have resulted in identity theft for any members of the settlement class.  This analysis, which will be performed more than two years after customers were notified of the data breach, will provide additional information indicating whether the data breach may have led to identity theft.  If any potential victims of identity theft are identified, TD Ameritrade has agreed to provide special assistance to them and an alternative dispute resolution procedure.

Third, TD Ameritrade will offer internet security software at no charge that provides protection against spam and identity theft.  Finally, the proposed settlement provides class members with additional information regarding spam, identity theft and the dangers of trading based upon stock-touting spam and obligates TD Ameritrade to make certain contributions to organizations involved in promoting internet security for consumers.

Because the settlement provides significant benefits that likely exceed what class members could obtain through further litigation, the Court should approve the settlement as fair, reasonable and adequate.[1]

## ARGUMENT

**I.    The Fairness Of The Settlement To The Class Should Be Evaluated First And Separately From Plaintiffs' Fee Petition**

As explained in *In re Tableware Antitrust Litigation*, No. C-04-3514 VRW, 2007 WL 4219394, at *3 (N.D. Cal. Nov. 28, 2007), the first step in determining whether to approve a settlement is to consider the fairness of the settlement to the class:

In assessing whether a settlement is 'fair reasonable and adequate' under [Federal

---

[1]  TD Ameritrade takes no position as to plaintiffs' fee petition.

Rule of Civil Procedure 23], the court is to consider several factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement [presumably in comparison to comparable cases]; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

> To these factors, the court adds (9) the procedure by which the settlements were arrived at.

(internal citations omitted and second set of brackets in original); *see also In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 n.44 (7th Cir. 1979) ("The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.").

If the Court concludes that the settlement is fair, reasonable and adequate to the class after applying these factors, then the Court should approve the settlement and proceed to determine what attorneys' fee award is reasonable in light of the settlement. *In re Tableware Antitrust Litig.*, 2007 WL 4219394 at *4 ("The settlement amount having been found to be fair, the court turns to class counsel's request for expenses.").

The settlement is not contingent upon the Court approving any specific amount of fees. If the Court approves the settlement as fair, reasonable and adequate to the class, then the settlement is final as to the class and TD Ameritrade, and the Court can make whatever fee award it believes is reasonable up to the maximum amount specified in the settlement agreement.

## II. The Settlement Is Fair, Reasonable And Adequate.

The factors to be considered in assessing the fairness of the settlement decisively weigh in favor of approving the settlement.

### A. Strength Of Plaintiffs' Case

If this case were not settled, plaintiffs most likely would not obtain any monetary or injunctive relief. In private class action litigation of data breach cases, the vast majority of the courts that have addressed the issue have dismissed these actions where, as here, plaintiffs' only

3

1    alleged injury is receipt of spam, increased risk of identity theft or loss of benefit of the bargain.

2    *See, e.g., Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 639-40 (7th Cir. 2007) (dismissing all

3    claims arising from financial institution's data breach:  "Without more than allegations of

4    increased risk of future identity theft, the plaintiffs have not suffered a harm that the law is

5    prepared to remedy.  Plaintiffs have not come forward with a single case or statute, from any

6    jurisdiction, authorizing the kind of action they now ask this federal court, sitting in diversity, to

7    recognize as a valid theory of recovery under Indiana law."); *In re Hannaford Bros. Co.*

8    *Customer Data Sec. Breach Litig.,* 613 F. Supp. 2d 108, 132 (D. Maine 2009) (dismissing all

9    contract, tort and statutory claims for damages and injunctive relief based upon a merchant's data

10   breach where purported class members claimed only increased risk of identity theft); *Ruiz v.*

11   *Gap, Inc.,* __F. Supp.2d__, 2009 WL 941162, at *4-*6 (N.D. Cal. 2009) (dismissing all claims

12   for damages based upon a merchant's data breach where purported class members claimed only

13   increased risk of identity theft); *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 609 (S.D.N.Y.

14   2009) ("dismissing all claims arising from financial institutions data breach:  "The receipt of

15   spam by itself, however, does not constitute a sufficient injury entitling [the plaintiff] to

16   compensable relief;" *also rejecting as too speculative the theory that social security numbers*

17   *were likely stolen and used because they were in the same data base as the e-mail addresses*

18   *used to send spam)*; *Shafran v. Harley-Davidson, Inc.*, No. 07 Civ. 01365, 2008 WL 763177, at

19   *3 (S.D.N.Y. Mar. 20, 2008) (dismissing all claims arising from a data breach:  "Courts have

20   uniformly ruled that the time and expense of credit monitoring to combat an increased risk of

21   future identity theft is not, in itself, an injury that the law is prepared to remedy.  Plaintiff has not

22   presented any case law or statute from any jurisdiction, indicating otherwise."); *Cobell v.*

23   *Kempthorne,* 455 F.3d 301, 325 (D.C. Cir. 2006) (vacating preliminary injunction in data breach

24   case that imposed judicial supervision of an organization's information technology system where

25   the only alleged injury was increased the risk of identity theft:  "The inherently imperfect nature

26   of IT security means that if we granted injunctive relief here, based only on [the Department of]

27   Interior's security vulnerabilities and not on a showing of some imminent threat or specific

28                                              4

1  reason to be concerned that IITD is a target, we would essentially be justifying perpetual judicial

2  oversight of Interior's computer system. . . .  Moreover, nearly any system administrator who

3  maintains data for private trusts could be in danger of facing similar claims for relief, as only the

4  unreachable goal of perfect security would be sufficient to counter general fears of data

5  tampering by internal threats or external hackers.").

6        Congress has addressed the problem of spam by enacting the CAN SPAM Act, 15 U.S.C.

7  § 7704(a)(1) (2009).  But plaintiffs here have no cause of action under the CAN SPAM Act.

8  Standing to sue under the Act is limited to internet access providers that suffer a material adverse

9  effect to their service as a result of the receipt of spam.  Consumers, like plaintiffs here, who

10  suffer the ordinary inconvenience of spam do not have standing to sue under the Act.  *See*

11  *Gordon v. Virtumundo*, __F.3d__, 2009 WL 2393433, at *9 (9th Cir. 2009).  In addition, the Act

12  imposes liability on spammers, not companies, like TD Ameritrade, that were the targets of

13  hackers who subsequently used stolen e-mail addresses to send spam.[2]

14        Plaintiffs filed a motion for preliminary injunction requiring TD Ameritrade to give

15  notice of the data breach to those persons whose personal information may have been accessed

16  by unauthorized persons.  TD Ameritrade provided such notice in September 2007 once it

17  determined that a data breach had occurred and it eliminated the cause of the breach.[3]  (A copy

---

18  [2]  Only parties that intentionally initiate, originate or procure others to initiate spam are liable

19  under the Act.  *See* 15 U.S.C. § 7704(a)(1) (makes it unlawful for a person to "initiate the transmission, to a protected computer, of a commercial electronic message" with certain

20  qualities); § 7702(9) (defining "initiate" as "to originate or transmit such message or to procure the origination or transmission of such message"); § 7702(12) (defining "procure" as

21  "intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf"); *see also* U.S.C. §§ 7701(a)(10), 7703(b)(2), 7704(b)(1)(A)

22  (targeting those who take e-mail addresses from online services); S. Rep. No. 108-102, at 2-4 (describing spammers targeted by statute).

23  [3]  Most states have enacted statutes requiring companies to notify their customers if they have

24  reason to believe that an unauthorized person has obtained sensitive customer information, such as social security numbers, which could be used to commit identity theft.  Most of these statutes

25  do not treat e-mail addresses as the type of sensitive information that triggers an obligation to notify customers of a data breach.  *See, e.g.*, Cal. Civ. Code § 1798.82(e) (2009) (triggering

26  notification upon acquisition of name plus one or more of social security number, driver's license number or account number in combination with any required password that would permit

27  access to a financial account). TD Ameritrade and its consultant found no evidence that the unauthorized persons obtained sensitive customer information such as social security numbers

(cont'd)

28                                          5

of the notice is attached hereto as Exhibit A.)  Plaintiffs sought, and Elvey continues to demand, a notice that provides detailed information about the nature and cause of the breach.  But no state data breach notice statute requires disclosure of such information, and there is no precedent under any other governing laws or regulations for requiring such disclosures.  Indeed, disclosing such details to the public could facilitate hackers' attempts to breach the system again and affirmatively harm class members.  Whether or not required, TD Ameritrade's notice complied with existing state law notice statutes and was sufficient to put the potentially affected persons on notice that there was a risk of identity theft so that they could monitor their accounts.  There is no precedent for requiring TD Ameritrade to provide any other public disclosures regarding the data breach.  Objectors have cited no authority to support their position.

In addition, there are other checks in place to ensure that customers' interests are protected.  TD Ameritrade is subject to SEC regulations[4] covering privacy and security, and both the SEC and FINRA periodically conduct compliance reviews.  Notably, regulators have never sanctioned TD Ameritrade for any alleged failure of its privacy policies or security systems to meet government standards.

Furthermore, companies like TD Ameritrade have an economic incentive to prevent data breaches to protect their business reputations.  Here, TD Ameritrade had an additional economic incentive to maintain a secure IT environment as the Company provides its customers with an asset protection guarantee covering losses of customers' assets in accounts with the Company arising from unauthorized activity including identity theft if it occurred through no fault of the customer. Information security is a high priority for TD Ameritrade because it is important to its customers and because TD Ameritrade offers its customers its asset protection guarantee.

In short, the case law and public policy considerations are squarely against plaintiffs' claims in this case.  None of the objectors has cited any authority that suggests they could obtain

---

and date of birth.  Nor was there any evidence that passwords to accounts were taken. Nevertheless, TD Ameritrade decided to give notice to its customers of the data breach it had discovered.

[4] Regulation S-P: Privacy of Consumer Financial Information, 17 C.F.R. § 248.1 *et seq.* (2009).

6

any of the remedies that they argue should be part of the settlement by continuing to litigate this case on the merits.  In light of the weight of authority that is against them, plaintiffs' chances of recovery would be very low.  The weak nature of plaintiffs' claims militates heavily in favor of approving the proposed settlement.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (finding that the district court properly approved a class action settlement where "[t]he plaintiffs' case was weak and the risk, expense, and complexity of trial weighed against them."); *Yeagley v. Wells Fargo & Co.*, No. C 05-03403, 2008 WL 171083, at *5 (N.D. Cal. Jan. 18, 2008) (quoting *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 392 (C.D. Cal. 2007)) ("the limited settlement benefits are fair and reasonable.  In other words, plaintiff's prospects for prevailing in this litigation are 'so bleak as to render this a good value for a relatively weak case.'" (internal citation and quotations omitted)).

Tellingly, Elvey's counsel, after examining the applicable law and reviewing the transcript of the deposition of TD Ameritrade's chief information security officer, advised the Court at the hearing on preliminary approval of the settlement that, although Elvey was objecting to the settlement, they had no interest in assuming representation of the class in continued litigation against TD Ameritrade.[5]  Moreover, Objectors Brad Richards and Theodore Frank, counsel from the Center for Class Action Fairness, expressly acknowledged that plaintiffs' claims are extremely weak.  In a section of Richards and Frank's submission, captioned "The Underlying Lawsuit is Meritless and Harms Class Members' Interests," they state that:  (1) "[t]here is no evidence of monetary damage as a result of receiving the spam in question"; (2) there is "no evidence that the breach resulted in any instances of identity theft"; (3) "increased risk of identity theft is not a compensable injury"; and (4) increased risk of identity theft "is [not] . . . the type of action where common issues predominate over individual ones."  Richards and

---

[5]  Elvey's counsel, Gregory Beck, states in his submission on behalf of Elvey that TD Ameritrade did not give him access to the deposition of its chief information security officer. That statement is mystifying.  TD Ameritrade personally delivered a copy of the unredacted transcript to Mr. Beck, and in a subsequent e-mail, Mr. Beck thanked TD Ameritrade's counsel for "accommodating" him.  (A copy of the communications between counsel regarding the transcript review is attached as Ex. B.)

7

1    Frank Objections, Doc. No. 150 at 8.

2        For the reasons discussed above, the weakness of plaintiffs' claims on the merits supports

3    approval of the settlement.

4        B.    The Risk, Expense, Complexity, And Likely Duration Of Further Litigation

5        As explained above, there is a substantial risk that plaintiffs would not obtain any

6    recovery if this case were litigated on the merits. In addition, class members who were

7    customers of TD Ameritrade would be at risk if the information TD Ameritrade was required to

8    produce to plaintiffs or their counsel during discovery and that might be disclosed in public

9    hearings and trial would facilitate illegal actions by unauthorized persons to evade TD

10   Ameritrade's information security system and acquire customer personal information without

11   authorization.

12       If the Court did not dismiss plaintiffs' claims for failure to state a cause of action,

13   discovery, discovery motions, dispositive motions, trial and appeal in a case of this type

14   involving multiple legal theories, complex information technology and six million class members

15   would likely be very complex, time-consuming and expensive.

16       For these reasons, the risk, expense, complexity and likely duration of further litigation

17   support approval of the settlement.

18       C.    The Risk Of Maintaining Class Action Status Throughout The Trial

19       Our research has not found any cases where a court has granted class certification in a

20   data breach case involving spam, alleged increased risk of identity theft or actual identity theft;

21   the objectors have cited no such cases either. At least one court has denied class certification in

22   a data breach case involving alleged identity theft on the ground that individual issues of

23   causation and damages would predominate. *TJX Companies Retail Sec. Breach Litig.*, 246

24   F.R.D. 389, 397 (D. Mass. 2007) ("Given that there are a myriad of ways in which fraud losses

25   can occur, as well as the fact that the [p]laintiffs themselves have admitted the difficulty of

26   attributing any particular loss to the data breach, evidence of general causation will not suffice to

27   prove the element of causation with regard to fraud-related losses on a class-wide basis. Instead,

28

8

1    causation will have to be determined loss-by-loss, bank-by-bank, further rendering certification

2    inappropriate."(internal citation omitted)).  At the very least, there is substantial doubt that a data

3    breach case involving spam, actual identity theft or increased risk of identity theft could be

4    maintained as a class action on the merits.

5                    D.    The Amount Offered In Settlement

6            The reasonableness of the amount offered in settlement should be assessed in relation to

7    the recovery that might be obtained through litigation, discounted by the probability of recovery.

8    *See, e.g.*, *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1132 n.44.  As

9    discussed above, plaintiffs most likely would obtain no recovery if this case were litigated on the

10   merits.  In contrast, the proposed settlement provides significant benefits to the class.

11           In assessing the fairness of a settlement, the value of the benefits to the class is the proper

12   test, not the defendants' cost of providing those benefits.  *See O'Keefe v. Mercedes-Benz United*

13   *States, LLC*, 214 F.R.D. 266, 304 (M.D. Pa. 2003) (settlements should be valued according to

14   their "benefit to the class and not the cost to the defendant."); *In re Prudential Ins. Co. of Am.*

15   *Sales Practices Litig.*, 962 F. Supp. 450, 557 (D.N.J. 1997) ("[t]he cost of the relief to [the

16   defendant] is not the measure of class member benefit. . . [t]he value of the relief to the Class is

17   what matters);" *In re Initial Public Offering Sec. Litig.*, 226 F.R.D. 186, 197 n. 63 (S.D.N.Y.

18   2005) (same).  Nonetheless, it should be noted that TD Ameritrade has paid more than $6 million

19   for the right to distribute Trend Micro Internet Security ("TIS") Pro software to all settlement

20   class members.[6]  *See* Thomas Decl., Doc. No. 67, Ex. 3 ¶ 11.

21           The benefits offered by the proposed settlement are of significant value to class members.

22   They address every aspect of plaintiffs' complaint.  An independent penetration test will give

23   class members another objective basis to have confidence that TD Ameritrade's information

24   security system is sound.  An analysis by ID Analytics[7] will update class members as to whether

25   _____

26   [6] TD Ameritrade entered into the agreement with Trend Micro after entering into an agreement
     in principle with plaintiffs.

27   [7] The methodologies used by ID Analytics in analyzing potential data breaches are described in
     the Declaration of the company's co-founder and Chief Operating Officer, Mike Cook.  *See* Doc.

                                                                                              (cont'd)

28                                                  9

they might be victims of identity theft as a result of the data breach, and the Company will provide special assistance to anyone who is identified as a potential victim by ID Analytics. Free internet security software will reduce spam e-mail and provide additional protection against identity theft that can arise from a customer's use of his or her computer. Finally, additional information provided by TD Ameritrade about stock-touting spam and identity theft for all class members will assist them in avoiding injury.

As discussed above, TD Ameritrade most likely would not be required to provide any of these benefits if the case were litigated. Furthermore, TD Ameritrade does not provide these benefits in the ordinary course of its business and would not be providing these benefits but for the settlement. Before the settlement, the Company never sought approval from class members in selecting experts to perform penetration tests. Similarly, the Company's contract with ID Analytics covered four analyses and expired in September 2008. An additional analysis is an added benefit made available only by the settlement. Also, TD Ameritrade was under no obligation to provide internet security software at no cost.

In short, the proposed settlement provides significant benefits to class members that are the result of this litigation and are substantially greater than the benefits they likely would obtain through continued litigation. Even if the Court were to conclude that the benefits provided to the class under the proposed settlement are limited, "plaintiff's prospects for prevailing in this litigation are so bleak as to render this a good value for a relatively weak case." *Yeagley,* 2008 WL 171083, at *5 (internal quotations omitted). The amount offered in the settlement supports its approval.

E.    The Extent Of Discovery Completed And The Stage Of The Proceedings

The settlement of this case was entered into after the parties briefed TD Ameritrade's motion to dismiss the complaint and plaintiffs' motion for preliminary injunction, and after TD Ameritrade gave notice to class members of the data breach and had its chief information security officer deposed. By this point in the litigation, it was apparent, without the need to take

No. 67, Ex. 2.

additional discovery, that plaintiffs had a very low probability of achieving any monetary or injunctive remedies through continued litigation because they had suffered no legally cognizable injury and applicable law provided them no basis for seeking damages or injunctive relief.  In addition, as mentioned above, objector Elvey's counsel reviewed the deposition of TD Ameritrade's chief information security officer and when asked by the Court whether they were willing assume representation of the class, they declined to do so.  In sum, all discovery and other steps necessary to make an informed decision to settle this case at the current stage in the proceeding were taken.  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459 (recognizing that formal discovery is not necessary when the parties have sufficient information to make an informed decision about settlement); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (same).  This factor also supports approval of the settlement.

F.    The Experience And Views Of Counsel

Counsel on both sides of this case are experienced in class action litigation and believe that the settlement is fair, reasonable and adequate.  Furthermore, as mentioned above, counsel for objector Elvey advised the Court that they had no interest in representing the class in further litigation against TD Ameritrade.  Actions speak louder than words.

G.    The Presence Of A Governmental Participant

TD Ameritrade sent notices under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1711 *et seq.*, disclosing the terms of the settlement to the Attorney General's Offices of the fifty states, the District of Columbia and Puerto Rico.  Only the Texas Attorney General's Office submitted an objection in response to the notice, and that office withdrew its objection after counsel for the parties explained the litigation and settlement to them, and agreed to modify the settlement and notices in certain respects.  The final settlement agreement and notices to the class were served on the Texas Attorney General's Office at the same time they were submitted to the Court for preliminary approval.  This factor also supports approval of the settlement.

11

H.     The Reaction Of Class Members To The Proposed Settlement

The size of the settlement class is approximately 6 million persons.  Only 239 persons (less than 0.01% of the class) timely requested to be excluded from the class.  Only 44 persons (less than 0.001% of the class) filed objections to the settlement.  Of the objectors, four are represented by counsel and submitted objections that cite legal authorities.  None of the objectors pointed to any authority showing a class recovering damages or obtaining injunctive relief in a data breach case or even the certification of a class to pursue such claims on the merits.  The opt-out and objection rates in this case are much lower than many other cases where class action settlements have been approved.  *See, e.g., In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26, 2007) (observing that class actions have been approved where 1% or more of the class disapproved).  The fact that less than one one-hundredth of a percent of the class objected or opted-out to the proposed settlement also supports approval of the settlement.

I.     The Procedure By Which The Settlement Was Reached

As discussed above, the settlement was reached at an appropriate time in the development of the case when the legal and factual issues central to assessing the plaintiffs' likelihood of success in further litigation were understood.  Over a period of several months, the parties negotiated the terms of the settlement at arms' length.  The parties reached agreement on terms that would provide benefits to the class that are directed to the alleged harms.  Only after agreement was reached on the terms of the settlement was the issue of attorneys' fees was addressed.  The parties negotiated the settlement provisions on attorneys' fees through mediation before retired Judge Richard Neville.  Under the settlement agreement, the fee award is left to the discretion of the Court up to a maximum amount specified in the agreement.  As also discussed above, an independent government agency initially objected to the initial settlement agreement, but withdrew its objection after learning more about the issues in the case and after certain modifications were made to the settlement agreement and the notices to the class.  These

12

procedures demonstrate well-informed, arms-length negotiations and independent assessment of fairness by a government agency.  The procedure by which the settlement was reached supports approval of the settlement.

*   *   *

For all the reasons discussed above, the Court should approve the settlement as fair, reasonable and adequate.  TD Ameritrade will separately address the objections to the settlement below.

**III.   The Objections To The Settlement Do Not Justify Rejection Of The Settlement**

We will address the objections of Mathew Elvey, and then address objections asserted by other objectors that were not asserted by Elvey.

*Matthew Elvey's Objections*

**A.   Benefits**

Elvey's principal objection[8] is that the settlement does not provide sufficient benefits to the class.  Among other things, he would like to see TD Ameritrade pay hundreds of millions of dollars in damages to the class, provide details to the public concerning the nature and cause of the data breach and its remedial measures, and change the Company's information security system to meet his standards.  The short answer to all of his objections is that, for the reasons discussed above, he could not achieve his objectives if he continued to litigate with TD Ameritrade on the merits.  Elvey does not cite a single data breach case that supports his position with respect to any of the relief he is demanding.  This objection is groundless.

---

[8]  Elvey has both objected to the settlement and indicated that he wishes to exclude himself if the settlement is approved.  He is not permitted to do both.  *See Devlin v. Scardelletti*, 536 U.S. 1, 10-11 (2002) (recognizing that the petitioner who objected to the approval of a class action settlement at the fairness hearing was bound by the settlement); *Olden v. LaFarge Corp.*, 472 F.Supp.2d 922, 931 (E.D. Mich. 2007) ("If an absent class member (or even a class representative) desires to affect the settlement by filing objections, then the objector must abide the result and be bound by the consequences").

1    B.    Scope of Release

2       Elvey also argues that the scope of the release is too broad because it includes a release of

3    claims that could have been brought in this suit and preserves individual claims for damages

4    caused by identity theft but not individual claims for injunctions relating to identity theft.  These

5    objections are without merit.

6       The "could have been asserted in the action" release language that Elvey complains about

7    in the proposed settlement agreement is simply standard release language that bars claims that

8    either have or could have been brought in this litigation based upon the facts alleged in the

9    amended complaint.  District courts routinely approve class action settlement agreements that

10   contain similar releases.  *See, e.g., In re Cendant Corp. Litig.*, 264 F. 3d 201, 227 (3d Cir. 2001)

11   (citing the Stipulation of Settlement) (affirming the district court's approval of a class settlement

12   where the class "agreed to release [the defendants] from all claims that 'are based upon, are

13   related to, arise from or are connected with any facts, circumstances, statements, omissions,

14   events or other matters raised or referred to in the pleadings in the Litigation *or which could have*

15   *been asserted against [the defendants] and the other Released Parties by the Lead Plaintiffs and*

16   *any Class Member.*'" (emphasis added)); *Serventi v. Bucks Tech. High Sch.*, 225 F.R.D. 159, 164

17   (E.D. Pa. 2004) (approving a class settlement where "plaintiffs and class members agree to

18   release all claims that were brought *or could have been brought in this lawsuit.* . . ." (emphasis

19   added)).

20      The case cited by Elvey, *National Super Spuds v. New York Mercantile Exchange*, 660

21   F.2d 9 (2d Cir. 1981), is not to the contrary.  It only stands for the proposition that the release

22   cannot extend to causes of action based upon a different transaction than was alleged in the

23   complaint.  The case expressly notes that a release can cover all claims, regardless of legal

24   theory, that arise from the same set of facts alleged in the complaint.  *Id*. at 18 ("We assume that

25   a settlement could properly be framed so as to prevent class members from subsequently

26   asserting claims relying on a legal theory different from that relied upon in the class action

27   complaint but depending upon the very same set of facts.").  The language used in the release in

28                                                      14

this case has consistently been construed by courts to have precisely that meaning.  If such releases were not valid, it would be difficult to achieve a final settlement of a dispute since new legal theories might be asserted based upon the same core facts alleged in the complaint.

Elvey's objection to the release including individual actions for injunctions also is without merit.  An individual action for an injunction could have the same adverse impact on TD Ameritrade as a class action seeking an injunction.  Accordingly, TD Ameritrade has required a release of individual claims for injunctions.  Elvey has not argued that the release language is unclear.  If a class member did not want to provide the required release, he had the right to exclude himself from the settlement.

As Elvey acknowledges, the Texas Attorney General's Office paid careful attention to the release language and requested certain modifications to the language which the parties made.  As with all other aspects of the settlement, the Texas Attorney General's Office found the scope of the release, as revised according to its suggestions, to be fair and reasonable.

C.     Class Notice

Elvey's objections to the class notice are essentially the same as he made at the time of the preliminary approval hearing and should be rejected for the same reasons that the Court preliminarily approved the settlement and authorized that the notices be given to the class.

Elvey's principal objection to the notices is that they do not adequately notify class members that the suit included claims related to identity theft so that class members would not have been alerted that they might be releasing such claims.  As Elvey acknowledges, the Texas Attorney General's Office focused on this aspect of the notices, and the language was modified to satisfy the Attorney General's office.  The notices now state:  "The Complaint seeks monetary and injunctive relief for any alleged injuries arising from the data breach, including alleged receipt of spam and identity theft, if it were to occur."  The notices adequately informed class members that the suit involved allegations relating to identity theft and that the release, therefore, would include such claims, except individual claims for damages caused by identity theft.

Elvey also asserts that the summary notice did not advise class members that if they did

15

not exclude themselves from the settlement, they would be releasing claims if the settlement were approved. Elvey's assertion is false. The summary notice states: "Upon final approval of the settlement by the Court, if you are a member of the Settlement Class and have not validly excluded yourself, your claims against Defendant and its affiliates, their predecessors and successors will be released. . . ."

D.   Evidentiary Record in the Case

Elvey's objection states: "Here, Ameritrade has kept most aspects of the breach secret and has refused the request of undersigned counsel to view the only discovery in the case—the single deposition of Ameritrade's security chief. The lack of any information about the breach other than Ameritrade's self-serving assertions prevents Elvey and other class members from evaluating key aspect of the case that bear on their decision whether to settle."

It is incredible that Elvey's counsel makes this assertion. As discussed above, TD Ameritrade delivered to Gregory Beck, Elvey's counsel, a copy of the unredacted transcript of the deposition of its chief information officer. After reading that deposition, Mr. Beck stated at the preliminary approval hearing that he was not interested in representing the class in continued litigation against TD Ameritrade.

Elvey's counsel have substantial information to assess the fairness of the settlement. As discussed above, the nature of the alleged injuries in this case are undisputed and Elvey concedes —by failing to cite any analogous cases—that the law does not provide monetary or injunctive remedies for the class claims being asserted. In addition, Elvey's counsel received a copy of the deposition of TD Ameritrade's chief information security officer, presumably read it, and decided they did not want to represent the class in continuing to litigate against TD Ameritrade. None of the other materials Elvey seeks—ID Analytics reports, contracts with Trend Micro, Inc. ("Trend Micro"), information about redemption rates for the anti-spam software (which information does not exist since the software is not yet available to the class)—has any bearing on assessing the fairness of the settlement. They do not address the central issue—are the benefits of the settlement to the class as great as or greater than the benefits the class could likely

16

achieve if it continued litigating this case.  Elvey and other class members have more than enough information to address that issue.

E.    Plaintiffs' Attorneys' Fees

Elvey objects to the attorneys' fees provision in the settlement agreement.  Pursuant to the settlement, TD Ameritrade takes no position on plaintiffs' petition for attorneys fees.  Rather, the question of attorneys' fees is completely in the Court's discretion (up to the maximum amount set forth in the agreement), and plaintiffs' counsel has the burden of persuading the Court that their fee petition is reasonable.  At the time the agreement was signed, Plaintiffs' counsel understood that if the settlement was deemed fair and reasonable as to the class, they would have to accept whatever award of attorneys' fees the Court decided, subject to their right of appeal.  In other words, they could not block a settlement that was fair and reasonable to the class based upon their interest in attorneys' fees.  Accordingly, the maximum amount of plaintiffs' attorneys' fees described in the settlement agreement could not have affected the reasonableness of the settlement and raises no suspicions about the fairness of the other terms of the agreement.  The agreement essentially was for plaintiffs' counsel to accept whatever fees the Court awarded, but in any event not more than the maximum amount specified in the settlement agreement.

F.    Elvey's Compensation

Finally, Elvey, who is arguing that the settlement should not be approved and litigation should continue, complains that he will not receive a $10,000 "incentive award" pursuant to the initial settlement agreement that he signed and subsequently repudiated.  Interestingly, this "objection," which is discussed at the end of his submission, may really have been the first thing on his mind after the Texas Attorney General withdrew its objection to the settlement.  At that time, Mr. Beck contacted TD Ameritrade's counsel and inquired whether TD Ameritrade would agree to restore the $10,000 award to Elvey.  Mr. Beck said he needed this information to assess whether to continue objecting to the settlement.  (A copy of the communications between

17

1    counsel regarding the incentive award is attached as Exhibit C.)   TD Ameritrade was not
2    prepared to agree to pay Elvey an "incentive award" after all the delay and needless cost Elvey
3    imposed by sabotaging a settlement agreement he signed and acting contrary to the interests of
4    the class.  TD Ameritrade also was not going to allow itself to be put in a position where Elvey
5    or someone else might suggest that it "paid off" Elvey to drop his objections.

6        We respectfully submit that Elvey is not entitled to an incentive award.

7                                        *   *   *

8        For the reasons discussed above, Elvey's objections do not warrant rejection of the
9    settlement.

10   *Richard Holober's Additional Objections*

11       Objector Richard Holober has asserted several objections, most of which were asserted
12   by objector Elvey and are addressed above.  In addition, Holober asserts that:  (1) the Trend
13   Micro software is inferior to other products; (2) attorneys general of 41 states achieved a better
14   settlement in a data breach case involving TJX and (3) the proposed settlement attempts to place
15   unlawful requirements on objectors.  None of these objections has merit.

16       First, Trend Micro software has been highly rated by several reputable consumer groups.
17   The fact that one reviewer, using a particular methodology, had a negative view of the product
18   does not make it dangerous or provide adequate grounds for withholding final approval of the
19   settlement.   Trend Micro has submitted a declaration addressing the review at issue and
20   providing additional information, including other reviews regarding its product.  (A copy of the
21   declaration is attached as Exhibit D).

22       It also should be noted that journals that review internet security software acknowledge
23   that Trend Micro has substantial value to consumers and typically cost more than $30.00 to
24   purchase, although occasionally promotions result in lower prices.  (Copies of *PC Magazine* and
25   *PC World* software reviews are attached as Exhibits E and F.)

26       Turning to the TJX settlement referenced by Holober, the settlement of an action brought
27   by 41 state attorneys general involving the theft of more than 45 million customer credit and

28                                            18

debit card numbers is not analogous to the settlement of this private class action in which no state attorneys general joined or separately sued TD Ameritrade.   The only state attorneys general's office involved in this case (Texas) withdrew its objection to the settlement after the parties made certain revisions that addressed its concerns.

Finally, the procedure of requiring written objections to be filed by a specified deadline is standard practice in class actions.   The case cited by objector Holober does not support his objection.   It holds only that a non-named member of the plaintiff class does not have to intervene in a class action to preserve his right to appeal the approval of the settlement. Holober's objections do not warrant rejection of the settlement.

*Elli Weinstein's Additional Objection*

Objector Elli Weinstein objects to the procedure under which he was required to object to the settlement and plaintiffs' counsel's fee petition before counsel was required to file their final fee petition.   This objection should be disregarded.   Weinstein and other class members had sufficient information about the terms of the settlement and the amount of fees sought by plaintiffs' counsel to decide whether to object, and a small number of class members have objected to the settlement and fees sought by plaintiffs' counsel.   Plaintiffs' counsel's fee petition will be filed well in advance of the hearing and will be a public document.   Objector Weinstein can comment further on the petition at the fairness hearing, if he so desires.   His objection does not warrant disapproval of the settlement.

*Brad Richards and Theodore Frank's Additional Objections*

Objectors Brad Richards and Theodore Frank complain that the proposed settlement is a "coupon settlement" under CAFA, 28 U.S.C. § 1712, and ask the Court to reject the entire settlement based simply on its attorneys' fee provision.   These arguments miss the mark for two reasons.   *First*, the free internet security service that TD Ameritrade has agreed to provide to the class is not a "coupon" and the proposed settlement is not a "coupon settlement" as that term is used in CAFA.   Although CAFA does not expressly define "coupon settlement," at least one Northern District of California case has clarified the types of settlements that should properly be

19

treated as such.  In *Yeagley*, 2008 WL 171083, at *6, the court recognized that the right to a free tri-merged credit report under the settlement at issue was "unlike a coupon in that it does not require a class member to do business with [the defendant] and it entitles the class member to a whole product—a tri-merged credit report—rather than merely a discount."[10]  The benefit TD Ameritrade has agreed to provide under the proposed settlement is "unlike a coupon." Like the goods offered in *Yeagley*, the internet security services that TD Ameritrade will provide do not require the class members to purchase anything from the Company (or anyone else) in order to "realize the settlement benefit"—the products will be provided free of charge.  Accordingly, the proposed settlement should not be considered a coupon settlement under CAFA.[11]

*Second*, while objectors Brad Richards and Theodore H. Frank recognize plaintiffs' lawsuit as "low-value" and meritless," they argue that the amount of attorneys' fees being sought by plaintiffs' counsel is excessive and this, in turn, requires rejection of the settlement.  The lack of merit of plaintiffs' claims is certainly a key factor supporting approval of the settlement, as discussed above, but Richards and Frank are mistaken in suggesting that approval of the settlement is linked to an award of fees.  The proposed settlement is not contingent on the Court approving any particular amount of attorneys' fees.  Rather, the amount of attorneys' fees to be awarded is left solely to the discretion of the Court and that determination is made only after the Court determines—without consideration of the fee request—that the benefits to the class are fair, reasonable and adequate.  Indeed, this is precisely how the Court proceeded in *Yeagley*, first finding that the settlement benefits were fair and reasonable based on the plaintiffs' "bleak" prospects for prevailing if the litigation continued and only then determining a reasonable amount of attorneys' fee to award plaintiffs' counsel.  2008 WL 171083, at *4-*6.  Based on the foregoing, Richards and Frank's objections do not warrant disapproval of the settlement.

---

[10] The court in *Yeagley* did not make a final determination as to whether the settlement at issue was in fact a coupon settlement.

[11] Even if the proposed settlement were to be considered a "coupon settlement" under CAFA, section 1712 simply directs the Court to carefully consider the fee award based on certain criteria and to hold a hearing to determine whether the settlement is fair, reasonable, and adequate, which the Court is already doing. *See* 28 U.S.C. § 1712.

1    *Jonathan Lee Riches and Richard Holober's Motions To Intervene Should Be Denied.*

2            Objectors to a class action settlement and those who exercise the right to opt out of the

3    settlement may not intervene as a matter of right under Federal Rule of Civil Procedure 24(a) and

4    should not be allowed to intervene permissively under Rule 24(b) where there is no purpose

5    served by the intervention and where it would unduly delay or prejudice the adjudication of the

6    rights of the original parties.  *See, e.g. Townes v. Trans Union*, LLC, No. 04-1488, 2007 WL

7    2457484, at *3 (D. Del. Aug. 30, 2007) (denying non-named class member's motion to intervene

8    to challenge settlement).  Objectors do not have a right to review discovery taken in connection

9    with the approval of the settlement unless the court finds that it needs additional input based on

10   such discovery to determine the fairness and adequacy of the settlement.  *See, e.g., Jaffe v.

11   Morgan Stanley & Co.*, No 06-3903, 2008 WL 346417, at *10-*11 (N.D. Cal. Feb. 7, 2008)

12   (denying class members' motion for discovery in connection with approval of settlement because

13   the court had sufficient facts before it to intelligently approve or disapprove of the settlement).

14   Allowing these objectors to intervene at this point would serve no purpose but could delay these

15   proceedings in their effort to gain access to highly confidential discovery materials that were

16   made available to class counsel and counsel for Matthew Elvey.  TD Ameritrade vigorously

17   opposes such access.  Expanding the number of people who have access to highly confidential

18   information concerning TD Ameritrade's information security systems would increase the risk

19   that sensitive information about its information security apparatus may be disclosed and is

20   completely unnecessary.  Both class counsel and Elvey's counsel, after reviewing this

21   information, concluded that they did not wish to continue litigating this case on the merits

22   against TD Ameritrade.  There is no reason to believe that the parties seeking intervention will

23   provide more useful input to the Court after reviewing the evidentiary materials than has already

24   been submitted.  As discussed above, the undisputed facts concerning the nature of plaintiffs'

25   alleged injury and the case law applicable to their claims provide an adequate basis for the Court

26   to conclude that plaintiffs' claims are weak and that the benefits of the settlement likely exceed

27   any recovery plaintiffs could obtain through continued litigation on the merits.  Accordingly,

28

objectors' motions to intervene and to review discovery should be denied.

## CONCLUSION

The settlement is fair, reasonable and adequate. Plaintiffs' case is weak. They have no viable claim for affirmative relief because there is no cognizable injury from receipt of spam or from increased risk of identity theft. There is no valid basis for injunctive relief; the data breach was discovered and remedied in August 2007, and a notice was given to class members. Moreover, no one has submitted to the Court any tangible evidence of identity theft resulting from the data breach. Even if a class member were to have a viable claim for identity theft, this settlement does not prevent him or her from bringing an individual claim based on the identity theft.

The objections offered by class members are simply unpersuasive and largely go to the issue of the attorneys' fee award rather than approval of the settlement. The settlement provides significant benefits to the class, which specifically address their alleged harms. It is highly doubtful that the class would achieve a better result by continuing to litigate the case on the merits. For the foregoing reasons, the settlement should be approved.

MAYER BROWN LLP

Dated: August 20, 2009

By: s/Lee H. Rubin
    Lee H. Rubin
    Counsel for Defendant TD Ameritrade, Inc.

Of Counsel
MAYER BROWN LLP
Robert J. Kriss
Charles E. Harris, II
71 South Wacker Drive
Chicago, Illinois 60606-4637

22